UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---

ZEEVI HOLDINGS LTD.,

                    Plaintiff,

          v.

THE REPUBLIC OF BULGARIA,

                   Defendant.

Case No. 1:09-cv-8856 (RJS)

---

## EXPERT LEGAL OPINION OF LAZAR TOMOV

February 3, 2010

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    NATURE AND GOVERNING LAW OF ARTICLE 15.3 OF THE PRIVATIZATION AGREEMENT ..................................................................................................................... 3

II.   THE VALIDITY AND EFFECT OF ARTICLE 15.3 OF THE PRIVATIZATION AGREEMENT AS A FORUM SELECTION AGREEMENT ................................................ 5

III.  THE SCOPE OF APPLICATION OF ARTICLE 15.3 ......................................................... 10

IV.  PROCEDURES AVAILABLE TO A PARTY SEEKING TO ENFORCE AN ARBITRAL AWARD UNDER BULGARIAN LAW .......................................................... 25

V.   THE ADEQUACY OF THE COURTS OF BULGARIA, A MEMBER OF THE EUROPEAN UNION, AS THE AGREED FORUM .......................................................... 30

1.      My full name is Lazar Vladimirov Tomov.  As a member of Sofia Bar I am duly licensed to practice law in Bulgaria.

2.      I am a partner of the law firm of Tomov & Tomov.  I mainly practice in the field of commercial litigation and arbitration, commercial transaction, and corporate law.  I am also an Arbitrator with the Court of Arbitration of the Chamber of Commerce and Industry of Bulgaria.  In 2000-2004, I was a lecturer in International Business Law and Commercial Law in the Faculty of Law of the New Bulgarian University, Sofia, Bulgaria.

3.      I graduated in 1984 from the Faculty of Law of the University St. Clement of Ohrid, Sofia with a diploma in law with distinction.  In 1993 I received a LLM degree in International Business Law (*magna cum laude*) from the Faculty of Law of the Katholike Universiteit, Leuven, Belgium.  I also studied in 1994 international and comparative law at the Academy of American and International Law, Dallas, USA, and European Union law at the Academy of European Law, Florence, Italy, and in 1995 financial law and arbitration at Queen Mary and Westfield College, University of London, United Kingdom.

4.      My curriculum vitae is attached as Exhibit 1.  A list of documents that I relied upon for this opinion is attached as Exhibit 2.

5.      I am asked by counsel for Bulgaria in the above-referenced case to address as a matter of Bulgarian law the following issues in respect of Article 15.3 of the Privatization Agreement between the Privatization Agency of the Republic of Bulgaria and Zeevi Holdings Ltd. and Knafaim-Arkia Holdings Ltd. dated 30 June 1999: (i) the nature and governing law of Article 15.3; (ii) the validity and effect of Article 15.3 as a forum selection agreement; (iii) the scope of application of Article 15.3; (iv) the procedure applicable in the Bulgarian courts to enforce a foreign arbitral award; and (v) the adequacy of Bulgarian courts as an appropriate

forum for Zeevi Holdings Ltd. to seek enforcement of the arbitral award as agreed in Article 15.3.

6.      On the basis of the legal analysis set out below I have reached the following conclusion: (i) Article 15. 3 is a choice of forum agreement which is governed by Bulgarian law; (ii) Article 15.3 is a valid exclusive choice of forum agreement which has a mandatory nature and obligates the parties to it to submit the agreed disputes to a Bulgarian Court; (iii) the word "execution" used in Article 15.3 applies to court proceedings for the confirmation of the arbitral award and is not limited only to proceedings for coercive enforcement by a bailiff; (iv) Bulgarian courts recognize and enforce foreign arbitration awards under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards signed in New York in 1958 and apply it in the manner which is consistent with its letter and its pro-enforcement spirit; (v) there is no basis to conclude that the Bulgarian courts do not provide an appropriate forum for Zeevi Holdings Ltd. to seek enforcement of the arbitral award as agreed in Article 15.3 because the Bulgarian court system has legally guaranteed independence from the executive branch of the government, has demonstrated willingness to rule against the state and state entities, and accords the high standards of the European Union.  In addition, due to the integration of the Bulgarian legal order with public international law instruments, such as the European Convention for the Protection of Human Rights and Fundamental Freedoms, the Agreement for the Promotion and Reciprocal Protection of Investments between Bulgaria and Israel and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, Zeevi Holdings Ltd. enjoys in any proceedings for recognition and enforcement in Bulgarian courts not only the substantive legal protection guaranteed by these instruments but also a direct access to an international tribunal the decision of which is directly binding on the Republic of Bulgaria as a matter of international law and immediately enforceable against it in any of the contracting parties to these

conventions.

## I.   NATURE AND GOVERNING LAW OF ARTICLE 15.3 OF THE PRIVATIZATION AGREEMENT

7.     Article 15. 3 of the Privatization Agreement between the Privatization Agency of the Republic of Bulgaria and Zeevi Holdings Ltd. ("Zeevi") and Knafaim-Arkia Holdings Ltd. dated 30 June 1999 (the "Privatization Agreement") reads in relevant part: "The execution of any award against the seller may be conducted only in Bulgaria in accordance with the provisions of Bulgarian law."

8.     Undoubtedly, this provision has the nature of a choice of forum agreement.  As a matter of Bulgarian law, a choice of forum agreement is a contract which has procedural consequences.  Depending on whether it is exclusive or non-exclusive, it confers jurisdiction on the selected court (a prorogation effect) and/or deprives of jurisdiction the court/s which in its absence would have had jurisdiction under the applicable national or conventional rules (a derogation effect).  Due to its mixed character, it is governed simultaneously by the substantive law of contract and the procedural law or private international law related to jurisdiction.  The substantive law of contract determines whether there is consent, whether it is vitiated by fraud, mistake, duress, etc., and the scope of consent.  The procedural law or private international law governs the jurisdictional effect of the agreement, *i.e.*, whether a particular court is conferred with or deprived of the power to adjudicate a case and, often, the requirements for its formal validity.

9.     Since a choice of forum agreement is a contract, the parties to it are free to select the law which governs it.  When a forum selection agreement is included as a clause in the main contract, parties seldom select applicable law only for it.  For this reason, if no such specific choice of law is made, it is presumed that the parties have submitted the choice of forum

3

agreement to the law chosen by them to govern the main contract.

10.     If the parties have not selected the law governing the contract and/or the forum selection clause, the latter is presumed to be governed by the putative law of the main contract or by the law of the selected court.

11.     In view of the absence of applicable legislative provisions or case-law, these choice of law rules for forum selection agreements were developed by T. Chipev, a former professor in civil procedure, a former member of the Bulgarian Constitutional Court, a former Minister of Justice of Bulgaria and a current Judge at the Court of First Instance of the European Union, in his book "International Jurisdiction in Civil Litigation", and stands unchallenged ever since.  There he writes: "When the parties have chosen applicable law but it is not clear whether it governs both the choice of court agreement and the main contract or only the main legal relationship, according to one widely shared in legal literature opinion the choice of applicable law covers also the prorogation or derogation agreement.  This opinion may be accepted for reasons to have a single applicable law.  However, on the basis of the separability of the prorogation or the derogation agreement, another solution is possible, *i.e.*, the prorogated or the derogated court applies its law on all issues of prorogation or derogation.  The same solution is also possible when there is no choice law and the applicable law on the main relationship will be determined by objective criteria."[1]  This principle accords with the practice of European states.[2]

12.     In the present case, Article 14.1 of the Privatization Agreement provides in part: "This Contract will be governed by and construed in accordance with the laws of Bulgaria."

---

[1] Teodor Chipev, *International Jurisdiction in Civil Litigation* 114-116 (1987)

[2] In the Report on the Application of the Regulation 'Brussels I' in the Member States (known as the "Heidelberg Report"), commissioned by the EU, paragraph 377 provides: "As of now, the law of some Member States refers to the *lex fori* (since choice-of-forum agreements constitute a procedural contract) whereas others refer to *lex causae*."  Heidelberg Report dated Sept. 2007, available at http://www.ipr.uni-heidelberg.de/studie2/index.htm on 3 December 2009.

Consequently, it must be concluded that the parties have chosen Bulgarian law to govern the choice of forum agreement.  Even if one were to assume that Article 14.1 relates only to the main contract and does not cover the choice of forum agreement contained in it, the latter will again be governed by Bulgarian law by virtue of the default rules explained above.

13.    Since a forum selection agreement operates in two jurisdictions – the jurisdiction of the court granted the power to adjudicate the case and the jurisdiction of the court deprived of the power to adjudicate the case, its jurisdictional effect is independently determined by both of them.  The court whose jurisdiction is prorogated determines the validity of prorogation according to its own rules, and the court whose jurisdiction is derogated determines the derogation effect according to its own rules.  In the absence of a convention which synchronizes the applicable rules one court may find that the choice of forum selection is valid and the other court may find that it is not.

14.     In the present case Article 15.3 grants jurisdiction to a Bulgarian court.  If seized with the matter, it will decide for itself on the basis of Bulgarian law which law governs it and, accordingly, whether this choice of forum agreement is valid, what is its scope, and whether it grants to it exclusive jurisdiction.  However, due to considerations of sovereignty, Bulgarian law and a Bulgarian court which applies it have no power to impose their rules and decision on a foreign court which has been seized with the same dispute.  The latter will determine independently under its own rules whether the choice of law made by the parties in relation to their forum selection agreement is valid, as well as the validity and the derogative effect of the forum selection agreement.

## II.    THE VALIDITY AND EFFECT OF ARTICLE 15.3 OF THE PRIVATIZATION AGREEMENT AS A FORUM SELECTION AGREEMENT

15.    Bulgarian law allows parties to a legal relationship to choose the court which will

decide all or some of their disputes arising out of or relating to this legal relationship.  From the date of the execution of the Privatization Agreement until May 2005 this possibility was regulated by Article 9[3] of the Bulgarian Code of Civil Procedure (now repealed) ("repealed CCP") and since May 2005 it has been regulated by Article 23[4] of the Bulgarian Code of International Private Law ("CIPL").

16.     These articles not only allow the parties to select the court which will decide some or all of their disputes, but also lay down the conditions for the validity of such a choice.

17.     Under Article 9 the following conditions must be satisfied:

i.      The agreement must be in writing.

ii.     The dispute must relate to a right which is arbitrable and does not fall within the exclusive jurisdiction of Bulgarian courts (in this respect, to be valid, a forum selection agreement is similar to an agreement to submit a dispute to arbitration).   Pursuant to Article 9 (1) of the CCP the only disputes that are not arbitrable are those related to property rights or possession over real estate, alimony or a right under a labour legal relationship.  Pursuant to Article 91[5] of the repealed CCP in connection to

---

[3] Repealed CCP, Art. 9: "(1) (amend. – State Gazette ("SG") No 60 of 1998, No 55 of 1992) The parties to a dispute which relates to an economic right may agree that it would be decided by an arbitration court unless the dispute has as its subject matter any property rights or possession over a real estate, an alimony or a right under a labour legal relationship. (2) (New - SG No 55 of 1992) The arbitration court may have its seat abroad if one of the parties has its place of residence or seat in another country. (3) (New - SG No 55 of 1992) Under the conditions of paragraphs 1 and 2 the parties may refer to a foreign court a claim which is not within the exclusive jurisdiction of the Bulgarian courts provided that the agreement is in writing and is effective in accordance with the law of the country of the seat of the court. Under the same conditions a claim which is within the jurisdiction of a foreign court may be referred to a Bulgarian court."

[4] CIPL, Art. 23: "(1) (amend. – SG 59/07, in force from 1 March 2008) If the subject matter of a claim is a dispute relating to an economic right and the dispute does not fall within the exclusive jurisdiction of the Bulgarian courts, it may be referred to a foreign court by a written agreement between the parties. In the event that a claim is filed with a Bulgarian court while such agreement exists for the same claim, the defendant must object within the term set for a reply to the statement of claim and before he stated his position on the merits of the dispute. Sentence one shall not be applied to claims for alimony. (2) A claim which is within the jurisdiction of a foreign court may be referred to Bulgarian courts under the conditions of paragraph 1, sentence one. This shall not be applied to claims for alimony. (3) Unless otherwise provided by the agreement, it shall be deemed that it confers exclusive jurisdiction on the Bulgarian or on the foreign courts over the dispute for which it has been entered into."

[5] Repealed CCP, Art. 91: "By a contract in writing, the parties may determine that a certain dispute relating to an economic right  will be adjudicated by a court different than the court that would have had jurisdiction in accordance with the rules for local jurisdiction (venue). This provision shall not apply to the jurisdiction under art. 83."

Article 83[6] of the repealed CCP Bulgarian courts have exclusive jurisdiction over rights over property situated in Bulgaria.

    iii.    One of the parties must have its residence or seat outside Bulgaria.

    iv.    The selected court must be competent under its own law. This requirement aims at avoiding the undesirable jurisdictional vacuum which may arise if the derogative effect of an exclusive choice of forum agreement is valid, but it its prorogative effect is not.

