# UNCITRAL ARBITRATION CASE UNC 39/DK

## ARBITRATION IN ACCORDANCE WITH THE ARBITRATION RULES OF THE UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

ZEEVI HOLDINGS

v.

1. THE REPUBLIC OF BULGARIA

2. THE PRIVATIZATION AGENCY OF BULGARIA

# FINAL AWARD

OF 25 OCTOBER 2006

BY THE ARBITRAL TRIBUNAL:
**Adv. Avner Yarkoni (Co-Arbitrator)**
**Prof. Silvy Chernev (Co-Arbitrator)**
**Prof. Karl-Heinz Böckstiegel (Chairman )**

## <u>Table of Contents</u>

Table of Contents _____ 2

Abbreviations _____ 12

**A. The Parties** _____ 16

  A.I.   The Claimant _____ 16

  A.II.  The Respondents _____ 16

    1.  Respondent No. 1 _____ 16

    2.  Respondent No. 2 _____ 17

**B. The Arbitral Tribunal** _____ 18

**C. Short Identification of the Case** _____ 19

  C.I.   Perspective of Claimant _____ 19

  C.II.  Perspective of Respondent No. 1 _____ 23

  C.III. Perspective of Respondent No. 2 _____ 24

**D. Procedural History** _____ 31

**E. Relief Sought by the Parties** _____ 64

  E.I.   Relief Sought by Claimant _____ 64

    1.  According to Claimant's Statement of Claim of 2 February 2001 _____ 64

    2.  According to Claimant's Brief Regarding Relief Sought of 29 May 2003 _ 65

    3.  According to Claimant's Response Brief of 13 May 2004 _____ 70

    4.  According to Claimant's Post-Hearing Brief dated 8 October 2004 _____ 71

    5.  According to Claimant's Post-Hearing Response Brief of 12 November 2004 _____ 71

    6.  According to Claimant's Brief Regarding the Admissibility of the Republic's Counterclaims of 12 November 2004 _____ 72

    7.  According to Claimant's 1st and 2nd Post Hearing Brief of 12 and 31 October 2005 _____ 72

  E.II.  Relief Sought by Respondents _____ 75

    1.  According to Respondent's Statement of Defense of 8 February 2002 __ 75

    2.  Relief Sought in the present procedure on liability _____ 76

      a.  Relief sought by the Republic of Bulgaria _____ 76

        *(1)  According to Republic of Bulgaria's Brief of 21 June 2004* _____ 76

        *(2)  According to the Republic of Bulgaria's Brief on the "Real Counterclaims" dated 17 September 2004* _____ 78

     (3) *According to the Republic of Bulgaria's Post Hearing Brief dated 8 October 2004* _____ 78

     (4) *According to the Republic's Second Post-Hearing Brief dated 12 November 2004* _____ 79

     (5) *According to The Republic's Memorial on Counterclaims dated 27 May 2005* _____ 80

     (6) *According to The Republic's First Post-hearing brief on Quantum dated 31 October 2005* _____ 80

    b.   Relief Sought by the Privatization Agency _____ 81

     (1) *According to Privatization Agency's Brief of 21 June 2004* _____ 81

     (2) *According to the Privatization Agency's Post-Hearing Brief of 8 October 2004* _____ 83

     (3) *According to the Privatization Agency's Second Post-Hearing Brief dated 12 November 2004* _____ 84

     (4) *According to the Privatization Agency's Second Round Post-Hearing Brief of 31 October 2005* _____ 86

  E.III.   The Tribunal _____ 87

**F.**   **General Considerations of the Tribunal** _____ 88

  F.I.   Applicable Substantive Law _____ 88

    1.   Contentions by Respondent No. 1 _____ 88

    2.   Contentions by Respondent No. 2 _____ 89

    3.   Contentions by Claimant _____ 89

    4.   The Tribunal _____ 89

  F.II.   Procedural Issues _____ 90

**G.**   **Liability under the claims raised by Claimant** _____ 92

  G.I.   Legal Grounds and Principles regarding Liability and Compensation _____ 92

    1.   Summary of Contentions by Claimant _____ 92

     a.   Indemnity Clauses contained in the PA _____ 92

     b.   Bulgarian Law _____ 93

    2.   Summary of Contentions by Respondent No. 2 _____ 94

     a.   Indemnity Clauses contained in the PA _____ 94

     b.   Bulgarian Law _____ 95

      (1) *Pre-Contractual Liability* _____ 96

      (2) *Contractual Liability* _____ 98

     c.   Application of European Contract Law _____ 99

     d.   Agency _____ 99

e.   Nature of the claims and arbitrability _____ 99

3.   Summary of Contentions by Respondent No. 1 _____ 101

4.   The Tribunal _____ 101

G.II.   Due diligence and financial condition of BBA prior to its sale _____ 105

1.   Summary of Contentions by Claimant _____ 105

a.   The Claimant did NOT examine the Information Room._____ 107

b.   The Agreement Does Not Provide that the Information Room Would Qualify the Information Documents _____ 108

c.   The Claimant could legitimately rely on the Information Documents__ 110

d.   The Respondents Have Not Shown that the Information Room Contained any Relevant Information _____ 111

2.   Summary of Contentions by Respondent No. 2 _____ 112

3.   Summary of Contentions by Respondent No. 1 _____ 114

4.   The Tribunal _____ 116

G.III.   The Relief Sought by Claimant under Alternative I _____ 119

1.   The National Carrier Status _____ 119

a.   Summary of Contentions by Claimant _____ 119

b.   Summary of Contentions by Respondent No. 1 _____ 126

c.   Summary of Contentions by Respondent No. 2 _____ 127

d.   The Tribunal _____ 130

2.   The Equant Shares _____ 132

a.   Summary of Contentions by Claimant _____ 132

b.   Summary of Contentions by Respondent No. 1 _____ 136

c.   Summary of Contentions by Respondent No. 2 _____ 138

d.   The Tribunal _____ 139

3.   Company not being subsidized or financially supported _____ 141

a.   Summary of Contentions by Claimant _____ 141

b.   Summary of Contentions by Respondent No. 1 _____ 144

c.   Summary of Contentions by Respondent No. 2 _____ 144

d.   The Tribunal _____ 146

4.   Ansett Aircraft Maintenance Liabilities _____ 147

a.   Summary of Contentions by Claimant _____ 147

b.   Summary of Contentions by Respondent No. 1 _____ 153

c.   Summary of Contentions by Respondent No. 2 _____ 154

      d.   The Tribunal _____ 155

5.   Liabilities in respect of Provisions for Employees _____ 157
      a.   Summary of Contentions by Claimant _____ 157
      b.   Summary of Contentions by Respondent No. 1 _____ 160
      c.   Contentions of Respondent No. 2 _____ 161
      d.   The Tribunal _____ 163

6.   Debt of the Government of Bulgaria due in respect of Training of Pilots _ 165
      a.   Summary of Contentions by Claimant _____ 165
      b.   Summary of Contentions by Respondent No. 1 _____ 166
      c.   Summary of Contentions by Respondent No. 2 _____ 166
      d.   The Tribunal _____ 167

7.   Change of Government Policies towards BBA _____ 169
      a.   Summary of Contentions by Claimant _____ 169
      b.   Summary of Contentions by Respondent No. 2 _____ 171
      c.   The Tribunal _____ 172

8.   New Debt of BBA to ATC _____ 173
      a.   Summary of Contentions by Claimant _____ 173
      b.   Summary of Contentions by Respondent No. 1 _____ 175
      c.   Summary of Contentions by Respondent No. 2 _____ 175
      d.   The Tribunal _____ 176

9.   Transfer of Real Estate Assets _____ 178
      a.   Summary of Contentions by Claimant _____ 178
      b.   Summary of Contentions by Respondent No. 1 _____ 178
      c.   Summary of Contentions by Respondent No. 2 _____ 179
      d.   The Tribunal _____ 179

10.  Debt of the Yugoslavian Railway Company _____ 180
      a.   Summary of Contentions by Claimant _____ 180
      b.   Summary of Contentions by Respondent No. 1 _____ 181
      c.   Summary of Contentions by Respondent No. 2 _____ 182
      d.   The Tribunal _____ 183

11.  Assistance with respect to Excess Debts _____ 184
      a.   Summary of Contentions by Claimant _____ 184
      b.   Summary of Contentions by Respondent No. 2 _____ 185
      c.   The Tribunal _____ 185

12. Compensation for Loss of the Value of the Company ____ 186
a. Summary of Contentions by Claimant ____ 186
b. Summary of Contentions by Respondent No. 1 ____ 188
c. Summary of Contentions by Respondent No. 2 ____ 190
d. The Tribunal ____ 191
13. Conclusion on Claimant's Alternative 1 ____ 192
G.IV. The Relief Sought by Claimant under Alternative 2 ____ 192
G.V. The Relief Sought by Claimant under Alternative 3 ____ 193
G.VI. Investments made by Claimant ____ 194
G.VII. Claimant's right to compensation ____ 194
1. Summary of Contentions by Claimant ____ 194
2. Summary of Contentions by Respondent No. 1 ____ 195
3. Summary of Contentions by Respondent No. 2 ____ 197
4. The Tribunal ____ 197
H. Liability under the Counterclaims raised by Respondent No. 1 ____ 200
H.1. The Reasons for the Republic's Counterclaim ____ 200
1. Summary of Contentions by Respondent No. 1 ____ 200
a. Zeevi and Knafaim-Arkia were selected because of their intention to invest in Balkan Airlines ____ 200
b. Zeevi's Failure to Invest ____ 202
c. Zeevi Diverted Balkan Airlines Revenues ____ 202
d. Claimant appropriated Balkan Airlines' assets ____ 204
e. Claimant's explanation of its asset-stripping is not credible ____ 204
f. Claimant caused Balkan to cease operations ____ 205
g. Claimant abandoned Balkan Airlines on 13 February 2001 ____ 205
h. The Bankruptcy Proceedings ____ 205
i. Bulgaria Air was designated as NC following the formal liquidation of Balkan Airlines ____ 206
2. Summary of Contentions by Claimant ____ 206
3. The Tribunal ____ 208
H.II Zeevi breached Article 7 of the PA ____ 211
1. Summary of contentions by Respondent No. 1 ____ 211
2. Summary of contentions by Claimant ____ 211
3. The Tribunal ____ 215

H.III. Zeevi breached the Investment Commitments in Article 8 of the PA _____ 217

  1. Parties' contentions in connection with the claims raised by Claimant ___ 217

    a. Summary of Contentions by Claimant _____ 217

    b. Summary of Contentions by Respondent No. 2 _____ 218

    c. Summary of Contentions by Respondent No. 1 _____ 219

  2. Contentions of the Parties in connection with the Counterclaims _____ 223

    a. Summary of Contentions by Respondent No. 1 _____ 223

    b. Summary of contentions by Claimant _____ 224

  3. The Tribunal _____ 229

    a. The Duty to Provide Funds as Investment. _____ 230

    b. The Duty not to Withdraw Investments. _____ 231

H.IV. Zeevi breached Article 7.9.1 of the PA _____ 235

  1. Summary of Contentions by Respondent No. 1 _____ 235

  2. Summary of contentions by Claimant _____ 236

    a. The Equant Shares _____ 236

    b. Sale of Balkan's Real Estate _____ 239

  3. The Tribunal _____ 240

H.V. Claimant breached its duty of good faith _____ 242

  1. Summary of Contentions by Respondent No. 1 _____ 242

  2. Summary of Contentions by Claimant _____ 243

  3. The Tribunal _____ 250

H.VI. Balkan Airlines collapsed in 2001 as a result of Zeevi's mismanagement of the Airline _____ 251

  1. Summary of Contentions by Respondent No. 1 _____ 251

  2. Summary of contentions by Claimant _____ 252

  3. The Tribunal _____ 254

H.VII. Deduction and Extinguishing Factors _____ 255

  1. Summary of Contentions by Respondent No. 1 _____ 255

    a. Set-off against counterclaim _____ 255

      (1) *Claimant Breached Article 7 of the PA* _____ 256

      (2) *Claimant breached Article 8 of the PA* _____ 257

      (3) *Claimant breached Article 7.9.1 of the PA* _____ 258

      (4) *Claimant breached its Duty of Good Faith* _____ 259

    b. Unjust enrichment _____ 259

    c.    Contributory negligence and failure to mitigate damages     260
    d.    Amounts received by Claimant through "consultancy agreements"     260
  2.    Contentions of Respondent No. 2     261
  3.    Summary of Contentions by Claimant     261
    a.    Investments by way of secured loans     261
    b.    Claim in bankruptcy proceedings     261
    c.    Transfer of the airline's assets     262
    d.    Mitigation of damages     262
    e.    Claimant's motives     262
    f.    Contributory Negligence     263
  4.    The Tribunal     263

**I.    Causation of Damages and Quantum for accepted Claims     265**
  I.I.    NCS     265
    1.    Summary of contention by Claimant     265
    2.    Summary of Contentions by Respondent No. 1     265
    3.    Summary of Contentions by Respondent No. 2     267
    4.    The Tribunal     267
  I.II.    The Equant Shares     269
    1.    Summary of Contentions by Claimant     269
    2.    Summary of Contentions by Respondent No. 1     269
    3.    Summary of Contentions by Respondent No. 2     270
    4.    The Tribunal     271
  I.III.    Subsidies of Aviation Fees     273
    1.    Summary of Contentions by Claimant     273
    2.    Summary of Contentions by Respondent No. 1     273
    3.    Summary of Contentions by Respondent No. 2     273
    4.    The Tribunal     274
  I.IV.    Ansett Aircraft Maintenance Fees     275
    1.    Summary of Contentions by Claimant     275
    2.    Summary of Contentions by Respondent No. 1     275
    3.    Summary of Contentions by Respondent No. 2     275
    4.    The Tribunal     276
  I.V.    Debt Owed to Employees     276
    1.    Summary of Contentions by Claimant     276

|   |   |   |
|---|---|---|
| 2. | Summary of Contentions by Respondent No. 1 | 277 |
| 3. | Summary of Contentions by Respondent No. 2 | 277 |
| 4. | The Tribunal | 278 |
| I.VI. | Debt Due for Training of Pilots | 279 |
| 1. | Summary of Contentions by Claimant | 279 |
| 2. | Summary of Contentions by Respondent No. 1 | 279 |
| 3. | Summary of Contentions by Respondent No. 2 | 280 |
| 4. | The Tribunal | 280 |
| I.VII. | Change of Government Policies | 281 |
| 1 | Summary of Contentions by Claimant | 281 |
| 2. | Summary of Contentions by Respondent No. 1 | 281 |
| 3. | Summary of Contentions by Respondent No. 2 | 281 |
| 4. | The Tribunal | 281 |
| I.VIII. | Debt Owed to ATC | 282 |
| 1. | Summary of Contentions by Claimant | 282 |
| 2. | Summary of Contentions by Respondent No. 1 | 282 |
| 3. | Summary of Contentions by Respondent No. 2 | 282 |
| 4. | The Tribunal | 282 |
| I.IX. | Transfer of Real Estate | 283 |
| 1. | Summary of Contentions by Claimant | 283 |
| 2. | Summary of Contentions by Respondent No. 1 | 283 |
| 3. | Summary of Contentions by Respondent No. 2 | 283 |
| 4. | The Tribunal | 284 |
| I.X. | Debt to Yugoslavian Railway Company | 284 |
| 1. | Summary of Contentions by Claimant | 284 |
| 2. | Summary of Contentions by Respondent No. 1 | 284 |
| 3. | Summary of Contentions by Respondent No. 2 | 284 |
| 4. | The Tribunal | 285 |
| I.XI. | Summarizing the Quantification of Damages and Losses due to Claimant | 285 |
| 1. | Liability according to the PA | 285 |
| a. | Summary of Contentions by Claimant | 285 |
| b. | Summary of Contentions by Respondent No. 1 | 287 |
| (1) | Claimant's claim for damages in excess of its alleged investments in Balkan is Hopeless | 288 |

    (2) *The supposed direct value of the alleged misrepresentations does not represent loss to Claimant* _____ 289

    (3) *Claimant's Illusory „Price Tags"* _____ 289

  c. Summary of Contentions by Respondent No. 2 _____ 290

  d. The Tribunal _____ 292

2. Damages or Restitution of Amounts Transferred by Claimant in Connection with the PA and Rescission of the PA _____ 294

  a. Summary of Contentions by Claimant _____ 294

  b. Summary of Contentions by Respondent No. 1 _____ 297

  c. Summary of Contentions by Respondent No. 2 _____ 298

  d. The Tribunal _____ 300

3. Liability according to the OCA _____ 304

  a. Summary of Contentions by Claimant _____ 304

  b. Summary of Contentions by Respondent No. 2 _____ 304

  c. The Tribunal _____ 307

4. Liability according to the European Principles of Contract Law _____ 307

  a. Summary of Contentions by Claimant _____ 307

  b. Summary of Contentions by Respondent No. 2 _____ 307

  c. The Tribunal _____ 308

5. Liability due to breach of warranties _____ 309

  a. Summary of Contentions by Claimant _____ 309

  b. Summary of Contentions by Respondent No. 2 _____ 309

  c. The Tribunal _____ 309

6. Liability due to fraud _____ 310

  a. Summary of Contentions by Claimant _____ 310

  b. Summary of Contentions by Respondent No. 2 _____ 310

  c. The Tribunal _____ 311

7. Damages as a Result of the Collapse of the Company _____ 311

  a. Summary of Contentions by Claimant _____ 311

  b. Summary of Contentions by Respondent No. 1 _____ 314

  c. Summary of Contentions by Respondent No. 2 _____ 315

  d. The Tribunal _____ 316

8. Additional Damages in Respect to Increase in Financing Costs, Failure of Public Offering, Failure of Public Offering of Zeevi Logistics and Damages to Reputation and Goodwill _____ 318

    a.    Summary of Contentions by Claimant _____ 318

    b.    Summary of Contentions by Respondent No. 1 _____ 319

    c.    Summary of Contentions by Respondent No. 2 _____ 319

    d.    The Tribunal _____ 320

  9.    Burden of Proof _____ 321

    a.    Summary of Contentions by Claimant _____ 321

    b.    Summary of Contentions by Respondent No. 2 _____ 321

      (1)  *General Comments on Claimant's Quantification Brief* __ 321

      (2)  *No Duty for Compensation for Missing Assets and Additional Liabilities* _____ 323

    c.    The Tribunal _____ 324

  10.   Total of Claimant's Damage Claim Accepted by the Tribunal _____ 325

**J.**   **Quantum for accepted Counterclaims** _____ 327

**K.**   **Final Conclusions on Claims and Counterclaims** _____ 328

**L.**   **Interest** _____ 329

  **L.I.**   Summary of Contentions by Claimant _____ 329

  **L.II.**  The Tribunal _____ 329

**M.**  **Cost of Arbitration** _____ 330

**N.**  **Decisions** _____ 332

## **Abbreviations**

| | |
|---|---|
| Arkia | Arkia Israeli Airlines |
| ASA | Air Service Agreement |
| ATC | Air Traffic Control |
| Balkan Airlines | Balkan Airlines EAD |
| Balkan Holdings | Balkan Airlines Holdings B.V. an affiliate of the Zeevi Group |
| BBA | Bulgarian Balkan Airlines |
| BDZ | Bulgarian State Railways |
| C I | Claimant's Brief of 9 February 2004 |
| C II | Claimant's Brief of 13 May 2004 |
| C III | Claimant's letter of 1 July 2004 |
| C III a | Claimant's Brief of 23 July 2004 |
| C IV | Claimant's 1st Post Hearing Brief of 8 October 2004 |
| C V | Claimant's Post Hearing Response Brief of 12 November 2004 |
| C VI | Claimant's Brief Regarding the Admissibility of the Republic's Real Counterclaims of 12 November 2004 |
| C VII | Claimant's Brief on the Quantum of its Claims of 27 May 2005 |
| C VIII | Claimant's Further Brief in Reply to the Republic's Counterclaims of Set-Off of 27 May 2005 |
| C IX | Claimant's Brief in Response of the Republic's Quantification Brief of 15 July 2005 |
| C X | Claimant's Post Hearing Brief Regarding Quantification and Counter Set-Off Claims of 12 October 2005 |