18.    Under Article 23 of the CIPL the following conditions must be satisfied:

    i.    The agreement must be in writing.

    ii.    The dispute must relate to an economic right, *i.e.*, a right that can be valued in money, with the exception of an alimony right.

    iii.    The dispute must not fall within the exclusive jurisdiction of the Bulgarian courts. Pursuant to Articles 12 (1)[7], 13 (2)[8] and 19[9] of the CIPL the jurisdiction of the Bulgarian courts is exclusive in matters related to rights connected with movable and immovable property situated in the country, industrial property when the patent is issued or registered in the country, and existence and internal matters of a juridical person registered in the country. This requirement aims at protecting the jurisdiction of the Bulgarian courts which according to Bulgarian law is exclusive. It, however, does not prevent parties from extending this exclusivity by a

---

[6] Repealed CCP, Art. 83 (Amend. - SG No 124 of 1997): "The claims for rights over a real estate, for partition of a co-owned real estate, for borders and for protection of impaired ownership over a real estate, shall be filed in the place where the real estate is situated. Claims for conclusion of a final contract for establishment or transfer of rights over a real estate, as well as for terminating, avoiding, or declaring null and void of contracts for rights over a real estate shall be filed at the location of the estate."

[7] Competence on cases for property rights

CIPL, Art. 12 (1) (amend. – SG 59/07, in force from 01.03.2008): "The cases under Art. 109 of the Civil Procedure Code regarding immovable property located in the Republic of Bulgaria, the coercive enforcement proceedings or proceedings for establishing securities over such property, as well as the cases for transfer or certification of property rights over them shall be within the exclusive jurisdiction of the Bulgarian courts and other organs."

[8] Competence on cases for rights over sites of intellectual property

CIPL, Art. 13 (2): "In claims for rights over objects of industrial property, the Bulgarian courts shall be exclusively competent, if the patent has been issued or it has been registered in the Republic of Bulgaria."

[9] Exclusive competence on cases for the legal status of the legal persons registered in the Republic of Bulgaria

CIPL, Art. 19: "(1) (amend. – SG 59/07, in force from 01.03.2008) The Bulgarian courts shall have exclusive jurisdiction over claims under Art. 104 (5) of the Civil Procedure Code if the legal person is registered in the Republic of Bulgaria.

(2) Para 1 shall be applied to claims for invalidity or winding up of a company or another legal person, for revocation of acts of its bodies, for defense of membership rights, as well as for challenging the transformation of the trade company and of the monetary payments in transformation, if the company or the another legal person is registered in the Republic of Bulgaria."

forum selection agreement which derogates the jurisdiction of all foreign courts which according to their own law also might be competent.

19.     The requirements under the old and the new law have considerable similarities. For sake of completeness and avoidance of any doubt I will assess below the validity of Article 15. 3 under the old law and the new law.

20.     Article 15.3 is included as a separate clause in the Privatization Agreement which is signed by both parties.  It is universally accepted that this meets even the most stringent test for a valid written form.  Therefore, it satisfies the written form requirement of Article 9 of the repealed CCP and Article 23 of the CIPL.

21.     Zeevi and Knafaim-Arkia Holdings Ltd. have their registered seats outside Bulgaria and as a result the seat requirement of Article 9 is met.

22.     By its wording Article 15.3 relates to execution of an arbitral award.  Obviously, it relates to a right which can be valued in money.  Consequently, it meets the economic right requirement of Article 23 of the CIPL.

23.     By its wording Article 15.3 relates to execution of an arbitral award.  As seen from the above, a dispute concerning execution of an arbitral award does not fall within the scope of disputes which are considered not arbitrable under Article 9 of the repealed CCP or within the exclusive jurisdiction of Bulgarian courts under the repealed CCP and the CIPL.

24.     Article 15.3 confers jurisdiction to a Bulgarian court.  The analysis so far indicates that all the conditions of Bulgarian law for a valid grant of jurisdiction are met.  As a result, the requirement that the court would be competent under its own law is also met.

25.     The above analysis clearly demonstrates that Article 15.3 satisfies the criteria for

validity of both Article 9 of the repealed CCP and Article 23 of the CIPL. Consequently, it is a valid choice of forum agreement in regard to the proceedings covered by it.

26.     A choice of forum agreement may confer jurisdiction on a particular court (for example the district court in Amsterdam), or on the courts of a particular country (for example the courts of Germany). In the latter case the competent court will be determined according to the internal rules of the selected country.

27.     A choice of forum agreement may be exclusive or non-exclusive. Pursuant to Article 23(3) of the CIPL, if the parties have not stated otherwise in it, the agreement is deemed to be exclusive. This rule codifies the interpretation practice which existed under Article 9 of the repealed CCP and accords with the European Union Council Regulation (EC) No 44/2001 of 22 December 2000 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters[10] and the new Hague Convention on Exclusive Choice of Court Agreements.[11] From the wording of Article 15.3 it is very clear that the parties have not stated that the agreement is non-exclusive. Consequently, it is an exclusive forum selection agreement.

28.     A valid exclusive forum selection agreement is mandatorily applicable in its field of application. It is binding upon the parties to that agreement and leaves no discretion to them

---

[10] "Prorogation of jurisdiction. Article 23 (1) If the parties, one or more of whom is domiciled in a Member State, have agreed that a court or the courts of a Member State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have jurisdiction. Such jurisdiction shall be exclusive unless the parties have agreed otherwise." Council Regulation (EC) No 44/2001 of 22 December 2000 on jurisdiction and the recognition of judgments in civil and commercial matters, available at http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri= OJ:L:2001:012:0001:0023:EN:PDF on 3 December 2009.

[11] "Article 3. Exclusive choice of court agreements
For the purposes of this Convention …b) a choice of court agreement which designates the courts of one Contracting State or one or more specific courts of one Contracting State shall be deemed to be exclusive unless the parties have expressly provided otherwise." Convention on Choice of Court Agreements (Concluded 30 June 2005), available at http://www.hcch.net/index_en.php?act=conventions.text&cid= 98&zoek= on 3 December 2009.

in regard to their obligation to submit the disputes falling within its scope to the chosen court.

29.     If a Bulgarian court is selected by a valid exclusive forum selection agreement, the agreement is binding also on the court.  Under Bulgarian law the court has no discretion to decline jurisdiction on the basis of forum non conveniens or any similar doctrine.

## III.     THE SCOPE OF APPLICATION OF ARTICLE 15.3

30.     In this case the scope of application of Article 15.3 of the Privatization Agreement is disputed.

31.     Since a forum selection agreement is a contract, its precise scope of application is to be interpreted in accordance with the general rules of contract interpretation.  These rules are set out in Article 20 of the Bulgarian Obligations and Contracts Act ("OCA").

32.     Pursuant to Article 20 "[t]he actual common will of the parties shall be sought in interpreting contracts.  The individual provisions shall be interpreted in their interrelation and each one of them shall be interpreted in the meaning ensuing from the contract as a whole, taking into account the purpose of the contract, usage and good faith."

33.     This article requires that the meaning of a contract be established based upon the actual common intent of the parties to it.  This is done by applying the rules of interpretation set out in Article 20.  However, the list of rules contained in it is not exhaustive.  In addition to the above rules, there are other rules which have been acknowledged in legal theory and are widely used in practice.[12]  In the present context more significant among them are the following rules:

---

[12] See Pavlova, *Civil Law: General Part* 494 (2nd ed. 2002) – "Art. 20 OCA does not exhaustively regulate the rules that may be used for interpretation."  See Tadzher, *Civil Law of People's Republic of Bulgaria: General Part* 451 (2nd ed. 2001) – "Art. 20 sets out three rules for the interpretation of transactions. Prior to indicating the rules themselves, we must emphasise that these do not exhaust all means of interpretation; they provide the main guidelines for interpretation."

      i.     The ordinary and generally accepted meaning of words is used in interpreting contracts, but the context in which they are used also has to be taken into account. The party contending that a given word has been used with a particular meaning bears the burden of proof.[13]

      ii.    The provisions of a contract should not be interpreted in a meaning that makes them legally invalid due to contradiction with or circumvention of the mandatory provisions of the law, or in a way which makes them devoid of meaning and practical and legal value in view of the purpose of the provision or the contract.

      iii.   There is no rule or scholarly opinion that would support a contention that a choice of forum agreement should be interpreted restrictively because it is a derogation from the court's competence.

34.    An analysis of the meaning of a contract typically is a two-step process. First, the meaning of the provisions of the contract is ascertained by a semantic interpretation using a monolingual dictionary and by syntactic interpretation using grammar rules. If the result of the linguistic interpretation is clear and unambiguous, this is a very strong indication of the common will of the parties. Nevertheless, it is not conclusive. The requirement to seek the actual common will of the parties means that literal linguistic interpretation of the language of the contract is neither sufficient nor decisive for finding its exact meaning.[14]

35.    Second, in order to confirm the meaning resulting from the linguistic interpretation when it is clear or to clarify it when it is still vague and ambiguous, the process of interpretation must proceed using the other rules formulated above and taking into account the origin and the context of the provision being interpreted and all other facts which are relevant to

---

[13] See Kalaidzhiev, *Law of Obligations: General Part* 100 (3rd ed. 2005) – "The meaning of words is established in accordance with their generally accepted meaning. Where a party alleges that a word has a special meaning, it must prove its contention. Often the actual meaning could be established from context, *i.e.*, susceptible of being derived out of all circumstances surrounding the execution of a contract. Sometimes specific characteristics of the parties or the subject-matter of the contract indicate that the contract has been executed through the use of technical or professional terminology."

[14] See Pavlova at 493 – "In accordance with Art. 20 OCA, the purpose of interpretation is to reveal the actual common will of the parties in the case of contracts, and not to be limited to the literal meaning of words, signs or acts whereby that will was expressed."; Tadzher at 450 – "Art. 20 sets forth the general principle which we must follow in the interpretation of transactions and it reads: 'interpretation … must seek the actual common will of the parties.' What stems, before all, from this text is that literal interpretation is insufficient."

finding out the common will of the parties.  The only limitation is that the relevant facts should have been known by both parties.  If the result of the second stage of the interpretation shows that the actual will of the parties is different from the literal linguistic meaning of the language whereby the will was expressed, Article 20 OCA gives priority to the actual will.

36.     Applying these principles to the instant case, Article 15.3 of the Privatization Agreement reads in relevant part: "The execution of an award against the Seller may be conducted only in Bulgaria in accordance with the provisions of Bulgarian law."

37.     The court should note that the Privatization Agreement was concluded in both the English and Bulgarian languages and this is relevant to its interpretation.  Article 17.2 of the Privatization Agreement provides:

> This Agreement consists of 19 (nineteen) pages and is drawn up in the Bulgarian and English languages, of which one copy for either party.  The signatures of the SELLER and of the BUYER, parties to this Agreement, were made after the chartered translator Boyan Georgiev Genov, Unified Registration No. 2411046260 was cautioned about his liabilities for incorrect translation and after he acknowledged the truthfulness of the translation of the content and declared that the BUYER having understood the meaning of the activity conducted gives his consent to sign it.  In the event of conflict between the Bulgarian and English versions of this Agreement, the English language version will prevail.

38.     Ascertaining the meaning in Article 15.3 of the language "execution of an award against the Seller" may begin by considering the significance of the contract language in the English text as well as the Bulgarian.  Reference to the Bulgarian text, without conflicting with the English text, may be illuminating as to the parties' intent.  It is also necessary because the interpretation of this provision must include an analysis of the meaning of the term "execution" in the context of the requirements that it must be "in accordance with the provisions of Bulgarian law."

39.     According to the Merriam-Webster Online Dictionary the verb "to execute" in

English means "to carry out fully" and to "put completely into effect;"[15] its primary synonym is the verb "to enforce."[16]   The noun "execution" means "the act or process of executing," "the process of enforcing a legal judgment (as against a debtor)," and also "a judicial writ directing such enforcement."[17]   These definitions underscore the close relationship between execution and enforcement.

40.    The verb "execute" is translated in the Bulgarian language with the verb „изпълнявам" (izpalniavam).[18]   According to the Bulgarian monolingual dictionary the verb "izpalniavam" has the same meaning as the verb "execute" in English, *i.e.*, it means to carry out, to do.[19]   The noun "execution" is translated in the Bulgarian language with the noun „изпълнение" (izpalnenie).[20]   According to the Bulgarian monolingual dictionary the noun "izpalnenie" has the same meaning as the noun "execution" in English, *i.e.*, it means the act or process of carrying out.[21]   It also might mean a coercive enforcement of judgment by a bailiff.