| | |
|---|---|
| C XI | Claimant's Post Hearing Brief Regarding Quantification and Counter Set-Off Claims of 31 October 2005 |
| C-1 *et seq.* | Claimant's Exhibit |
| C-RS | Claimant's Brief Regarding Relief Sought of 29 May 2003 |
| C-SoC | Claimant's Statement of Claim of 2 February 2001 |
| Disclosure Letter | Information disclosure letter prepared by the Privatization Agency attached as Appendix 1 to the Privatization Contract |
| Equant | Equant N.V. |
| et seq. | and following |
| Financial Analysis | KPMG financial analysis of BBA dated 15 April 1999 |
| ICAO | International Civil Aviation Authority of the United Nations |
| IAI | Israel Aircraft Industries Ltd. |
| IAS | International Accounting Standards |
| Information Memorandum | KPMG information memorandum regarding BBA of 5 March 1999 |
| IPO | Initial Public Offering |
| Knafaim-Arkia | Knafaim-Arkia Holdings Ltd.; DOV Airport, P.O.B. 39301, Tel Aviv 61392, Israel |
| Law on Financial Recovery | Bulgarian Law on the Financial Recovery of State-Owned Enterprises of August 1996 |
| Morgan Stanley | Morgan Stanley Capital Partners |
| NC | National Carrier |
| NCS | National Carrier Status |
| OCA | Bulgarian Obligations and Contracts Act |
| p. | Page |
| PA | Privatisation Agreement |

| | |
|---|---|
| para. | Paragraph |
| paras | Paragraphs |
| pp. | Pages |
| Privatization Agreement | Agreement of 30 June 1999 as amended on 15 July 1999 for the sale of 75 per cent of the shares of Balkan Bulgarian Airlines to Zeevi Holdings Ltd. and Knaifaim-Arkia Holdings Ltd., see also: *PA* |
| Privatization Law | Bulgarian Law on the Transformation and Privatization of State-Owned and Municipal-Owned Enterprises of 1992 |
| PwC | PricewaterhouseCoopers |
| R I | Respondent's Brief of 13 April 2004 |
| R II B | Republic of Bulgaria's Brief of 21 June 2004 |
| R III B | Republic of Bulgaria's 1st Post Hearing Brief of 8 October 2004 |
| R IV B | Republic of Bulgaria's Counterclaims of 17 September 2004 |
| R V B | Republic of Bulgaria's 2nd Post-Hearing Brief of 12 November 2004 |
| R VI B | Republic of Bulgaria's Memorial On Counterclaims of 27 May 2005 |
| R VII B | Republic of Bulgaria's Reply Brief of 15 July 2005 |
| R VIII B | Republic of Bulgaria's 1st Post-hearing Brief on Quantum of 12 October 2005 |
| R IX B | Republic of Bulgaria's 2nd Post-hearing Brief on Quantum of 31 October 2005 |
| R II PA | Privatization Agency's Brief of 21 June 2004 |
| R III PA | Privatization Agency's 1st Post Hearing Brief of 8 October 2004 |
| R IV PA | Privatization Agency's 2nd Post Hearing Brief of 12 November 2004 |

| | |
|---|---|
| R V PA | Privatization Agency's Reply Brief on the Quantum of the Claims of 15 July 2005 |
| R VI PA | Privatization Agency's 1st Post-Hearing Brief of 12 October 2005 |
| R VII PA | Privatization Agency's 2nd Post-Hearing Brief of 31 October 2005 |
| R-1 *et seq.* | Respondents' Exhibit |
| R-SoD | Respondent's Statement of Defense of 8 February 2002 |
| seq. | following |
| SITA | Société Internationale de Télécommunications Aéronautiques |
| the Agreement | Privatization Agreement (*see supra*) |
| the Airline | Balkan Bulgarian Airlines |
| TPSMEA | The Transformation and Privatization of State-owned and Municipal-owned Enterprises Act |
| YRC | Yugoslavian Railway Company |
| ZBI | ZBI AD an affiliate of the Zeevi Group |

## A.    The Parties

## A.I.   The Claimant

Zeevi Holdings Ltd.
11 Gush Etzion Street
GIVAT SHMUEL 54030
ISRAEL

*Represented by:*

Dr. Yaakov Neeman
Mr. David Zailer
Mr. Efri Berkovich
HERZOG, FOX & NEEMAN
Asia House
4 Weizmann St.
64239 TEL-AVIV
ISRAEL

Claimant introduces itself as, verbatim, "a member of the Zeevi Group of
Companies comprised of some 100 companies. It operates across five
continents and employs thousands of employees. The Group is active in the
areas of energy, real estate, medical equipment, information technology,
telecommunications and more. In 1999 its total revenues exceeded USD 3.5
billion" (C-SoC, para. 2.1).

## A.II.  The Respondents

### 1.     Respondent No. 1

The Republic of Bulgaria

*Represented by:*

Jan Paulsson, Esq.
Constantine Partasides, Esq.
Georgios Petrochilos, Esq.
FRESHFIELDS BRUCKHAUS DERINGER
2-4 rue Paul Cézanne
75375 PARIS Cedex 8
FRANCE

## 2.     Respondent No. 2

The Privatization Agency of the Republic of Bulgaria
29 Aksakov Street
1000 SOFIA
BULGARIA

*Represented by:*

Ivaylo Dermendjiev, Esq.
SIMEONOV & DERMENDJIEV
3, Pozitano Str., 2nd Floor
1000 SOFIA
BULGARIA

The Privatization Agency describes itself as a "legally separate from the Government of Republic of Bulgaria state agency established under the Provisions of The Transformation and Privatization of State-owned and Municipal-owned Enterprises Act (TPSMEA)" (R-SoD, para. 1.3.1.).

## B.    The Arbitral Tribunal

By ICC letter of 6 November 2001 the parties were informed that the International Court of Arbitration had confirmed the appointment of the Chairman of the Tribunal:

> Prof. Dr. Karl-Heinz Böckstiegel
> Parkstr. 38
> 51427 BERGISCH GLADBACH
> GERMANY

At first, Claimant appointed as Co-Arbitrator:

> Joseph Ciechanover, Esq.
> 20 Lincoln Street
> TEL AVIV 67134
> ISRAEL

Claimant communicated a notice of change of the Co-Arbitrator by letter of 6 April 2001 (see C III, p. 3) and appointed as Co-Arbitrator:

> Prof. David Libai
> Arnor Mishpar Building
> 8 Shaul Hemelech Boulevard
> TEL AVIV 64733
> ISRAEL

Mr. Libai resigned on 1 July 2004 (see letter by the Chairman of 1 July 2004).

As communicated by Claimant's letter of 1 July 2004 Claimant appointed as Co-Arbitrator:

> Adv. Avner Yarkoni
> 13, Balfour Street
> TEL AVIV 65211
> ISRAEL

Respondent appointed as Co-Arbitrator:

> Silvy Chernev, Esq.
> Chernev, Komitova & Partners
> 51 Parensov Street
> 1000 SOFIA
> BULGARIA

## C.    Short Identification of the Case

1.    A short identification of the case from the perspectives of the Parties seems best be possible by citing the Parties' own wording.

## C.I.    Perspective of Claimant

2.    In its Brief of 9 February 2004 Claimant outlines the case as follows (C I, Chapter 1, Section B):

> „5. As has been more fully outlined in the Statement of Claim, these arbitration proceedings deal with the purchase of 75% of the share capital of Bulgaria's national airline, Balkan Bulgarian Airlines (the **"Company"** or **"Balkan"**) by Zeevi Holdings together with Knafaim-Arkia Holdings Ltd. (the **"Buyers"**) from the Republic of Bulgaria. The transaction was effected through an agreement dated 30th June 1999 as amended on 15th July 1999 (the **"Privatization Agreement"** or the **"Agreement"**).
>
> A copy of the Agreement, as amended with English translations of its relevant appendices is attached as **_Exhibit "C/35"_**.
>
> 6. Within the scope of the transaction, Zeevi Holdings directly invested an amount of **USD 23,150,000** in the Company. In addition, Zeevi Holdings made indirect investments in the Company which together with accumulated interest bring the total of its investments in or on behalf of the Company to approximately **USD 30,000,000**.
>
> 7.  [...]
>
> 8. Clearly, an investment of such enormous amounts in a company, situated in a foreign country, demonstrates a very high degree of goodwill on behalf of the investor and confidence in that country's integrity and regime of government and law. If it is subsequently found that the investment was lost due to **incorrect, misleading and fraudulent** information provided by that country, it must own up to its responsibility accordingly.
>
> 9. The state of the Company prior to its sale to Zeevi Holdings, was by no means good. This fact was known to Zeevi Holdings. However, the Company was presented as having two most

valuable assets – its status as Bulgarian's *exclusive national carrier* and holdings of certificates of *SITA (or Equant)* shares.

10. *The national carrier status* - The national carrier status allows an airliner to operate international scheduled routes; to fly and land at various airports around the world; to fly over various countries en route to other destinations; to enjoy precious landings slots at various airports around the world, etc. The national carrier status had also meant that the Company was enjoying various rights and benefits commonly associated with this status, such as reduced aviation fees payable to various governmental authorities; rights to provide various services at the home airports (refueling, catering), etc.

Zeevi Holdings would *not* have purchased and subsequently invested in the Company given its problematic financial situation, were it not for its position as Bulgaria's national carrier and the important benefits and advantages associated with this. For this reason, and at Zeevi Holdings' specific request, the Bulgarian Government undertook in the Agreement that the status of the Company as *exclusive national carrier* will be maintained for a period of 12 years after the privatization and that this status will *not* be adversely affected by the sale of the Company to Zeevi Holdings.

11. *The SITA shares certificates* - In addition to its status as Bulgaria's national carrier, the Company was presented as holding certificates of Equant N.V shares known as the *SITA shares*. These shares were valued in the KPMG Financial Analyses presented to Zeevi Holdings as being worth *over USD 35,000,000 (see page 37 of the KPMG Financial Analyses).* This was a crucial representation regarding the sources available for the recovery of the Company, which was fundamental to Zeevi Holdings' decision to purchase the Company and subsequently invest in it substantial amounts.

12. *[...]*

13. The negotiations leading to the Agreement were conducted with representatives of the Republic of Bulgaria. These representatives carefully cultivated a spirit of goodwill and honesty throughout the entire process. It was thus inconceivable to Zeevi Holdings that the Government of Bulgaria would not perform obligations it had undertaken in the Agreement, or that any information represented by it regarding the state of the Company could be anything other than *absolutely true and correct.* Similarly, it was inconceivable that the Bulgarian

Government would **immediately**, after the sale of the Company, begin to take various rights and benefits away from the Company, which the Company had enjoyed for years prior to its privatization. These were rights, which were worth millions of dollars to the Company. No disclosure of any of this was made to Zeevi Holdings during the negotiations. On the contrary: the Bulgarian Government represented that it intended to collaborate in future with Zeevi Holdings in the efforts to facilitate the recovery of Balkan – Bulgaria's national flag carrier. [...]

14. The negotiations regarding the sale of the Company to Zeevi Holdings lasted no more than a little over a month. This was a result of a deadline set by the Bulgarian party, which claimed that due to Bulgarian legislation, no sale could occur after 30th June 1999. In view of the Company's vast operation, it was impossible, under such conditions, for Zeevi Holdings to conduct an extensive due-diligence investigation into the state of Company.

15. Given the Company's problematic financial condition, the only way by which the transaction could be carried forward, was to rely entirely on the integrity of the information supplied by the Respondents regarding the state of the Company. As far as Zeevi Holdings was concerned, this information was contained in the Financial Analyses prepared by KPMG, which was handed to it by the Respondents (the **"KPMG Financial Analyses"**); and the Disclosure Letter, which formed part of the Agreement (the **"Disclosure Letter"**) (collectively the **"Information"** or the **"Information Documents"**). [...]

16. [...]

17. [...]

18. Hence, specific and unequivocal representations were made in the Agreement, that the Information supplied to Zeevi Holdings, regarding the state of the Company, was **"exhaustive"**, **"true"**, **"accurate"**, **"complete"** and **"not misleading"**.

19. As detailed in David's Golan Witness Statement, these representations were not included in the Agreement inadvertently. They were **extensively** negotiated between the parties, with the **clear and deliberate intention of both parties**, that they would allow Zeevi Holdings to enter the Agreement, based solely on the Information provided to it by the Bulgarian

Government, and without conducting an independent due diligence investigation. This also clearly emerges from a comparison between the first draft of the agreement, which Zeevi Holdings was presented with by the Respondents (the "**First Draft**"), and the final version of the Agreement which had subsequently been signed (<u>Exhibit "C/35"</u>). [...]

As appears from this comparison, various vital provisions were inserted into the Agreement during the negotiations regarding, inter-alia, the true and accurate nature of the Information supplied; the lack of adverse change in the Company's financial position since 31st December 1998; the implicit imposition of contractual liability on the Seller if any Information is found to be incorrect; and the deletion of *all* references to the Information Room, as constituting a valid representation of whatsoever nature toward Zeevi Holdings.

20. An examination of Zeevi Holdings' internal documents reveals that Zeevi Holdings had indeed relied solely on the Information provided by the Bulgarian Government. Reference is made in this respect to Zeevi Holdings board resolution approving purchase of the Company pursuant to the Agreement dated 29th June 1999. The resolution stated on the agenda: "**The details of the agreement were presented together with a due diligence examination prepared by KPMG...**". It is clear that the board *relied* on the KPMG Financial Analyses in deciding to approve the transaction. Similarly reference is made to a letter of Zeevi Holdings to Mrs. Liora Meridor of the "First International Bank In Israel" dated 30th June 1999 in which Zeevi Holdings described to the Bank its obligations pursuant to the Agreement. The end of the letter indicates that the KPMG Financial Analyses was forwarded to the bank. Thus, it is clear that Zeevi Holdings had no other sources of information regarding the Company but for the Information provided to it by the Seller. [...]

21. [...]

22. [...]

23. [...]

24. Once it became clear that the Government of Bulgaria had no intention to fulfill its obligations pursuant to the Agreement, and after approximately **USD 30,000,000** had already been invested in the Company, Zeevi Holdings could not afford to continue to invest funds in the Company.

25. *With the lack of additional investments, the Company faced a severe cash-flow problem, and was forced to enter into bankruptcy proceedings, which were initiated in mid - February 2001. Consequently, Zeevi Holdings' total direct investments in the Company, reaching approximately **USD 30,000,000** were lost.*

26. *[...]"*

## C.II. Perspective of Respondent No. 1

3.      In its Brief of 21 June 2004 the Republic of Bulgaria identifies the case as follows (R II B, paras 2 – 7):

"2. *This dispute arises under an agreement dated 30 June 1999 (the **Privatization Agreement**, as amended), by which Zeevi Holdings Limited (**Zeevi**) purchased Balkan Airlines EAD (**Balkan Airlines**), Bulgaria's insolvent national carrier. Although the purchase price was set at the nominal amount of USD 150,000, Zeevi undertook to invest over USD 100 million in the airline to ensure its survival and future development. Instead of making this investment, however, by March 2001 Zeevi had appropriated Balkan Airlines' principal assets, halted all of its operations and allowed it to fall into bankruptcy. Thus, within approximately 18 months of Zeevi having taken control of Bulgaria's national carrier, Balkan Airlines had effectively disappeared.*

3. *Notwithstanding Zeevi's failure to make the investments that it had undertaken to make, Zeevi claims in these proceedings to be the victim, rather than the perpetrator, of contractual breach. Specifically, Zeevi alleges that it was fraudulently misled as to the financial condition of Balkan Airlines at the time of the acquisition, and that contrary to undertakings given by the Bulgarian government, Balkan Airlines' designation as national carrier was withdrawn following the privatization.*
4. *However, as the documentary record in these proceedings reveals, these allegations are meritless.*

5. *It is a matter of documentary record that Zeevi was expressly informed prior to the conclusion of the Privatization Agreement that: (1) Balkan Airlines' debts exceeded USD 100 million, and that it had been incurring heavy losses every year for a number of years; (2) Balkan Airlines was amongst those insolvent state-owned enterprises that were "isolated" pursuant to the Law on*

*the Financial Recovery of State-owned Enterprises; and (3) Balkan Airlines had no chance of survival following the end of its "isolation" without heavy and sustained investment. Indeed, this common knowledge was reflected in the terms of the Privatization Agreement, which provided for only a nominal purchase price, while imposing obligations on Zeevi to make investments in the company in excess of USD 100 million in the coming years. Manifestly, Zeevi was not misled about the dire financial condition of Balkan Airlines.*

*6. It is also a matter of documentary record that Balkan Airlines retained its designation as the Bulgarian national carrier until after Zeevi had caused it to halt all of its operations in February 2001, and after the airline's bankruptcy proceedings had commenced in March 2001.*

*7. In reality, Zeevi's confusing but empty allegations are little more than a subterfuge to obscure Zeevi's own straightforward breaches of the Privatization Agreement, specifically: its failure to service Balkan Airlines' debts up to USD 30 million; its failure additionally to invest USD 100 million in the airline; its failure to secure these obligations by way of letters of credit and corporate guarantees; and its illegitimate appropriation of Balkan Airlines' principal assets in violation of express terms of the Privatization Agreement. The reason for these multiple breaches appears to lie in Israel, where Zeevi was itself amassing huge and unsustainable debts during this period in respect of other acquisitions unrelated to Balkan Airlines – debts that ultimately culminated in the appointment of a receiver over Zeevi's own assets."*

## C.III. Perspective of Respondent No. 2

4.      The Privatization Agency identifies the case as follows in the wording from its Brief of 13 April 2004 (R I, paras 1.3., 1.5. and 4.):

> *"1.3.      Further and in addition the Respondent repeats its position for lack of competence of the present tribunal to rule on the claims submitted by the Claimant, pursuant to lack of valid arbitration clause, lack of proper procedure for formation of the Tribunal and finally on the grounds of lack of arbitrability of several of the claims set forth in the Statement of Claim as amended by the Claimant's Brief Regarding the Relief Sought and in the latest submission dated 9 February 2004.*

1.5.     The Honorable Tribunal is hereby kindly requested to find that it has no jurisdiction on all of the issues of the submitted claim and that neither the Respondent nor the Republic of Bulgaria is liable for any breach of contract or misrepresentation of what so ever nature. With respect of such ruling and in addition the Tribunal is requested to award to the Respondent all the expenses suffered and made by it in these proceedings."

4.1.     [...]

4.2.     The three basic reasons to refute the arbitrability of the claims were mentioned already and they are:

a.     the specific claims may not be subject to these proceedings as being investments claim as opposed to contractual;

b.     the claims may be submitted by third party (the Company) which is not a party to the arbitration agreement or to the dispute and

c.     as the claim has been already submitted in other proceedings the non bis in idem principle should apply and it may be not reviewed once again in these arbitration proceedings.

4.3.     Further each claim that is maintained in the Claimant's Brief will be reviewed in brief with regards of the arbitrablity. As some of the claims lack both factual and legal reasoning in the Statement of Claim and in the Brief they may not be subject of detailed comments.

4.4.     The claim for loss of investments though in facts is related to the Privatization Agreement is not a contractual based claim as it is more investment dispute. The Claimant is referring as factual background and as legal ground of the claim loss of invested monetary funds, safe this fact is denied, which loss is allegedly due to particular actions of state authorities which are not parties to the Privatization agreement. Applying state policy, adopting of new legislative frame and any other act of executive powers of a sovereign state may be a cause of investment claim and dispute only. Therefore a contradiction between the possible means of solving such disputes and the way this Tribunal was constituted exist. It is widely adopted international practice that in investment disputes, when one of the parties to it is a State applicable will be the bilateral treaties between the hosting state

and the state of the investor. In this occasion the arbitral clause even being not null and void in general, which is denied in the present case, will not apply as different procedure is accepted in the respective bilateral treaty on protection of investments. Further with respect of this claim should be noted that:

a.  the Claimant is not the "investor" who allegedly invested the moneys in the Company. Easily seen from the presented documents is that the drawer of the bank transfers is a company named Balkan Airlines Holding BV, Holland which company evidently is not the same person as Zeevi Holdings Ltd., who is the Claimant in these proceedings;

b.  The beneficiaries of the receivables from the Company: Balkan Airlines Holding BV and ZBI AD, Bulgaria had already claimed the existing balance sums transferred as loans to Balkan Airlines AD, Sofia, Bulgaria (as a great amount of these sums has been paid) before the respective Bulgarian courts and accepting such a claim for arbitration will be contradictory to the principle of non bis in idem.