41.    The noun "izpalnenie" is used in the Bulgarian version of Article 15.3.   It should be noted that both nouns "execution" and "enforcement" are translated in the Bulgarian language with the noun "izpalnenie".[22]

42.    No matter whether one employs the general or the technical meaning of the noun "execution", one should take into consideration that there is a fundamental difference between

---

[15] http://www.merriam-webster.com/dictionary/execute on 3 December 2009.

[16] http://www.merriam-webster.com/thesaurus/execute on 3 December 2009.

[17] http://www.merriam-webster.com/dictionary/execution on 3 December 2009.

[18] See English-Bulgarian Dictionary 554 (Millennium ed., Geberoff, Sofia, 2000).

[19] Bulgarian monolingual dictionary 311 (4th ed., Science and Art, Sofia, 2003).

[20] See English-Bulgarian Dictionary 555 (Millennium ed., Geberoff, Sofia, 2000).

[21] See footnote 19 *supra*.

[22] See English-Bulgarian Dictionary 526, 555 (Millennium ed., Geberoff, Sofia, 2000).

the execution of a domestic judgment or arbitration award and the execution of a foreign judgment or arbitration award. It is universally recognized that a judgment/award cannot be directly executed by a bailiff in a country different than the country where it was rendered, but rather first has to be confirmed by a court of the country where execution is sought. This is done through special court proceedings called variously proceedings for recognition and enforcement, proceedings for confirmation, or exequatur proceedings. In the context of international commercial arbitration these proceedings are almost universally regulated by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards signed in New York in 1958 ("New York Convention") to which more than a hundred countries are parties.

43.     In this context the terms "enforcement of an arbitral award", "confirmation of an arbitral award" and "exequatur of an arbitral award" nearly always refer to the same procedure and the term "execution of an arbitral award" also may refer to the same procedure. This is clearly seen from the titles of the principal international conventions regulating the issue. The title of the New York Convention which regulates confirmation proceedings is "Convention on the Recognition and Enforcement of Foreign Arbitral Awards".[23] Its predecessor, the Geneva Convention, which regulated precisely the same types of proceeding, was entitled "Convention on the Execution of Foreign Arbitral Awards".[24] Although the title of the latter convention contains the word "execution", in its text this term is replaced by its synonymous term "recognition and enforcement". Similarly, the analogous Panama Convention,[25] which also

---

[23] United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Done at New York, 10 June 1958), available at http://www.uncitral.org/pdf/english/texts/arbitration/NY-conv/XXII_1_e.pdf on 3 December 2009.

[24] Convention on the Execution of Foreign Arbitral Awards (Done at Geneva, 26 Sept. 1927), available at http://www.jurisint.org/doc/html/ins/en/2000/2000jiinsen68.html on 3 December 2009.

[25] Inter-American Convention on International Commercial Arbitration (Done at Panama City, 30 Jan. 1975), available at http://www.jus.uio.no/lm/inter-american.international.commercial.arbitration.convention.panama.1975/portrait.pdf on 3 December 2009.

governs the same type of proceedings, refers throughout its text not to "recognition and enforcement," but rather to the "execution or recognition" of arbitral awards.

44.     The relevant legal term in the Bulgarian language referring to such proceedings as currently regulated by the New York Convention is the same as the term that appears in Article 15.3 of the Privatization Agreement, *i.e.*, "izpalnenie" (execution/enforcement).  This can be seen from the official Bulgarian translation of the New York Convention.  The term "enforcement" in its title is translated as "izpalnenie", and the term "execution" in the title of the Geneva Convention as referenced in Article VII (2) of the New York Convention is also translated officially as "izpalnenie".

45.     The Bulgarian treatises of Professor Zhivko Stalev cited below in regard to the proceedings for recognition and enforcement of a foreign judgment/award clearly indicate that in the Bulgarian legal language the terms "izpalnenie" (execution/enforcement), "zachitane" (confirmation), "exequatur" (ekzekvatura), "recognition and enforcement" (priznavane i izpalnenie)  and "recognition and granting enforcement" (priznavane i dopuskane na izpalnenie) are used interchangeably in reference to such proceedings.

46.     Seen in this light, and since to the best of my knowledge, it is not possible in any jurisdiction to obtain a coercive enforcement through a court bailiff of a foreign arbitral award without the necessary proceeding regulated by the New York Convention, *i.e.*, "recognition and enforcement" or "priznavane i izpalnenie," sometimes also referred to as "recognition and execution", it is logical to conclude that the parties intended by their choice of words to agree that it was such proceedings that were to be conducted in Bulgaria in accordance with the provisions of Bulgarian law.  There is nothing to suggest that the term only envisages proceedings for coercive enforcement by a bailiff and that it does not include the necessary

preliminary court proceedings for the confirmation of the award.

47. Consequently, the linguistic interpretation of the term "execution/izpalnenie" used in Article 15.3 leads to the conclusion that it encompasses proceedings to confirm the arbitral award and is not confined to proceedings for coercive enforcement by a bailiff.

48. That interpretation is strengthened when one considers the Bulgarian legal regime regarding recognition and enforcement, and the legal provisions regarding coercive enforcement by a bailiff of foreign arbitral awards.

49. A foreign judgment or arbitral award has no automatic direct effect or consequence in the Bulgarian legal order. It is legally irrelevant and as a result it could not be enforced automatically by a bailiff. This follows directly from Article 237 (b)[26] of the repealed CCP and Article 404(3)[27] of the newly adopted Code of Civil Procedure ("new CCP") pursuant to which only foreign judgments and arbitral awards which have been recognized and granted enforcement may be enforced through proceedings for coercive enforcement.

---

[26] Repealed CCP, Art. 237: "The following acts can be enforced coercively: …

b. decisions rendered by foreign courts which had been granted enforcement by a Bulgarian court."

"Foreign courts" is interpreted to mean foreign state and arbitral courts. Prof. Zhivko Stalev wrote in *Bulgarian Civil Procedure* that "the decisions of foreign state and arbitral courts which have been granted enforcement by a Bulgarian court under the exequatur proceedings are also enforcement titles [under] Article 237 (b)". Zhivko Stalev, *Bulgarian Civil Procedure* 728 (8th ed. 2004).

[27] New CCP, Art. 404 (3): "The following acts can be enforced coercively: …

3. Judgments, acts and court settlements of foreign courts, as well as the awards of foreign arbitral tribunals and settlements confirmed by them, which had been granted enforcement on the territory of Republic Bulgaria."

The only exception to this general rule is Article 404 (2) of the new CCP. It provides that judgments, acts and court settlements of foreign courts which are subject to enforcement in the territory of the Republic of Bulgaria without special proceedings may be coercively enforced. The judgments and acts which are subject to direct coercive enforcement are defined in Article 624 of the new CCP, entitled enforcement without special proceedings. These include (a) European enforcement orders for uncontested claims under Regulation (EC) No 805/2004 of the European Parliament and of the Council of 21 April 2004 creating a European Enforcement Order for uncontested claims, and (b) judgments in European small claims procedure under Regulation (EC) No 861/2007 of the European Parliament and of the Council of 11 July 2007 establishing a European Small Claims Procedure.

50.     A foreign judgment or award, however, could acquire a legal force and effect in the Bulgarian legal order, if it is confirmed by a Bulgarian court.  This is done at the request of one of the parties in special court proceedings called proceedings for recognition and enforcement or exequatur.  These proceedings are a necessary and indispensable conditio juris. They are the key which opens the door to the Bulgarian legal order.

51.     Proceedings for recognition and enforcement of foreign judgments were regulated until May 2005 by Articles 303-307[28] of the repealed CCP and since May 2005 they have been

---

[28] Repealed CCP, Art. 303: "(Amend. - SG No 28 of 1983) (1) The decisions of foreign courts shall be recognized and granted enforcement in the Republic of Bulgaria, where there is an agreement to that effect between the Bulgarian and the respective foreign state, and on the basis of reciprocity. (2) (New - SG No 28 of 1983) The states towards which there is reciprocity shall be determined by the Minister of Justice. (3) (Previous par. 2 - SG No 28 of 1983) Where in the agreements themselves the rules for recognition and granting enforcement of the decisions are not determined, the rules of the present chapter shall apply.  (4) (New - SG No 41 of 1985) Any decision on a marriage claim of a foreign court, referring to Bulgarian citizens, shall be recognised without meeting the conditions under par. 1, if at the time of lodging the claim the defendant has had a place of residence in the country where the decision was rendered."

Repealed CCP, Art. 304 (Amend. - SG No 28 of 1983): "The application for recognition and granting enforcement of a decision under art. 303 shall be filed at the Sofia City Court."

Repealed CCP, Art. 305: "(1) Enclosed with the application should be the following: a) a copy of the decision, certified by the court that has rendered it, and a certificate from the same court that the decision has entered into force. These documents should be certified by the Ministry of Foreign Affairs of the Republic; b) the necessary supplements under art. 99. (2) The court charge shall be determined by the rules of art. 55."

Repealed CCP, Art. 306: "(Amend. - SG No 28 of 1983, amend. - SG No 124 of 1997) (1) The court, upon hearing the case, shall not enter into consideration of the merits of the dispute settled by the foreign court, but shall only check if the submitted decision contains pronouncements contradictory to the laws of the Republic of Bulgaria or bona mores. (2) (New SG - No 28 of 1983) The debtor may object that the conditions for the granting enforcement are not met and that the debt was extinguished after the decision was rendered. (3) (Previous par. 2 - SG No 28 of 1983) The decision of the court by which the application is granted or rejected shall be subject to appeal by the ordinary procedure. (4) (New par. 4 - SG No 28 of 1983) After the entry of the decision into force the debtor may not contest the existence of the debt on grounds that he could have put forward under par. 2."

Repealed CCP, Art. 307: "The decision of the foreign court shall not be recognized in the Republic and shall not be enforced: a) if by it a claim for ownership right or any other property right over a real estate in the Republic is granted; b) if, in accordance with the provisions of the Bulgarian laws, the dispute could not be within the jurisdiction of a court in the state where the decision was issued, or could be within the jurisdiction of such a court only on the grounds of art. 88; c) if the defendant – Bulgarian citizen, has not taken part in the case and no evidence has been produced that at least one subpoena for his appearance in the case has been served; d) if between the same parties, for the same demand and on the same grounds there is a decision in force rendered by a Bulgarian court, or if between the same parties, for the same demand and on the same grounds there are pending proceedings before a Bulgarian court, initiated before the entry into force of the decision of the foreign court and e) if the decision is null and void according to the laws of the state where it was rendered."

regulated by Articles 117-122 of the CIPL.[29]

52.     Proceedings for recognition and enforcement of foreign arbitral award are regulated by Article 51 (3)[30] of the International Commercial Arbitration Act ("ICAA"), which refers to applicable international bilateral and multilateral treaties if an award falls within their scope.

53.     Under Bulgarian rules of civil procedure, a final court decision has two main

---

[29] Articles 117-122 of the CIPL provide:

"*Conditions for recognition and granting enforcement.* Art. 117. The decisions and acts of foreign courts and of other organs shall be recognized if: 1. the foreign court or body has jurisdiction as per the provisions of the Bulgarian law, except where the citizenship of the claimant or his/her registration in the state of the court was the only ground for jurisdiction regarding property disputes; 2. a copy of the claim has been handled to the defendant, the parties have been regularly summoned and the main principles of the Bulgarian law regarding their defense had not been violated; 3. if between the same parties, on the same ground and for the same claim there is no  decision in force by a Bulgarian court; 4. if between the same parties, on the same ground and for the same claim there is no pending litigation before a Bulgarian court, started before the foreign case in which the decision whose recognition and enforcement is sought was rendered; 5. recognition or granting enforcement shall not contradict the Bulgarian public order."

"*Jurisdiction for recognition.* Art. 118. (1) The recognition of the foreign decision shall be performed by the body before which it is submitted. (2) In case of dispute regarding the conditions for recognition of the foreign decision, a declaratory judgment may be requested before the Sofia City Court."

"*Jurisdiction in granting enforcement.* Art. 119. (1) A claim for granting enforcement of a foreign decision shall be filed at the Sofia City Court. (2) A copy  of the decision certified by the court that has rendered it, and a certificate from the same court that the decision has entered into force must be attached to the application. These documents should be certified by the Ministry of Foreign Affairs of the Republic of Bulgaria. (3) Para 2 shall be applied also in the cases of Art. 118."

"*Checking of the conditions for recognition and granting enforcement.* Art. 120. (1) The court shall check ex-officio the conditions under Art. 117. (2) The defendant in the litigation on the recognition and granting enforcement of the foreign decision may not refer to breaches under Art. 117. item 2 which breaches he/she could have submitted before the foreign court."

"*Scope of the check and defense of the debtor.* Art. 121. (1) The court shall not consider the merits of the dispute settled by the foreign court. (2) The debtor may make objections that the obligation is extinguished on the grounds of circumstances that have occurred after the foreign decision has entered in force. (3) The debtor may not make objections that the obligation is extinguished on the grounds of the circumstances under Para 2 after the decision granting enforcement has entered in force."