4.5.    The claim for breach of undertaking to maintain the Company as national air carrier. In its submissions the Claimant mostly grounds such claim with facts related to actions on behalf of the Government of Bulgaria that allegedly threatened this status or deprived the Company of it – the fact that Bulgaria intends to join the EU, adoption of new legislation (the amendments to the Civil Aviation Act, etc.) and omission to achieve agreements with other contracting states on bilateral treaties that banned Balkan Airlines from flights over their territory. Apart from the fact that the claim are denied as unfounded and lacking of evidence these factual grounds speak of an investment dispute but not of such related to contract. Therefore it may not be subject of these proceedings. In addition to this arguments it should be noted that the person who was directly affected by this breaches, the existence of which breaches is expressly denied, is not the Claimant but the Company. The Claimant has only indirect interest. Therefore any claim based on such allegations and demanding compensation for this reason is out of the scope of the present arbitration;

4.6.    The claim for missing Equant shares. It is more than logical to conclude that the lack of assets is directly affecting the party who is entitled to them. The Claimant was not granted rights over Equant shares, therefore it may not claim

*compensation that they are missing. Entitled to such claim could be only the beneficiary owner of such shares;*

*4.7.        Further it should be noted with respect of all claims based on the allegation that the Respondent had mislead the Claimant with respect of some vital or important facts regarding the status (the qualities) of the Company that such claims do not find legal grounding in Bulgarian laws, which are the applicable substantive law provisions in case of a contract based arbitration in this case. Subject of the contract is transfer of shares, paragraph 3.15. above is repeated, and if a legal ground for a flaw or defect in the subject of the contract exists than according Article 197 in relation to Article 195 of the Obligations and Contracts Act such claim should be submitted by the Claimant within 6 months of the purchase, or 1 year at latest if an immovable asset is in question. The Request for Arbitration was submitted by the Claimant in February 2001, i.e. more than 1 ½ year after the purchase of shares. Therefore any claim arising of alleged flaw or defect of the shares resulting from lack of certain quality of the Company should be rejected and dismissed for being precluded by limitation. Such precluding is referred hereby to any and all of Claimant's claims stated in the initial Statement of Claim and amended by the submissions following it.*

*4.8.        The claim related to alleged misrepresentation of the Company not being subsidized. Once again in the factual presentation of this claim the Claimant is basing its request for relief on alleged actions of the State that lead to increase of fees payable from the purchased company. Such undertaking – not to increase applicable fees is not contractual. Evidently the only remaining possible reason to raise such claims is change in the legislation and the policy of the government affecting the investments. Therefore such claim also is not contractual but investment and should be reviewed by different type of arbitration. Further it should be noted that in this case, as in most of the other claims, the party affected by the change was not the Claimant but the Company. It had to pay the allegedly increased fees. Therefore the Claimant may not put for resolving claimed rights of third parties and the claim should be dismissed or rejected as unfound.*

*4.9.        The claim regarding the Ansett aircraft maintenance. The second part of paragraph 4.8. is repeated. The Claimant was not directly affected by such alleged misrepresentation, safe such is denied to exist at all.*

Final Award 25 October 2006 in UNCITRAL Arbitration
Zeevi v Bulgaria et al

4.10.    The claim related to misrepresentation with respect of the liabilities to employees. The second part of paragraph 4.8. is repeated. The Claimant was not directly affected by such alleged misrepresentation, safe such is denied to exist at all. It did not pay directly any such costs and is not entitled to receive compensation for such costs.

4.11.    The claim with respect of breach or representation for the debt of Bulgarian Government for training pilots. The second part of paragraph 4.8. is repeated. The Claimant was not directly affected by such alleged misrepresentation, safe such is denied to exist at all. The only person entitled to seek such payment is Balkan Airlines AD but not the Claimant. Further, these relations were not contractual and no arbitration clause to settle them existed. The Claimant is unfoundedly trying to spread the action of the arbitration agreement, the validity of which is generally denied by the Respondent, over all relations involving the privatized Company. However such attempt does not have legal grounds to be founded on.

4.12.    The claim based on non disclosure of future government plans and change of government policy. This claim is based completely on factual grounds that could not be related to the contractual obligations. Even if it is accepted that such action of the Government existed, which is denied, no undertaking related to them was made in the Privatization Agreement. Therefore the dispute related to them is based on governmental policy affecting an investment and therefore is not a contractual but an investment dispute. As a result it may not be subject of the present proceedings. Further the Claimant is not the party affected by the alleged changes of governmental policy. Such affected party is the Company and only it may submit claims for damages, losses or loss of future profits based on such arguments.

4.13.    The claim related to misrepresentation regarding the debt of the Company to the Air Traffic Control. Last part of paragraph 4.12. above is repeated. The Claimant was not directly affected by this liability of the Company and did not claim that it had paid this obligation or presented proof of such payment. Therefore such claim is lacking legal grounds.

4.14.    The claim related to alleged breach of undertaking for transfer of real estates on the name of the Company. Once again the Claimant is trying to put in issue rights of third parties. As seen from the factual background the Claimant was not entitled to receive such rights. Allegedly, which is denied, the Company,

which is a different from the Claimant person was to benefit of this undertaking. Therefore the Claimant has no rights to claim other person's rights. Just a short note to mention that according Bulgarian legislation – Article 22 of the Obligations and Contracts Act one person (for example the Claimant) may negotiate and contract in favor of third person (the Company), but in this case the rights will occur in the patrimony of the third person beneficiary and may not be claimed by the contracting person – the Claimant. So in case the Respondent had contracted with the Claimant to transfer to the Company real estate assets, safe such an agreement does not exist and is denied, the beneficiary of the said agreement is the Company and only it may demand transfer of the assets from the Respondent.

4.15.     Claims regarding the breach of undertaking with respect of the Yugoslavian Railway Company. Paragraph 4.14. is repeated. The Claimant was not beneficiary of this undertaking, but the Company. Therefore the Claimant may not raise this issue in these proceedings.

4.16.     Claim for breach of undertaking to assist with respect to Company's excess debt. Paragraph 4.14. is repeated. The Claimant did not benefit directly of such undertaking, safe it is denied that the undertaking bears the sense implied by the Claimant and it is denied that such undertaking was breached.

4.17.     Claim for additional operating costs. Paragraph 4.14. is repeated. The Claimant did not suffer these costs directly and may not claim them. Further according Bulgarian legislation future costs, i.e. not suffered damages or losses may not be claimed.

4.18.     Claims for loss of future profits. These profits, safe no proof exists and is presented that they could be realized, would not have been received by the Claimant but by the Company. Further the Claimant was not the only shareholder in this company and the possible profits should have been allocated among all shareholders (including Bulgarian state) but not contributed to the claimant only. Therefore the profits of the Company may not be claimed in these proceedings. Paragraph 4.14. is repeated.

4.19.     Inability to sell a share in the Company to a strategic investor. As the Claimant had admitted that it was no longer in possession of the acquired shares of the company as they were transferred to Balkan Airlines Holding BV and ZBIA Ltd. than this claim is not attached to the Claimant in these proceedings as

*it could not sale something that did not belong to it. Further if a sale under additional public or private offering of shares was in question when stating this quite unclear and vague ground of claim the offering issuer would not be the Claimant but the Company and in this case the claim alleged is also not attached to the Claimant. No arbitration agreement exists between the Respondent and/or the State of Bulgaria and the Company or Balkan Airlines Holding BV and ZBIA Ltd.*

*4.20.    Claim for damage to reputation and goodwill. In the respective claim it is alleged that an undefined personality "Zeevi Group" was damaged with respect of its reputation. Such company was not proved to exist and is not a party to the Privatization Agreement. Therefore neither the Claimant may not claim some one else's rights nor this person (Zeevi Group) is a party to these proceedings and/or the arbitration agreement, safe the statement of its invalidity is maintained by the Respondent.*

*4.21.    The claim for failure of public offering of Zeevi Logistics. Neither this company is proven to exist nor is it a party to the Privatization Agreement. Therefore paragraph 4.20. above is repeated regarding the lack of grounds for arbitration in this claim.*

*4.22.    The Claim for management time and expenses. Once again no clarification is made who actually bore these expenses. If this is the Company, as seems more likely, than the claim may not be submitted by the Claimant though it is majority shareholder. If this is Zeevi Group, than once again the claim is submitted by a Claimant different from the person that incurred the expenses and therefore is inadmissible.*

*4.23.    And on the last place – any of the claims submitted by the Claimant which allegedly find their grounds in the applicable liability for tort provisions of the Bulgarian legislation – Articles 45 to 54 of the Obligations and Contracts Act may not be subject of Arbitration as under Bulgarian law the claims based on tort may not be occurring out of contract i.e. contractual liability is not such of tort. Therefore for such kind of claims no arbitration agreement may be existing and, as the Respondent had repeatedly stated in all of its submissions, these claims may not be resolved on in these arbitration proceedings."*

## D.    Procedural History

5.    On 1 February 2001, Claimant submitted its Statement of Claim and placed the Notice of Arbitration (R II PA, para. 26).

6.    The Arbitral Tribunal rendered PO No. 1 on 19 January 2002 establishing the rules for the further procedure in the case.

7.    On 8 February 2002, Respondent No. 2 submitted its Statement of Defense.

8.    By ICC letter of 6 November 2001, the Parties were informed that the International Court of Arbitration had confirmed the appointment of Prof. Böckstiegel as Chairman of the Arbitral Tribunal by the President of the ICC.

9.    By their submissions of 14, 21 and 22 April 2003, the Parties identified in response to the Chairman's letter of 7 April 2003 what they consider as Preliminary Issues. After consideration of these submissions the Arbitral Tribunal issued PO No. 3 of 5 May 2003 regarding PO No. 1. Additionally, the following new timetable was set up:

> "*3.1. By 29 May 2003, Claimant shall submit a brief identifying shortly:*
>
> *a) the relief sought of (now) USD 70 million,*
>
> *b) from which Respondents which of this relief is sought,*
>
> *c) the factual and legal basis of these claims (which may be done by references to sections to the original Statement of Claim insofar as still applicable to the reduced relief sought).*
>
> *3.2. By 10 July 2003, each Party shall file a brief presenting all factual and legal arguments regarding the Preliminary Issues identified in their respective letters of 14, 21 and 22 April 2003 respectively.*
>
> *3.3. By 25 August 2003, each Party shall file a brief in response to the above brief of the other Party.*
>
> *3.4. To avoid misunderstanding, the Tribunal recalls that the above briefs shall be submitted in accordance with*

> *Sections 2.2., 7, 8, and 9 of Order No. 1 and Section 2.2. of this Order No.3.*
>
> *3.5. After reviewing the Parties' above briefs, the Tribunal intends to decide whether a Hearing is considered necessary to decide on all Preliminary Issues."*

10. Claimant submitted its Brief regarding Relief Sought pursuant to Section 3.1 of PO No. 3 on 29 May 2003.

11. On 10 July 2003 Claimant submitted its Brief pursuant to Section 3.2 of PO No. 3.

12. After having reviewed the Parties submissions regarding the Preliminary Issues in accordance with PO No. 3 as cited above, the Arbitral Tribunal issued PO No. 4 of 14 October 2003 containing its decisions on the Parties' requests on Preliminary Issues. The decision is cited below under Section F.II.1.

13. On 14 October 2003 the Arbitral Tribunal rendered PO No. 5 regarding the next steps in the procedure including, inter alia, determination of the total deposit due. The Parties were requested to transfer their respective share of the deposit to a trust account and notified that the next stage of procedure will not be started before receipt of the full deposit.

14. By PO No. 6 of 6 December 2003 the Tribunal communicated its ruling regarding the further procedure as being limited to the issue of liability.

15. The Tribunal acknowledged receipt of the Claimant's share of the deposit as recorded in PO No. 6. It further noted that Respondents have given notice that they will not pay their share of the deposit. Therefore, the Tribunal decided to proceed according to UNCITRAL Rule 41.4. and invited Claimant to pay the Respondents' share of the deposit. The Tribunal's rulings on the further procedure on liability are cited hereafter:

> *"5. Rulings on further procedure on liability*
>
> *Therefore, taking into account the comments received from the Parties as well as Section 8 of Order No.4 and Section 2 of Order No.5, the Tribunal rules hereafter regarding the further procedure which is limited to liability and does not deal with quantum of such liability.*
>
> *6. Communications*

6.1. The Tribunal shall address communications to Counsel of the Parties.

6.2. Counsel of the Parties shall address communications directly to each member of the Tribunal either by fax or courier and, in addition, by e-mail, with a copy to counsel for the other Party. Fax communications shall not exceed 20 pages. Submission by e-mail shall be in Windows Word to facilitate later citations in decisions of the Tribunal. If a submission is sent as an attachment to a cover e-mail that e-mail shall identify the attachments.

In this context, the Tribunal notes that (1) Claimant's recent submissions were not received also by e-mail and (2) Arbitrator Chernev informs the Tribunal that he did not receive the recent submissions from Claimant at all. Claimant is, therefore, requested to still send these submissions and respect this paragraph in the future.

6.3. Larger submissions shall be preceded by a Table of Contents.

6.4. Submissions of documents shall be submitted unbound in 2-ring binders separated from Briefs and preceded by a list of such documents consecutively numbered with consecutive numbering in later submissions (C-1, C-2 etc. for Claimants; R-1, R-2 etc. for Respondents). As far as possible, in addition, documents shall also be submitted in electronic form (Windows Word). Insofar as documents have been submitted in earlier stages of this procedure and a Party wishes to rely on them for liability, they shall be re-submitted in the above context and form.

7. **Timetable**

7.1. By 9 February 2004, Claimant submits Brief with all further documents and any witness- and expert-statements on which it wishes to rely.

7.2. By 13 April 2004, Respondents submit Brief with all further documents and any witness- and expert-statements on which they wish to rely.

7.3. *By 13 May 2004, Claimant submits further Brief, only in reply to Respondents' Brief, with all further documents and any witness- and expert-statements on which it wishes to rely in rebuttal.*

7.4. *By 14 June 2004, Respondents submit further Brief, only in reply to Claimant's Brief under Section 7.3., with all further documents and any witness- and expert-statements on which they      wish to rely in rebuttal.*

7.5. *For all witnesses and experts of which they submit statements with their briefs, Parties shall assure that they are available for oral examination, if required, during the period of the Hearing mentioned under Section 7.8. below.*

7.6. *By 21 June 2004, the Parties submit:*

   * *notifications of the witnesses and experts they wish to examine at the Hearing,*

   * *and a chronological list of all exhibits with indications where the respective documents can be found in the file.*

7.7. *As soon as possible thereafter, Tribunal issues Procedural Order regarding details of the Hearing.*

7.8. *Hearing in Paris from 27 to 30 July 2004.*

7.9. *By 8 August 2004, transcript of Hearing is received by Parties and the Tribunal.*

7.10. *By 6 September 2004, Parties submit Post-Hearing Briefs of up to 30 pages (no new documents allowed).*

**8. Documentary Evidence**

8.1. *Regarding all documentary evidence, reference is made to section 6.4. above.*

8.2. *New factual allegations or evidence shall not be permitted after the respective dates indicated in the above Timetable, unless agreed by the Parties or authorized by the Tribunal.*

8.3. Documents in a language other than English shall be accompanied by a translation into English.

## 9. Witness Evidence

9.1. In so far as the Parties wish to present witness testimony, written Witness Statements of all witnesses shall be submitted together with their Briefs mentioned above at the time limits established in the Timetable.

9.2. Reference is made to Section 7.5. regarding availability of witnesses for the Hearing, if required.

9.3. To make most efficient use of time at the Hearing, written Witness Statements shall generally be used in lieu of direct oral examination though exceptions may be admitted by the Tribunal. Therefore, insofar as, at the Hearing, such witnesses are invited by the presenting Party or asked to attend at the request of the other Party, after a short introduction of the witness by the presenting Party of up to 10 minutes, the available hearing time should mostly be reserved for cross-examination and re-direct examination, as well as for questions by the Arbitrators.

9.4. If a witness whose statement has been submitted by a Party and whose examination at the Hearing has been requested by the other Party, does not appear at the Hearing, his statement will not be taken into account by the Tribunal. A Party may apply with reasons for an exception from that rule.

## 10. Expert Evidence

Should the Parties wish to present expert testimony, the same rules and procedure would apply as for witnesses.

## 9. Hearing

Subject to changes in view of the further procedure up to the Hearing:

9.1. A maximum of 4 working days from 27 to 30 July 2004 has been blocked as provided in the Timetable.

9.2. The Hearing shall be in Paris at a location chosen by the Tribunal.

9.3. The Parties are invited to present short opening statements of not more than one hour.

9.4. No new documents may be presented at the Hearing unless agreed by the Parties or authorized by the Tribunal. But demonstrative exhibits may be shown using documents submitted earlier in accordance with the Timetable.

9.5. Taking into account the time available during the period provided for the Hearing, the Tribunal intends to establish equal maximum time periods both for the Claimant and for the Respondent which the Parties shall have available for examination and cross-examination of all witnesses and experts.

9.6. A transcript shall be made of the Hearing and sent to the Parties and the Arbitrators as provided in the Timetable.

9.7. The Parties presenting a witness or expert requiring interpretation are expected to provide the interpreter unless agreed otherwise.

**10. Extensions of Deadlines and Other Procedural Decisions**

10.1. Short extensions may be agreed between the Parties as long as they do not affect later dates in the Timetable and the Tribunal is informed before the original date due.

10.2. Extension of deadlines shall only be granted by the Tribunal on exceptional grounds and provided that a request is submitted immediately after an event has occurred which prevents a Party from complying with the deadline.

10.3. The Tribunal indicated to the Parties, and the Parties took note thereof, that in view of travels and other commitments of the Arbitrators, it might sometimes take a certain period for the Tribunal to respond to submissions of the Parties and decide on them.

10.4. Procedural decisions will be issued by the chairman of the Tribunal after consultation with his co-arbitrators

> *or, in cases of urgency or if a co-arbitrator cannot be reached, by him alone.*

16. On 9 February 2004, Claimant submitted its Brief pursuant to PO No. 6.

17. By letter of 10 February 2004, Counsel for Respondent No. 2, inter alia, emphasized that neither he personally nor the respective law firm represent the Republic of Bulgaria but only the Privatization Agency both of which were separate legal entities. The Counsel also noted that:

> *"[t]he Republic of Bulgaria neither have been served the Request for Arbitration, the Statement of Claim and all other submissions, nor participated in the appointment of the Tribunal nor was granted proper possibilities and means of defense in the proceedings. Therefore any award issued by this tribunal and on this case against "The Republic of Bulgaria" will not be binding and executable not only in Bulgaria but in any other state and before any other institution and jurisdiction."*

Regarding the Claimant's Brief of 9 February 2004 it was further noted that documents accompanying the Brief which were allegedly enclosed under lit. d and lit. e to the letter had not been received.

18. By letter of 8 April 2004 / 11 May 2004, the Chairman responded to the letter of the Ministry of Finance of the Republic of Bulgaria dated 19 March 2004 regarding the procedural timetable. The relevant part regarding the Tribunal's intention not to change the timetable as set before is cited hereafter:

> *"2.1. As reasoned in detail in Procedural Order No.4, the Republic of Bulgaria has been decided by this Tribunal to be a Party to this arbitration, because the Privatization Agency (PA) acts as a typical government body. Therefore, should the PA - which does not seem likely – not have informed the Government about the ongoing arbitration, the two Respondents must be considered responsible.*
>
> *2.2. Procedural Order No. 4 was issued on 14 October 2003 and, therefore, from that time the two Respondents must be considered to have been aware of the Republic's position as a Respondent in this arbitration.*

> *2.3. Procedural Order No. 6 was issued on 6 December 2003 including the timetable for the further procedure up to the Hearing in Paris starting 27 July 2004.*
>
> *2.4. In view of the above considerations, the submission of the Ministry's letter at this late stage of the procedure cannot be accepted as justifying a further delay in this long going case. To avoid undue further delay in this procedure, and as new Hearing dates agreeable to all would not be available for a considerable time thereafter until the end of 2004, the Tribunal does not intend to change the timetable as set in Procedural Order No. 6 and, particularly not the Hearing dates as set.*
>
> *2.5. However, of course, the Ministry – and a new law firm should one be appointed as its Counsel separate from the Counsel so far representing the Respondents – is invited to participate in the procedural steps from now on in accordance with the timetable as set, i.e. starting with Section 7.2. of Procedural Order No. 6 according to which Respondents' Brief is due by 13 April 2004."*

19. On 13 April 2004, Respondent No. 2 submitted its Brief pursuant to PO No. 6.

20. On 13 May 2004, Claimant submitted its Response Brief pursuant to PO No. 6.

21. On 1 June 2004, the Arbitral Tribunal issued PO No. 7 granting, inter alia, an extension in time to 21 June 2004 for Respondents regarding their submissions due under Section 7.4. of PO No. 6. The Order further contained the Arbitral Tribunal's ruling on Freshfields' request for production of documents.