"*Recognition and enforcement of court settlement agreements.* Art. 122. The provisions of Art. 117 - 121 shall be applied to court settlement agreements, if the state where they have been concluded treats them as equal to a court decision."

[30] ICCA, Art. 51 (3): "Claims for recognition and granting of enforcement of awards of foreign arbitral tribunals and settlements entered into before them must be filed, unless otherwise provided in an international treaty to which the Republic of Bulgaria is a party, before Sofia City Court and they are treated in accordance with articles 118-122 of the Code of Private International Law, with the exception of the debtor's right to raise an objection that the debt is extinguished."

effects: a res judicata effect and an enforceability effect.  Res judicata effect relates to all decisions and means that the judgment is final and binding on the parties and the courts, and the issue resolved by the judgment cannot be re-litigated.  The enforceability effect relates only to those decisions that obligate the losing party to take an action or to pay money and means that the judgment can be enforced by a bailiff in proceedings for coercive enforcement.

54.     If in the proceedings for recognition and enforcement the issue is limited to confirming only the res judicata effect of a foreign court judgment/arbitral award and does not require enforcement, e.g. when the judgment is declaratory or the claimant wants only to block a re-litigation of the issues already decided by it, the Bulgarian court only recognizes the foreign judgment/award.  This means that the conditions set out by Bulgarian law for the confirmation of the foreign judgment/award are met and, as a result, its res judicata effect is given relevance in the Bulgarian legal order.

55.     If in these proceedings the claimant wants to benefit from the enforceability effect of the judgment/award because it obligates the debtor to pay a sum of money or to do something, the Bulgarian court not only recognizes the res judicata effect of the judgment/award but goes one step further and permits its enforcement.  This means that the conditions set out by Bulgarian law for the confirmation of the foreign judgment/award are met and, in addition to its res judicata effect, its enforceability effect is given relevance in the Bulgarian legal order, *i.e.*, the claimant can start coercive enforcement proceedings.  In that circumstance, the claimant will receive from the court an enforcement order (*i.e.*, a writ of execution) and based on that enforcement order could request that a bailiff start coercive enforcement proceedings against the debtor.

56.     When a judgment/award is granted enforcement, it is also recognized.  The grant of enforcement includes recognition.  A judgment/award can be recognized without being

granted enforcement, but cannot be granted enforcement without being recognized.

57.     This procedure for obtaining enforcement effect for a foreign judgment/award is confirmed also in the most authoritative Bulgarian treatises on civil procedure and international commercial arbitration.

58.     The late Professor Zhivko Stalev, a former professor in civil procedure, a former Chairman of the Arbitration Court with the Bulgarian Chamber of Commerce and Industry and a former Chairman of the Constitutional Court of Bulgaria, wrote in his book "Bulgarian Civil Procedure":

> Foreign proceedings ended with a judgment are as irrelevant here [in Bulgaria] as pending foreign proceedings are.  However, in contrast to pending foreign proceedings, proceedings which have ended with a final judgment could acquire here the legal consequences which are normally attached to concluded legal proceedings if the foreign judgment is *recognized* by our court pursuant to the proceedings under art. 303-307 [of the Code of Civil Procedure], respectively if under the same proceedings our court *grants the enforcement* of a foreign judgment here.   The recognition of a foreign judgment aims to recognize the res judicata effect and constitutive effect of this foreign judgment.   The granting of enforcement of the foreign judgment encompasses its recognition but, in addition, it opens the possibility its enforceability effect to start to operate – it turns the foreign judgment into an enforcement title.  It is necessary only in regard to a judgment which has dispositive (operative holding) which can be enforced and is not applicable in regard of declaratory and constitutive judgments which do not require enforcement.  Apart from these differences in the scope of applicability and the resulting effect, there is no other difference between the recognition and enforcement of a foreign judgment.  In both cases the conditions and the proceedings are *one and the same*….   The proceedings for recognition or granting enforcement of a foreign judgment (in short exequatur proceedings or EP) is regulated by the CCP as a *special adversarial* proceedings which with res judicata decides the controversy whether the foreign decision should be confirmed….   The judgment which recognized or enforced a foreign decision alongside its own res judicata creates a special *constitutive* effect which is its aim.   This effect consists not in creating the legal consequences of the foreign judgment, but in allowing them to have relevance here.   With its decision rendered in EP our court *gives significance* and relevance of the foreign decision here, *extends its effect* on our territory.   In the case of recognition this extension of effect encompasses res judicata….   In case of granting enforcement of the

20

foreign judgment it becomes relevant here also in regard of its enforceability effect.  Because it does not create but only gives effect here of already existing legal consequences our decision cannot give the foreign decision force which is greater than the force it has in the country where it was rendered.  This shows that our decision in EP *does not replace the foreign decision* … but only add itself to it ... here the foreign judgment has a leading role.  In relation to it our judgment is conditio juris, determining the relevance of the foreign decision.[31]   (emphasis added)

59.     Professor Zhivko Stalev wrote in his book "Arbitration in Private Law Disputes":

Pursuant to Article 41 (1) of the ICAA upon service to one of the parties the arbitral award shall enter into force, become binding on the parties and may be coercively enforced.  By providing that the arbitral award shall become binding on the parties Article 41 (1) ICAA refers to the res judicata effect, and the constitutive effect of the award in case of a constitutive claim.  The res judicata effect of an arbitral award has the same content as the res judicata effect of a court judgment, the same objective limits, and it must be observed by state courts and other state organs as a court judgment….  Since it may be coercively enforced an arbitral award has the same enforceability effect as a court judgment.  Like a court judgment, an arbitral award is an enforcement title (Article 237, lit. a) [Code of the Civil Procedure], and an enforcement order may be granted on this basis (article 242 (2) [of the Code of Civil Procedure].…  Only arbitral awards rendered by an arbitral tribunal with a seat in Bulgaria have [res judicata and enforceability effect] unlike arbitral awards rendered by an arbitral tribunal with a seat in another country.  Such awards are foreign awards in regard to our legal order.  In order for a foreign arbitral award to acquire legal force in our country it must be recognized and its enforcement must be granted by a Bulgarian state court….    Pursuant to Article 51 (2) of the ICAA recognition and enforcement of foreign arbitral awards is granted in accordance with the bilateral and multilateral international agreement concluded by the Republic of Bulgaria.[32]

60.     On page 148 of the same treatise he further states:

The [New York Convention] speaks of recognition and enforcement of foreign arbitral awards.  Under recognition it means recognition of the res judicata effect and under enforcement – granting coercive enforcement of the foreign arbitral award, *i.e.*, recognition of its enforceability effect.  The claimant may request the local court to recognize both effects of the

---

[31] Zhivko Stalev, *Bulgarian Civil Procedure* 989-992, 997 (8th ed. 2004).

[32] Zhivko Stalev, *Arbitration in Private Law Disputes* 131-133 (1997).

award.  But he may request only recognition, *i.e.*, recognition of its res judicata effect in the country of the defendant.[33]

61.     From the provisions of Bulgarian law and legal treatises cited above it is clear that according to applicable Bulgarian law a foreign arbitral award cannot be executed by a bailiff in proceedings for coercive enforcement in Bulgaria unless it first is confirmed by a Bulgarian court judgment in proceedings for recognition and enforcement.  Consequently, if the term "execution" in Article 15.3 is interpreted in the light of applicable Bulgarian rules, the term must refer to proceedings to confirm the arbitral award with enforceability effect and cannot be confined to proceedings for coercive enforcement.  A fortiori, when one considers the exclusive nature of the forum selection agreement, proceedings to confirm the arbitral award are a necessary first step in any coercive enforcement action.

62.     Indeed, even if one were to consider that linguistically the term "execution" means coercive enforcement proceedings, it also implies the proceedings for confirmation of the award because under the Bulgarian law the latter are an indispensable precondition for the former.

63.     Another consideration that is relevant to the interpretation of Article 15.3 of the Privatization Agreement is whether a judgment of a foreign court which confirmed the award could be executed in Bulgaria automatically by a bailiff without confirmation, or following a prior confirmation by a domestic court.  In Bulgaria a foreign arbitral award is entitled to recognition and enforcement, but a foreign judgment which confirms an arbitral award is not.

---

[33] Zhivko Stalev, *Arbitration in Private Law Disputes* 148 (1997).  The same statement is also made by him in Bulgarian Civil Procedure, p.  1011-12 (8th ed. 2004):

> When [the New York Convention for the Recognition and Enforcement of Foreign Arbitral Awards of 1958] refers to recognition it means the res judicata and the constitutive effect of an arbitral award, while granting of enforcement relates to the enforceability effect of the arbitral award. It opens the doors for its coercive enforcement.

Zhivko Stalev, *Bulgarian Civil Procedure* 1011-1012 (8th ed. 2004).

This follows from the principle *exequatur sur exequatur ne vaut* ("exequatur on exequatur is not valid"), which is the prevailing view in Continental Europe that recognition of a recognition judgment is not possible.[34]   This is because each State should have the right to decide for itself which foreign arbitral award it will recognize and enforce, and no State should be able to prescribe recognition and enforcement of foreign arbitral awards to other states.   Pursuant to the New York Convention a Contracting State undertakes an obligation to recognize and enforce foreign arbitral awards if certain conditions are satisfied, and not an obligation to recognize and enforce a judgment of a foreign court which has confirmed a foreign arbitral award.   In conformity with this, in his book "Bulgarian Civil Procedure" Professor Stalev wrote: "The procedure under Articles 303-307 applies only to judgments on the merits rendered in adversarial proceedings by an organ which has the characteristics of a court....   A judgment which enforces a judgment of a foreign court is not a judgment within the meaning of Article 303."[35]   Consequently, in Bulgaria a judgment of a foreign court which confirmed the Zeevi award cannot be executed.   It should be noted that this conclusion applies, even if Article 15.3 were to be construed as not preventing a foreign court from assuming jurisdiction to confirm the award.

64.     Moreover, even if one were to assume that the principle *exequatur sur exequatur ne vaut* ("exequatur on exequatur is not valid") does not apply, a judgment of a foreign court

---

[34] "It has always been accepted that a judgment awarding a declaration of enforceability of a foreign judgment cannot, on its turn, be the object of further recognition or enforcement proceedings.  This is expressed in the French maxim *exequatur sur exequatur ne vaut*.  This general rule holds for judgments granting a declaration of enforceability in respect of a judgment given in a third state as well as in respect of a judgment given in another Member State.  The rationale behind the principle is that when a court authorizes the enforcement of a foreign judgment or accepts that the judgment may be recognized, it must verify whether the judgment complies with the requirements laid down in the Regulation.  This examination will prove pointless if the decision which is sought to be recognized or enforced is itself a decision authorizing enforcement of yet another decision.  In that case, the court addressed will not be in a position to review, for example, the compatibility of the original decision with its own public policy.  The same rule must apply when the foreign judgment whose recognition or enforcement is sought, has been subject to enforcement proceedings which led to the issue of a new judgment incorporating the first decision *(actio judicati)*."  Wautelet, in Peter Mankowski and Ulrich Magnus eds, Brussels I Regulation 545 (2007).

[35] Zhivko Stalev, *Bulgarian Civil Procedure* 991 (8th ed., 2004).

which confirmed the Zeevi award again cannot be executed. As can be seen from the conditions for recognition and enforcement of foreign judgments set out in Article 303[36] of the repealed CCP and now in Article 117[37] of the CIPL, a foreign judgment will be recognized only if the foreign court which rendered it was competent according to the Bulgarian rules of jurisdiction. Because, as noted above, Article 15.3 is a valid forum selection agreement under Bulgarian law which confers exclusive jurisdiction on Bulgarian courts, a Bulgarian court would consider that a foreign court which has confirmed the award acted without jurisdiction. As a result, it would not recognize and enforce its decision for that reason as well.

65.     The fact that a judgment of a foreign court which confirmed the award does not have and cannot acquire any legal effect in Bulgaria indicates that the interpretation of Article 15.3 advanced by Zeevi is contrary to the principle of effectiveness because it would render Article 15.3 devoid of any practical and legal significance. It would mean that Zeevi could ask for confirmation of the award anywhere in the world and, if successful, it could start coercive enforcement proceedings only in Bulgaria based on that confirmation. However, under Bulgarian law as stated above, the foreign confirmation judgment would have no legal effect. Zeevi still would have to request fresh confirmation of the award in Bulgaria, which in turn renders confirmation proceedings in other jurisdictions meaningless.

66.     In view of the foregoing, I conclude that if Article 15.3 is considered in the light of the principles of interpretation required by Bulgarian law, the word "execution" used in it applies to court proceedings for the confirmation of the arbitral award and is not limited to proceedings for coercive enforcement by a bailiff.

---

[36] See footnote 28 *supra*.