22. On 1 July 2004, the Tribunal rendered the following PO No. 9 regarding preparation and conduct of the forthcoming hearing taking place from 27 to 30 July in Paris:

> *"1. The Tribunal takes into account the recent submissions by the Parties.*
>
> *2. The Tribunal recalls its previous rulings, particularly in*
>
> ***Procedural Orders No. 6. and the following text from Chairman's e-mail of 8 February 2004:***

*"In follow-up to my mail of 22 January, this is to inform you that the **Hearing** in this case will take place from 27 to 30 July 2004 at the Hotel Raphael in Paris and that I have booked Briaut Court Reporting Service, which has worked very efficiently in other arbitrations of mine, to do the transcript. The address is:*

*Hotel Raphaël*
*17, avenue Kleber*
*75116 Paris*
*Tel. 0033-1-5364 3200*
*Fax 0033-1-5364 3201*
*e-mail: reservation@raphael@raphael-hotel.com*
*website: http://www.raphael-hotel.com/*

*At the Hotel Raphael, I have booked the hearing room and the accommodation rooms for the three arbitrators as well as the court reporter. Insofar as the Parties wish to book rooms for their representatives (and possibly : witnesses and experts) at that hotel, they should do so soon to be sure that rooms are available."*

*The Hearing will start on **Tuesday 27 July at 9:00 in the Salon La Bibliotheque of the Hotel Raphaél.***

*By 20 July 2004, the Parties shall inform the Tribunal of the names and functions of the persons who will be attending the Hearing from their respective sides.*

3. *Intention and Scope of the Hearing*

    3.1. *The Tribunal has taken note of the **Counterclaims** and the respective explanations presented in the Republic of Bulgaria's brief of 21 June 2004. To provide the Parties with the fast clarifications regarding the upcoming Hearing they have requested for understandable reasons, the following ruling is made by the Tribunal before having received the comments due from Claimant on 2 July 2004, because, after the resignation of Arbitrator Prof. Libai, no full consultation can be held regarding these comments before a new Arbitrator is appointed.*

        *As Section 7.4 of Procedural Order No. 6 permitted a brief "only in reply to Claimant's Brief" and as, under the timetable until the Hearing, Claimant has no opportunity to respond on the substance of the counterclaims, the Tribunal, in application of*

*UNCITRAL Rules 19.3 and 20, for the up-coming Hearing, considers the counterclaims only admissible in so far as their relief sought does not go beyond requesting a dismissal of the claims presented by Claimant. Only to that extent shall evidence, particularly the expert report of PricewaterhouseCoopers, be considered at the Hearing.*

*This is without prejudice to whether the Tribunal may admit the counterclaims in a later phase of the procedure. In this regard, the Parties are invited to submit their comments in the Post-Hearing Briefs due after the Hearing according to Section 7.10 of Procedural Order No. 6.*

3.2. *In view of the many and voluminous submissions and documents filed by the Parties before the Hearing, there is no need to repeat such presentations at the Hearing. As only a selected number of these exhibits will be used in the limited time available at the Hearing, to avoid that all exhibits have to be transported to Paris and to avoid delays for search of documents at the Hearing, the members of the Tribunal intend to bring to the Hearing all of the Parties' briefs (without exhibits), witness statements and expert opinions as well as the major contractual documents (Privatization Agreement including its Amendment and Appendices and the Attachment (C/43), and the French Arbitration Law), but invite the Parties to prepare and provide at the Hearing to each member of the Tribunal and to the other Party a "**Hearing Binder**" containing copies of those further exhibits or parts of exhibits to which they intend to refer in their oral presentations at the Hearing. If possible, the contents of the Hearing Binder shall also be handed over on a CD.*

3.3. *Section 9.3 of Procedural Order No. 6 1 is recalled, according to which written statements of witnesses and experts will generally be used in lieu of direct oral examination and the available Hearing time should mostly be used for cross and re-direct examination, as well as for questions by the members of the Tribunal.*

3.4. *Insofar as the Parties have submitted opinions of **legal experts**, the Tribunal does not consider it necessary to have oral examination at the Hearing. In so far as a*

*Party wishes to further confirm or object to such legal opinions, it may do so in its oral pleadings by Counsel or Co-Counsel of its choice during the Hearing (which will be later available by transcript) and may submit a written and electronic summary of its respective pleading at the Hearing. This also applies in so far as the witness statements and the report of PricewaterhouseCoopers go beyond factual testimony and include legal evaluations.*

4. *Agenda of Hearing*

*The following Agenda is established for the Hearing:*

1. *Introduction by the Chairman of the Tribunal.*

2. *Opening Statements by the Parties*

   *of not more than 60 minutes for the Claimant,*

   *of not more than 60 minutes for the Respondents (together).*

3. *Examination of witnesses or fact experts presented by Claimant. For each:*

   a) *Affirmation of witness or expert to tell the truth.*

   b) *Short introduction by Claimant of up to 10 minutes (This may include a short direct examination on new developments after the last written statement of the witness or expert).*

   c) *Cross examination by Respondents.*

   d) *Re-direct examination by Claimant, but only on issues raised in cross-examination.*

   e) *Remaining questions by the members of the Tribunal, but they may raise questions at any time.*

4. *Examination of witnesses and experts presented by Respondents. For each: vice versa as under a) to e) above.*

6. *Remaining Questions by the members of the Tribunal, if any.*

*No final oral pleadings are foreseen, as the timetable of Procedural Order No. 6, in Section 7.10, provides for Post Hearing Briefs of the Parties.*

5. *Witnesses and Experts*

5.1. *The Tribunal has taken note of the submissions of the Parties indicating the witnesses and experts they wish to examine at the Hearing. Attention is drawn to Section 3.4 above regarding legal evaluations in the statements of witnesses and experts.*

5.2. *To accommodate with the availability of witnesses and experts during the week of the Hearing and enable to plan their presence more precisely, the Parties may and are encouraged to agree on the order in which the witnesses and experts shall be heard and shall inform the Tribunal of such agreement by 20 July 2004.*

5.3. *Unless otherwise agreed between the Parties under Section 5.2 above or ruled by the Tribunal, the order of examination shall be as provided in Sections 3 and 4 of the above Agenda and the Party which presented the witnesses or experts shall decide on the order in which they shall be examined.*

5.4. *Unless otherwise agreed between the Parties or ruled by the Tribunal, witnesses and experts may be present in the Hearing room during the testimony of other witnesses and experts.*

5.5. *Section 9.7. of Procedural Order No. 6 regarding the Hearing is recalled*

*regarding **witnesses or experts requiring interpretation** to and from English.*

*Should more than one such person presented by each side require interpretation, as no sufficient time is available for successive interpretation, the respective Party or Parties shall provide a simultaneous interpretation service and make respective arrangements in due time with the Hotel Raphael to assure that such a service is fully available at the start of the Hearing and shall, **by 20 July 2004**, inform the Tribunal of such arrangements.*

6. *Timing*

6.1. To give sufficient time to the Parties and the Tribunal to prepare for and evaluate examination and related files, the daily sessions shall not go beyond the period between 9 a.m. and 5 p.m. However, the Tribunal, in consultation with the Parties, may change the timing during the course of the Hearing.

6.2. Section 9.5 of Procedural Order No. 6 regarding the Hearing is recalled, where it is recorded that the Tribunal to intends to establish equal maximum time periods for the examination by the Parties.

6.3. Taking into account the Calculation of Hearing time attached to this Order, the total maximum time available for the Parties shall be as follows:

9 hours for Claimant

9 hours for Respondents (together).

It is left to the Parties how much of their allotted total time they want to spend on Agenda items 3 and 4.

6.4. As there is no room for an extension of the Hearing, the parties shall prepare their presentations and examinations at the Hearing on the basis of the above time limits.

7. *Other Matters*

7.1. As the Tribunal intends to save the costs of an administrative assistant to the Tribunal, the Parties are requested to make arrangements with the Hotel Raphael in advance of the Hearing that **_microphones and loudspeakers_** are available in the Hearing room to ensure easy understanding of all interventions by all in the room and for the court reporter.

7.2. The Chairman's e-mail of 8 February 2004 is recalled regarding the **_court reporting service retained_** for the Hearing.

7.3. The Tribunal may change any of the rulings in this order, after consultation with the Parties, if considered appropriate under the circumstances.

*Attachment to Procedural Order No. 9 :*

*Calculation of Hearing Time*
*UNCITRAL Arbitration Zeevi v Bulgaria et alt*

| | Hours |
|---|---|
| Time available | |
| *4 days of 8 hours* | *32* |
| Time needed | |
| *Lunch breaks: 4 x 1.5* | *6* |
| *Various breaks (procedural and 8 coffee)* | *2.5* |
| *Procedural discussions (estimated total)* | *2* |
| *Introduction by Chairman* | *0.5* |
| *Additional Questions by members of Tribunal* | *3* |
| *Total time for other purposes* | *14* |
| *That leaves for the Parties a total of* | *18* |

*Available for each the Claimant and the Respondents (together)
9"*

23. By letter of 15 June 2004, Counsels for Respondent No. 1 communicated repetition of their request made by letter of 31 May 2004 for Claimant to provide the original text of several of Claimant's exhibits.

24. On 21 June 2004, Respondent No. 2 submitted its Second Brief pursuant to PO No. 6.

25. By letter of 21 June 2004, Respondent No. 1 submitted "The Republic of Bulgaria's Defense and Counterclaim" accompanied by an Expert Report by PricewaterhouseCoopers.

26. By letter of 1 July 2004, Claimant gave notice of the appointment of Avner Yarkoni, Esq., as arbitrator in place of Professor David Libai.

27. By its second letter of 1 July 2004, Claimant requested the Tribunal (i) to delete or to declare inadmissible the counterclaim contained in the Brief of Respondent No. 1 of 21 June 2004 and (ii) to delete parts of this Brief which are not in accordance with Section 7.4 of PO No. 6.

28. On 23 July 2004 Claimant submitted its Brief.

29.    From 27 July 2004 till 30 July 2004 the Oral Hearing was conducted in Paris.

30.    On 2 August 2004 the Tribunal rendered the following PO No. 10:

With regard to the witness statements of Mr. Ananiev and Mr. Mustakov the Tribunal decided, according to the due process principle,

*"not to take into account these witnesses' statements in its decision on liability"*

since they did not appear at the Hearing giving the other Party the opportunity to cross-examine them.

As to the admissibility of certain recent submissions by the Parties, which has been objected to by the other side the Tribunal decided the following:

*"Taking into account the Parties' comments at the Hearing particularly what they considered as acceptable deadlines for their submissions, the Tribunal rules as follows:*

*2.4.1. By 8 October 2004, the Parties shall submit Post Hearing Briefs, Claimant of up to 100 pages and each Respondent of up to 50 pages, presenting:*

*a) any comments they have in rebuttal to the most recent Brief of the other side (i.e. Respondents' Briefs of 21 June and Claimant's Brief of 23 July 2004) to which they may enclose further documents (but no new witness statements), but in rebuttal only;*

*b) their evaluation and comments regarding the Hearing.*

*2.4.2. By 12 November 2004, the Parties may submit 2nd Round Post Hearing Briefs, Claimant of up to 40 pages and each Respondent of up to 20 pages) again with further documents (but no new witness statements), but only in rebuttal of the 1st Round Post Hearing Brief(s) of the other side.*

Finally, in PO No. 10 the Tribunal issued a further ruling regarding the "Real Counterclaims":

> *"3.2. In so far as the counterclaims presented in the Republic of Bulgaria's Brief of 21 June 2004 go <u>beyond</u> requesting a dismissal of the claims presented by the Claimant ("the Real Counterclaims") the Tribunal rules as follows:*
>
> *3.2.1. By **17 September 2004**, the Republic of Bulgaria shall submit a Brief*
>
> > *a) identifying exactly the relief sought by the Real Counterclaims either as a counterclaim or as a claim for the purposes of set-off (Art. 19.3 of the UNCITRAL Rules),*
> >
> > *b) identifying the total amount in dispute by all of these Real Counterclaims,*
> >
> > *c) providing reasons why these Real Counterclaims should be admitted at this late stage of the arbitral procedure taking into account Articles 19.3 and 20 of the UNCITRAL Rules,*
> >
> > *d) providing information and comments regarding the relevance of the parallel arbitration procedure started by the Republic against Claimant for the present arbitration.*
>
> *3.2.2. By **12 November 2004**, Claimant shall submit a Brief in reply to the above Brief of the Republic.*
>
> *3.3. Thereafter, the Tribunal intends to decide on the admissibility of the Real Counterclaims."*

31.    On 17 September 2004 the Republic of Bulgaria submitted its Brief regarding the "Real Counterclaims" according to PO No. 10.

32.    On 8 October 2004 the Claimant submitted its Post-Hearing Brief regarding the question of liability in accordance with PO No. 10.

33.    On 8 October Respondent No. 1 submitted its Post-Hearing Brief according to PO No. 10.

34.    On 8 October Respondent No. 2 submitted its Post-Hearing Brief in accordance with PO No. 10.

35.    On 12 November 2004 Claimant submitted its Post-Hearing Response Brief and its Brief Regarding the Admissibility of the Republic's Real Counterclaims pursuant to PO No. 10.

36.     On 12 November 2004 Respondent No. 1 submitted its Second Post-Hearing Brief in accordance with PO No. 10.

37.     On 12 November 2004 Respondent No. 2 submitted its Second Post-Hearing Brief according to PO No. 10.

38.     On 12 January 2005 the Tribunal issued PO No. 11 ruling as follows:

> ### *A. Admissibility of the Real Counterclaims*
>
> *1. In view of UNCITRAL Rules 19.3 and 20, the Tribunal takes into account:*
>
> > *1.1. The counterclaims raised obviously arise out of the same contractual relationship as the claims.*
> >
> > *1.2. The Tribunal is presently inclined to conclude that the Respondents are, at least to some extent, liable for the claims raised by Claimant. But, the Tribunal considers that it cannot take a final decision in this regard before having fully examined the alleged liabilities of Claimant raised by Respondent No. 1 in its counterclaims.*
> >
> > *1.3. Though, after this Tribunal's decisions in Procedural Orders No. 4 to 6 late in 2003, Respondent No. 1 took a considerable time until the counterclaims were submitted, the tribunal appreciates that, under the circumstances, the governmental tender process for the selection of a law firm in this case should be taken into account as well as the fact that Respondent No. 1 complied with the timetable set by he Tribunal in order to maintain the Hearing dates in July 2004.*
> >
> > *1.4. As recorded in Section 2.2. of Order No. 10, the Tribunal took note that "the Parties expressed their support for a solution which enables the Tribunal to take into account all factual aspects relevant for a decision on liability under the claims as long as the Parties have sufficient opportunity to comment on all of these factual aspects."*
> >
> > *1.5. As the procedure on the quantum of Claimant's claims had been postponed to a later stage of the procedure, the counterclaims would have to be taken into account as a possible set-off at that later stage as well.*

1.6. In view of the parallel arbitration proceedings started by the PPCA, it would be more efficient and less time-, work- and cost-consuming to deal with the opposing claims between the Parties in this present arbitration procedure rather than having a separate further arbitration perhaps resulting in conflicting decisions.

1.7. No relevant prejudice for Claimant would result, if this Tribunal admits the counterclaims. In this context, the Tribunal assumes and takes note of the respective explanations given by Respondent No. 1 in its brief of 17 September 2004, particularly concluding that the claims admitted in this present arbitration as counterclaims "would clearly fall away" in that other arbitration. Furthermore:

a) In the present stage of the procedure, Claimant could only achieve a partial award on liability which, without a decision on the quantum of such liability, could not lead to any payments by Respondents or be enforced.

b) Thus, no delay will result for Claimant in receiving a possible decision on amounts due, if the examination of the counterclaims is joined to the stage for the procedure on quantum as foreseen later in this Order.

c) Claimant has already dealt with the facts and law relating to the counterclaims to some extent in its brief of 23 July 2004 and its Post-Hearing Briefs. As ruled later in this Order, Claimant, as it requested in its Brief of 12 November 2004 page 3, will be given a further opportunity to fully respond to the counterclaims.

2. Taking into account all above considerations, the **Tribunal hereby admits the counterclaims.**

**_B. Further Procedure_**

3. **By 15 April, 2005:**

Claimant shall submit:

A further brief in reply to the counterclaims,

*a brief on the quantum of its claims identifying precisely which amount is requested in relation to each of the liabilities claimed.*

*Respondent No. 1 shall submit a brief on the quantum of its counterclaims identifying precisely which amount is requested in relation to each of the liabilities claimed.*

*4. By 17 June 2005:*

*Claimant shall submit a reply brief on the quantum of the counterclaims,*

*Respondents No. 1 and 2 shall submit a reply brief on the quantum of the claims.*

*No documents or statements of witnesses or experts will be admitted thereafter, unless agreed between the Parties or authorized by the Tribunal.*

*5. Thereafter, as soon as possible, the Tribunal intends to issue an Order regarding the details of a Final Hearing in this case.*

*6. The Tribunal intends to schedule the **Final Hearing from 29 August to 1 September 2005** at a place still to be chosen after consultation with the Parties.*

*7. **By 14 October 2005**, after receiving the transcript of the Hearing, the Parties shall submit 1st Round Post-Hearing Briefs (no new documents).*

*8. By 28 October 2005, the Parties shall submit*

*2nd Round Post-Hearing Briefs (no new documents) in rebuttal of the 1st Round briefs of the other side,*

*Statements on the Costs of legal representation and assistance they are claiming in this case.*

*9. **All communications and particularly the briefs** under sections 3 and 4 above as well as the documents and statements of witnesses and experts enclosed, shall be in conformity with the rulings in Order No. 1 sections 2, 7, 8, 9, Order No.3 section 2.2., and Order No.6 sections 6, 8, 9, 10.*

39.    On 12 January 2005 with reference to PO No. 11, the Tribunal issued the following PO No. 12:

### *1. Further deposits regarding the Claims*

*The calculation in Section 8 of Procedural Order No. 4, for the final stage on quantum, leads to a total further deposit for fees due of USD 106,032.00.*

*To cover expected expenses of the procedure on quantum, including travels, a hearing of several days, a transcript of such hearing, meetings of the Arbitrators for deliberations, administrative secretary for deliberations, the Chairman's VAT, etc., the Tribunal has determined that a further deposit on expenses of USD 23,068.00 is appropriate and necessary under Rule 41.2.*

*This leads to a total deposit now due under Rule 41.2. of USD 130,000.00. Therefore, both the **Claimant and the Respondents No. 1 and 2 (together)** are hereby requested to each transfer*

### *USD 65,000.00.*

### *2. Further deposits regarding the Counterclaims*

*Regarding the counterclaims, applying the same considerations as they were used in Order No. 2 section 3.1. to 3.3. for the claims, the Tribunal determines that a separate fee calculation is appropriate because the counterclaims could not be dealt with in the same procedural stage as the claims.*

*From the Brief of Respondent No. 1 of 17 September 2004 pages 4 to 17, the various counterclaims presently quantified by a specific amount lead to a total of approximately USD 25,000,000.00.*

*Taking this as the presently identified amount in dispute for the counterclaims and applying the ICC Cost Calculator for average arbitrators' fees, the fees for a three member tribunal are USD 315,900.00.*

*To cover expected expenses of the procedure on the counterclaims, including travels, a hearing (together with the final hearing on the claims) of several days, a transcript of such hearing, meetings of the Arbitrators for deliberations, administrative secretary for deliberations, the Chairman's VAT, etc., the Tribunal has determined that a further deposit on expenses of USD 44,100.00 is appropriate and necessary under Rule 41.2.*

*This leads to a total deposit now due under Rule 41.2. of USD 360,000.00. Therefore, both the **Claimant and Respondent No. 1** are hereby requested to **each** transfer*

**USD 180,000.00.**

### 3. Payment Instructions

*The Parties shall transfer the above payments under sections 1 and 2 in such a way that, by 14 February 2005, they are available on the trust account set up for this case:*

> *Deutsche Institution für Schiedsgerichtsbarkeit*
> *DIS-Sonderkonto*
> *Konto-No. 108 301301*
> *(IBAN-No. 53,3707.0024.01083013.01)*
>
> *Deutsche Bank*
> *BLZ. 370 700 24*
> *SWIFT-Code: DEUTDEDBKOE*

*The Tribunal will not start its work on the next stage of the procedure before the full deposits have been received.*

### 4. Final Determination on Costs

*The Tribunal recalls that a final determination as to which Party has to bear which costs will be decided by the Tribunal in its Final Award taking into account the criteria of UNCITRAL Rule 40 and any submissions the Parties may have made in this respect."*

40.  On 4 February 2005, referring to Claimant's letter of 27 January 2005, the Tribunal sent a letter to all Parties stating that the issues raised in Claimant's letter had been taken into account and reaffirming that PO Nos 11 and 12 remain unchanged.