[37] See footnote 29 *supra*.

## IV.    PROCEDURES AVAILABLE TO A PARTY SEEKING TO ENFORCE AN ARBITRAL AWARD UNDER BULGARIAN LAW

67.    Pursuant to Article 51 (3)[38] of the ICAA foreign arbitral awards which fall in the scope of an international bilateral and multilateral treaty to which the Republic of Bulgaria is a party are recognized and enforced in accordance with the applicable treaty.  The same article further provides that foreign arbitral awards which do not fall in the scope of an international treaty are recognized and enforced in accordance with Articles 118-122 of CIPL.

68.    The Bulgarian Constitution adopts the monistic theory regarding the relation between international law and domestic law.  Pursuant to its Article 5 (4)[39] international treaties which have been ratified, published and come into force with respect to the Republic of Bulgaria are part of its domestic legislation without the need for any further acts of implementation and have priority over any conflicting domestic law.

69.    The New York Convention came into force with respect to the Republic of Bulgaria on 8 January 1962 and the Zeevi award clearly falls into its scope.

70.    Pursuant to Article 51 (3) of ICAA, the competent court is Sofia City Court.  The proceedings are open court adversary proceedings.  In regard to all procedural issues not regulated by the New York Convention, Bulgarian courts apply by analogy the general rules on adversarial proceedings set out in the CCP to the extent that they do not contravene the

---

[38] ICCA, Art. 51 (3): "Claims for recognition and granting of enforcement of awards of foreign arbitral tribunals and settlements entered into before them must be filed, unless otherwise provided in an international treaty to which the Republic of Bulgaria is a party, before Sofia City Court and they are treated in accordance with articles 118-122 of the Code of Private International Law, with the exception of the debtor's right to raise an objection that the debt is extinguished."

[39] Constitution of the Republic of Bulgaria, Art. 5 (4): "International treaties which have been ratified in accordance with the constitutional procedure, published, and have come into force with respect to the Republic of Bulgaria, shall be part of its domestic legislation. They shall have primacy over any conflicting provision of the domestic legislation."

Convention.[40]

71.      The proceedings start at the request of one of the parties under the award.  The application must be accompanied by duly authenticated originals, or duly certified copies of the arbitral award and the arbitration agreement.  If these documents are not in Bulgarian, an official translation must be submitted.  The claimant is not required to submit any other documents.[41] The proceedings include the exchange of written briefs followed by an oral hearing.[42]

72.      According to the practice of the Bulgarian Supreme Cassation Court and the legal theory, the court may not review the substance of the dispute.  It may refuse recognition and enforcement of a foreign award only on the grounds exhaustively listed in Article V of the New York Convention.  The grounds under Article V (1) of the New York Convention must be invoked and proved by the defendant.  The grounds under Article V (2) of the Convention may also be applied by the court *ex officio* regardless of whether or not they have been raised by the defendant.

73.      For example, in Decision No. 717 of 27 July 2005 in civil case 183/2004 the Supreme Cassation Court said:

> Since the court is requested to grant exequatur, the Bulgarian court is not empowered to check the correctness of the arbitral award on the substance, respectively to verify the substantive law relations covered by the arbitration agreement…The grounds for refusal of exequatur are specified in Article V of the Convention and they are exhaustively listed.

---

[40] "Our legislation does not have provisions regarding the procedure itself that has to be followed by the Sofia City Court when considering a request for recognition and enforcement of a foreign arbitral award. By analogy, the rules on exequatur proceedings for foreign court judgments set out in the Civil Procedure Code have to be applied. This is the court practice in this regard in our country…. Because of that these proceedings are adversarial and they are governed by the general rules on adversarial proceedings set out in the Civil Procedure Code unless there is a special provision set out in Part III."  Zhivko Stalev, *Arbitration in Private Law Disputes* 153-4 (1997).

[41] "The claimant is not under an obligation to submit other evidence in support of the exequatur claim." Zhivko Stalev, *Arbitration in Private Law Disputes* 156 (1997).

[42] New CCP, Art. 125, 131 and 140.

> Furthermore, the defendant must exhaust in the pending procedure the grounds that he refers to, since the missed grounds shall be barred by the res judicata effect of the decision whereby exequatur is granted. Article V of the Convention divides the grounds for refusal of exequatur in two categories. The difference between them is that the grounds set forth in par. 1 of the quoted text must be raised and proven by the defendant and if the defendant fails to raise them or fails to prove them, the court shall grant enforcement of the arbitral award. As regards the grounds specified in par. 2 of Article V, the exequatur court checks whether they are satisfied *ex officio*. The court is bound to check whether any of them is satisfied and to refuse the requested exequatur even if the defendant has not raised it.

74.    Similarly, Professor Zhivko Stalev wrote in his book "Arbitration in Private Law Disputes":

> [The grounds for refusal of exequatur] are exhaustively listed in Article V of the Convention. The court cannot refuse the requested exequatur on a ground which is not listed in Article V…. As a whole, these grounds do not include mistakes of the arbitral tribunal in establishing the facts of the case or in applying the substantive law applicable to the disputed right. The exequatur court cannot re-adjudicate the dispute. This is the essence of the prohibition to review the correctness of the arbitral award or, in other words, to review the merits of the case…. The grounds are alternative, and not cumulative, and it is sufficient for refusal of exequatur if one of them is met. On the other hand, the defendant must exhaust in the pending exequatur proceedings all grounds under Article V on which the requested exequatur must be denied. The grounds not raised shall be barred on the basis of the res judicata effect of the decision granting exequatur. Article V divides the grounds for refusal of exequatur in two groups. The first group consists of those listed in Article V (1) and the second – those listed in Article V (2). The difference between them is that the grounds under Article V (1) must be raised and proven by the defendant, so that if he fails to do that, the court will recognize and grant enforcement of the arbitral award. On the contrary, the court applies the grounds under Article V (2) *ex officio*. The court is under an obligation to check whether any of them is met and to refuse the requested exequatur if any of them is met, even if the defendant did not raise it.[43]

75.    The Bulgarian Supreme Court of Cassation has adopted a restrictive interpretation of the concept of public order/public policy under Article V. In the decision cited above it said

---

[43] Zhivko Stalev, *Arbitration in Private Law Disputes* 159 (1997).

that "contradiction with public order does not mean contradiction with law in general or even with mandatory legal provisions.  This term refers to violations of such mandatory rules which are in the very basis of the legal order of the country where exequatur is sought, such as adversarial proceedings, equality of parties in the proceedings and other provisions relating to the basic rules of justice which have universal significance."[44]

76.     A respondent is not precluded from resisting the enforcement of an award on a ground envisaged in Article V of the New York Convention if it did not challenge the award in set aside proceedings in the state of the seat of the arbitration.  The text of the New York Convention does not envisage such preclusion and I am not aware of any Bulgarian court decision or theoretical legal writing which states otherwise.

77.     A decision of the Sofia City Court, regardless of whether it grants or refuses recognition and enforcement, is subject to two levels of appeal.  The first one is to the Sofia Appellate Court and is as of right;[45] the second one is to the Supreme Court of Cassation and is by leave.[46]

78.     When the decision of the Sofia City Court granting recognition and enforcement of a foreign award enters into force because it has not been appealed within the statutory time limits or the appeals have been unsuccessfully exhausted, the Sofia City Court, at the request of

---

[44] Decision No. 717 of 27 July 2005 in civil case 183/2004, Commercial Department of the Supreme Cassation Court.

[45] New CCP, Article 258 (1): "Decisions of municipal courts are subject to appeal before district courts, and decisions of district court rendered as first instance courts are subject to appeal before the courts of appeal."

[46] New CCP, Article 280: "(1) (declared unconstitutional in respect of the word "important" by Decision of the Constitutional Court No 04/09 – SG 47/09) Subject to appeal before the Supreme Court of Cassation shall be the appellate decisions…."
"Leave of appeal
Article 288. The Supreme Court of Cassation shall decide admissibility of the cassation appeal by a ruling at a closed session by a panel of three judges."

the claimant, will issue an enforcement order.[47]

79.     On the basis of the enforcement order the claimant may start coercive enforcement of the award by a bailiff.   These proceedings are governed by general rules applicable to coercive enforcement.[48]

80.     The general rules, however, do not apply in case of enforcement against the state and state entities.   The enforcement in such cases is governed by a special procedure regulated in the repealed CCP by Article 399[49] and in the new CCP by Article 519.[50]   According to it the enforcement order must be submitted to the financial body of the state entity that is the debtor under the award or the judgment.   The money is paid from the credit envisaged for that purpose in the state entity's budget.   If there is no money envisaged for that purpose, the superior entity should do what is necessary in order to provide the necessary sum at the latest in the next budget. The payment is guaranteed.

81.     The purpose of this special procedure is to prevent socially undesirable disruption of the public function of the state by random and unpredictable enforcement actions.   The Bulgarian Supreme Cassation Court and Supreme Administrative Court have confirmed in their decisions that the payment under the special procedure, however, is guaranteed.

---

[47] New CCP, Article 405 (4): "The court, on granting enforcement, issues an enforcement order on the ground of the acts under Art. 404 (2) and (3). An enforcement order issued on the ground of an act under Article 404 (3) shall not be given to the creditor unless the decision on granting the enforcement has entered into force."

[48] New CCP, Chapters 36, 38-45.

[49] Repealed CCP, Art. 399. "The money claims against state entities shall be paid from the credit envisaged for that in their budget. For that purpose the writ of execution shall be submitted to the financial body of the respective entity. If there is no credit, the superior entity should do what is necessary in order to provide such in the next budget at the latest."

[50] New CCP, Art. 519. "(1) Execution of money claims against state entities is not permitted.

(2) The money claims against state entities shall be paid from the credit envisaged for that in their budget. For that purpose the enforcement order shall be submitted to the financial body of the respective entity. If there is no credit, the superior entity should do what is necessary in order to provide such in the next budget at the latest."

The comparison between the two articles shows that there is not any material difference between them.

82.    The Bulgarian Supreme Cassation Court said the following in regard to the special procedure for enforcement against the state and state entities:

> [M]oney claims against state entities are paid by the following procedure – the writ of execution must be submitted to the relevant financial body and payment is made from the credit envisaged for this purpose in the budget of the entity, and if no such credit was envisaged, a credit must be envisaged in the next budget at the latest.   This enforcement method follows from the fact that state entities perform public functions entrusted to them and in this connection they dispose of earmarked funds in accordance with a budget adopted in advance pursuant to a procedure provided by law.   If coercive enforcement is undertaken by a bailiff through garnishment of random budget accounts of theirs, the normal functioning of the entity would be disrupted.   This requires the money necessary for payment of the debt to be specially envisaged, which is done by the procedure for adoption of the budget of the entity.   Therefore the conclusions are that coercive enforcement of money claims against state entities is not permitted and that payment of pecuniary obligations of state entities under a court judgment which has entered into force is always guaranteed by the state.[51]

83.    In regard to the same procedure the Bulgarian Supreme Administrative Court said: "Coercive enforcement against state entities for collection of money claims is not permitted, and payment of pecuniary obligations of state entities which have been established by an administrative act or court judgment in force are always guaranteed by the state."[52]

## V.    THE ADEQUACY OF THE COURTS OF BULGARIA, A MEMBER OF THE EUROPEAN UNION, AS THE AGREED FORUM

84.    The Bulgarian Constitution is based on the principles of separation of powers and the rule of law. Pursuant to its Article 117 (2) the judicial branch of the government is independent from the executive branch of government and judges decide cases only on the basis

---

[51] Ruling dated 28 June 2000 in civil case 1279 of 2000 of the Supreme Cassation Court, 5th civil chamber.

[52] Ruling No. 641 dated 21 January 2005 in administrative case 10386 of 2004 of the Supreme Administrative Court, 6th chamber.

of the applicable law.[53]

85.     The Constitution and the Judicial System Act which implements the constitutional provisions contain strong guarantees for the independence of the judiciary system.

86.     The main guarantees for the independence of the judicial system are that it is both self-governed and financially independent.   The judicial system is governed by the Supreme Judicial Council ("SJC").[54]   The SJC is a part of the judicial system itself and not of the executive branch of the government.   The SJC consists of the Chairpersons of the Supreme Cassation Court and the Supreme Administrative Court, the Chief Prosecutor and 22 other

---

[53] Constitution of the Republic of Bulgaria, Art. 117 (2): "The judicial branch is independent. In the performance of their functions, all judges, members of juries, prosecutors, and investigators shall obey only to the law."

Judicial System Act, Art. 3: "When delivering their acts, the judges, the prosecutors and the investigators shall stand on the law and on the evidence collected in the case."

[54] Constitution of the Republic of Bulgaria, Art. 130: "(1) The Supreme Judicial Council shall consist of 25 members.    The Chairperson of the Supreme Court of Cassation, the Chairperson of the Supreme Administrative Court, and the Chief Prosecutor shall be its members *ex officio*.