41.  On 20 February 2005 in view of preceding communications with the Parties, PO No. 13 was issued by the Tribunal:

### 1. Regarding Acceptance of Jurisdiction

*It happens frequently in international arbitration that, after a party has challenged the tribunal's jurisdiction and the tribunal has decided against such a challenge to the effect that it does indeed have jurisdiction, the respective party on one hand then*

*participates in the procedure on the merits and raises a counterclaim, but on the other hand does not waive to re-raise its jurisdictional objections before the state courts once an award has been issued. In such cases, the arbitral procedure on the merits proceeds as usual.*

*The Tribunal takes note that Respondent No. 1, as clarified in its letter of 11 February 2005, only maintains its counterclaims "by way of set-off in these proceedings".*

*Therefore. the Tribunal takes it that the counterclaims are now only raised for set-off purposes.*

*However, irrespective of that issue, this Tribunal has to decide on its jurisdiction, because, as can also be concluded from Art. 19.3. of the UNCITRAL Rules, the Tribunal can only decide on claims raised for set-off purposes if these claims arise out of the same contract and it does indeed have jurisdiction over the claims raised for set-off. In this context, the Tribunal refers to section A.1.5. of its Procedural Order No. 11.*

*Therefore, in this case as well, it is appropriate for this Tribunal to continue with the procedure on the merits as ruled in Procedural Orders No. 11 and 12.*

**2. Regarding the parallel arbitration started by the PPCA**

*As mentioned in section 1 above, this Tribunal needs and, by Procedural Order No. 11, has accepted its jurisdiction over the counterclaims, even if these are now only raised for set-off. Therefore, the question remains relevant whether the parallel proceedings started by the PPCA (which, for convenience will now be called the "PPCA Arbitration") affect the manner in which this Tribunal should handle these set-off claims.*

*The Tribunal recalls its considerations in Procedural Order No. 11 in this respect.*

*Furthermore, it has to be taken into account that the PPCA Arbitration contains several differences to the present one. Particularly, its claimant is the PPCA and it involves three respondents additional to Zeevi, thus several parties which are not Parties in the present arbitration.*

*Therefore, this Tribunal can only consider whether the counterclaims raised by Respondent No. 1 in the present procedure against Zeevi should not be admitted insofar as they*

*will also be raised in the PPCA Arbitration against Zeevi as one of the four respondents.*

*In this regard, it must be noted that this Tribunal has already accepted its jurisdiction over the counterclaims by Procedural Order No. 11 for the reasons given in that Order. This was at a time when the tribunal in the PPCA Arbitration was not yet constituted. It would, therefore, be rather a matter to be brought before the Tribunal in the PPCA Arbitration (which has now been constituted) whether and in how far it accepts its jurisdiction over those claims in view of this Tribunal's decision.*

*Taking into account the above considerations, the rulings in Procedural Orders No. 11 and 12 remain unchanged."*

Regarding deposit payments according to PO No. 12 the Tribunal confirmed that those due from Respondents had been fully received from Respondent No. 1 and that USD 65.000 had been received from Claimant.

In application of Article 39.2. of the UNCITRAL Rules, the Tribunal had by analogy used the ICC cost rules to determine the advance payments, since the ICC was the appointing authority in this UNCITRAL case. Therefore, according to Article 30.5. of the ICC Rules the Tribunal requested Claimant to transfer the 2nd advance payment of USD 180,000.00 due under section 2 of PO No. 12 no later than 1 March 2005.

Further, the Tribunal drew the Parties' attention to the last paragraph of section 3 of that Order to the effect that the Tribunal will not start its work on the next stage of the procedure before the full deposits have been received.

42.  By letter of 3 March 2005 the Tribunal informed all Parties that Vienna would be the place for the Final Hearing, in accordance with Section B.6. of PO No. 11 and that respective reservations have been made at the Hotel Hilton Vienna. The Tribunal invited the Parties to make their respective reservations.

43.  On 17 March 2005 the Tribunal replied to a letter of same date from Claimant by email as follows:

*"1. **Respondents** are invited to submit any comments they may have by **24 March 2005.***

*2. As Claimant has twice not transferred its deposit of USD 180,000.00 due under Procedural Order No. 12 and 13 by the dates given by the tribunal, **Claimant** is invited*

> to clearly state *by 24 March 2005, whether is refuses to pay its deposit due in case the procedure continues as ruled in Procedural Orders No. 11, 12, and 13.*
>
> 3. *To avoid any misunderstanding, the Tribunal clarifies that, for the time being, its Procedural Orders No. 11, 12, and 13 remain valid and the Parties shall take all measures to ensure that the respective timetable up to the Hearing is maintained."*

44. On 1 April 2005 the Tribunal issued PO No. 14 regarding further procedure and advance payments. With regard of the further procedure, the Tribunal drew the attention of the Parties to Provisions of The Transformation and Privatization of State-owned and Municipal-owned Enterprises Act PO Nos 9, 10, 11, 12 and 13. In particular, the Tribunal reminded the Parties that:

> *"the consideration in Section A.1.2. of PO No. 11, i.e. that the Tribunal can only take a final decision regarding Respondents' liability for the claims raised by Claimant after examining Claimant's alleged liabilities raised in the Real Counterclaims, is not changed by the fact that these Real Counterclaims are now only raised for set-off".*

The Tribunal reaffirmed its position that:

> *"for the reasons mentioned in paragraphs a) to c) of section A.1.7. of PO No. 11, the Tribunal still considers that no relevant prejudice for the Claimant results from the procedure as now established and that this is the relatively most cost-saving and fastest way to conclude this case by an award".*

> ## 2. Regarding the outstanding advance payment
>
> *The Tribunal thanks Claimant for its confirmation that it does not refuse to pay its outstanding advance payment if the procedure continues in accordance with POs No. 11, 12, and 13*
>
> *The Tribunal confirms that, when deciding on the costs of this arbitration at the end of the procedure according to Art. 40 UNCITRAL Rules, it will take into account in how far additional costs have been caused by Respondents' objection to jurisdiction, the late submission of the counterclaims and any other procedural steps taken by the Parties. In this respect, the Parties may submit their comments and arguments in their submissions due by 28 October 2005 according to section 8 of PO no.11.*

*In accordance with its above-mentioned confirmation, Claimant is hereby requested to transfer its outstanding advance payment of USD 180,000.00 pursuant to PO No. 12 in such a way that it is received in the trust account **no later than 15 APRIL 2005**.*

### 3. Regarding hotel reservations for the Hearing

*The Vienna Hilton has informed the Chairman that only very few reservations have been made by the Parties for the Hearing. To assure availability and avoid additional costs for the hearing room, the Parties are invited to book **by 15 April 2005** the reservations for all persons mentioned in the Chairman's letter of 3 March 2005."*

45. On 5 April 2005 the Tribunal, by email and fax, extended the dates for submission of briefs according to section B.3. of PO No. 11 to 19 May 2005 and for the submission of briefs according to section B.4. of PO No. 11 to 14 July 2005. The Tribunal further informed the Parties that no further extensions would be possible.

46. On 26 April 2005 the Tribunal, by email, confirmed to the Parties the last advance payment of USD 180,000.00 due from Claimant had been received.

47. On 27 May 2005 Claimant submitted its Brief regarding the Quantum of its Claims and its Reply Brief to the Republic's Counterclaims of Set-Off including a Witness Statement of Mr. Raphael Harlev, an Expert Opinion of Mr. Elli Kraizberg and Claimant's Exhibits Vol. 7.

48. On 27 May 2005 Respondent No. 1 submitted its Brief on Counterclaims, a second Expert Report by PwC, Witness Statements of Mr. Hristo Todorov and Ms. Tsvetanka Krumova and two volumes of documentary evidence (Exhibits B-103 – B-155).

49. On 7 June 2005 Claimant issued a letter with reference to the "Republic's Memorial on Counterclaims" claiming several documents and Exhibits of the Republic do not have an English translation enclosed therewith. It therefore announced that it may request a further extension of time.

50. On 14 June 2005, Respondent No. 1 submitted the remaining translations as requested by Claimant.

51. On 11 July 2005 the Republic requested a 1 day extension till 15 July 2005 because 14 July 2005 is a public Holiday in France.

52.     On 15 July 2004 Claimant submitted its Brief In Response Of The
        Republic's Quantification Brief, a second Expert Opinion of Dr. Elli
        Kraizberg and Claimant's Exhibits Vol. 8.

53.     On 15 July 2005 Respondent No. 1 submitted its Reply Brief
        pursuant to section B.4 of PO No. 11 accompanied by a third Expert
        Report by PwC and five new exhibits.

54.     On 15 July 2005 Respondent No. 2 submitted its Reply Brief on the
        Quantum of the Claims pursuant to Section B.4. of PO No 11.

55.     On 29 July 2005, the Tribunal issued PO No. 15 dealing with the
        details of the Final Hearing held between 29 August and 1
        September 2005. After recalling Section B.4 of PO No. 11 and
        Chairman's letter of 3 March 2005, the Tribunal orders as follows:

        *"By 11 August 2005, each Party shall inform the Tribunal*

            a) *of the names of all witnesses and experts (of which
               statements or reports have been presented by itself or by
               the other Parties) which they wish to examine at the
               Hearing.*
            b) *of the names and functions of the persons who will be
               attending the Hearing from their respective sides.*

        4.  *The Hearing will start on **Monday 29 August 2005 in the
            Klimt Ballsaal at 9:oo a.m.***

        5.  *Intention and Scope of the Hearing*

            5.1.  *The Hearing shall deal with all aspects of the claims
                  and counterclaims on the basis of the submissions filed
                  by the Parties and taking into account the Hearing of
                  July 2004 and its respective transcript.*

            5.2.  *In view of the many and voluminous submissions and
                  documents filed by the Parties before the Hearing,
                  there is no need to repeat such presentations at the
                  Hearing. As only a selected number of these exhibits
                  will be used in the limited time available at the
                  Hearing, to avoid that all exhibits have to be
                  transported to Vienna and to avoid delays for search of
                  documents at the Hearing, the members of the Tribunal
                  intend to bring to the Hearing the major contractual
                  and selected other documents, but invite the Parties to
                  prepare and provide at the Hearing to each member of
                  the Tribunal and to the other Party **"Hearing Binders"***

    a) one containing the statements of those witnesses and opinions and reports of those experts for which the Parties will notify their examination at the Hearing under Section 3.a. above,

    b) containing copies of those further exhibits or parts of exhibits to which they intend to refer in their oral presentations at the Hearing.

    *If possible, the contents of the Hearing Binders shall also be handed over on a CD.*

5.3. *Section 9.3 of Procedural Order No. 6 1 is recalled, according to which written statements of witnesses and experts will generally be used in lieu of direct oral examination and the available Hearing time should mostly be used for cross and re-direct examination, as well as for questions by the members of the Tribunal.*

5.4. *Insofar as the Parties have submitted opinions of **legal experts**, the Tribunal does not consider it necessary to have oral examination at the Hearing. In so far as a Party wishes to further confirm or object to such legal opinions, it may do so in its oral pleadings by Counsel or Co-Counsel of its choice during the Hearing (which will be later available by transcript) and may submit a written and electronic summary of its respective pleading at the Hearing. This also applies in so far as the witness statements and expert reports go beyond factual testimony and include legal evaluations.*

6. *Agenda of Hearing*

*The following Agenda is established for the Hearing:*

6.1. *Introduction by the Chairman of the Tribunal.*

6.2. *Opening Statements by the Parties*

    *of not more than 60 minutes for the Claimant,*

    *of not more than 60 minutes for the Respondents (together).*

6.3. *Examination of witnesses and experts presented by Claimant. For each:*

    a) *Affirmation of witness or expert to tell the truth.*

b) *Short introduction by Claimant of up to 10 minutes (This may include a short direct examination on new developments after the last written statement of the witness or expert).*

c) *Cross examination by Respondents.*

d) *Re-direct examination by Claimant, but only on issues raised in cross-examination.*

e) *Remaining questions by the members of the Tribunal, but they may raise questions at any time.*

6.4. *Examination of witnesses and experts presented by Respondents. For each:*

    *vice versa as under a) to e) above.*

6.5. *Remaining Questions by the members of the Tribunal, if any.*

    *No final oral pleadings are foreseen, as the timetable of Procedural Order No. 11, in Sections B. 7 and 8, provides for Post Hearing Briefs of the Parties.*

    *The Tribunal may change this agenda after consultation with the Parties if considered appropriate during the Hearing*

7. *Witnesses and Experts*

7.1. *Attention is drawn to Section 5.4 above regarding legal evaluations in the statements of witnesses and experts.*

7.2. *To accommodate with the availability of witnesses and experts during the week of the Hearing and enable to plan their presence more precisely, the Parties may and are encouraged to agree on the order in which the witnesses and experts shall be heard and shall inform the Tribunal of such agreement by 18 August 2005.*

7.3. *Unless otherwise agreed between the Parties under Section 7.2 above or ruled by the Tribunal, the order of examination shall be as provided in Sections 6.3 and 6.4 of the above Agenda and the Party which presented*

> *the witnesses or experts shall decide on the order in which they shall be examined.*

7.4. *Unless otherwise agreed between the Parties or ruled by the Tribunal, witnesses and experts may be present in the Hearing room during the testimony of other witnesses and experts.*

7.5. *Section 9.7. of Procedural Order No. 6 regarding the Hearing is recalled regarding __witnesses or experts requiring interpretation__ to and from English.*

> *Should more than one such person presented by each side require interpretation, as no sufficient time is available for successive interpretation, the respective Party or Parties shall provide a simultaneous interpretation service and make respective arrangements in due time with the Hotel to assure that such a service is fully available at the start of the Hearing and shall, __by 18 August 2005,__ inform the Tribunal of such arrangements.*

8. *Timing*

8.1. *To give sufficient time to the Parties and the Tribunal to prepare for and evaluate examination and related files, the daily sessions shall not go beyond the period between 9 a.m. and 5 p.m. However, the Tribunal, after consultation with the Parties, may change the timing during the course of the Hearing.*

8.2. *Section 9.5 of Procedural Order No. 6 regarding the Hearing is recalled, where it is recorded that the Tribunal intends to establish equal maximum time periods for the examination by the Parties.*

8.3. *Taking into account the Calculation of Hearing time attached to this Order, the total maximum time available for the Parties shall be as follows:*

> *9 hours for Claimant*
> *9 hours for Respondents (together).*

> *It is left to the Parties how much of their allotted total time they want to spend on Agenda items 6.2, 6.3 and 6.4.*

> 8.4. As there is no room for an extension of the Hearing, the parties shall prepare their presentations and examinations at the Hearing on the basis of the above time limits.
>
> 9. <u>Other Matters</u>
>
> 9.1. As the Tribunal intends to save the costs of the attendance by the administrative assistant to the Tribunal at the Hearing, the Parties are requested to make arrangements with the Hotel in advance of the Hearing that **<u>microphones and loudspeakers</u>** are available in the Hearing room to ensure easy understanding of all interventions by all in the room and for the court reporter.
>
> 9.2. The Chairman has retained again Briault **<u>court reporting service</u>** for the Hearing.
>
> 9.3. The Tribunal may change any of the rulings in this order, after consultation with the Parties, if considered appropriate under the circumstances."

56.    The Final Hearing was conducted from 29 August to 1 September 2005 in Vienna, in accordance with PO No. 15, Section B. 4 of PO No. 11 and Chairman's letter of 3 March 2005.

57.    Following the Final Hearings in Vienna the Tribunal issued PO No. 16 cited hereafter:

> "Taking into account the discussion and agreements reached during the final Hearing in Vienna, the tribunal rules as follows:
>
> 1. <u>Testimony of Claimant's witness Mr. Frank</u>
>
> Considering
>
> Respondents' application regarding the absence of Mr. Frank at the 2005 Hearing,
>
> the respective written and oral presentations of the Parties,
>
> Sections 7.5 and 9.4 of Procedural Order (PO) No. 6 and Section 1.2. of PO No. 10,
>
> the Tribunal will take into account Mr. Frank's testimony in his written statement and at the 2004 Hearing

     a)    *insofar as it is relevant for liability regarding Claimant's claims,*

     b)    *and for the quantum of Claimant's claims insofar as it was subject to cross-examination by Respondents during the 2004 Hearing.*

     c)    *but not otherwise.*

    2.  *Further Timetable*

      2.1.  *By 12 October 2005, the Parties shall submit 1st Round Post-Hearing Briefs (no new documents), Claimant of up to 80 pages and each Respondent of up to 40 pages,*

           *presenting a summary of their final arguments at the end of this procedure,*

           *and particularly including a separate section with a clear identification of all the Relief Sought at the end of this procedure and identifying precisely which amount is requested in relation to each of the liabilities claimed.*

      2.2.  *By 31 October 2005, the Parties shall submit 2nd Round Post-Hearing Briefs (no new documents), but only in rebuttal of the 1st Round briefs of the other side, Claimant of up to 40 pages and each Respondent of up to 20 pages.*

      2.3.  *By 14 November 2005, the Parties shall submit Statements on the Costs of legal representation and assistance they are claiming in this case.*

      **2.4.  *By 21 November 2005, the Parties shall submit comments, if any, to the cost claims of the other side. ...***"

58.    On 12 October 2005 Claimant submitted its 1st Post Hearing Brief regarding Quantification and Counter Set-Off Claims pursuant to PO No. 16 of 6 September 2005.

59.    Respondent No. 1 submitted its 1st Post-hearing brief on Quantum on 12 October 2005 according to PO No. 16

60.    On 12 October 2005 Respondent No. 2 submitted its 1st Post-Hearing Brief pursuant to Section 2.1. of PO No 16.

61.    After reviewing the Parties' submissions the Tribunal issued PO No. 17 cited hereafter:

      "*Taking into account the recent submissions by the Parties regarding the exhibits enclosed to Claimant's Post-Hearing Brief, the tribunal rules as follows:*

1.  *Section 2.1.of Procedural Order No. 16 expressly provided that "no new documents" were admitted at this stage. Particularly, it provided for no exceptions to be admitted upon application by a Party or for legal authorities.*

2.  *By Procedural Orders No. 11 and 15, a long time before the Vienna Hearing, the Parties were aware of 15 July 2005 as the cut off date for the submission of documents. The Parties were given several and sufficient opportunities to submit all documents they wished to rely on before that cut off date. Neither Party objected to the cut off date.*

3.  *Claimant has not provided convincing and compelling reasons why, nevertheless, the above rulings should now be changed.*

4.  *Admitting these new documents would give Clamant an unfair advantage in this procedure which could only be levelled by admitting Respondents to reply to these new documents and also be permitted to submit further documents in rebuttal, to which, in turn, Claimant would then have to be permitted to reply. This would re-open and prolong this already by now extremely long arbitral procedure even further. The Tribunal sees no justification for such a prolongation.*

5.  *For all the above considerations, the Tribunal does not admit the new documents submitted by Claimant and will not take these documents into account."*

62.  On 31 October 2005 Claimant submitted its Post Hearing Response Brief regarding Quantification and Counter Set-Off Claims pursuant to PO No. 16 of 6 September 2005.