(2) Eligible for election to the Supreme Judicial Council besides its *ex officio* members shall be practicing lawyers of high professional and moral integrity with at least 15 years of professional experience.

(3) Eleven of the members of the Supreme Judicial Council shall be elected by the National Assembly, and eleven shall be elected by the organs of the judicial branch.

(4) The elective members of the Supreme Judicial Council shall serve terms of five years.   They shall not be eligible for immediate re-election.

(5) The meetings of the Supreme Judicial Council shall be chaired by the Minister of Justice, who shall not be entitled to vote.

(6) (New SG 12 of 2007) The Supreme Judicial Council:

1. appoints, promotes, transfers and removes from office judges, prosecutors and investigators;

2. imposes disciplinary punishments 'demotion' and 'discharge from office' to judges, prosecutors and investigators;

3. organizes training of judges, prosecutors and investigators;

4. approves the budget of the judicial branch;

5. determines the yearly report under article 84 (16).

(7) (New SG 12 of 2007) The Supreme Judicial Council hears and approves the yearly reports of the Supreme Cassation Court, the Supreme Administrative Court and of the Chief Prosecutor on application of the law and on the activities of courts, prosecution offices and investigation offices, and submits those reports to the National Assembly."

Judicial System Act, Art. 16 (1): "The Supreme Judicial Council shall be an authority of permanent functioning, representing the judiciary and ensuring its independence. It shall determine the composition and organization of the work of the judiciary and shall administer its activity without affecting the independence of its authorities."

lawyers of high professional and moral integrity with at least 15 years of professional experience.  They are appointed by the National Assembly and by the judiciary itself.[55]

87.     The SJC determines the number of the courts in the country and the number of the judges in these courts.[56]  It appoints, promotes, demotes, transfers and discharges from office all

---

[55] Judicial System Act, Art. 17: "(1) The National  Assembly shall elect members of the Supreme Judicial Council from among judges, prosecutors, investigators, law professors, advocates or other lawyers.

(2) The organs of the judicial system shall elect members of the Supreme Judicial Council from their composition, where the judges shall elect six, the prosecutors – four, and the investigators – one."

[56] Constitution of the Republic of Bulgaria, Art. 130 (6): "(New SG 12 of 2007) The Supreme Judicial Council:

1. appoints, promotes, transfers and discharges from office judges, prosecutors and investigators;

2. imposes disciplinary punishments 'demotion' and 'discharge from office' to judges, prosecutors and investigators;

3. organizes training of judges, prosecutors and investigators;

4. approves the budget of the judicial branch;

5. determines the yearly report under article 84 (16)."

Judicial System Act, Art. 30: "(1) In exercising its competences, specified in the Constitution, the Supreme Judicial Council shall carry out the following activities:

1. discuss the draft budget of the judiciary, proposed by the Minister of Justice, submit it to the Council of Ministers for inclusion in the draft Law on the State Budget of the Republic of Bulgaria and control its performance;

2. determine the number, the judicial venues and the seats of the district, regional, administrative and appellate courts upon proposal of the Minister of Justice, and of the military courts – in coordination with the Minister of Defence;

3. (suppl. - SG 33/09) determine the number of the judges, prosecutors and investigators in the courts, prosecution authorities and investigation authorities and also the number of the judicial officials upon proposal of the administrative heads of the judiciary;

4. organize and conduct the contests for judges', prosecutors' and investigators' offices;

5. determine the number of the administrative heads and the deputies of the administrative heads of the judiciary authorities and appoint and dismiss them, except the Chairman of the Supreme Court of Cassation. the Chairman of the Supreme Administrative Court and the Chief Prosecutor;

6. propose to the president of the Republic of Bulgaria the appointment and dismissal of the Chairman of the Supreme Court of Cassation, the Chairman of the Supreme Administrative Court and the Chief Prosecutor;

7. elect and dismiss the director of the National Investigation Service;

8. determine the salary of the judges, prosecutors and investigators;

9. examine the degree of workload of the judiciary authorities;

10. examine the work of the judges, prosecutors, investigators and of the administrative heads;

11. maintain and keep the staff files of the judges, prosecutors and investigators;

12. (amend. - SG 33/09) approve a Code of Ethics of the judges, prosecutors and investigators and a Code of Ethics of the judicial officials;

13. (amend. - SG 33/09) every 6 months request and summarize information from the courts, the prosecution authority and from the National Investigation Service on their activity;

judges.  It also checks the work of the judges and imposes disciplinary liability on them for professional misconduct.  The judicial system also has a budget of its own.[57]  The budget is approved and administered by the SJC.

88.    The main guarantees for independence of the judges are their life tenure and their immunity.  Judges acquire tenure[58] after five years in office and following a performance appraisal and decision by the SJC.  After that, they may be discharged from office only in the event of retirement, resignation, entry into force of a sentence for deprivation of liberty for an intentional crime, lasting actual impossibility to discharge their duties for over a year, serious, systematic failure to discharge their official duties, or behaviour that undermines the prestige of the judicial branch.  In addition, judges have criminal and civil immunity for acts performed in

---

14. by 31 May draw up and submit to the National Assembly an annual summary report on its own activity and the activity of the Inspectorate at the Supreme Judicial Council, as well as the annual reports of the Supreme Court of Cassation, the Supreme Administrative Court and the Chief Prosecutor.”

Judicial System Act, Art. 31: “The Supreme Judicial Council shall provide its opinion to the Council of Ministers and to the National Assembly on draft laws related to the judiciary.”

[57] Constitution of the Republic of Bulgaria, Art. 117 (3): “The judicial branch of government shall have an independent budget.”

[58] Constitution of the Republic of Bulgaria, Art. 129 (3): “(Amendments – State Gazette, N: 85/2003) Judges, prosecutors and investigators shall be granted tenure upon having been in office for five years and after performance evaluation by the Supreme Judicial Council. Those persons and the persons under para. 2 shall be removed from office only in the event of:

1. reaching the age of 65;

2. resignation;

3. entry into force of a sentence, whereby a punishment of imprisonment for an intentional crime has been imposed;

4. de facto incapacitation to discharge their official duties for a period exceeding one year;

5. serious breach of or systemic failure to discharge official duties, as well as action detrimental to the prestige of the judiciary.”

Judicial System Act, Art. 209 (1): “A judge, prosecutor or investigator shall acquire tenure after being in office for a period determined in Art. 129 (3) of the Constitution of the Republic of Bulgaria, and a positive performance evaluation.”

Judicial System Act, Art. 165 (3): “A judge, prosecutor and investigator, who has tenure, shall be dismissed only on the grounds under Art. 129 (3) of the Constitution of the Republic of Bulgaria, as well as in the cases under Para 1 (7).”

discharge of their official duty.[59]

89.     Bulgarian courts exercise their independence in practice and show readiness to rule against the state and state entities when this is warranted by the facts of the case and the law applicable to them.  This holds true both in general civil litigation and in the specific proceedings for recognition and enforcement of foreign arbitral awards.

90.     There are many court judgments against the state and state entities.  For example, in the case of Economic and Investment Bank v. the Republic of Bulgaria (Decision dated 21 July 2004 of Sofia Court of Appeals in case No. 2408/2003 and Decision No. 473 dated 25 July 2005 of the Supreme Cassation Court in case No. 807/2004) the court ordered the state to pay more than 12 million Euro in damages plus interest and 700,000 Bulgarian leva in legal costs. My search in the most widely used Bulgarian legal database "Ciela" shows that there is no claim for recognition and enforcement of a foreign arbitral award against the Bulgarian state as such. The search reveals, however, that there are several decisions for recognition and enforcement of a foreign arbitral award against state entities and companies – against the Bulgarian Ministry of Agriculture, the Bulgarian National Electricity Company and the Bulgarian Sport Tote.

91.     Recognition and enforcement was denied only in the last case because the court decided that the arbitral tribunal had violated the principle of equal treatment of the parties and the right to be heard, which are a part of procedural public order.

92.     For example, in its Judgment of 16 February 2008 in commercial case 62/2007, the Sofia City Court recognized and enforced an ICC arbitral award rendered against the

---

[59] Constitution of the Republic of Bulgaria, Art. 132: "(Amended, SG No. 85/2003) (1) In implementing the judicial authority the judges, prosecutors and investigators shall bear no criminal and civil responsibility for their official actions and for the acts adjudicated by them, unless the offence committed by them is publicly prosecuted intentional crime."

Bulgarian Ministry of Agriculture and Food. Although the Ministry argued that the award should not be enforced because, among other things, the award was "contrary to the Bulgarian public policy,"[60] the court rejected that argument. The Court held:

> The Award is not contrary to the Bulgarian public policy because it settles a dispute between the parties to a commercial transaction. This transaction was concluded by the Ministry as a subject of civil law which has assumed certain obligations. These obligations were not honoured and, therefore, the debtor, regardless of being a state body, was ordered by a court to pay the sums due.
>
> Besides this, the subject matter of the difference is capable of settlement by arbitration because the right of the claimant derives from a commercial transaction, the difference is over a property interest and does not fall under the scope of the exceptions in respect of which arbitration is inadmissible.[61]

Under these circumstances, the Sofia City Court found that the application for enforcement was "well founded and, therefore, the Award merits to be recognized and to be enforced within the territory of the Republic of Bulgaria."[62]

93.     To the best of my knowledge there is no case-law or any other indication that the special procedure for enforcement against the state or state entities is preventing creditors from enforcing their rights.

94.     Bulgaria is a member of the European Union ("EU"). The EU is a union of states and peoples based on legal and economic integration of its Member States as well as on values of democracy, human rights, free market economy, rule of law and very strong legal mechanisms for the implementation and protection of these values.

95.     EU integration envisages the creation of supranational institutions and transfer of

---

[60] Sofia City Court Judgment of 16 February 2008 in Commercial Case No. 62/2007, at 1.

[61] Sofia City Court Judgment of 16 February 2008 in Commercial Case No. 62/2007, at 3.

[62] Sofia City Court Judgment of 16 February 2008 in Commercial Case No. 62/2007, at 4.

sovereignty to them; direct effect of the acts of these institutions in the legal order of the member state; the creation of a single internal market with free movement of goods, services, capital and people within it; and automatic or simplified recognition of a wide range of administrative and judicial acts of one member state in the legal order of another member state.  For example, in the field of civil law procedure, a judgment on an uncontested claim which has been certified as a European Enforcement Order in the Member State of origin is recognized and enforced directly in the other Member States without the need for a recognition procedure and a declaration of enforceability.[63]  Other decisions in civil and commercial matters are recognized and enforced on the basis of the Council Regulation (EC) No 44/2001 of 22 December 2000 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters under a considerably simplified condition and procedure.

96.      This close political and economic integration and related mutual recognition of administrative and judicial acts requires a high level of confidence between Member States and, hence, very high standards for accession to the EU.  Article 49 in connection with Article 6 of the Treaty on the European Union provides that only a state which respects the principles of liberty, democracy, human rights and fundamental freedoms, and the rule of law may apply to become a member.  The accession criteria for the Eastern European countries and for any other country were established by the European Council in Copenhagen in 1993 and strengthened by the European Council in Madrid in 1995.  They are:

- political: stability of institutions guaranteeing democracy, the rule of law, human rights and respect for and protection of minorities;

- economic: existence of a functioning market economy and the capacity to cope with competitive pressure and market forces within the Union; acceptance of the

---

[63] Regulation (EC) No 805/2004 of the European Parliament and of the Council of 21 April 2004 creating a European Enforcement Order for uncontested claims available at http://eur-lex.europa.eu/LexUriServ /LexUriServ.do?uri=OJ:L:2005:097:0064:0064:EN:PDF on 3 December 2009.

Community *acquis*: ability to take on the obligations of membership, including adherence to the aims of political, economic and monetary union.[64]

97.    The European Council may open negotiations with a candidate for accession to the EU only after the political criterion is satisfied.  The opening of the negotiations is followed by a process of adoption, implementation and enforcement by the candidate of all the EU rules already in force.  Compliance with commitments is closely monitored throughout the process by regular reports, and negotiations are closed only when all the Member States are satisfied with the candidate's achievements.  The accession treaty with a new member has to be ratified by each EU Member State.

98.    The negotiations for the accession of Bulgaria were opened in early 2000 and closed in mid-2004.  The Accession Treaty between the Members States of the EU and Bulgaria and Romania was signed in 2005.  Bulgaria became a Member State of the EU on 1 January 2007.

99.    Pursuant to Article 4 (3) of the Accession Treaty by a Decision dated 13 December 2006 the European Commission established a mechanism for cooperation and verification of the progress of the Bulgarian legal system in reaching judicial reform.  The mechanism requires Bulgaria to address specific benchmarks in the areas of judicial reform and the fight against corruption and organized crime.  The decision also empowers the Commission to take appropriate measures in the case of imminent risk to the implementation and application of, *inter alia*, mutual recognition in civil law matters, including the suspension of the obligation of Member States to recognize and execute Bulgarian judgments and judicial decisions.