63.  On 31 October 2005 Respondent No. 1 submitted its 2nd Post-hearing brief on Quantum.

64.  Respondent No. 2 submitted its 2nd Post-Hearing Brief pursuant to Section 2.2. of PO No. 16 on 31 October 2005.

65.  By 14 and 21 November 2005, the Parties submitted Cost Claims and      comments thereon in accordance with PO No. 16.

66.  By letter of 22 May 2006, the chairman of the Tribunal informed the Parties that, due to some unexpected and unforeseeable circumstances, the Tribunal had been delayed in completing its deliberations for an Award in this case.

67.    By a further letter of 9 September 2006, the Chairman informed the
       Parties that additional delay had been caused by the military conflict
       involving Israel which prevented Co-Arbitrator Yarkoni from timely
       participating in the deliberations.

# E.     Relief Sought by the Parties

## E.I.   Relief Sought by Claimant

### 1.     According to Claimant's Statement of Claim of 2 February 2001

68.     In its Statement of Claim of 2 February 2001 Claimant sought the following relief (see C-SoC, paras 12.2 to 12.11):

- USD 45,000,000 for decrease in value of the company due to breach of undertaking regarding company standing as exclusive NC;
- USD 44,779,235 for decrease in value of the company due to shortage in assets and unknown liabilities, *in detail*:
  - USD 10,000,000 for shortage in Equant Shares;
  - USD 13,000,000 for restriction on timely sale of Equant Shares;
  - USD 3,662,000 for extent of Company debts being higher than provided for:
  - USD 3,387,235 for non-payment of Bulgarian Government debt due for training of Bulgarian pilots;
  - USD 1,250,000 for undisclosed freezing of Company bank accounts in Iraq and Libya;
  - USD 4,500,000 for undisclosed liabilities due to Ansett for maintenance of three Boeing Aircraft;
  - USD 6,000,000 for undisclosed liabilities in respect of payments due to Company employees;
  - USD 3,000,000 for misrepresentation regarding debt to Air Traffic Control;
- USD 35,000,000 for additional operating costs due to misrepresentations regarding fees payable to CCA;
- USD 45,000,000 for breach of undertaking to decrease the excess debt;
- USD 10,000,000 for breach of further undertakings and duties of good faith;
- USD 100,000,000 for loss of future profits;
- USD 50,000,000 for inability to sell a share in the Company to a strategic investor;
- USD 75,000,000 for damages to reputation and goodwill;
- USD 2,000,000 for increase in financing costs;

- USD **25,000,000** for failure of public offering of Zeevi Logistics and
- USD **4,000,000** for management time and expenses.

69.     Claimant further notes that (C-SoC, paras 12.12 and 12.13):

> *"[a]s aforementioned, these damages losses and costs are based on preliminary investigations and estimations, and the Zeevi Group reserves the right to change or amend these damages upon further study.*

> *Without derogating from the above, if the Company ceases to operate due to its severe financial condition, after filing of the arbitration claim, the Zeevi Group will amend these heads of damages so as to reflect its **additional** losses due to the entire loss of its investment in the Company.*

> *The damages losses and costs are claimed in the aggregate unless they overlap. Because some of the heads of damages listed above overlap (in full or in part), the Zeevi Group sets the amount of the damages claimed in this Arbitration at* **USD 230,000,000."**

## 2.     According to Claimant's Brief Regarding Relief Sought of 29 May 2003

70.     In its Brief Regarding Relief Sought of 29 May 2003 Claimant identified the relief sought then as follows (C-RS, Sections A to C):

> *"A. The Relief Sought*
> *1.  Pursuant to the Claimant's letter of 4 March 2003 the Claimant limits the amount of the relief it is seeking in this claim to US$ 70.000.000.*
>
> *It is stressed, that the limitation of the amount of the relief does not derogate from any of the Claimant's arguments as appearing in the Statement of Claim concerning the amount of damages, losses and costs it has suffered and incurred as a result of the misrepresentations and violations of the Agreement.*
>
> *It is further noted that the limitation on the amount of the relief which is currently sought has been forced on the Claimant due to the Respondent's refusal to fulfil the Arbitrator's Order regarding payment of the arbitration fees, which may force the Claimant to pay the arbitration fees for both sides.*

*The Claimant reserves the right to apply to amend the amount of the relief sought and reinstate the original amounts which were sued.*

2. *The amount of the relief sought is comprised of the following heads:*

### 2.1 Loss Of Investments Of The Claimant In The Company

*The Claimant invested in the Company (or on its behalf or in its favour) substantial amounts of money. Such investments were made in reliance and based on the warranties and representations given to the Claimant with regard to the condition of the Company prior to entering into the Privatization Agreement, and undertakings regarding its future condition and operation. These warranties and representations were subsequently found to be incorrect inaccurate, misleading and incomplete. The undertakings were breached.*

*The Claimant would not have invested the said amounts in the Company had it known about the said misrepresentations and breaches and the fact that the Respondent would deny any liability to amend and/ox indemnify against these misrepresentations and breaches.*

*Due to the true condition of the Company and breaches of the Agreement by the Respondent, the Company subsequently entered insolvency proceedings, and the said investments have now become permanently lost.*

*The overall amount invested by the Claimant excluding accrued interest is approximately US$ 30,000,000. Accordingly the Relief sought under this head is:*

**US$ 30,000,000**

**The factual and legal basis of this claim is based on the misrepresentations and breaches outlined in the Statement of Claim (see in particular sections 5-10) and the Claimant's investments in the Company and futile attempts to negotiate with the Respondent described in the Statement of Claim (see in particular sections 1 and 11),**

**In the alternative to the amount of the Relief sought in section 2.1 above the Claimant is asking for the Relief sought in section 2.2 below:**

### 2.2 Misrepresentations And Breaches Of The Agreement By The Respondent

*As detailed in the Statement of Claim the Respondent gave the Claimant various warranties, representations and undertakings with regard to the condition of the Company prior to entering into the Privatization Agreement These warranties and representations were subsequently found to be incorrect, inaccurate, misleading and incomplete. In addition, the undertakings which were given, were breached.*

*The said misrepresentations and breaches decreased the value of the Company and/or entitle the Claimant to indemnification and/or compensation and/or reimbursements in the following amounts:*

a. *Misrepresentation with regard to the total number of "Equant Shares" held by the Company and limitations on their sale. Amount of Relief sought US$ 10,500,000;* ***See in particular section 6(a) of Statement of Claim for factual and legal basis.***

b. *Misrepresentation with regard to the debts owed to the Company which were bad debts. Amount of Relief sought; US$ 750,000;* ***See in particular section 6(b) of Statement of Claim for factual and legal basis.***

c. *Misrepresentation with regard to a debt from the State to the Company in respect of the training of Bulgarian pilots. Amount of Relief sought: US$ 3,000,000.* ***See in particular section 6(c) of Statement of Claim for factual and legal basis.***

d. *Misrepresentation with regard to Company monies frozen in foreign bank deposits. Amount of Relief sought: US$ 250,000.* ***See in particular section 6(d) of Statement of Claim for factual and legal basis.***

e. *Misrepresentation with regard to the Company's liabilities involved in the maintenance of its aircraft. Amount of Relief sought: US$ 4,500,000.* ***See in particular section 7(a) of Statement of Claim for factual and legal basis.***

f. *Misrepresentation with regard to the Company's liabilities to its employees. Amount of Relief sought: US$ 3,000,000.* ***See in particular section 7(b) of Statement of Claim for factual and legal basis.***

g. *Misrepresentation with regard to the Company's total liabilities to Bulgarian Air Traffic Control. Amount of Relief sought: US$ 3,000,000.* ***See in particular section 7(c) of Statement of Claim for factual and legal basis.***

h. *Misrepresentations and breaches of undertakings with regard to the rates of aviation fees which the Company is obligated to pay. Amount of Relief sought: US$ 5,000,000. **See in particular section 8 of Statement of Claim for factual and legal basis.***

*Total amount of Relief sought under this (alternative) head:*

**US$ 30,000,000**

## 2.3 Breach Of Warranties And Undertakings Regarding Company Standing As Exclusive National Carrier

*The Respondent undertook and warranted in the Agreement that the Company enjoys and will continue (for 12 years) to enjoy the Exclusive National Carrier Status. This was one of the most significant undertakings and warranties under the Privatization Agreement and constituted a significant asset of the Company which greatly influenced the decision of the Purchasers to acquire the Company. The said warranty was subsequently found to be incorrect and the undertaking was breached. Amount of Relief sought due to this:*

**US$ 7,000,000**

*See in particular Section 5 of the Statement of Claim for factual and legal basis.*

## 2.4 Breach Of Further Undertakings And Duties Of Good-Faith

*The Agreement was breached in a serious of further breaches, including duty to transfer assets on the name of the Company, "change" in government policy regarding flight of government officials on Company planes and breach of the Agreement with regard to the sale of debt of Yugoslavian railways. The total Relief sought for these further breaches is:*

**US$ 2,000,000**

*See in particular section 10 of Statement of Claim for factual and legal basis.*

## 2.5 Loss of Future Profits

*Amount of the Relief sought:*

**US$ 12,000,000**

*See in particular section 12.6 of Statement of Claim for factual and legal basis of this Relief.*

## 2.6 Inability To Sell A Share In The Company To A Strategic Investor

*Amount of Relief sought:*

*US$ 4,000,000*

*See in particular section 12.7 of Statement of Claim for factual and legal basis.*

### 2.7 Damage To Reputation And Goodwill

*Amount of Relief sought:*

*US$ 5,000,000*

*See in particular section 12.8 of Statement of Claim for factual and legal basis.*

### 2.8 Increase In Financing Costs

*Amount of Relief sought:*

*US$ 2,000,000*

*See in particular section 12.9 of Statement of Claim for factual and legal basis.*

### 2.9 Failure Of Public Offering of Zeevi Logistics Amount of Relief sought:

*Amount of Relief sought:*

*US$ 6,000,000*

*See in particular section 12.10 of Statement of Claim for factual and legal basis.*

### 2.10 Management Time and Expenses

*Amount of Relief sought:*

*US$ 2,000,000*

*See in particular section 12.11 of Statement of Claim for factual and legal basis.*

2.11 *Total Amount Of Relief Sought (as explained above the Relieves sought in Sections 2.1 and 2.2 above are alternative to each other):*

*US$ 70,000,000*

*For the avoidance of doubt it is stressed that the limitation of the total amount of Relief as detailed herein does not derogate from the Claimant's arguments regarding the amount of damages, losses and costs it has suffered and incurred as detailed in the Statement of Claim.*

### B. From Which Respondent The Relief is Sought

4. *The above Relief is sought from the Republic of Bulgaria.*

5. *The Claimant notes the Respondent's conflicting position that the Republic of Bulgaria is not a party to these proceedings. It is understood that this issue is going to be resolved by the honourable Arbitrators after the appropriate briefs by the parties are filed.*

6. *If it is decided that the Republic of Bulgaria is not a party to these proceedings and that only the Privatization Agency of the Republic of Bulgaria, is a party (which is denied), then the Relief is sought against the Privatization Agency or any other entity which the honourable Arbitrators will decide are the Respondents in these proceedings.*

7. *If it is decided that the Privatization Agency is a separate entity from the Republic of Bulgaria (which is denied) then the Relief is sought both from the Republic of Bulgaria and the Privatization Agency.*

*C. The Factual and Legal Basis Of These Claims*

8. *The Arbitrators are referred to section 2 above which points, with respect to each of the relieves sought, which are the relevant sections in the Statement of Claim supporting the said relieves. It is stressed, however, that the reference is made to particular sections in the Statement of Claim does not exclude the relevance of other sections in the Statement of Claim, which provide me factual and legal background to all the claims and relieves sought."*

## 3. According to Claimant's Response Brief of 13 May 2004

71. The latest version of Relief Sought regarding Liability can be found in Claimant's Response Brief of 13 May 2004 (C II, para. 189):

„*In view of the above the Honorable Arbitrators will be requested to determine that the Republic of Bulgaria and the Privatization Agency of the Republic of Bulgaria are **each jointly and severally** liable for the following misrepresentations and breaches:*

a. *Breach of the undertaking that the Company's status as exclusive national carrier will be maintained for a period of 12 years, and that acquisition of the Company by Zeevi Holdings shall not adversely affect this status and the rights attaching thereto.*

b. *Misrepresentation regarding the Company's entitlement to Equant Shares and the limitations existing on their sale.*

c. *Misrepresentation regarding subsidies and financial support enjoyed by the Company prior to the privatization*

     *d.     Misrepresentation    regarding    Ansett    aircraft*
         *maintenance liabilities.*

     *e.     Misrepresentation regarding liabilities in respect of*
         *provisions for employees.*

     *f.     Breach of the representation regarding debt of the*
         *Government of Bulgaria due in respect of training of*
         *pilots.*

     *g.     Non-disclosure of future government plans regarding*
         *the Company and change of Government policies*
         *towards the Company after its privatization.*

     *h.     Misrepresentation regarding new debt owed by the*
         *Company to the Air Traffic Control.*

     *i.     Breach of undertaking to transfer real estate assets in*
         *the Company's name.*

     *j.     Breach of undertaking regarding debt of the*
         *Yugoslavian Railway Company.*

     *k.     Breach of undertaking to assist with respect to the*
         *Company's Excess debts.*

*The Honorable Arbitrators shall further be requested to award expenses in the Claimant's favor in respect of this stage of the proceeding."*

## 4.     According to Claimant's Post-Hearing Brief dated 8 October 2004

72.     Claimant's Relief Sought in its Post-Hearing Brief of 8 October 2004 corresponds exactly with the Relief Sought by Claimant in its Response Brief dated 29 May 2003.

## 5.     According to Claimant's Post-Hearing Response Brief of 12 November 2004

73.     The Relief Sought in Claimant's Post-Hearing Response Brief dated 12 November 2004 equals the Relief Sought in Claimant's Post-Hearing Brief of 8 October 2004.

6.  **According to Claimant's Brief Regarding the Admissibility of the Republic's Counterclaims of 12 November 2004**

74.  The Final Conclusion of Claimant's Brief Regarding the Admissibility of the Republic's Counterclaims dated 12 November 2004 is that:

> *"the Honorable Tribunal is asked to rule that the Real Counterclaims are inadmissible"* (see C VI, para. 53).

75.  According to Claimant's Further Brief in Reply to the Republic's Counterclaims of Set-Off dated 27 May 2005.

76.  The Honourable Tribunal is asked to dismiss the Republic's set-off claims.

77.  Furthermore, Claimant asks the Tribunal to award expenses in the Claimant's favor in respect of this stage of the proceedings. (C VIII, para. 161).

7.  **According to Claimant's 1st and 2nd Post Hearing Brief of 12 and 31 October 2005**

78.  The latest relief sought by Claimant can be found in paras 156-157 of its 2nd Post Hearing Brief of 31 October 2005. They concur with the amounts claimed in Claimant's 1st Post Hearing Brief of 12 October 2005 (see also paras 411-415) but include updated interest calculations until 28 October 2005.

79.  Claimant requests the Tribunal to award it with the following amounts:

> *"A. Alternative 1*

> *i. Misrepresentations and Breaches*

| Description | Principal Amount (USD) | Interest Amount During The Period 1 February 2001 – 28 October 2005 (USD) | Total Amount (USD) |
|---|---|---|---|
| National Carrier | 5,000,000 | 2,947,013 | 7,947,013 |
| Equant Shares | 11,000,000 | 6,483,428 | 17,483,428 |
| Aviation Fees | 5,000,000 | 2,947,013 | 7,947,013 |
| Ansett Aircraft | 2,400,000 | 1,414,566 | 3,814,566 |
| Employees | 2,400,000 | 1,414,566 | 3,814,566 |
| Training Of Pilots | 2,500,000 | 1,473,506 | 3,973,506 |
| Change Of Government Policies | 2,000,000 | 1,178,804 | 3,178,804 |
| ATC Loan | 1,000,000 | 589,402 | 1,589,402 |
| Real Estate | 500,000 | 294,701 | 794,701 |
| Yugoslavian Debt | 2,075,000 | 1,223,009 | 3,298,009 |
| Total | 33,875,000 | 19,966,008 | 53,841,008 |

*ii. Compensation for the loss of the value of the Company*

| Description | Principal Amount (USD) | Interest Amount During The Period 1 February 2001 – 28 October 2005 (USD) | Total Amount (USD) |
|---|---|---|---|
| Company Value | 33,875,000 | 19,966,012 | 53,841,012 |

**B. Alternative 2**

*i. Amount Transferred Over And Above Contractual Commitment*

| Description | Principal Amount (USD) | Interest Amount During The Period 1 February 2001 – 28 October 2005 (USD) | Total Amount (USD) |
|---|---|---|---|
| Amount Transferred Over And Above | 14,750,000 | 8,693,688 | 23,443,688 |

*ii. Compensation for the loss of the value of the Company*

Final Award 25 October 2006 in UNCITRAL Arbitration
Zeevi v Bulgaria et al

| Description | Principal Amount (USD) | Interest Amount During The Period 1 February 2001 – 28 October 2005 (USD) | Total Amount (USD) |
|---|---|---|---|
| Company Value | 45,000,000 | 26,523,116 | 71,523,116 |

*iii. Compensation for value of additional assets*

| Description | Principal Amount (USD) | Interest Amount During The Period 1 February 2001 – 28 October 2005 (USD) | Total Amount (USD) |
|---|---|---|---|
| Value of additional assets and/or additional liabilities | 8,000,000 | 4,715,220 | 12,715,220 |

## C. Alternative 3

*i. Damages or restitution of amounts transferred*

| Description | Principal Amount (USD) | Interest Amount During The Period 1 February 2001 – 28 October 2005 (USD) | Total Amount (USD) |
|---|---|---|---|
| Amounts Transferred by Zeevi Holdings | 23,150,000 | 13,644,669 | 36,794,669 |

*ii. Compensation for the loss of the value of the Company*

| Description | Principal Amount (USD) | Interest Amount During The Period 1 February 2001 – 28 October 2005 (USD) | Total Amount (USD) |
|---|---|---|---|
| Company Value | 44,600,000 | 26,287,352 | 70,887,352 |

**In addition to each of the Alternatives 1, 2 or 3**

| *Description* | *Principal Amount (USD)* | *Interest Amount During The Period 1 February 2001 – 28 October 2005 (USD)* | *Total Amount (USD)* |
|---|---|---|---|
| Increase in Financing Costs, etc. | 2,250,000 | 1,326,155 | 3,576,155 |

80.   Claimant further requests the Tribunal (see C XI para. 157):

> „a. *To award the Claimant the amounts in accordance and as set out in Part C of the Claimant's First Post Hearing Brief on Quantification (updated to reflect the interest calculations set out in section 156 above); and determine that interest, according to the Bulgarian statutory rate, will be added on any amount awarded until the date of actual payment.*
>
> b.   *To dismiss the Republic's counterclaims by way of set-off.*
>
> c.   *To award the Claimant any other relief that the Tribunal considers just and appropriate.*
>
> d.   *To award the Claimant its costs and expenses with respect of these arbitration proceedings. "*

# E.II.   Relief Sought by Respondents

## 1.   According to Respondent's Statement of Defense of 8 February 2002

81.   In the Privatization Agency's Statement of Defense (R-SoD, Section 9) the Respondent requests an Award in its favour as follows:

> *"(a) declaring that the arbitration clause as set in Article 15 of the Contract is null and void and the present Arbitral Tribunal is not competent to resolve the dispute and make an award.*
>
> *(b) in alternative - declaring that the present Arbitral Tribunal is not competent to resolve he dispute and make an award as it was improperly formed against the provisions of the arbitration clause and the UNCITRAL Rules.*

(c) *Further in alternative - declaring that the Respondent has not breached the Contract or a warranty as it had properly and in good faith informed the Claimant of all necessary aspects of the financial, legal and material status of the Company and had not breached any of its provisions;*

(d) *Further in alternative - finding that the Claimant is not entitled to receive any of the sums claimed due to the fact that the Claimant did not suffer the damages claimed and such damages may not be caused by the Respondent as it had properly performed its obligations and did not misinterpret any important issue in giving necessary information to the Claimant;*

(e) *Further in alternative - declaring that the obligations of the Respondent were properly executed;*