---

[64] European Council in Copenhagen, 21-22 June 1993, Conclusions of the Presidency, available at http://www.europarl.europa.eu/summits/copenhagen/co_en.pdf on 3 December 2009; Madrid European Council, 15 and 16 Dec. 1995, Presidency Conclusions, available at http://www.europarl.europa. eu/summits/mad1_en.htm#intro on 3 December 2009.

100.    This cooperation and verification mechanism is an ongoing process.    The cooperation and verification mechanism consists of annual reports by Bulgaria on its progress and respective reports by the Commission on its findings every six months.    While the reports have been critical and list a number of weaknesses in the Bulgarian court system, the criticism has focused mainly on shortcomings in the field of criminal procedure, e.g., the fight against corruption, fraud related to EU funds and organized crime, and not in the field of civil procedure.

101.    The reports also mark the progress Bulgaria has made in meeting the relevant benchmarks.    For example, the report of July 2008[65] states that the adoption of amendments to the Constitution and of a new Judicial System Act confirms the independence of the judiciary (benchmark 1).    The reports also point to the progress in achieving a more transparent and efficient judicial process by the adoption of a new Code of Civil Procedure (benchmark 2).

102.    While the Commission's reports indicate that the Bulgarian legal system requires further improvement, the reports have not led to the imposition of any measures.    This shows that the Bulgarian judicial system meets the high standards of the European Union.    The continuing nature of the cooperation and verification mechanism also ensures that Bulgaria's court system is closely monitored and that Bulgaria is strongly encouraged to maintain the standards achieved to support EU accession.

103.    Bulgaria has signed and ratified the European Convention for the Protection of Human Rights and Fundamental Freedoms ("CPHRFF")[66] and its Protocol No. 1.    Bulgaria also has signed and ratified the Agreement for the Promotion and Reciprocal Protection of

---

[65] Report from the Commission to the European Parliament and the Council on Progress in Bulgaria under the Co-operation and Verification Mechanism (Done at Brussels, 23 July 2008), available at http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=COM:2008:0495:FIN:EN:PDF on 3 December 2009.

[66] European Convention for the Protection of Human Rights and Fundamental Freedoms (Done at Rome, 4 Nov. 1950), available at http://www.echr.coe.int/ECHR/EN/Header/Basic+Texts/The+Convention+and+additional+protocols/The+European+Convention+on+Human+Rights/ on 18 January 2010.

Investments with Israel ("Bulgaria-Israel Agreement") and the Convention on the Settlement of

Investment Disputes between States and Nationals of Other States ("ICSID Convention").[67]

104.    Pursuant to Article 1[68] of the CPHRFF in conjunction with Article 1(1)[69] of

Protocol No. 1 and Article 6 (1)[70] of the CPHRFF, each contracting state is obliged to guarantee

to all natural and legal persons within its jurisdiction, no matter whether they are nationals of a

contracting state or not, a right to fair trial and to the peaceful enjoyment of possessions.

According to the case-law of the European Court on Human Rights ("ECHR") an arbitral award

comes within the scope of Article 1 of Protocol No. 1 and Article 6 (1) of the CPHRFF.  In the

case of *Stran Greek Refineries and Stratis Andreadis v. Greece*[71] the ECHR found that a debt

under an arbitration award is a possession within the meaning of Article 1 of Protocol No. 1, and

that the right to recover the sums awarded by the arbitration court was a "civil right" covered by

the fair trial requirement of Article 6.[72]

---

[67] ICSID Convention, Regulations and Rules, available at http://icsid.worldbank.org/ICSID/ICSID/RulesMain.
jsp on 18 January 2010.

[68] CPHRFF, Art. 1: "Obligation to respect human rights

The High Contracting Parties shall secure to everyone within their jurisdiction the rights and freedoms defined
in Section I of this Convention."

[69] Protocol No. 1 to CPHRFF, Art. 1: "Protection of property

(1) Every natural or legal person is entitled to the peaceful enjoyment of his possessions. No one shall be
deprived of his possessions except in the public interest and subject to the conditions provided for by law and
by the general principles of international law."

[70] CPHRFF, Art. 6: "Right to a fair trial

(1) In the determination of his civil rights and obligations or of any criminal charge against him, everyone is
entitled to a fair and public hearing within a reasonable time by an independent and impartial tribunal
established by law. Judgment shall be pronounced publicly but the press and public may be excluded from all
or part of the trial in the interests of morals, public order or national security in a democratic society, where the
interests of juveniles or the protection of the private life of the parties so require, or to the extent strictly
necessary in the opinion of the court in special circumstances where publicity would prejudice the interests of
justice."

[71] *Case of Stran Greek Refineries and Stratis Andreadis v. Greece*, ECHR Case No. 22/1993/417/496,
Judgment (9 Dec. 1994), available at http://www.menschenrechte.ac.at/orig/95_1/Stran_Greek.pdf on 18
January 2010.

[72] In paragraph 62 of the judgment in *Stran Greek Refineries and Stratis Andreadis v. Greece* the ECHR held
that "the arbitration award of 27 February 1984 therefore conferred on the applicants a right in the sums

105.     Pursuant to Article 2.2[73] and Article 5[74] of the Bulgaria-Israel Agreement the Republic of Bulgaria is obliged to afford the investments of Israeli investors a fair and equitable treatment which includes the prohibition of denial of justice, and the requirement not to subject investments to expropriation or measures having similar effect without full, prompt and effective compensation.    According to the *Saipem case*,[75] a case decided under a similar investment agreement, residual contractual rights crystallized in a final and binding award constitute a covered investment entitled to the legal protections set forth in the ICSID Convention and the standards found in investment agreements such as the Bulgaria-Israel Agreement.[76]

106.     Arbitral tribunals deciding cases under investment protection treaties such as the Bulgaria-Israel Agreement and the ECHR have developed identical definition for denial of justice and the right to a fair trial.   For example, in the *Azinian* case,[77] the tribunal held that there

---

awarded.…"   Accordingly, in the Court's view, that right constituted a "possession" within the meaning of Article 1 of Protocol No. 1.   In paragraph 40 the ECHR also held that "[t]he Court notes that the applicants' right under the arbitration award was 'pecuniary' in nature....   Their right to recover the sums awarded by the arbitration court was therefore a 'civil right' within the meaning of Article 6 (art. 6)....   It follows that the outcome of the proceedings brought in the ordinary courts by the State to have the arbitration award set aside was decisive for a 'civil right.'"

[73] Agreement between The Government of The Republic of Bulgaria and The Government of The State of Israel for the Promotion and Reciprocal Protection of Investments (Done at Jerusalem, 6 Dec. 1993) ("Bulgaria-Israel Agreement"), Art. 2.2: "Investments made by investors of each Contracting Party shall be accorded fair and equitable treatment and shall enjoy full protection and security in the territory of the other Contracting Party. Neither Contracting Party shall in any way impair by unreasonable or discriminatory measures the management, maintenance, use, enjoyment or disposal of investments in its territory of investors of the other Contracting Party."

[74] Bulgaria-Israel Agreement, Art. 5: "Investments of investors of either Contracting Party shall not be nationalised, expropriated or subjected to measures having effect equivalent to nationalisation or expropriation (hereinafter 'expropriation') in the territory of the other Contracting Party, except by virtue of law, for a public purpose of that Contracting Party on a non-discriminatory basis and against prompt, adequate and effective compensation."

[75] *Saipem S.p.A. v. the People's Republic of Bangladesh*, ICSID Case No. ARB/05/7, Decision on Jurisdiction and Recommendation on Provisional Measures (21 Mar. 2007), available at http://icsid.worldbank.org/ICSID/FrontServlet?requestType=GenCaseDtlsRH&actionVal=ListConcluded on 18 January 2010.

[76] "[T]he contract rights which are crystallized by the Award constitute an investment within Article 1(1)(c) of the BIT."  *Saipem S.p.A. v. the Republic of Bangladesh*, Decision on Jurisdiction, paragraph 127.

[77]   *Robert Azinian and others v. United Mexican States*, ICSID Case No. ARB(AF)/97/2, Award (1 Nov. 1999), available at http://icsid.worldbank.org/ICSID/FrontServlet?requestType=GenCaseDtlsRH&actionVal=ListConcluded on 18 January 2010.

is a denial of justice (and hence a treaty violation) "if the relevant courts refuse to entertain a suit, if they subject it to undue delay, or if they administer justice in a seriously inadequate way. … [and that t]here is a fourth type of denial of justice, namely the clear and malicious misapplication of the law." [78]   Similarly, the ECHR in the case of *Golder v. the United Kingdom*[79] stated: "[t]he principle whereby a civil claim must be capable of being submitted to a judge ranks as one of the universally 'recognized' fundamental principles of law; the same is true of the principle of international law which forbids the denial of justice.  Article 6 para. 1 (art. 6-1) must be read in the light of these principles."[80]  In the line with this definition the ECHR in *Stran Greek Refineries and Stratis Andreadis v. Greece*  found that state interference through a legislative action in the court determination of a dispute is a violation of the right of fair trial,[81] and in *Regent Company v. Ukraine*[82] found that non-enforcement of a debt based on the arbitral award is a violation of Article 6 (1) of the CPHRFF.[83]

107.    Even more, both the ECHR and tribunals deciding cases under investment agreements such as the Bulgaria-Israel Agreement have held that when a state through legislative or judicial action eviscerates the rights of a party under a final and binding arbitral award, it

---

[78]  *Robert Azinian and others v. United Mexican States*, Award, paragraphs 102-103.

[79]  *Golder v. the United Kingdom*, Application No. 4451/70, Judgment (21 Feb. 1975), available at http://cmiskp.echr.coe.int/tkp197/view.asp?item=1&portal=hbkm&action=html&highlight=golder&sessionid=45279238&skin=hudoc-en on 18 January 2010.

[80]  *Golder v. the United Kingdom*, Judgment, paragraph 35.

[81]  "The principle of the rule of law and the notion of fair trial enshrined in Article 6 (art. 6) preclude any interference by the legislature with the administration of justice designed to influence the judicial determination of the dispute. In conclusion, the State infringed the applicants' rights under Article 6 para. 1 (art. 6-1) by intervening in a manner which was decisive to ensure that the - imminent - outcome of proceedings in which it was a party was favourable to it. There has therefore been a violation of that Article (art. 6-1)."  *Greek Refineries and Stratis Andreadis v. Greece*, Judgment, paragraphs 49-50.

[82]  *Case of Regent Company v. Ukraine*, Application No. 773/03, Judgment (Strasbourg, 3 Apr. 2008), available at http://cmiskp.echr.coe.int/tkp197/view.asp?item=2&portal=hbkm&action=html&highlight=773&sessionid=43054026&skin=hudoc-en on 18 January 2010.

[83]  "[T]he continued non-enforcement of the judgment debt at issue constituted a violation of Article 6 § 1 of the Convention." *Case of Regent Company v. Ukraine*, Judgment, paragraph 60.

commits an act similar or equivalent to expropriation.  In the *Saipem case* the tribunal held that when a national court in national proceedings related to an arbitral award abuses its power in a manner which is contrary to public international law or is illegal under the New York Convention, this amounts to a measure having similar effect to expropriation.[84]  In *Stran Greek Refineries and Stratis Andreadis v. Greece* the ECHR held that a state committed a violation of Article 1 of Protocol No. 1 of the CPHRFF when it passed legislation which had the sole purpose to block the enforcement of a final and binding award and deprive the party of the benefit under it.[85]

108.    In all of the above cited cases the respondent states were ordered to pay compensation in the amounts due to the claimants under the original arbitral awards.[86]

---

[84] "161. … [T]he Tribunal is of the opinion that the Bangladeshi courts exercised their supervisory jurisdiction for an end which was different from that for which it was instituted and thus violated the internationally accepted principle of prohibition of abuse of rights."

"167. … It is the Tribunal's opinion that a decision to revoke the arbitrators' authority can amount to a violation of Article II of the New York Convention whenever it *de facto* "prevents or immobilizes the arbitration that seeks to implement that [arbitration] agreement" thus completely frustrating if not the wording at least the spirit of the Convention.  This is indeed what happened here."

"129. In respect of the taking, the actions of the Bangladeshi courts do not constitute an instance of direct expropriation, but rather of 'measures having similar effects' within the meaning of Article 5(2) of the BIT.  Such actions resulted in substantially depriving Saipem of the benefit of the ICC Award. This is plain in light of the decision of the Bangladeshi Supreme Court that the ICC Award is 'a nullity'.  Such a ruling is tantamount to a taking of the residual contractual rights arising from the investments as crystallised in the ICC Award.  As such, it amounts to an expropriation within the meaning of Article 5 of the BIT."  *Saipem S.p.A. v. the People's Republic of Bangladesh*, ICSID Case No. ARB/05/7, Award (30 June 1999), paragraphs 129, 161, 167, available at http://www.investmenttreatynews.org/documents/p/160.aspx.