(f) *directing the Claimant to pay all of the Respondent's costs and expenses including legal costs incurred in connection with the preparation for and conduct of the proceedings, including, but not limited to, the administrative expenses of the Arbitral Tribunal, the fees and expenses of the arbitrators and legal counsel, and those of any experts and witnesses."*

## 2.    Relief Sought in the present procedure on liability

### a.    *Relief sought by the Republic of Bulgaria*

#### (1)    *According to Republic of Bulgaria's Brief of 21 June 2004*

82.    From the Republic of Bulgaria's Brief of 21 June 2004 the following relief sought is (R II B, paras 392 *seq.*):

"*1. The Republic's Counterclaim*

*In view of the foregoing, the Republic respectfully requests that the Arbitral Tribunal:*

(1) *DISMISS Zeevi's claims in their entirety; or*

(2) *DECLARE that Zeevi's claim for the return of its "investments" in Balkan Airlines is inadmissible; and/or*

(3) *DECLARE that Zeevi is entitled to claim only in respect of damage it has suffered; and/or*

(4) *DECLARE that Zeevi's damages claims described at paragraph 334 above are inadmissible on account of their remoteness and/or speculative character; and/or*

(5) *DECLARE that any compensation due in respect of any admissible claims by Zeevi will be set off against compensation due from Zeevi in respect of the Republic's counterclaims; and/or*

(6) *DECLARE that any compensation due in respect of any admissible claims by Zeevi will be set off against amounts and benefits received by Zeevi, directly or indirectly, as a consequence of (a) the consultancy and management agreements described at paragraphs 313 and 315 above, (b) the sales of Balkan Airlines' Equant shares in August 2001 and June 2002 and (c) the sales of Balkan Airlines' real estate; and/or*

(7) *DECLARE, in respect of any admissible claims by Zeevi, that the Republic's liability to compensate Zeevi will be extinguished or reduced as a result of Zeevi's failure to comply with the requirements of due diligence and mitigation of damages; and/or*

(8) *DECLARE that Zeevi has breached the Privatization Agreement; and*

(9) *AWARD the Republic liquidated damages in an amount to be quantified; and*

(10) *AWARD the Republic damages arising from the discontinuance of operations of Balkan Airlines, the Bulgarian National Carrier, in an amount to be quantified; and*

(11) *AWARD the Republic interest on the amounts awarded under paragraphs (9) and (10) above, in amounts to be quantified; and*

(12) *AWARD such other relief as the Tribunal deems appropriate.*

## 2. Costs

*The Republic respectfully requests the Arbitral Tribunal to order Zeevi to pay all of the costs and expenses of this arbitration, including the fees and expenses of the Arbitral Tribunal, the fees*

*and expenses of any experts appointed by the Arbitral Tribunal and the fees and expenses of the Republic's legal representation in respect of this arbitration and any other costs of this arbitration."*

(2) **According to the Republic of Bulgaria's Brief on the "Real Counterclaims" dated 17 September 2004**

83. The Republic in its Brief on the "Real Counterclaims" requests the Tribunal to

   *"admit the Real Counterclaims formulated by the Republic in section II of this memorial in the present arbitration (R IV B, para. 85)."*

(3) **According to the Republic of Bulgaria's Post Hearing Brief dated 8 October 2004**

84. The Relief Requested by the Republic of Bulgaria in its Post Hearing Brief of 8 October 2004 is as follows (R III B, para. 202 et sec.):

   *"1. Liability*

   *In view of the foregoing, the Republic respectfully requests that the Arbitral Tribunal:*

   *(1) DISMISS Zeevi's claims in their entirety;*

   *(2) DECLARE that Zeevi has breached the Privatization Agreement;*

   *(3) AWARD the Republic liquidated damages in an amount to be quantified;*

   *(4) AWARD the Republic damages in an amount to be quantified;*

   *(5) AWARD the Republic interest on the amounts awarded under paragraphs (3) and (4) above, in amounts to be quantified; and/or*

   *(6) AWARD such other relief as the Tribunal deems appropriate.*

   *2. Quantum*

   *In the event that the Tribunal's award on liability is such as to require this arbitration to proceed to a quantum phase, we invite*

*the Tribunal to make the following declarations in respect of the principles of recovery, in order to ensure that the quantum phase is conducted as efficiently as possible (in the event that the Tribunal considers it inappropriate at this time to make any findings in respect of the quantification of damage, the Republic hereby reserves its right to request the following declarations in the next phase of this arbitration):*

(1) *DECLARE that Zeevi's claim for the return of its "investments" is inadmissible as a matter of Bulgarian law, for the reasons set out at paragraphs 317-328 of the Republic's Defence and Counterclaim of 21 June 2004;*

(2) *DECLARE that Zeevi is entitled to claim only in respect of damage it has suffered; and/or*

(3) *DECLARE that any compensation due to Zeevi will be set off against compensation due from Zeevi in respect of the Republic's counterclaims;*

(4) *DECLARE that any compensation due to Zeevi shall be reduced by the sum total of amounts and benefits received by Zeevi, directly or indirectly, as a consequence of (a) the consultancy and management agreements entered into by Balkan Airlines and various Zeevi entities, (b) the sales of Balkan Airlines' Equant shares in August 2000 and June 2002, and (c) the sales of Balkan Airlines' real estate; and/or*

(5) *DECLARE that the Republic's liability to compensate Zeevi will be extinguished or reduced as a result of Zeevi's failure to comply with its duties of due diligence and mitigation of damages.*

3. *Costs*

*The Republic respectfully requests the Arbitral Tribunal to order Zeevi to pay all of the costs and expenses of this arbitration, including the fees and expenses of the Arbitral Tribunal, the fees and expenses of any experts appointed by the Arbitral Tribunal and the fees and expenses of the Republic's legal representation in respect of this arbitration and any other costs of this arbitration."*

**(4)** **According to the Republic's Second Post-Hearing Brief dated 12 November 2004**

85.     In its Second Post-Hearing Brief, the Republic of Bulgaria:

>   *"reiterates the prayers for relief formulated at paragraphs 202,*
>   *203 and 204 of its Post Hearing Brief." (see RV B, para. 64;*
>   *above, para. 46)*

### (5)     *According to The Republic's Memorial on Counterclaims dated 27 May 2005*

86.     The Republic respectfully requests the Arbitral Tribunal to:

>   *"[...]*
>   *(i) AWARD the Republic USD 56,510,712 by way of set-off*
>   *on any amount that the Arbitral Tribunal may award to the*
>   *Claimant; and*
>
>   *(ii)     AWARD the Republic any other relief that the Arbitral*
>   *Tribunal considers appropriate.*
>
>   269   *Pursuant to Article 104 of the Bulgarian Law on Contracts*
>   *and Obligations, the Republic respectfully submits this*
>   *Brief as a set-off statement insofar as it concerns all*
>   *monetary compensation for damages arising from Zeevi's*
>   *non-performance.*
>
>   *B.  Costs*
>
>   270   *The Republic respectfully requests the Arbitral Tribunal to*
>   *ORDER Zeevi to pay all of the costs and expenses of this*
>   *arbitration, including the fees and expenses of the Arbitral*
>   *Tribunal, the fees and expenses of any experts appointed by*
>   *the Arbitral Tribunal, the fees and expenses of*
>   *PricewaterhouseCoopers, the fees and expenses of the*
>   *Republic's legal representation in respect of this*
>   *arbitration, and any other costs of this arbitration; all of*
>   *these amounts to be assessed".*

### (6)     *According to The Republic's First Post-hearing brief on Quantum dated 31 October 2005*

87.     In R VIII B, paras 175, 176 and R IX B paras 96, 97 Respondent No.
1 summarizes its relief sought as follows:

>   *"A. Relief Sought*
>
>   175.  *[...] the Republic respectfully requests that the Arbitral*
>   *Tribunal:*

(i)     DISMISS Zeevi's claims in their entirety; or

(ii)    AWARD the Republic USD 59,714,733.41 consisting of

      a.   USD 39,090,677 in liquidated damages for breaches of Article 8 in respect of the period 1999-2004, together with interest thereon of USD 5,801,580.25, giving a total of USD 44,892,257.25;

      b.   USD 5,000,000 in liquidated damages for breaches of Article 7 in respect of the period 1999-2004, together with interest thereon of USD 1,072,013.02, and USD 5,000,000 in lieu of Zeevi's performance of its debt-servicing obligation for the period 2005-2009, giving a total of USD 11,072,013.02;

      c.   USD 2,798,757 in liquidated damages for breaches of Article 7.9.1, together with interest thereon of USD 951,706.14, giving a total of USD 3,750,463.14;

all by way of set-off on any of the amount that the Arbitral Tribunal may award to the Claimant; and

(iii)   AWARD the Republic any other relief that the Arbitral Tribunal considers appropriate.

### B. Costs

176. The Republic also respectfully requests the Arbitral Tribunal to ORDER Zeevi to pay all of the costs and expenses of this arbitration, including the fees and expenses of the Arbitral Tribunal, the fees and expenses of any experts appointed by the Arbitral Tribunal, the fees and expenses of PricewaterhouseCoopers, the fees and expenses of the Republic's legal representation in respect of this arbitration, and any other costs of this arbitration."

### b.   Relief Sought by the Privatization Agency

### (1)   According to Privatization Agency's Brief of 21 June 2004

88.   The Privatization Agency defined the relief sought in its Brief of 21 June 2004 as follows (R II PA, para. 224):

"a. Both the Second Respondent - the Privatization Agency of the Republic of Bulgaria and the First Respondent - the Republic of Bulgaria **are not jointly or severally liable** for the any of the claims of the claimant, being addressed as misrepresentations and breaches:

(i) Not liable for any loss of investments made by Zeevi Holdings or any other related to it company or person;

(ii) Not liable for breach of the undertaking that the Company's status as exclusive national carrier will be maintained for a period of 12 years, and that acquisition of the Company by Zeevi Holdings shall not adversely affect this status and the rights attaching thereto;

(iii) Not liable for misrepresentation regarding the Company's entitlement to Equant Shares and the limitations existing on their sale

(iv) Not liable for misrepresentation regarding subsidies and financial support enjoyed by the Company prior to the privatization

(v) Not liable for misrepresentation regarding Ansett aircraft maintenance liabilities

(vi) Not liable for misrepresentation regarding liabilities in respect of provisions for employees

(vii) Not liable for breach of the representation regarding debt of the Government of Bulgaria due in respect of training of pilots

(viii) Not liable for non-disclosure of future government plans regarding the Company and change of Government policies towards the Company after its privatization

(ix) Not liable for misrepresentation regarding new debt owed by the Company to the Air Traffic Control

(x) Not liable for breach of undertaking to transfer real estate assets in the Company's name

(xi) Not liable for breach of undertaking regarding debt of the Yugoslavian Railway Company

(xii) *Not liable for breach of undertaking to assist with respect to the Company's Excess debts.*

b. *The Second Respondent - the Privatization Agency of the Republic of Bulgaria and the First Respondent - the Republic of Bulgaria **are not both or severally liable** for loss of investments incurred by the Claimant or it subsidiaries as submitted in its Statement of Claim and Brief on the Relief Sought as well as in the further Claimant's submissions;*

c. *The Second Respondent - the Privatization Agency of the Republic of Bulgaria and the First Respondent - the Republic of Bulgaria **had not breached** any provision of the Agreement and/or the applicable laws and **are not both or severally liable** for any of the claims submitted by the Claimant in its Statement of Claim and Brief on the Relief Sought as well as in the further Claimant's submissions;*

d. *Further and in the alternative, **the Second Respondent is not liable** for any of the claims set forth in Claimant's Statement of Claim and as amended with the further Claimant's submissions, as the Second Respondent is not a party to the Privatization Agreement but just was participating as agent of the First Respondent and therefore the rights and obligations occurring of this Agreement had caused directly in the patrimony of the First Respondent.*

e. *The Arbitral Tribunal is further requested to award the First Respondent and Second Respondent all of their expenses in respect of all stages of the proceedings, and order the Claimant to reimburse the Respondent's for their expenses as awarded, together with interest calculated on them and applicable from the day such expenses were incurred;*

f. *In regard of the above the Arbitral Tribunal is further requested to decide the costs of the Arbitration to be borne by the Claimant only.*

**(2)     *According to the Privatization Agency's Post-Hearing Brief of 8 October 2004***

89.     In addition to the Relief Sought by the Respondent No. 2 in its brief of 21 June 2004, the Privatization Agency, responding to the Relief Sought by Claimant, in its Post-Hearing Brief of 8 October 2004, requested the Tribunal

> *"to determine that all of Claimant's claims must be dismissed, and/or rejected as unfounded, not proven and not within the scope of the Arbitration Clause."* (R III PA, paras 216 et seq.)

### (3) *According to the Privatization Agency's Second Post-Hearing Brief dated 12 November 2004*

90. The latest relief sought by Respondent No. 2 can be found in R VI PA (see para. 107). Respondent No. 2 requests the Tribunal to determine that:

> *"1. Both the Second Respondent - the Privatization Agency of the Republic of Bulgaria and the First Respondent - the Republic of Bulgaria are not jointly or severally liable for the any of the claims of the claimant, being addressed as compensation and indemnity for misrepresentations and breaches:*
>
> > *(i)    Misrepresentation and breaches regarding national carrier status;*
> >
> > *(ii)    Misrepresentation regarding the Equant Shares;*
> >
> > *(iii)    Misrepresentation regarding aviation fees;*
> >
> > *(iv)    Misrepresentation regarding Ansett aircraft;*
> >
> > *(v)    Misrepresentation regarding Company employees;*
> >
> > *(vi)    Misrepresentation regarding training of pilots;*
> >
> > *(vii)    Breaches regarding change of Government policies;*
> >
> > *(viii) Misrepresentation regarding Air Traffic Control loan;*
> >
> > *(ix)    Breach regarding transfer of real estate*
> >
> > *(x)    Breach regarding debt of the Yugoslavian Railway Company*
>
> *2. The Second Respondent - the Privatization Agency of the Republic of Bulgaria and the First Respondent - the Republic of Bulgaria are not both or severally liable for any claim initially filed as submitted in its Statement of Claim and further submissions and not sustained or quantified in the stage of quantification of the proceedings. That particular request is provoked by the persistent alteration, evolution, substitution, etc. of the claims throughout the course of the proceedings where some of the initially filed claims were dropped or simply not maintained, others were included*

*subsequently and third changed drastically in terms of grounds or quantification;*

3. *The Second Respondent - the Privatization Agency of the Republic of Bulgaria and the First Respondent - the Republic of Bulgaria are not both or severally liable for compensation for the amount which Zeevi Holdings transferred in the Company allegedly over and above its contractual commitments, which is denied;*

4. *The Second Respondent - the Privatization Agency of the Republic of Bulgaria and the First Respondent - the Republic of Bulgaria are not both or severally liable for compensation for the loss of the value of the company;*

5. *The Second Respondent - the Privatization Agency of the Republic of Bulgaria and the First Respondent - the Republic of Bulgaria are not both or severally liable for compensation for damages or restitution of the amounts transferred by the Claimant in connection to the agreement;*

6. *The Second Respondent - the Privatization Agency of the Republic of Bulgaria and the First Respondent - the Republic of Bulgaria are not both or severally liable for compensation for any additional damages with respect to increase in financial costs, failure of public offering of Zeevi logistics, managerial time and expenses and damages to reputation and good will;*

7. *The Second Respondent - the Privatization Agency of the Republic of Bulgaria and the First Respondent - the Republic of Bulgaria had not breached any provision of the Agreement and/or the applicable laws and are not both or severally liable for any of the claims submitted by the Claimant in its Statement of Claim and Brief and further Claimant's submissions;*

8. *Further and only in the alternative, that **the Second Respondent** is not liable for any of the claims set forth in Claimant's Statement of Claim and as amended with the further Claimant's submissions, given the Second Respondent is not a party to the Privatization Agreement but just was participating as agent of the First Respondent and therefore the rights and obligations were assumed for the First Respondent as was considered in sections 4.1 to 4.6 of Procedural Order No. 4.*

> *9. The Arbitral Tribunal is further requested to award the First and the Second Respondent all of their expenses incurred in respect of all stages of the proceedings (as they will be identified in the forthcoming Statements of costs), and order the Claimant to compensate the Respondents for their expenses as awarded.*
>
> *10. In regard of the above the Arbitral Tribunal is further requested to decide the costs of the Arbitration to be borne by the Claimant.*

91. Later in the brief the Privatization Agency ads the following request:

> *"repeats (here) paragraph 9 of Respondent's First Brief dated 13 April 2004, paragraph 224 of Respondent's Second Brief dated 21 June 2004 and paragraphs 217 – 219 of its First Post Hearing Brief dated 8 October 2004."* (R IV PA, para. 123).

### *(4)    According to the Privatization Agency's Second Round Post-Hearing Brief of 31 October 2005*

92. In RVII PA Respondent No. 2 summarizes its relief sought (see para. 87). It requests the Tribunal to determine that:

> *"(i)   All Zeevi's claims are groundless, unproven and unjustified and therefore should be dismissed in full;*
>
> *(ii)   The Claimant is not entitled to compensation pursuant to any of the alternatives as set in Part C of the Claimant's Post-hearing Brief regarding quantification;*
>
> *(iii)  The Republic is to be awarded the amounts of its counterclaims by way of set-off to the extent the Claimant may be awarded for some of its claims;*
>
> *(iv)   In the alternative, the Second Respondent is not liable for any of the claims with respect to the Tribunal's view that the Privatization Agreement was participating as agent of the First Respondent and therefore the rights and obligations were assumed for the First Respondent.*
>
> *(v)    The Respondents are entitled to compensation for their expenses born in all stages of the procedure."*

## E.III.      The Tribunal

93.     In its Procedural Order No.16, the Tribunal ruled:

> *"By 12 October 2005, the Parties shall submit 1st Round Post-Hearing Briefs (no new documents), Claimant of up to 80 pages and each Respondent of up to 40 pages, presenting a summary of their final arguments at the end of this procedure, and particularly including a separate section with a clear identification of all the Relief Sought at the end of this procedure and identifying precisely which amount is requested in relation to each of the liabilities claimed."*

94.     Therefore, though the Relief Sought by the Parties has changed over this long procedure -- which is not unusual as the case, its evidence and the arguments of the Parties change -- the Tribunal concludes that it can and must only decide on the relief sought by the Parties in their last submissions. Earlier relief sought is cited above and may be referred to present a full picture of the procedural history and because it may be of some relevance in certain contexts for considerations of the Tribunal.

## F.  General Considerations of the Tribunal

95.  This procedure has been exceptionally long and burdensome for all concerned. Both the Claimant and the Respondents, in earlier stages of the procedure, have taken long periods to proceed with their claims, counterclaims and contentions which were changed a number of times. But after the final Hearing was held and the last submissions filed by the Parties, also on the side of the Tribunal, outside circumstances have delayed its deliberations. Furthermore, while the professional and personal relationship between the members of the Tribunal was never disturbed, the views of its three members on a number of issues proved to be very different and so far apart that a number of rounds of extensive deliberations and a readiness for compromise only made it possible to reach an Award which, though not being identical with the full personal preference of any of its members, at least made it possible to issue an Award supported by a majority of the Tribunal.

96.  Before the Tribunal can enter into evaluating the facts and contentions of the Parties on the merits, it seems appropriate to identify the legal framework in which the relevance of the factual aspects can and must be considered.

## F.I.  Applicable Substantive Law

## 1.  Contentions by Respondent No. 1

97.  Respondent No. 1 contends that the substantive law applicable in these proceedings is Bulgarian law as the *lex loci contractus* regarding claims based on the Agreement and as the *lex loci delicti commisi* regarding claims based on tort.

98.  Although, there are some administrative aspects in relation with the privatization process, the Parties to the Agreement enjoy equal status. Hence, their contractual relations are governed by the Bulgarian laws on sales contracts, subsidiary by the Trade Law, the Transformation and Privatization of State and Municipal Owned Enterprises Act and the OCA (R I, paras 3.1. *et seq.*). For determination of the scope of liability Respondent No. 2 refers to the express agreements of the Parties on this issue as set forth in Article 11.1 of the PA and paragraph 9.1.2. of the Amendment to the PA dated 15 July 1999 (R I, para. 3.10.).