[85] "By choosing to intervene at that stage of the proceedings ... by a law which invoked the termination of the contract in question in order to declare void the arbitration clause and to annul the arbitration award of 27 February 1984, the legislature upset, to the detriment of the applicants, the balance that must be struck between the protection of the right of property and the requirements of public interest. There has accordingly been a violation of Article 1 of Protocol No. 1."  *Stran Greek Refineries and Stratis Andreadis v. Greece*, Judgment, paragraphs 74-75.

[86] "…[T]he Tribunal considers that the expropriation of the right to arbitrate the dispute in Bangladesh under the ICC Arbitration Rules corresponds to the value of the award rendered without the undue intervention of the court of Bangladesh."  *Saipem S.p.A. v. the People's Republic of Bangladesh*, Award, paragraph 204.  The Court "*Holds* (a) that the respondent State is to pay the applicant company ... the outstanding amount of the arbitration award of 23 December 1998 still owed to it."  *Case of Regent Company v. Ukraine*, Judgment. See also paragraphs 81-83 of the decision in *Stran Greek Refineries and Stratis Andreadis v. Greece*.

109.     Pursuant to Article 5 (4) of the Constitution of the Republic of Bulgaria these rights conferred by Article 1 of Protocol No. 1 and Article 6 (1) of the CPHRFF and Article 2 and 5 of the Bulgaria-Israel Agreement are incorporated in the Bulgarian law and take precedence over any prior or subsequent contradicting national law.

110.     More importantly, pursuant to Article 34[87] in conjunction with Article 46[88] of the CPHRFF and Article 8[89] of the Bulgaria-Israel Agreement in conjunction with Article 54[90] of the ICSID Convention any person who is entitled to the protection of these legal instruments, including Zeevi, can start proceedings against Bulgaria before the ECHR or a tribunal constituted in accordance with the provisions of the ICSID Convention without any further consent of the

---

[87] CPHRFF, Art. 34: "Individual applications

The Court may receive applications from any person, non-governmental organisation or group of individuals claiming to be the victim of a violation by one of the High Contracting Parties of the rights set forth in the Convention or the protocols thereto. The High Contracting Parties undertake not to hinder in any way the effective exercise of this right."

[88] CPHRFF, Art. 46: "Binding force and execution of judgments

(1)  The High Contracting Parties undertake to abide by the final judgment of the Court in any case to which they are parties.

(2)  The final judgment of the Court shall be transmitted to the Committee of Ministers, which shall supervise its execution."

[89] Bulgaria-Israel Agreement, Art. 8.1: "Disputes between an investor of one Contracting Party and the other Contracting Party concerning an obligation of the latter under this Agreement, in relation to an investment of the former, shall, as far as possible, be settled by the parties in an amicable way."

Bulgaria-Israel Agreement, Art. 8.2: "If such a dispute related to Article 4, 5, 6 and 11 cannot be settled amicably  or otherwise within three (3) months from the date of written notification of the existence of the dispute, then the investor concerned may submit the dispute for settlement by arbitration to:

a) The International Centre for the Settlement of Investment Disputes, in the event the Republic of Bulgaria becomes a party to the Convention of Investment Disputes between States and Nationals of other States done at Washington, March 18th 1965…."

[90] ICSID Convention, Art. 54: "(1) Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State. A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.

(2) A party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General. Each Contracting State shall notify the Secretary-General of the designation of the competent court or other authority for this purpose and of any subsequent change in such designation.

(3) Execution of the award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such execution is sought."

state and execute the resulting decisions automatically without proceedings for recognition and enforcement in over 40 countries parties to the CPHRFF and in over 140 countries parties to the ICSID Convention.

111.    Consequently, in view of the foregoing there is not any basis to conclude that the Bulgarian courts do not provide an appropriate forum for Zeevi to seek enforcement of the arbitral award as agreed in Article 15.3 of the Privatization Agreement.

*  *  *

Signed this 3rd day of February, 2010

Sofia, Bulgaria

Lazar Vladimirov Tomov

<u>Exhibit 1</u>

**CURRICULUM VITAE**
**OF LAZAR TOMOV**

**Name:**       Lazar Vladimirov Tomov

**Address:**      4, Svetoslav Terter
                1124 Sofia
                Bulgaria

**Phone:**       + 359 2 843 76 62
                + 359 88 821 61 35

**Email:**       l.tomov@tomov.com


**Professional Membership and Experience:**
Attorney at law (advocate), member of Sofia Bar Association, member of International Bar Association, partner in Tomov and Tomov Law Firm.
Arbitrator in the Court of Arbitration with the Bulgarian Chamber of Commerce, Sofia
Former lecturer in International Business Law and Commercial Law, Law Faculty, New Bulgarian University, Sofia


**Education:**
**1984**   - Sofia University "St. Clement of Ohrid", Law Faculty,  Diploma in Law, with distinction;
**1993** - Katholike Universiteit, Leuven, Belgium, Law Faculty, Centre for Advanced Legal Studies; LLM in International Business Law; magna cum laude;
**1994** - Academy of American and International Law, Institute of Translational Arbitration, Dallas, Texas, USA, Certificate;
**1994** - Academy of European Law, Florence, Italy. Certificate;
**1995** - Queen Mary and Westfield College, University of London, United Kingdom Financial Law and Arbitration Studies, Certificate;
**2006** – American University, Washington College of Law, International Arbitration Program. Certificate.


**Language Proficiency**:
English

Exhibit 2

## DOCUMENTS RELIED UPON

| Tab | Document |
| --- | --- |
| | **Bulgarian Legal Authorities** |
| 1. | Constitution of the Republic of Bulgaria, published SG No. 56 of 13 July 1991, in force as of 13 July 199, as last amended SG No. 12 of 6 Feb 2007 (Articles 5, 117, 129, 130, 132) |
| 2. | Code Of Civil Procedure ("Repealed CCP"), published SG No. 12 of 8 Feb 1952, repealed SG No. 59 of 20 July 2007, effective as of 1 March 2008, as last amended SG No. 73 of 26 June 1998  (Articles 9, 83, 91, 237, 303-307, 399) |
| 3. | Code of Civil Procedure ("New CCP"), published SG No. 59 of 20 July 2007, in force as of 1 March  2008, as last amended SG No. 47 of 23 June 2009 (Articles 125, 131, 140, 258, 280, 288, 404, 405 (1), (3) and (4), 519, 624) |
| 4. | Code of International Private Law ("CIPL"), published SG No. 42 of 17 May 2005, as amended SG No. 59 of 20 Jul 2007 and SG No.  47 of 23 June 2009 (Articles 12, 13, 19, 23, 117-122) |
| 5. | International Commercial Arbitration Act ("ICAA"), published SG No. 60 of 5 August 1988, as last amended SG No. 59 of 20 July 2007 (Article 51) |
| 6. | Judicial System Act, published SG No. 64 of 7 August 2007, as amended SG No. 42 of 5 June 2009 (Articles 3, 16, 17, 30, 31, 165, 209) |
| 7. | Obligations and Contracts Act, published SG No. 275 of 22 November 1950, as last amended SG No. 50 of 30 May 2008 (Article 20) |
| 8. | Chipev, Teodor, *International Jurisdiction in Civil Litigation* 114-116 (1987) |
| 9. | Kalaidzhiev, Angel, *Law of Obligations: General Part* 100 (3rd ed. 2005) |
| 10. | Pavlova, Maria, *Civil Law: General Part* 493, 494 (2nd ed. 2002) |
| 11. | Stalev, Zhivko, *Bulgarian Civil Procedure* 728, 989-992, 997, 1011-1012 (8th ed. 2004) |
| 12. | Stalev, Zhivko, *Arbitration in Private Law Disputes* 131-133, 148, 153-154, 156, 159 (1997) |
| 13. | Tadzher, Vitaly, *Civil Law of the People's Republic of Bulgaria: General Part* 450, 451 (2nd ed. 2001) |

| Tab | Document |
|---|---|
| 14. | Decision No. 717 dated 27 July 2005 of the Supreme Cassation Court in civil case No. 183/2004 |
| 15. | Ruling dated 28 June 2000 in civil case No. 1279/2000 of the Supreme Cassation Court, 5th civil chamber |
| 16. | Ruling No. 641 dated 21 January 2005 in administrative case No. 10386/ 2004 of the Supreme Administrative Court, 6th chamber |
| 17. | Decision dated 21 July 2004 of Sofia Court of Appeals in case No. 2408/2003 (appeal decision in Economic and Investment Bank v. the Republic of Bulgaria) |
| 18. | Decision No. 473 dated 25 July 2005 of the Supreme Cassation Court in case No. 807/2004 (cassation appeal decision in Economic and Investment Bank v. the Republic of Bulgaria) |
| 19. | Decision dated 16 February 2008 of  Sofia City Court in commercial case No. 62/2007 (Ministry of Agriculture and Food) |
| 20. | Decision dated  31 March 2004 of the Sofia Court of Appeals in case No. 2539/2003 (National Electricity Company) |
| 21. | Decision No. 422 of 18 July 1997 in civil case No. 250/1997, Supreme Cassation Court (Bulgarian Sport Tote) |
| | **International and EU Legal Authorities** |
| 22. | United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Done at New York, 10 June 1958) |
| 23. | Convention on the Execution of Foreign Arbitral Awards (Done at Geneva, 26 Sept. 1927) |
| 24. | Inter-American Convention on International Commercial Arbitration (Done at Panama City, 30 Jan. 1975) |
| 25. | Convention on the Settlement of Investment Disputes between States and Nationals of Other States (Done at Washington, in force as of 14 Oct. 1966) |
| 26. | Agreement between The Government of The Republic of Bulgaria and The Government of The State of Israel for the Promotion and Reciprocal Protection of Investments (Done at Jerusalem, 6 December 1993) ("Bulgaria-Israel Agreement") |

| Tab | Document |
|-----|----------|
| 27. | *Saipem S.p.A. v. the People's Republic of Bangladesh*, ICSID Case No. ARB/05/7, Decision on Jurisdiction and Recommendation on Provisional Measures (21 Mar. 2007) |
| 28. | *Saipem S.p.A. v. the People's Republic of Bangladesh*, ICSID Case No. ARB/05/7, Award (30 June 1999) |
| 29. | *Robert Azinian and others v. United Mexican States*, ICSID Case No. ARB(AF)/97/2, Award (1 Nov. 1999) |
| 30. | Report on the Application of the Regulation 'Brussels I' in the Member States dated Sept. 2007 ("Heidelberg Report") (excerpts) |
| 31. | Council Regulation (EC) No 44/2001 of 22 December 2000 on jurisdiction and the recognition of judgments in civil and commercial matters |
| 32. | Convention on Choice of Court Agreements (Concluded 30 June 2005) |
| 33. | Regulation (EC) No 805/2004 of the European Parliament and of the Council of 21 April 2004 creating a European Enforcement Order for uncontested claims |
| 34. | Regulation (EC) No 861/2007 of the European Parliament and of the Council of 11 July 2007 establishing a European Small Claims Procedure |
| 35. | Peter Mankowski and Ulrich Magnus eds., Brussels I Regulation 545 (2007) (excerpt) |
| 36. | European Council in Copenhagen, 21-22 June 1993, Conclusions of the Presidency |
| 37. | Madrid European Council, 15-16 Dec. 1995, Presidency Conclusions |
| 38. | Report from the Commission to the European Parliament and the Council on Progress in Bulgaria under the Co-operation and Verification Mechanism (Done at Brussels, 23 July 2008) |
| 39. | European Convention for the Protection of Human Rights and Fundamental Freedoms (Done at Rome, 4 Nov. 1950) and Protocol No. 1 (Done at Paris, 20 Mar. 1952) |
| 40. | *Case of Stran Greek Refineries and Stratis Andreadis v. Greece*, ECHR Case No. 22/1993/417/496, Judgment (9 Dec. 1994) |
| 41. | *Golder v. the United Kingdom*, Application No. 4451/70, Judgment (21 Feb. 1975) |

| Tab | Document |
|---|---|
| 42. | *Case of Regent Company v. Ukraine*, Application No. 773/03, Judgment (3 Apr. 2008) |
| | **Other Documents** |
| 43. | Privatization Agreement dated 30 June 1999 between the Privatization Agency of the Republic of Bulgaria and Zeevi Holdings Ltd. and Knafaim-Arkia Holdings Ltd. |
| 44. | The Merriam-Webster Online Dictionary definition of "to execute" and "execution" |
| 45. | English-Bulgarian Dictionary 526, 554-555 (Millennium ed., Geberoff, Sofia, 2000) |
| 46. | Bulgarian monolingual dictionary 311 (4th ed., Science and Art, Sofia, 2003) |