## 2. Contentions by Respondent No. 2

99. Respondent No. 2 contends that all claims asserted should be evaluated in accordance with Bulgarian laws, in particular the OCA.

## 3. Contentions by Claimant

100. Even though Claimant does not directly address the question of applicable substantive law, it is its view that the primary source of law is a contract concluded between the parties. In addition Claimant implicitly acknowledges that in the case at issue Bulgarian Law will serve to fill gaps not governed by the Agreement. This becomes obvious in several of its arguments. E.g. Claimant in C XI, para. 19 states:

    *"ii. Order Of Argument*

    *19. [...]*

    *Secondly: An analysis is made of Zeevi Holdings' rights to be indemnified or compensated for the value of the misrepresentations, pursuant either the provisions of the Agreement or Bulgarian law."*

101. Even though Claimant contests Respondents' legal argument under the Agreement or Bulgarian Law, it does not contest its applicability in general. This conclusion can be drawn from C XI, para 153. Claimant states:

    *"As detailed below, the Respondents' analysis of the law does not reflect the reality under both the Agreement or Bulgarian law. As can be expected, both of which recognize, that when misrepresentations are made, liability for this arises."*

102. In addition Claimant makes reference to European Principles of Contract Law (see C XI, paras 175-176, 209).

## 4. The Tribunal

103. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents and the evidence:

    **Party Submissions:**

    R 1          paras 3.1. *et seq.*, 3.10.

104.    Pursuant to para. 15.1 of the PA the Parties have agreed to settle any claim or dispute arising out of or in relation to this contract by arbitration to be conducted under the Rules of Arbitration of the United Nations Commission on International Trade (UNCITRAL Rules). Regarding the substantive law to be applied by the tribunal, Article 33 UNCITRAL Rules provides:

> *"Article 33*
> *1. The arbitral tribunal shall apply the law designated by the parties as applicable to the substance of the dispute."*

105.    In Section 14.1 of the PA the Parties have agreed that the PA *"shall be governed by and construed in accordance with the laws Bulgaria."* Therefore, concerning the merits of the case the law of the Republic of Bulgaria will be applied.

106.    Since it has not been contested by the Parties that under the law of the Republic of Bulgaria, generally and subject to mandatory provisions of the law, the terms of the parties' contract have the force of law between them, and the parties must comply with what is expressly stated in the contract the PA is the primary legal source for the Tribunal's findings.

107.    Additionally, Bulgarian Law may be applied where the PA lacks an agreement on certain issues.

108.    Furthermore, pursuant to Article 33 (3) UNCITRAL Rules *"usages of trade applicable to the transaction"* might be pertinent, although they are cautiously applied.

## F.II.  Procedural Issues

109.    As set out above the Parties have agreed to settle any claim or dispute arising out of or in relation to the PA by arbitration to be conducted under UNCITRAL Rules. The place of arbitration being Paris, France (*see:* para. 15.1 PA). As the UNCITRAL Rules are silent and in the absence of any express choice of law by the Parties regarding the applicable arbitration law, the express choice of Paris, France as the seat of arbitration, gives rise to the applicability of any mandatory provision of French arbitration law.

110. Therefore, the Award will be a "French award" and thus, in so far as possible under French arbitration law, subject to review before French Courts.

## G.     Liability under the claims raised by Claimant

## G.I.   Legal   Grounds   and   Principles   regarding Liability and Compensation

### 1.     Summary of Contentions by Claimant

#### a.     *Indemnity Clauses contained in the PA*

111.    Claimant primarily relies on Articles 9.1.2 and 11.1. of the PA to entertain its claims. It is emphasized that Articles 9.1.2 and 11.1 impose general liability not confined to the issues dealt with in the two letters that form Appendix 11. If, however, an issue covered by these letters is concerned, liability shall only be borne in accordance with the latter (C II, para. 29; C X, paras 165-176). Necessity for this provision arose as the Minister of Finance's letter provides for a mechanism of how to deal with liabilities unknown at the time the Parties signed the PA (C II, para. 32).

112.    Claimant argues that even if the Respondents' assertion that Article 11.1 of the PA was null and void was correct, this fact did not render Article 9.1.2 of the PA invalid in its entirety. The latter provision encompasses two parts; the first imposes a general liability on the Respondents, whereas the second one, the part referring to Section 11.1.1, limits the obligation to provide compensation. Thus, if the second part is deemed null and void the scope of Article 9.1.2 is even broadened (C II, para. 23).

113.    A similar line of argument applies to Article 11.1 of the PA which provides for liability for misrepresentations. Such liability is subject to a qualification as it is to be borne "*in accordance to Attachment 11*." Claimant is of the view that reference to "Attachment 11" instead of "Appendix 11" is a mere typographical error. If it is not, however, liability imposed on Respondents under Article 11.1 is not subject to any qualification (C II, para. 24).

114.    The aforementioned reasoning therefore applies to the matter of unknown liabilities at the time the PA was signed. Claimant points out that its claims for misrepresentations do not concern such unknown liabilities. The claims rather concern known but undisclosed liabilities, missing assets and liabilities that arose only after the PA was signed (C II, para. 31).

115. In a subsidiary argument Claimant takes the view that liability to indemnify and compensate due to the misrepresentations is also imposed on the Respondents pursuant to Articles 3.6.2 and 3.7.3 of the PA, in which the Respondents *"warranted"* that (Article 3.6.2):

> *"all the information contained in this Agreement, the Information Disclosure Letter and in the Information Memorandum is true and accurate in all material respects, is not misleading and has been ceded to the Buyer is good faith"*

and (Article 3.7.3):

> *"there has been no material adverse change in the financial position of the Company since 31 December 1998..."* (C X, paras 177 et seq.)

116. Breach of these warranties gives rise to liability due to breach of contract. Article 79 of the OCA provides (C X, para. 178):

> *"If a debtor fails to perform his obligation accurately the creditor shall be entitled to claim performance plus damages for the delay, or to claim damages for non-performance".*

### b.  Bulgarian Law

117. Claimant contends that even if it should be found that the PA does not provide for specific liability clauses, then liability does still exist under the pertinent provisions of the OCA (C II, para. 39).

118. Claimant derives from Article 12 of the OCA a pre-contractual obligation to accurately provide all information relevant to the other party (C II, para. 40). If this obligation is violated, the other party owes damages as determined in Article 82 of the OCA. These damages are to be indemnified in accordance with Article 82 of the OCA and encompass damages suffered and profits lost (C II, para. 42).

119. In addition Claimant contends that Respondents are liable under fraud provisions. It refers to Article 45 of the OCA (C X, para. 180).

## 2.    Summary of Contentions by Respondent No. 2

### a.    *Indemnity Clauses contained in the PA*

120.   Respondent No. 2's contentions regarding Article 9.1.2 and Article 11.1 of the PA may be summarized in its own words as follows (R II PA, para. 34):

> "*a)  The clause of Article 9.1.2. refers to a non existing clause 11.1.1., i.e. it refers to no clause;*
>
> *b)  The clause of Article 11.1. on which the Claimant relies refers to non existing Attachment 11;*
>
> *c)  Even if Attachment 11 is the wrong reference to Appendix 11 (another error of the Claimant who was so concerned on the wording of the Agreement) this Appendix does not provide for limits of liability and scope of compensation, as interpreted by Claimant.*"

121.   According to Respondent No. 2's interpretation of Article 9.1.2 the scope of the seller's liability was to be described and qualified in clause 11.1.1. The two parts forming Article 9.1.2 are deemed inseparable. Clause 11.1.1. as referred to in the second part of Article 9.1.2., however, is non-existent. Thus, no scope of liability is defined and Article 9.1.2 is rendered meaningless. Consequently, Article 9.1.2. of the PA is null and void according to Article 26 of the OCA for lack of subject (R II PA, para. 40).

122.   Regarding Article 11.1 of the PA Respondent No. 2 notes that no "Attachment 11" exists, while "Appendix 11" that might have been meant, does not cover issues of liability (R II PA, para. 34). It consists of a letter by the Bulgarian Minister for Transportation regarding the NCS and a letter by the Minister of Finance concerning debts owed by Balkan Airlines to the state. The latter deals with unknown liabilities of the airline providing a mechanism for dealing with them but not providing for liability (R II PA, paras 45 *seq.*). Besides, Claimant does not allege misrepresentations in regard of such unknown liabilities. The Respondent No. 2 therefore concludes that either Article 11.1 of the PA is null and void for lack of subject or, in case the Tribunal concludes to the contrary, the Respondent's liability under this provision is limited to the subject matters of the two letters (R I, para. 3.11; R II PA, para. 44).

123.   Even if Article 9.1.2 is found to be valid, Respondent's liability is contended to be limited to the undertakings made in the letter

forming Appendix 11. These undertakings, however, have been fully complied with. Therefore, any liability is denied (R II PA, paras 44 *seq.*).

124. In addition, even if Article 9.1.2 and Article 11.1 should be deemed valid by the Tribunal, Respondent is in no means liable to the extent asserted by Claimant (R II PA, para. 60). The scope of indemnification owed is determined by Article 12 and Article 82 of the OCA. According to Article 12 Claimant may only be entitled to "damages" which excludes profits lost (R II PA, para. 58). Article 82 on the other hand requires:

> (i) that the damages
>
> *"are direct and immediate result of the non-fulfillment"* and
>
> (ii) that it
>
> *"was possible to be foreseen at the arising of the obligation."*

Respondent No. 2 contends that these requirements are not met since the alleged damages claimed could either only be suffered by third persons or were not foreseeable at the time the PA was concluded (R II PA, paras 59 *seq.*).

125. Furthermore, wording of clauses 9.1.2 and 11.1 of the PA was drafted by Claimant (R II B, para. 58) who may now not rely on the wording's missing clarity to support its claim by giving the clauses a wider meaning as originally intended (R II PA, paras 43 and 49). To the opposite, the clauses' wording rather aims at limiting the scope of liability (R II PA, para. 53). Claimant is liable for those discrepancies in the wording of the PA and the clauses not expressing the Parties' mutual will should be disregarded as being null and void (R II PA, para. 37).

126. As a consequence, liability was not negotiated between the Parties. Therefore the general provisions of Bulgarian law apply (R II PA, para. 37). Moreover, as liability is thus not a contractual issue, it does not fall within the scope of the arbitration agreement.

### *b.* **Bulgarian Law**

127. Respondent No. 2 observes that Bulgarian law, in particular the OCA, does not provide for a general obligation to compensate *"damages from misrepresentation,"* but only for specific cases of indemnification for such damages.

*(1)*     ***Pre-Contractual Liability***

128.   Legal basis for liability regarding alleged bad faith conduct in course of negotiations is Article 12 of the OCA as cited by the Respondent:

> "*At leading the negotiations and in concluding the contract the parties must act in good faith. In the opposite case they owe compensation*". (R I, para. 3.6; R II PA, para. 18)

129.   In this regard, obligations of the seller regarding the production of information were regulated by the Privatization Act. Liability under Article 12 of the OCA requires intentional production of untrue information or deliberate omission of facts essential for the other party's decision to conclude the agreement. This on the other hand requires that the defaulting party had actual knowledge of such facts. The Respondent No. 2 denies that Claimant complied with the burden of proof it bears regarding Respondent's knowledge in order to claim compensation for misrepresentations (R II PA, para. 18).

130.   Respondent No. 2 describes the term "misrepresentation" as follows. According to English legal doctrine a representation

> "*is a statement of fact, express or implied, anterior to the contract, which is intended to and does induce the persons to whom it was made to enter into the contract but is not at the tame [time] of its making intended as a promise [...]*" (R II PA, para. 20, citing R. M. Goode, Commercial Law, pp. 111 *seq.*, see R-93).

A false representation constitutes a misrepresentation and is actionable if it occurred fraudulently. Hence, even if misrepresentations existed in the present case, they were not made in fraud or negligence and are therefore no ground for liability (R II PA, para. 21).

131.   Furthermore, damages arising in connection with misrepresentations may only justify a claim for compensation if they constitute the direct and unavoidable consequence of such misrepresentation (R II PA, para. 22).

132.   Besides, Respondent No. 2 denies that it ever undertook to bear the risk of misrepresentation, but merely explained BBA's financial condition at the time it was sold (R II PA, para. 19). Remedies available to the opposing party in case the actual financial condition of the airline transpired not to be as described are rescission and damages suffered by such rescission. Thus, Claimant may under no circumstances claim damages and losses but only rescission and the subsequently occurring damages (R II PA, para. 21).

133. Moreover, liability under Article 12 of the OCA is to the Respondent No. 2's view pre-contractual and as such not covered by the scope of the arbitration clause as opposed to contractual liability. Therefore, the claims based on this ground should be rejected for not falling within the Tribunal's competence.

134. Respondent No. 2 further address the issue of liability under Article 195 of the OCA. It points out that claims based on the PA as a contract on the sale of shares are subject to the provisions of Articles 193 to 197 of the OCA (R II PA, para. 23). The alleged misrepresentations are considered defects of the shares in Balkan Airlines sold to Claimant. Shares, however, are regarded as movable assets and are therefore subject to the above stated provisions of the OCA (R II PA, para. 26).

135. As such the claims are subject to the provision of Article 197 of the OCA which imposes a time limit of 6 month for submitting these claims. Time limit has expired as the Request for Arbitration was filed a year and a half after the date of the sale (R II PA, paras 25 ff; R VI PA para. 42).

136. Thus, Respondent No. 2 concludes that the applicable ground for liability is either contractual and as such subject to the time restrictions of Article 197 of the OCA or pre-contractual and as such not subject to the arbitration clause.

137. By application of these provisions of the OCA *analogia legis* Respondent No. 2 derives further conclusions for the limitation of the seller's liability: (i) seller is not liable for defects known to the purchaser and (ii) according to Article 194 Claimant had a duty to review assets purchased and to give notice immediately to the seller in case defects were discovered. If the notice requirement is complied with, the following remedies are available to the buyer: (i) restitution and recovery of purchase price and costs of transaction; (ii) reduction of purchase price; (iii) repair of defects for account of seller or (iv) damages under the general provisions of law.

138. Furthermore, the required knowledge of the facts underlying Respondent's possible liability is not presumed but needs to be proven by Claimant. Respondent denies any knowledge in this regard and refers to the audit report prepared by KPMG on which it relied (R II PA, para. 27).

139. In addition, Respondent No. 2 determines that even if it should be found that Respondent is liable under the Privatization Contract for damages caused to BBA, Claimant may nonetheless not claim compensation since these damages are not attributed to Claimant (R II PA, para. 28, R VI PA, para. 27). Respondent refers to Article

15(2) of the Bulgarian CCP which, albeit integrated into the CCP, is a substantive law rule regarding the issue of liability (R I, para. 3.13.):

> "Except in cases provided by the law no one may claim from its name others (sic) rights in court."

Thus, Claimant may not claim compensation for damages incurred to third persons, i.e. Balkan Airlines or Balkan Holdings. Moreover, the Tribunal may not rule on claims for damages suffered by Balkan Airlines due to lack of jurisdiction as the latter is not a party to the arbitration agreement.

140. Further, Claimant contends that pre-contractual liability is limited to the negative interest, meaning the reimbursement of expenses incurred by relying on the contract, while under Bulgarian Law only contractual liability allows indemnification for the positive interest. (R VI para. 36 et seq.)

## (2) Contractual Liability

141. As for Claimant's argument that it can claim damages under Article 82 of the OCA Respondent No. 2 contends that Claimant has to establish the relevant facts, that is to prove:

(1) the unlawfulness of the alleged conduct,

(2) the actual damage;

(3) the existence of a causal link between that conduct and the alleged damage;

(4) the existence of a direct link of cause and effect between the unlawfulness of the conduct of the Respondent and the damage alleged, that is to say the damage must be a direct consequence of the conduct complained, and

(5) the damages that allegedly occurred and were suffered by the Claimant were not foreseeable at the time the obligations were assumed. (R VI PA, para. 22-29)

Respondent is in the view that Claimant failed to prove those prerequisites of liability under Bulgarian Law.

142. Respondent further argues that in the case at issue liability has to be determined under the application of negligence rules – as opposed to strict liability rules, meaning that Respondents are held liable only if they failed to take due care. under Bulgarian Law The alleged

misconduct of the Respondents should be estimated through the prism of Bulgarian law where liability is imposed in cases of possible negligence to the utmost.

### c.     Application of European Contract Law

143.   Respondent No. 2 contends that Claimant's reference to the European Contract Law Principles as a legal source for liability does not help the Claimant's case. It is reminded that the applicable substantive law to these proceedings is the Bulgarian law. Pursuant to Article 1:101 (b) of the European principles they may be applied *"when the parties have not chosen any system or rules of law to govern their contract."* In its views that Parties have chosen the Bulgarian legal system and the rules of its law to govern the contract. Thus, the initial determination of the governing law excludes the applicability of the European principles even on the basis of subsidiarity let alone if a conflict of rules is detected.

### d.     Agency

144.   Respondent No. 2 emphasizes that the notion of liability is closely related to the status of the respective party (R II PA, para. 213). In the light of the Tribunal's finding as recorded in PO No. 4 that Respondent No. 2 is a mere agent acting on behalf of Respondent No. 1, i.e. the Republic of Bulgaria, it asserts that it may not be held liable for breach of contract. The status as an agent implies that it bears no liability for breach of a contract it concluded on behalf of its principal (R II PA, paras 226 *seq.*). Instead, the effects of legal acts it performs arise directly for the principal by virtue of the pertinent Article 36 of the OCA. Respondent No. 2 further addresses the Claimant's request to determine joint and several liability of both Respondents for the alleged breaches of contract. Pursuant to Article 121 of the OCA which is applicable to this matter joint liability may not be presumed but arises either by virtue of law or by party agreement (R II PA, paras 229 *seq.*). In the present case there is no such statutory provision nor have the Parties agreed on the Respondents' joint liability. Therefore, Respondent No. 2 cannot be held liable for the alleged breaches of contract by its principal (R II PA, para. 231).

### e.     Nature of the claims and arbitrability

145.   Respondent No. 2 denies arbitrability of the prevailing part of the claims submitted to the Tribunal for being either non-contractual or not attributed to Claimant (R I, paras 4.2. *et seq.*).

146. Several claims are investment claims as opposed to contractual claims and as such not subject to arbitration. Such claims are the claim for loss of investment, claim for breach of undertaking to maintain NCS, the alleged misrepresentation of the airline not being subsidized and the non disclosure of future government plans and change of government policy. Furthermore, Claimant is not entitled to claim the loss of investment as the drawer of the transfers of funds described as investments was not Claimant but Balkan Holdings. Likewise, Claimant would not be the beneficiary owner of the Equant Shares it claims missing and is therefore not entitled to claim compensation.

147. Directly affected by alleged misrepresentations regarding Ansett aircraft maintenance, liabilities to employees, outstanding debt of the Bulgarian state for training pilots, debt of Balkan Airlines to ATC and additional operation and management costs was only Balkan Airlines. Claimant has an indirect interest which is, however, outside the scope of this arbitration (R I, para. 4.5.).

148. Several claims concern rights only the airline was to benefit from, like undertakings regarding transfer of real estates and assistance with the airline's excess debt as well as undertaking with respect to Yugoslavian Railway Company. Therefore, Claimant cannot raise these issues in the arbitration either.

149. As shareholder Claimant would not have received the airline's future profits claimed lost but only its respective share. Profits of the airline cannot be claimed in this arbitration.

150. Claimant admits that it transferred its shares in Balkan Airlines to Balkan Holdings and ZBI. Thus, the claim regarding the inability to sell the shares to a strategic investor is not attached to Claimant.

151. Respondent No. 2 questions the existence of "Zeevi Group" and "Zeevi Logistics". Claimant further failed to provide any evidence that the alleged public offering was planned or launched (R IV PA, para. 23). But in any way Claimant may not invoke damages allegedly incurred to these entities regarding reputation and goodwill and damages caused by failed public offering respectively.

152. Following this argumentation Respondent's position is that despite of the ruling of the Tribunal in PO No. 4 dated 14 October 2003 regarding the competence of the Tribunal, all claims submitted by the Claimant in these proceedings should be dismissed as they fall off the scope of the arbitration agreement pursuant to Articles 20 and 21 of the UNCITRAL Rules. PO No. 4 deals with the competence of the Tribunal in general terms, however the Tribunal did not rule on the issue whether each of the separate claims stated in the Statement