of claim actually falls within its competence (R III PA, para. 33). Therefore, all claims shall be dismissed.

## 3. Summary of Contentions by Respondent No. 1

153. Respondent No. 1 outlines two major legal principles governing the parties' liabilities and their respective entitlement to compensation. The first is the concept of reliance damages as claimed by Claimant for its investments in Balkan Airlines. This kind of compensation means to be restored in the position in which the party would have been had it never concluded the PA. This claim, however, requires prior avoidance or rescission of the PA (R II B, para. 294). Second, the requirement of direct causality between breach of contract and damage suffered is invoked by Respondent No. 1 (R II B, para. 295). Such causal connection has to be proven by the Claimant. This principle is set forth both in Article 11.1 of the PA (R II B, para. 331) and Article 82 of the OCA (R II B, para. 332). By virtue of this principle all heads of damages too remote from the alleged breaches of contract are eliminated (R II B, para. 333). Secondly, the requirement of a causal nexus has the consequence that Claimant may only claim damages sustained to itself and not Balkan Airlines (R II B, para. 335).

## 4. The Tribunal

154. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents and the evidence:

**Party Submissions:**

| | |
|---|---|
| C II | paras 23- 42 |
| C X | paras 177 *et seq.* (178) |
| | |
| R I | paras 3.6, 3.11, 3.13, 4.2 *et seq.*, 4.5 |
| R II PA | paras 18-22, 25 *et seq.*, 36 *et seq.*, 40 *et seq.*, 49, 58 *et seq.*, 213, 226-231 |
| R III PA | para. 33 |
| R IV PA | para. 23 |
| R VI PA | paras 22-29, 27 |
| | |
| R II B | paras 294 *seq.*, 331 *et seq.*, 335 |

155. Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

156. First of all, the Tribunal is not persuaded by the Respondent No. 2's objections to arbitrability. The Tribunal has already dealt with some aspects of its jurisdiction in its PO No. 4. Further it is sufficient to point out that the Tribunal will only deal with claims covered by the cited arbitration clause and the UNCITRAL Arbitration Rules that the clause refers to. The fact that the contract provided duties to invest does not make respective claims investment claims not covered by the arbitration clause as it may be in arbitrations under Bilateral Investment Treaties.

157. Though the wording of a contract such as the PA is of primary relevance for its interpretation, the Tribunal has to take into account the intention of the Parties and that, before coming to an invalidity of a clause due to its wording, an interpretation should be examined which keeps the clause valid and is covered by the intention of the Parties. In concluding the PA and its Amendment, the Parties were obviously trying to conclude a valid agreement. Therefore, if some "sloppy" drafting leads to difficulties, the Tribunal has to examine whether nevertheless the intention of the Parties can be established.

158. When the Parties redrafted Article 9.1.2. of the PA by the Amendment, their intention was obviously to establish a valid clause. The reference to the non-existing "Section 11.1.1." in the reworded Article 9.1.2. must therefore be interpreted to refer to Article 11.1. PA (which was not changed by the Amendment) which makes sense in the context.

159. Further, for similar considerations, when Article 11.1. refers to the non-existing "Attachment 11", it would be against the intention of the Parties to consider this as an invalid reference. Rather, both the wording and the intention must be interpreted to refer to "Appendix 11", a reference which also makes sense in the context.

160. Therefore, the Tribunal concludes that the PA did include an agreement by the Parties on liability. Therefore, this agreement has priority over non-mandatory provisions of Bulgarian law, particularly of the OCA, regarding the liability of the Parties under the PA. This is particularly so regarding the Seller's liability for information or misrepresentation, because that is exactly what Article 9.1.2. is dealing with. This provision is therefore interpreted to be the exclusive ruling between the Parties regarding the scope, but also the limits of Seller's liability regarding information.

161. Thus, the next task for the Tribunal is to examine the scope of liability on which the Parties have agreed.

162. In the first part of Article 9.1.2., the provision lists for which information Seller shall be liable ("contained in (...)"). In the second

part of Article 9.1.2., the wording *"provided the liability for damages in such case subject to Section 11.1.1. of the PA"*, taking into account that this is a reference to Article 11.1. as concluded above, can only be understood to contain a limitation of the liability established in the first part of Article 9.1.2.

163. The next step, therefore, must be to establish which limits of liability are provided by Article 11.1.

164. This provision expressly deals with Seller's *"liability (...) resulting from misrepresentation or beach of warranty"* and thus, as intended by the Parties by their reference in Article 9.1.2., indeed provides a ruling on Seller's liability regarding information.

165. Its wording *"in accordance to Attachment 11"* - which, as concluded above, has to be understood as a reference to "Appendix 11" - must be interpreted as limiting the liability to the effect that only in so far as Appendix provides a list of the information by Seller, a liability of the Seller shall exist.

166. The only exception thereto is information which the amended wording of Article 9.1.2., expressly lists and which is not mentioned in Appendix 11. Therefore, Seller is also liable for information *"contained in this Agreement, the Data Room, the Disclosure Letter or the Information Memorandum"*, because all these are expressly mentioned in the new Article 9.1.2.

167. Regarding the disputed issue as to whether Claimant also has to prove Respondent's negligence, a distinction has to be made between liability due to express contractual provisions and liability under Bulgarian law, particularly the OCA. While such prove of negligence may be required for the latter, the Tribunal does not have to decide this issue, because – as seen above – the Tribunal is applying not the liability provisions of the OCA, but those of the contract. Regarding the PA, in view of the express provisions establishing liability of the seller for certain information, the Tribunal concludes that Claimant only has to prove that the information was incorrect, but does not have prove that this was due to negligence of the seller.

168. The Tribunal does not agree with Respondents' argument that they are not liable for damage which was not foreseeable at the time of the conclusion of the contractual provisions. The contractual liability provisions do not contain such a limitation, and by expressly mentioning the information for which Seller would be liable, the contract shifted the risk of such information being incorrect to the Seller who was in better control of such information than Claimant.

169. Regarding the argument of Respondent No. 2, that in view of the Tribunal's ruling in PO No. 4, it must be considered as a mere agent of Respondent No. 1 and therefore is not liable, the Tribunal considers the following.

170. On one hand, Respondent No. 2 is expressly mentioned in the preamble of the PA as the party to the contract ("*Seller*") and also has signed the PA. The considerations in PO No. 4 only concern the procedural question whether the Republic of Bulgaria is an additional Respondent and conclude that the procedure is against Respondents No. 1 and No. 2. As it is undisputed that Respondent No. 2 has, at least for civil law relations, a legal identity separate from the Republic, the considerations of PO No. 4 to the effect that the Republic is an additional party to the PA and its arbitration clause may speak in favour of considering that both Respondents are jointly and severally liable for whatever liability the contract provides for.

171. On the other hand, however, taking into account considerations already given in PO No. 4, there can be no doubt, that although designated as a party to the PA, in the process of negotiating and signing of the PA the Privatization Agency was acting as an agent of the Republic. It was namely in this capacity Respondent No. 2 signed the PA which was later "approved" by a special Act of the Government. The separate legal identity does not make the PA a real Seller in that context. Further, although Article 121 OCA provides an option for a contractual establishment of joint liability, it requires an explicit statement of all parties assuming joint liability directed to the establishment of such type of liability. In the present case we have mere agency and there is no statement on behalf of the PA in its capacity as a separate legal entity directed towards assuming by itself any form of joint liability. On the other hand, the General Law (OCA) does not provide for joint liability in case of agency (representation). The same is true of the Special Law (the Privatization Law) which is also silent on this issue. Lastly, there are no practical or equity reasons to come to another conclusion. Under the relevant law (Article 399 of the Civil Procedure Code) in case any budgeted entity (the Agency is such an entity.) is condemned to pay a certain sum of money, this sum has to be paid from a budget credit specially provided for that purpose. If there is no such credit, it has to be provided for by the entity's higher standing authority for the next budget period (in our case by Respondent No. 1).

172. Therefore, the Tribunal concludes that, on one hand the actions of both Respondents have to be taken into account in evaluating the conclusion and performance of the contract, because Respondent No. 2 acted on behalf and with the authorization of Respondent No. 1.

But, on the other hand, should the Tribunal come to conclude a liability in its Award, only Respondent No.1 shall be liable.

173. In this context, the Parties also disagree regarding the following issues:

　　1) Whether Claimant knew or should have known that certain information was incorrect and that this may exclude Seller's liability. The Tribunal considers that this issue can better be examined in the context of the further issue of causality also disputed between the Parties.

　　2) Whether there is causality between the incorrect information and any damage of Claimant. The Tribunal will examine this issue further when dealing with the specific claims raised and with the quantum of any liability.

　　3) Whether damage of third Parties is claimed by Claimant and is covered by the liability provisions. Again, the Tribunal will deal with this issue when examining specific claims raised and with the quantum of damages.

　　4) Finally, the Parties disagree on the scope of liability under the provisions of the PA. Again, the Tribunal will deal with this issue when examining the specific claims raised and the quantum of liability.

## G.II. Due diligence and financial condition of BBA prior to its sale

### 1. Summary of Contentions by Claimant

174. Claimant acknowledges that it was aware of the difficult financial situation of Balkan Airlines at the time of purchase. However, the airline

> "was presented as having two most valuable assets – its status as Bulgarian's exclusive national carrier and holdings of certificates of Equant shares." (C I, para. 9).

175. The latter were worth over USD 35,000,000 according to the KPMG Financial Analysis (C I, para. 11). Claimant points out that this representation was crucial and of fundamental importance for its decision to purchase Balkan Airlines (C I, para. 12). In this context, Claimant asserts that the draft agreement was changed and all references to Zeevi Holdings having knowledge of the information

contained in the Data Room were removed and an undertaking regarding Respondent's liability in case of misrepresentations was incorporated instead (C II, para. 6). Therefore, Respondents' assertion that Claimant could have known certain facts regarding the state of the airline is irrelevant. According to the "allocation of risks" reflected in the PA "the burden of putting things right" was thus with the Respondents (C II, para. 8).

176. Claimant further emphasizes that negotiations were subject to the deadline of 30 June 1999 set by the Bulgarian party. Due to these time restrictions it was not possible for Claimant to conduct an extensive due diligence (C I, para. 14). Instead, it had to rely entirely on the information supplied by the other side, in particular the KPMG Financial Analysis and the Disclosure Letter (C I, para. 15; C II, para. 4; see C-38 and C-39). As Claimant had to rely solely on this information, Respondents provided undertakings in the PA reassuring the correctness of the information given. In support of this contention Claimant refers, inter alia, to the following clauses of the PA (C I, para. 17):

> "3.6.1    The information regarding the legal, property and financial state of the Company is objectively and *exhaustively* reflected...
>
> 3.6.2 The Seller hereby warrants to the Buyer that *all* the information contained in this Agreement, the Information Disclosure Letter and the Information Memorandum is *true* and *accurate* *in all material respects, is not misleading*...
>
> 3.7.1 The accountancy reports... reflect the *true* financial state of the Company for the fiscal year as ended at 31 December 1998...
>
> 3.7.2 The Financial Analysis as prepared by KPMG and presented to the Buyer reflects the *true* state of the Company for the fiscal year as ended at 31 December 1998.
>
> 3.7.3 The Seller further warrants *that there has been no material adverse change* in the financial position of the Company since 31 December 1998..."

177. The Disclosure Letter (Exhibit C-39) Annexed as Appendix 1 to the PA contained similar undertakings:

> "2.    The accounting reports as of May 31, 1999 render *complete and accurate* information on the current status of Balkan...

3. *The accounting reports as of May 31, 1999 render* <u>*complete and accurate*</u> *information on the assets and liabilities of the Company ...*

4. *The present Disclosure Letter represents* <u>*complete and*</u> <u>*accurate*</u> *statement for all obligations of Balkan ... "*

178. A notice made by the Respondents on the date of Completion of the PA (15 July 1999) stated as follows:

   *"...we hereby confirm that the warranties and representations incorporated in the Agreement are* <u>*true, correct,*</u> *and are* <u>*not*</u> <u>*misleading"*.</u>

179. Claimant invokes the witness statement by David Golan, Esq., according to which these representations have been thoroughly negotiated between the parties in order to allow Claimant to enter the contract based solely on the information provided by Respondents. (C I, para. 19)

180. Claimant acknowledges that in hindsight it might have been easy to detect the misrepresentations. However, at the time the PA was signed, these misrepresentations were not known and detection would have required

   *"[conducting] a due diligence for the entire affairs regarding Balkan. This was something it [Claimant] was not capable or willing to do"* (C II, para. 10).

   Therefore, Respondents consented to give representations regarding the accuracy of the information.

181. Claimant's argumentation in this regard is supported by the Witness Statement given by Mr. Golan indicating that in entering into the transaction, the Claimant did not rely on any information other than the Information Documents, and certainly not on any information allegedly found in the Information Room. (C IV, para. 59)

182. In contrast, the Respondents failed to provide any witnesses in support of their version of events. Hence, their two arguments in this regard are unsupported by any evidence (C IV, para. 62) as established below.

### a. The Claimant did NOT examine the Information Room.

183. In contrast to Respondents' allegation on which it bases its argument, the Claimant did not examine the Information Room. This was supported by Ms. Valeva in her cross-examination and

confirmed by Mrs. Docheva's witness statement in stating that Mr. Golan's visits to the Information Room were for meeting purposes only, both witnesses on behalf of the Respondents. (C IV, paras 62 *et seq*.)

### b. *The Agreement Does Not Provide that the Information Room Would Qualify the Information Documents*

184. The Respondents falsely allege, the PA provided that the Information Room would qualify the representations regarding the Information Documents. However, this argument lacks any evidence. (C IV, para. 70)

185. The Respondents base their argument solely on Article 9.1.2 of the PA, concluding that the Seller shall only be liable if all the information contained in the Information Room is untrue or inaccurate. This interpretation is false. (C VI, paras 71 *et seq*.) This Article clearly does not restrict the imposition of liability to situations wherein the information contained in the "Agreement", the "Data Room", the "Disclosure Letter" and the "Information Memorandum", taken together, is found to be untrue. Instead the Article refers to each item of information separately (C IV, para. 73). This interpretation was supported by the Respondent's own expert, Mr. Neitchev.

186. Furthermore, the Respondents' interpretation of Article 9.1.2 leads to absurd results. The Respondents' interpretation frees the Seller to make any representations in the Information Documents, true or false, without incurring any liability for this pursuant to Article 9.1.2, so long as somewhere in the Information Room some document exists from which it could be ascertained that the representations in the Information Documents were false. (C IV, para. 74)

187. In addition, it is clear, according to the wording of Article 9.1.2 if a statement made in any of the Information Documents is "untrue" or "inaccurate", then the mere fact that an examination of the Information Room might reveal this, would not make this representation become "true" or "accurate". The Seller would, therefore, still be liable pursuant to Article 9.1.2. In any case, such representation would definitively be "misleading". It is clear, therefore, that Article 9.1.2 deals with imposition of liability and not with qualification of the warranties and representations found in Articles 3.6.1, 3.6.2, 3.7.1, 3.7.2 & 3.7.3 of the PA. (C IV, para. 75) Hence, what emerges is pursuant to Article 9.1.2 the Respondents would bear liability also (but not only) if the information in the

Information Room would transpire to be untrue, even if it was not examined by the Claimant (C V, para. 13).

188. This interpretation is further substantiated by Article 9.1.1, which provides that

> "*each warranty shall be interpreted individually as a separate warranty*". (C IV, para. 76)

189. Claimant's interpretation of the Article in question is additionally supported by the factual circumstances surrounding this Article's insertion. It is noted, that Bulgarian law, allows for an examination of outside sources when interpreting an Agreement. The version of the PA, which was signed on 30 June 1999, did not include any reference to the Information Room. Therefore, had the PA of 30 June 1999 not been subsequently changed, the warranties and representations regarding the

> "*exhaustive*", "*true*", "*accurate*", "*complete*" and "*not misleading*"

nature of the Information Documents (see Articles 3.6.1, 3.6.2, 3.7.1, 3.7.2 & 3.7.3 of the PA) could not be construed as being subject to the Information Room, even according to the Respondents' point of view. Article 9.1.2 was subsequently replaced by the Amendment to the PA, signed on 15 July 1999 (Exhibit C-41) by a request made by the Claimant. Ms. Valeva has confirmed this in her cross-examination. Hence, the terminology in question cannot be understood as making the warranties and representations subject to the Information Room where this was not the case beforehand (C IV, para. 80).

190. Therefore, the inevitable conclusion from this is that even if, assuming *arguendo*, there is an ambiguity in Article 9.1.2, then given that both parties knew that the Claimant did not examine the Information Room, it is impossible to interpret Article 9.1.2 as providing that the warranties and representations be subject to the Information Room. (C IV, para. 81)

191. Unlike the Respondents, Claimant was able to produce a knowledgeable witness on this issue. Mr. Golan, in his First Witness Statement, confirmed that the purpose of revising Article 9.1.2 was to reinforce the Respondents' liability (C IV, para. 82).

192. A review of the drafts of the PA further reinforces this conclusion. As noted above, the First Draft of the PA included an express provision qualifying the warranties and representations given to the Claimant, by the information found in the Information Room (see

Article 8.1.2 of the First Draft – Exhibit C-42). According to Mr. Golan, since it was impossible for the Claimant to examine the Information Room, references to the Information Room as constituting disclosure were intentionally removed from the PA. (C IV, para. 83)

193. Even if one takes into consideration only the language of this Article, one comes to the conclusion that the Respondents' argument in this matter lacks merit. The necessity, however, to refer to external circumstances in order to interpret this Article was even confirmed by the Respondents' own expert, Mr. Neitchev and is permitted by Bulgarian law. The result of the Respondents' failure to bring Mr. Zheliazkov to provide evidence is that Mr. Golan's testimony remains undisputed. (C V, para. 12)

194. Ms. Valeva's testimony does not change the above conclusion (C IV, para. 85).

c.   *The Claimant could legitimately rely on the Information Documents*

195. Contrary to Respondents' allegation, the Claimant did not enter into the transaction without the benefit of a due diligence examination. Zeevi Holdings based its decision to enter the transaction on a very extensive and professional due diligence analyses prepared by KPMG. Therefore, it cannot be said, that the Claimant acted unreasonably when it relied on the Respondents representations, especially, since the seller was a sovereign State that agreed to be liable under the PA if any Information it provided turned out to be "untrue", "inaccurate", "incomplete", "misleading" or "provided in bad faith" (C IV, paras 91 *et seq.*).

196. "In their Post Hearing Briefs, the Respondents argue for the first time that the KPMG Financial Analyses is not referred to in Article 9.1.2 of the PA and, therefore, the Respondents bear no responsibility for any untrue or misleading information it contains. One cannot but be amazed at the mere suggestion that the Respondents allegedly do not bear responsibility for false information provided by them in a report, which they represented was true. Such an argument in itself manifests the utmost bad-faith." (C V, para. 17)

197. Claimant supports this allegation with the following arguments: The Respondents raise this argument for the first time in this late stage of the proceedings although the Company had approached them with regard to the misrepresentations much earlier. (C V, para. 18) Moreover, by raising this argument, the Respondents contradict

themselves, having confirmed the accuracy of the KPMG Report (C V, para. 19). Furthermore, the accuracy and the resulting liability of the Respondents with regard to the KPMG Financial Analyses is specifically mentioned in Article 3.7.2 of the PA (C V, para. 20). Additionally, if indeed Article 9.1.2 excludes the Respondents' liability regarding the KPMG Financial Analyses, then it is not subject to qualification by the Data Room. Even if the Respondents were permitted to provide false information in the KPMG Financial Analyses, this would not affect most of Claimant's claims, since responsibility for almost none of the claims emerges from this Report (C V, para. 23).

### d. The Respondents Have Not Shown that the Information Room Contained any Relevant Information

198. Even if the Tribunal decides in the Respondents' favor on this issue, this will still not change the outcome of these proceedings. The Respondents failed to present any relevant content of the Information Room, nor gave any evidentially supported explanation as to why they failed. Therefore, this failure should be taken to mean that the Information Room did not contain any relevant information (C IV, paras 95 *et seq.*).

199. This conclusion is supported by the fact that, contrary to the Respondents' allegation, they had the possibility to provide any information necessary. (C IV, para. 97)

200. Any documents the Respondents referred to as having been in the Information Room, were not supported by any of their witnesses. (C IV, para. 98)

201. In addition, Exhibit R-33, which the Respondents claim to be the "*the list of documents provided in the Data Room*" is nothing more but a list of "*categories of documents*". The content of this document does not specifically refer to any document allegedly contained in the Information Room. Therefore it is impossible to find out which documents actually were in the Data Room. To conclude: even if the Information Room qualified the warranties and representations given under the PA (which is denied), the Respondents have not shown that any information found in the Information Room supplemented the false representations which were given in the Information Documents. Simply because they have not shown what documents were in the Information Room. (C IV, paras 99 *et seq.*)

## 2. Summary of Contentions by Respondent No. 2

202. Respondent No. 2 contends that Claimant knew all facts allegedly concealed from it or at least should have known them had it applied the necessary diligence in the transaction (R II PA, para. 11.). Claimant had been given the possibility to inspect all documents contained in the Data Room and was not forced by the Respondents to conduct this deal in a speedy manner (R IV PA, para. 7). Thereby, Respondent had discharged its obligation to provide accurate and exhaustive information on Balkan Airlines to the buyer (R II PA, para. 12.). The PA does by no means provide:

> "*direct obligation of the Respondent to verify that the information is correct*" (R II PA, para. 16).

It may not be Respondent's detriment that Claimant, unlike all other bidders (R IV PA, par. 7), was allegedly unable to conduct its own due diligence but relied on the information provided by Respondent instead. Respondent No. 2 asserts that due diligence is not only normal business practice but also stipulated by law (R II PA, para. 16) It is noted that Claimant was provided the possibility for such due diligence being conducted. As a professional investor Claimant should have considered the entirety of information provided. The question now is not on what part of the information Claimant relied on for its decision to purchase Balkan Airlines but on what information it could and should have relied upon. Likewise, it is irrelevant how Claimant allegedly interpreted the facts provided but how a professional investor would have acted. Claimant was neither misled nor was any information concealed. (R II PA, paras 13 to 16). Article 9.1.2 of the PA may not be interpreted as discharging Claimant from its obligation to bring the most diligent attention to the deal.

203. Respondent asserts that it acted diligently by hiring the internationally renowned auditor KPMG to prepare independent financial analysis of Balkan Airlines. This analysis reveals the dire financial situation of the airline together with all its assets and liabilities. Respondent No. 2 emphasizes that:

> "*[t]he so called "additional liabilities Zeevi Holdings is suing for" (such as the Ansett maintenance costs, employees costs etc.) were unknown to the Respondent and occurred of circumstances out of its control and rather under the control of the Claimant*". (R II PA, para. 46)

This is additionally revealed by the fact that the Minister of Finance agreed to establish a mechanism for dealing with unknown liabilities as expressed in the respective letter.

204. Furthermore, the KPMG Financial Analyses was not represented as being exhaustive, but merely represented the *"true state of the company for the fiscal year ended 31 December 1998"* (R IV PA, para. 10). It was neither intended to purport a due diligence according to IAS. The only reference made to the IAS in this Report was it had transferred the reports from BGL into US Dollars. (R IV PA, para. 12)

205. In any case, Article 9.1.2 clearly states that in deciding whether a representation is given or fact disclosed, one should also take into consideration the contents of the Data Room. In contrast to that, the KPMG Report is not even mentioned in this provision (R IV PA, para. 45). Hence, the Data Room does qualify the information provided to the Claimant (R IV PA, para. 22) and the parties did not agree otherwise (R IV PA, para. 44). Mr. Golan even admitted visiting the Data Room, but decided not to examine it (R IV PA, para. 43) due to the fact that the Data Room contained too vast information (R IV PA, para. 57).

206. Contrary to Claimant's questioning of the existence of the relevant documents in the Data Room, it shall be noted that the Respondents had provided sufficient evidence of the existence and contents of the Data Room and the fact that the Claimant had access to it. It was also confirmed by the witness testimony of Mrs. Emilia Docheva and Miss Valeva that the Data Room contained all substantial information for the activities and assets of the Company. (R IV PA, para. 57). Furthermore, the list of categories of documents found in the Data Room was not intended to purport an exhaustive enumeration of the vast number of documents contained in the Data Room, but merely provided an overview of the different topics on which documents may be found in the Data Room (R IV PA, para. 59).

207. With respect to the meaning of Article 9.1.2 of the PA, Respondent No. 2 emphasizes that the different sources of information enumerated under this provision do not replace each other, as alleged by Claimant, but substantiate each other in adding additional information. Therefore the word "or" or the commas were used just to separate the different sources of disclosure but not to create meaning of separation of liability for each of them. (R IV PA, para. 46) As to the scope of liability resulting thereof, Respondent No. 2 submits that the representations did not refer to all of the presented information and therefore the liability of the Respondent was intentionally limited to the documents or information described in Article 9.1.2. (R IV PA, para. 48) This will of the parties is expressly stated in the contract and does therefore not need "surrounding circumstances" in order to interpret it. In such a clear case, referring

to outside information is not even permitted by Bulgarian law, contrary to Claimant's allegation. (R IV PA, para. 51)

208. To conclude, it is irrelevant whether the KPMG Report was exhaustive, since in commercial investment transactions, all parties must apply the due diligence (R IV PA, para. 30).

## 3. Summary of Contentions by Respondent No. 1

209. Respondent No. 1 contends that Claimant had been expressly informed about Balkan Airlines dire financial situation prior to the purchase decision. Thus, Claimant was well aware that it was acquiring a company on the brink of bankruptcy.

210. Respondent No. 1 describes the history of the negotiations that lead to the PA in order to further elaborate this issue. Among other state enterprises struggling for survival in the post-communist era Balkan Airlines was placed in so-called "isolation" under the Law on Financial Recovery. "Isolation" was *"a moratorium on state enterprises that were effectively insolvent, by enabling the state to offer financial assistance for a time, while temporarily postponing the repayment of their long-standing debts"* (R II B, para. 16). The names of the companies under "isolation" were published in the State Gazette on 23 August 1996 (R II B, para. 17). The underlying Law on Financial Recovery, however, was effective only until 30 June 1999. Thus, the Bulgarian government decided to finally privatize Balkan Airlines under the auspices of the Privatization Agency in order to prevent bankruptcy. The Privatization Agency gave all potential purchasers access to the Data Room set up in the airline's administrative building at Sofia Airport. The Data Room contained comprehensive documentary records on the past and present operations of Balkan Airlines relating to the "isolation" and program for financial recovery, status as NC, service monopoly, discounts and fly-over landing taxes, the airline's assets, employment contracts, all obligations owed and all pending court proceedings.

211. Additionally an information memorandum and due diligence report produced by reputable independent auditor KPMG was made available to those interested in the purchase. The information provided in the KPMG reports was supplemented by the Disclosure Letter issued by the Privatization Agency.

212. The Information Memorandum as published by KPMG on 5 March 1999 presented income statements and balance sheets for the years of 1996 to 1998. From this information it became apparent that the airline suffered losses each year since 1996. The balance sheets

recorded huge liabilities. Furthermore, the Financial Analysis as produced by KPMG on 15 April 1999

> "*left no room for doubt about the seriousness of Balkan Airlines' financial condition*" (R II B, para. 34)

and revealed the airline's weaknesses and threats. All in all, the information provided to Claimant prior to its decision to purchase expressed the magnitude of the airline's desperate financial condition. Claimant's senior management recognized this condition by determining that

> "*the Company's debts range between $65 million and $120 million*". (R II B, para. 40).

213.  Zeevi, however, argues that it was entitled to ignore the Data Room, which is, according to Respondent No. 1, an unsustainable contention for the following reasons:

  (i)  *Practicality* – Given the volume of information relevant to an enterprise such as Balkan Airlines, and the Privatization Agency's own lack of familiarity with the airline's operations, comprehensive disclosure to potential purchasers was only possible through a data room;

  (ii)  *Commercial practice* – It is standard practice in a corporate acquisition of this magnitude for disclosures to be made both by way of a disclosure letter, and by making information available to potential purchasers in a data room; and

  (iii)  *The terms of the parties' contract* – the parties' expressly linked the Privatization Agency's liability for inaccurate and/or incomplete disclosures to the disclosures made in the Data Room, in Article 9.1.2 of the PA.

214.  Claimant has contended repeatedly during these proceedings that all references to the Data Room were removed from the PA at its request because it did not wish to rely on the disclosures made therein. However, the Bulgarian version in contrast to the English version, of the PA refers to the Information Room in Article 3.1.2.

215.  Even the English version contains reference to the Data Room in Article 9.2.1 that Zeevi itself included. Therefore, one must take into account the information disclosed to Zeevi in the Data Room. (R III B, para. 48 *et seq.*)

216. Furthermore, Zeevi contends that it was entitled to rely solely on the Financial Analysis produced by KPMG. Article 9.1.2, which is the Article in question, contains no reference whatsoever to KPMG's Financial Analysis, only, among others, to the KPMG Information Memorandum and the information contained in the Data Room. (R III B, para. 52 *et seq.*)

217. In this way, Zeevi obtained a right to compensation if *"the information contained in [...] the Data Room"*, but not if the Financial Analysis, was *"untrue, inaccurate, incomplete, misleading or presented in bad faith"*. (R III B, para. 61)

218. Accordingly, even if it were true that Zeevi chose -- as it now says -- *"not to take a look"* at the Data Room, contrary to Mr. Golan's letter dated 25 April 1999, which revealed that Claimant intended to examine the Data Room prior to making a proposal (R V B, para. 24), this does not alter the contractual relevance of disclosures made in the Data Room. Moreover, Zeevi had a period of 12 weeks to conduct a comprehensive due diligence investigation, which is not uncommon in corporate transactions of this nature. In view of that, both, Mr. Neitchev and Mr. Golan, conceded that large corporate acquisitions often involve the task of due diligence of data rooms containing vast quantities of documentation (R III B, para. 63 *et seq.*).

219. Claimant contends that each source of information enumerated in Article 9.1.2 must individually be true, exhaustive, not misleading, etc. However, if each of these documents replicated the contents of the others, there would have been no reason for the Privatization Agency to provide more than any one of these information sources. (R V B, para. 29). Such an interpretation would render the reference to the Data Room in Article 9.1.2 meaningless and the Data Room itself purposeless (R V B, par. 39).

## 4. The Tribunal

220. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | |
|---|---|
| C I | paras 9-12, 14 *seq.*, 17, 19 |
| C II | paras 4, 6, 8, 10 |
| C IV | paras 59, 62 *et seq.*, 70-76; 80 *et seq.*; 91 *et seq.*; 95 *et seq.* |
| C V | paras 12 *seq.*, 17 *et seq.*, 23 |

| R II PA | paras 11-16; 46 |
| R IV PA | paras 7, 10, 12, 22, 30, 43 *et seq.*, 51, 57, 59 |
| | |
| R II B | paras 16 *seq.*, 34, 40 |
| R III B | paras 48 *et seq.*; 52 *et seq.*; 61 *et seq.* |
| R V B | paras 24, 29, 39 |

**Exhibits:**

| C-38 | PA |
| C-39 | Disclosure Letter |
| C-41 | Amendment to the PA |
| R-33 | List of Documents provided in the Data Room |

221. Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

222. The PA provides quite a number of provisions according to which Respondents had to provide and Claimant could rely on information. In particular the following are relevant in the context of the various arguments put forward by the Parties:

223. Reference to information in the PA itself, the Disclosure Letter and the KPMG's Information Memorandum are found in Article 3.6.2. PA as well as in Article 9.1.2. as re-phrased by the Amendment.

224. Reference to the Financial Analysis prepared by KPMG is found in Article 3.7.2. Therefore there can be no doubt that Claimant could rely on that information.

225. What remains to be examined is the relevance of the information in the Data Room which is disputed between the Parties. It may well be that, as alleged by Claimant, all references to the Data Room were deleted from the original PA before it was signed. However, it is clear that the Amendment later did include such a reference in the newly worded Article 9.1.2.

226. Examining the wording of the new Article 9.1.2., the Tribunal notes that this provision expressly starts by saying that *"Seller shall be liable"* for the information mentioned thereafter including the Data Room. It does not contain any wording regarding the question as to whether and to what extent Claimant is obliged to examine this information. And even less does it contain any wording to the effect that, if information in the Data Room differs from information contained in the other sources of information mentioned (Agreement, Disclosure Letter and Information Memorandum), Claimant may not rely on such information from these other sources. The new Article 9.1.2. therefore can only be understood to provide

that Respondents are liable for information not only from these other sources, but also in addition for information from the Data Room.

227.    The Tribunal does not consider it relevant whether, as disputed between the Parties, Claimant did not and could not examine in detail the information in the Data Room due to lack of time. For, as concluded above, such information in the Data Room was in any case not able to discredit information from the other sources of information mentioned in Article 9.1.2. Based on that provision of the PA, Claimant could rely on and Respondents were liable for the information in these other sources. Even if information in the Data Room would have differed from information in these other sources, the express mentioning of the specific documents of these other sources (Agreement, Disclosure Letter and Information Memorandum) gave a priority to that information over the more general information contained in the thousands of documents placed in the Data Room.

228.    In view of the clear wording of Article 9.1.2., this would not exclude any liability of Respondents also for information contained in the Data Room. But no such liability is claimed by Claimant and the Tribunal thus does not have to deal with that issue.

229.    Therefore, the Tribunal concludes that Claimant could rely on and Respondents are liable for all information included in the documents referred to in the PA as well as in the documents expressly referred to in such documents irrespective of what the Data Room contained. In particular, this liability includes information in :

            1)      the PA itself;
            2)      the Disclosure Letter;
            3)      KPMG's Information Memorandum;
            4)      KPMG's Financial Analysis.

230.    The question whether and to which extent, as alleged by Claimant, Respondents breached their obligations under this liability will be examined by the Tribunal at a later stage in the context of the specific claims raised.

## G.III. The Relief Sought by Claimant under Alternative 1

### 1.  The National Carrier Status

### a.  *Summary of Contentions by Claimant*

231.  Scope and alleged breach of undertaking regarding the NCS of BBA are outlined by Claimant as follows (C I, paras 27 and 28):

> "Clause 3.9.2 of the Agreement (*Exhibit "C/35"*) provided as follows with regard to the Company's status as exclusive national carrier:
>
> > "The Company has been designated as Bulgarian exclusive national carrier in all bilateral agreements to which the Republic of Bulgaria is a party, and enjoys all rights and privileges attaching to such designated status.
> >
> > *This status of the Company as Bulgarian carrier will be maintained for at least 12 (twelve) years...*
> >
> > *The Seller hereby warrants that the acquisition of the Shares pursuant to this Agreement shall not adversely affect such exclusive national carrier status and the enjoyment by the Company or the Buyer of the rights attaching thereto or deriving therefrom".*
>
> Clause 5.1.3 of the Agreement additionally provided that:
>
> > "the intention of the Buyer being to maintain the Company as the leading provider of aviation services within and from Bulgaria and as the Bulgarian exclusive national carrier, the Buyer having received confirmation from the Bulgarian Government in the form of a letter from the Minister of Transportation (Attachment No 11) that: a) as of the time of entering into new intergovernmental treaties Balkan Airlines shall be entitled to the right of first refusal to be appointed as a carrier of the national flag if this is in compliance with the negotiated clauses of the specific treaty for air communications, and that it can rely on the Government's support when carrying out such duties...".

These commitments also appeared in the Bulgarian Minister of Transportation's letter annexed as Appendix 11 of the Agreement, which stated:

> *"The Minister of Transport undertakes for the next 12 years to preserve the status of "Balkan Airlines" AD as per the intergovernmental treaties, under which it was appointed as a carrier – bearer of the national flag..."*

English translations of the letter from the Bulgarian Minister of Transportation and the letter from the Bulgarian Minister of Finance, both dated 22nd June 1999 and annexed as Appendix 11 to the Agreement, are attached as **Exhibits "C/46A", "C/46B"**.

These undertakings were reconfirmed by the representation in paragraph 3 of the chapter of the Disclosure Letter (**Exhibit "C/39"**) dealing with Commercial Relations of the Company, which provided:

> *"No approval or consent of a third party is needed and no agreement exists, on which grounds the manner or the scope of activity of Balkan Airlines EAD can be restricted, except for the limitations provided for in the Law on the Financial Recuperation of State-Owned Enterprises and Art. 21 of the Law on Privatization."*

### ii. The Breach Of The Undertaking

The undertaking regarding the **exclusive national carrier** status of the Company were breached, inter-alia, in the following respects:

a. Company flights to Iran, Lebanon and Syria were cancelled following change of control over Balkan pursuant to the Agreement. The Respondents **took no steps** to remedy these cancellations.

   See correspondence attached as **Exhibit "C/47"**.

b. Rather than remedying the situation, the Bulgarian Government appointed Balkan's competitor, Hemus Air (which at the time was controlled by the Government), to be the designated carrier to destinations where Balkan was forced to stop flying to. No compensation from the Government, or payment from Hemus were offered to the Company as a result of this.

> See for example the Company's Marketing and Sales Department's letter dated 16th September 1999, attached as **Exhibit "C/48"**.

    c.    Queries were raised by Holland, Cyprus, Morocco, Algeria and Tunis, regarding change of control over the Company pursuant to the Agreement. These countries also threatened to cancel the Company's flights to them. The Respondents **took no steps** to remove these threats or to make them unattainable.

> See correspondence attached as **Exhibit "C/47"**.

    d.    The inability to fly over Iranian airspace, prevented or hardened flights to destinations such as Colombo, Bangkok and Mali. The Respondents **took no steps** to remedy these difficulties.

> See correspondence attached as **Exhibit "C/47"**.

    e.    The change of control over the Company threatened non-compliance with Council Regulation (EEC) 2407/92. The Respondents **took no steps** to remedy the difficulty which arose therefrom.

> The minutes of a discussion relating to the Company's non-compliance with Council Regulation (EEC) 2407/92 is attached as **Exhibit "C/49"**.

    f.    The Bulgarian Government appointed Hemus Air as national carrier to destinations Balkan ceased to fly to due to economical and commercial reasons, without compensating Balkan or alternatively obligating Hemus Air to do so, although the right to fly to these destinations belonged to Balkan.

    g.    The Company was denied privileges and benefits which it had been granted for years prior to its privatization and which were associated with its being Bulgaria's national carrier (reduced aviation fees; operation of various facilities at the airport; etc)."

232.    Claimant contends that according to the definition of "*national carrier*" as set forth in the Law on Civil Aviation of 1998 the aviation operator being awarded the NCS does not need to be of Bulgarian nationality (C II, paras 100 *et seq.*).

233. If indeed the immediate consequence of the shift of the airline's ownership to a foreign entity was the loss of the NCS, the mere sale of BBA would already constitute a breach of the undertaking made in the sales contract (C II, para. 103). The latter was expressly required by Claimant in the negotiations and crucial for its decision to enter into the PA (C II, para. 104). In addition, the NCS is associated with various other privileges (C II, para. 114).

234. The State of Bulgaria may not be excused for alleged impossibility to comply with undertaking to maintain BBA's NCS in international relations. Even if impossibility was assumed, this only meant that Respondents' primary obligation under the PA was replaced by a secondary obligation to compensate for damages (C II, para. 108).

235. It is emphasized by Claimant that BAA fulfilled the technical requirements for being an "aviation operator" as set forth by Article 3.9.2 of the PA at all times until it went bankrupt (C II, para. 101).

236. Additionally, Respondents may not argue that designation of Hemus Air as NC for destinations not serviced by BBA did not constitute a breach. Prior to its privatization BBA had also retained NCS for 31 destinations it was not actually flying (C II, para. 112).

237. It shall be noted at this point, that the Company's status as Bulgaria's "*exclusive national flag carrier*" was undisputedly Balkan Airline's most intangible asset. Without this feature, Zeevi would not have purchased Balkan. (C IV, para. 103)

238. Zeevi was to invest substantial amounts of money into the Company; in return, the Company's status would be maintained for at least 12 years in accordance with Article 3.9.2 of the PA (C IV, paras 106 *et seq.*). This warranty was meant to ensure that the change of control over the Company would not change its NCS and the rights attached thereto (C IV, para. 109). Unfortunately, the Respondents breached this agreement.

239. As noted above, after the privatization, Iran, Lebanon and Syria were displeased by the transfer of 75% of the shares of the Company to Israeli-owned corporations, and therefore terminated the Company's flights to these countries. (C IV, para. 112) The Respondents already knew before (as of 6 July 1999) the completion of the PA that the Company could not fly to Iran and Lebanon, as shown in Exhibit B-38. Concealment of such vital information from the Claimant cannot be described as anything but serious fraud and deceit (C IV, paras 113 *et seq.*).

240. According to the Respondents, Mrs. Docheva testified that the reason for Iran's cancellation of BBA's NCS was that the

> *"Company had not serviced its obligations to the Iranian Aviation Authority".*

However, there is no mention of this fact in Mrs. Docheva's witness statement. The letter from the Iranian Government to the Bulgarian Deputy Minister of Transport dated 25 October 1999 confirms the opposite.(C V, para. 26)

241.    In addition, some time before Completion – while undertaking to the Claimant that the Company's NCS will be preserved – the Bulgarian Government operated to designate another NC to Lebanon, instead of Balkan. As appears from Mr. Garabedian's letter of 14 July 1999, this in fact did take place, with Hemus Air replacing Balkan as NC in Lebanon before Completion (C IV, para. 116). Since Article 3.9.2 guarantees the Company as being the exclusive NC in all bilateral agreements, this clearly constituted a breach of said article. With that behavior, Respondents are further in breach of Articles 9.1.1, 5.4.2 and 3.7.3 of the PA (C IV, para. 118). Even after Completion of the PA, the Respondents took active steps to conceal the letters from the Claimant and eventually from the Honourable Tribunal (C IV, para. 119).

242.    The Respondents argue that they were not liable towards the Claimant under Article 3.9.2 of the PA, in situations where the NCS was cancelled by third-party states. This narrow misinterpretation of Article 3.9.2 is unacceptable for reasons set out in detail in sections 105-111 of the Claimant's Response Brief. In addition to this, the following is noted: (C IV, para. 122)

243.    This narrow interpretation is certainly not applicable in this case, since the Respondents concealed this fact from the Claimant prior to the completion of the PA (C IV, para. 123). Moreover, this interpretation narrows Article 3.9.2 to a mere undertaking that the Minister of Transport itself would not remove the NCS from the Company. Clearly, no investor would have entered into the transaction based on such feeble protection of the Company's most important intangible asset (C IV, para. 124). Furthermore, the Respondents' argument that they cannot be liable for the actions of third-party states beyond their control is irrelevant. If the Respondents could not provide such a firm undertaking, because it was not solely in their control, then they should not have given this commitment (C IV, para. 125).

244.    The Bulgarian Government appointed Hemus Air as NC to destinations Balkan ceased to fly to due to economical reasons. This was done without any compensation to Balkan for the value of these lines. Taking these lines without compensation, where an undertaking exists that the NCS will be preserved with respect of all

conventions, irrespective of whether these lines were used or not, constituted, therefore, a breach of the undertaking. The Respondents' argument that since Balkan did not fly to these destinations, they were forced to find replacements is false. Indeed, prior to the privatization, the Company was designated as the NC in 81 bilateral agreements, but was servicing only 44 of them. (C IV, paras 126 *et seq*.)

245. The Ministry of Finance's letter (Exhibit C-46A) only obliged Claimant to continue all activities characteristic for the company (C IV, para. 133), not to continue flying to all destinations.

246. Same applies to Article 4.1.8 of the PA. It only obliged Claimant to manage the company in a manner which is consistent with the performance of its rights and obligations as NC, not to fly to all destinations. (C IV, para. 134)

247. Forcing Claimant to continue operating loss-making lines is economically absurd especially with regard to the financial situation, the Company found itself in. (C IV, paras 135 *et seq*.)

248. The Respondents' claim that Claimant knew, prior to completion of the contract, of the possible substitutions, since this knowledge was reflected in Claimant's Draft Prospectus. This argument is false, because the Draft Prospectus was dated March 2000, i.e. after the completion of the Agreement.

249. Furthermore, Claimant alleges, the Respondents did not take any reasonable steps to preserve Balkan's NCS. What the Respondents referred to as "*extensive efforts to reverse that cancellation, and in respect of Libya those efforts were successful*" consisted of a total of only seven letters (with respect of four states), written over a eighteen month period. With respect to Iran, The Respondents disclosed (Exhibit B-38) only four diplomatic letters. None of these letters contained any demand by the Respondents against Iran concerning the cancellation of the NCS from Balkan (C IV, para. 141). The "*diplomatic efforts*" with respect to Libya are expressed in a single letter, dated 2 June 2000 (C IV, para. 144). With regard to Syria, the Respondents have not shown that even one letter was written to this country (C IV, para. 143). The Respondents' "success" in Lebanon was that from then on, not Balkan Airlines, but Hemus Air was appointed NC to that country (C IV, para. 142). Clearly, the diplomatic steps allegedly taken were not serious ones (C IV, para. 145).

250. In this regard, Claimant suggests, the simplest thing the Government of Bulgaria could have done to ensure BBA's NCS for example with regard to Lebanon, was to apply the same measures towards the

Lebanese NC, which would even have been in accordance with Article 7 (1) of the Bulgarian-Lebanon bi-lateral agreement.

251. The Respondents argue that the Republic's *"express international obligation to meet the anticipated requirements of traffic from or to Bulgaria"* required it to designate Hemus Air as Bulgaria's NC to Lebanon instead of Balkan. The Respondents' argument is totally unacceptable. On the one hand, the Respondents argue that Lebanon's cancellation of Balkan's designation as NC was in breach of its international obligation. On the other hand, the Respondents argue that in order to comply with the obligation imposed pursuant to the Air Services Agreement with Lebanon, they were obliged to designate Hemus Air as the NC to Lebanon. This in effect means, that the Respondents' interpretation of the ASA with Lebanon is that each time Lebanon breaches this agreement, the Republic of Bulgaria is under an obligation to take steps to remedy Lebanon's breach. (C V, para. 29)

252. The Respondents concentrate their arguments mainly on attempting to down play the damages and losses these misrepresentations and breaches caused. In response to that Claimant notes: Zeevi Holdings would not have entered into the PA knowing that several of the Company's destinations were cancelled prior to Completion of the PA. However, by entering into the transaction, it lost the USD 23,150,000 that it transferred directly into the Company (C IV, para. 149). Indisputably, the NCS was the Company's most valuable intangible asset. Zeevi Holdings entered the transaction based on an undertaking that this status would be preserved for a period of twelve years. Clearly, without a Governmental undertaking to preserve the Company's NCS, the value of this asset significantly decreased (C IV, para. 150). The loss of the lines to Iran, Lebanon and Syria was significant. Indeed, had the line to Lebanon not been profitable then Hemus Air would not have volunteered to take it. Furthermore, if the lines were unimportant, then why did the Respondents choose to conceal from the Claimant the fact that they were lost prior to completion? (C IV, para. 151) The loss of these lines affected the feasibility other destinations, such as Bangkok, Mali and Colombo (C IV, para. 152). The fact that lines to which the Company did not fly were transferred to Hemus Air with no compensation further damaged the Company (C IV, para. 153). Furthermore, contrary to Respondents' allegation, Mr. Golan did not mention Iran, Syria or Lebanon when referring to the destinations, to which BBA did not fly due to economical reasons. In fact, he stated, that these were potentially profitable lines. (C V, para. 31)

253. Pursuant to the warranties in Article 3.9.2 of the PA the Company should have continued to enjoy the privileges associated with the NCS also after completion of the PA (C IV, para. 155). The fact that

according to the Respondents the said privileges were not set forth in regulations does not mean that they did not exist. (C IV, para. 157) Contrary to the Respondents' allegation, Mr. Frank did not concede that it was not in the business of providing fuel to other airlines, as one of these privileges. He only stated that BBA was not selling fuel, which is different from the right to sell the service of providing fuel, which is part of the privileges associated with the NCS. (C V, para. 34)

254. In contrast to Respondents' allegation, Article 4.1.8 of the PA refers to Balkan as

> "*national flag bearer and as manger or operator of Bulgarian airports*".

This is also supported by the Minister of Transport's letter (Exhibit C-46A). (C IV, para. 158)

255. Respondents' argument that the Claimant did not protest against any unjust removal of privileges is false, as Mr. Golan's letter dated 14 February 2000 proves.

### b.  *Summary of Contentions by Respondent No. 1*

256. The designation is described as a unilateral act of state whereby the respective air carrier is given permission to conduct scheduled flights to and from foreign states that have concluded a bilateral ASA with the State of Bulgaria (R II B, para. 136).

257. Several ASAs required substantial ownership and effective control of the airline to be vested in nationals of the contracting state. This requirement is commonplace and part of the standard terms recommended by ICAO. Besides, this requirement (i) did not give rise to any problems for Claimant (R II B, paras 148 *et seq.*) and (ii) was fulfilled when Claimant transferred 26 per cent of BBA's shares to its wholly-controlled Bulgarian company ZBIA (R II B, para. 159).

258. Respondent No. 1 emphasizes that it maintained BBA's designation as NC until all operations ceased and bankruptcy proceedings had been initiated in March 2001 (R II B, paras 135 and 142, R VIII V, para.148) and thereby fulfilled its contractual obligation. Balkan's NCS was even preserved until November 2002 (R V B, para. 34).

259. It is noted by Respondent No. 1 that it could not and in fact did not underwrite the continuous observance by foreign states of BBA's status. It may not be held liable for any alleged refusal of a foreign

state to recognize the airline's designation. As a fundamental rule of international law responsibility of a state is engaged only by acts that are attributable to this state. Sovereign acts of foreign states, however, are not attributable to the Republic of Bulgaria (R II B, para. 146; R VIII B, para. 157) as conceded by Mr. Golan (R III B, para.75). Therefore, the Republic warranted Balkan's rights as NC insofar as such rights were within its own sphere of control (R V B, para. 37). Besides, the overwhelming majority of states respected BBA's continued designation (R II B, para. 147). Joint efforts by Bulgarian Authorities and Balkan Airlines succeeded in convincing Libya, which had denied its recognition as NC to withdraw that denial (R III B, para. 75). Those states that did not – Syria, Lebanon and Iran – did so for arbitrary reasons and despite rather than because of the terms of the respective ASA and the steps taken by Bulgarian officials (R II B, paras 151 *et seq.*). The aforementioned states that refused continuous recognition of BBA's status were minor and unprofitable destinations as confirmed by Mr. Golan. Moreover, due to Speedwing's recommendation to focus on mostly Western European destinations lead Balkan to voluntarily reduce its routes (R III B, para. 77; R VIII B, paras 152-154, Vienna Transcript, at 1234:1-16 (Mr Harlev).).

260. Regarding the destinations that were not serviced by BBA anymore, Bulgarian law and the ASAs permit and require designation of another airline as NC (R II B, para. 158).

261. To conclude, Respondent submits, under Article 3.9.2 of the PA Zeevi was promised that Balkan Airlines' NCS would be maintained insofar as Zeevi was prepared and able to service – and service adequately – a relevant ASA of the Republic.

262. The rights attached to the NCS are only those set forth in the ASAs and do not encompass the benefits asserted by Claimant (R II B, paras 166 *et seq.*). Zeevi relies principally on Mr. Frank's personal opinion, to the effect that national airlines "customarily" enjoy the exclusive right to provide ground handling and refueling in their home airports. On cross-examination however, he conceded that these allegations have no contractual basis and that Balkan Airlines was not in the business of providing fuel to other airlines (R III B, para. 48).

c. *Summary of Contentions by Respondent No. 2*

263. The Respondent No. 2 summarizes its contentions on this issue as follows (R I, p. 30, before 5.3):

*"The claim for breach of undertaking to preserve the Company as national air carrier is unfounded and lacking of proof. No breach of such undertaking was committed. The Respondent had undertaken only for its or for the respective state authorities behavior (for avoidance of misinterpretation on behalf of the Claimant the last undertaking is made directly by the Minister of Transportation) and under one very clear condition -- that the Company will meet any necessary by law requirements to be such carrier. Therefore the Respondent and/or the State of Bulgaria may not be liable for actions of other independent states. The Respondent also is not liable under the Privatization agreement for changes in internal or international legislation that may influence on this status as this is a trade contract and does not involve undertakings of a state to procure policy affecting its sovereignty. Further the Claimant did not present any consistent or sufficient evidence of breach of this undertaking and as a result could not prove the amount of the damages or losses of future profits such alleged breach would cause. In the last instance it is not Claimant's right to claim damages or losses of future profits as these could be suffered just by the Company being the exclusive national carrier and not directly by the Claimant."*

264.  Respondent No. 2 emphasizes that the status as NC is subject to various bilateral treaties with other states. Such status is not "general" i.e. there is not a general legal definition of National Air Carrier or this status do not necessarily apply to all destinations to which an air company from a specific state perform flights. Therefore, theoretically if there are 90 bilateral treaties there could be 90 different National Air Carriers, if there are 90 different aviation companies. (R IV PA, para. 61) The Agreement does not refer to BBA as being the exclusive NC (R IV PA, para. 62). Thus, it is not the Republic of Bulgaria's sole decision to grant or revoke this status. These bilateral treaties provided for the option for the contracting state to withdraw its consent in case the airline designated as NC was not majority owned by a local, i.e. Bulgarian, entity (R II PA, paras 119 *seq.*). Even if the respective treaty did not provide for the requirement of at least 51 per cent national shareholding, any state can renounce such treaty by its sovereign decision (R II PA, para. 126). Respondent No. 2 argues that it may not be held liable for such acts exceeding its power of control as acts of independent states. In the same vein, Respondent No. 2 asserts that the undertakings made in the PA could not have referred to such acts (R II PA, paras 120 *et seq.*).

265.  Furthermore, as these treaties became part of the internal legislation they limit the undertaking made by Respondent No. 2 as expressed

by the Minister of Transport in his letter to Claimant where it was determined that BBA's status as NC should be preserved

> "*under the condition that it meets the requirements for Bulgarian aviation operator contained in the respective laws and secondary legislation.*" (R II PA, para. 128; see C-46A).

266. Moreover, it does not constitute a breach if the NCS is designated to another airline in respect to those destinations not serviced by BBA anymore (R II PA, para. 131). In fact, Respondent No. 2 asserts that the Company kept its NCS, even in respect of the routs no longer operated by it, until its aviation operation license was revoked following Balkan's bankruptcy (R III PA, para. 157). In this respect, Claimant misuses the term "completion" of the contract in conjunction with the warranties given.

> "*A party (in this case the Respondent) when making a warranty is considering the facts existing and/or known to it at the date of making such warranty. Unless it [the warranty] refers to something dependant on the respective party, the warranty may not be deemed to be valid in the future also, as the party is not supposed to know what will happen in the future. Therefore the date of "completion" and events occurring after signing of the contract and before date of completion are irrelevant when speaking of representations and warranties as they are given at certain point of the time*". (R IV PA, para. 68)

267. Furthermore, it transpired from the witness statements of Mr. Frank and Mr. Golan that the destinations in question were not so valuable and important to the Company at all.

268. Moreover, according to Mrs. Docheva's witness statement the reasons for stopping the flights of Balkan Airlines to Iran do not lay in the change of ownership of the company but in the fact that the Company had not serviced its obligations to the Iranian Aviation Authority (R III PA, para. 157).

269. Contrary to Claimant's allegation, the Respondents did take active steps to overcome the difficulties of BBA to fly to Libya, Iran, Syria and Lebanon. The measure proposed by Claimant, to act in reciprocity to these states, would only have deepened the controversy with the respective states. (R IV PA, para. 77) Furthermore, contrary to Mr. Golan's statement, the Company continued to fly over Iran, which is proven from the written evidence presented. The speculation of Mr. Golan that the Company was trying to renew the Colombo, Bangkok and Male destinations but was stopped just from the problems with Iran is totally unsupported. (R IV PA, para. 80)

270. As to the lines to which Hemus Air was appointed NC due to the fact that BBA had ceased to operate these routs because of economical reasons, Respondent No. 2 states the following:

> *"The text of the Contract – Article 4.1.8 expressly provides that the Claimant is obliged to operate the company as national air carrier. As this status is not general but relative – to each separate bilateral aviation treaty, this means that ceasing of flights on each such destination where Balkan was the designated carrier is breach of Article 4.1.8. Therefore the Claimant may not now demand specific compensation as it was not granted the "monopoly" to fly to certain destinations."*

271. Respondent rejects the view that the mere status as NC is associated with further benefits (R II PA, paras 132 and 135). As demonstrated, the status of NC is the status as provided in the respective bi-lateral intergovernmental treaties, none of which specifies that the NC will have additional rights (R IV PA, para. 18).

### d.    *The Tribunal*

272. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents and evidence:

Party Submissions:

| | |
|---|---|
| C I | paras 27 *seq.* |
| C II | paras 100-114 |
| C IV | paras 116-127, 133 *et seq.*, 141-145, 149-153, 155, 157 |
| C V | paras 26, 29, 31, 34 |
| | |
| R II B | paras 135 *seq.*, 142; 148 *et seq.*, 151 *et seq.*, 157 *et seq.*, 166 *et seq.* |
| R III B | paras 48, 75, 77 |
| R V B | paras 34, 37 |
| R VIII B | paras 152-154 |
| | |
| R I | at page 30, before para. 5.3 |
| R II PA | paras 119 *et seq.*, 126, 128, 131 *seq.*, 135 |
| R III PA | para. 157 |
| R IV PA | paras 18, 61 *seq.*, 68, 77, 80 |

Exhibits:

| | |
|---|---|
| C-35 | PA |
| C-39 | Disclosure Letter |

| C-46A | Appendix 11 to the PA, English translation of the letter from Bulgarian Minister of Transportation of 22 June 1999 |
| C-46B | Appendix 11 to the PA, English translation of the letter from Bulgarian Minister of Finance of 22 June 1999 |
| C-47 | Letters relating to cancellation of overflight/landing rights |
| C-48 | letter of Company's Merketing and Sales Department of 16 September 1999 |
| C-49 | minutes of a discussion concerning Company's non-compliance with Council Regulation (EEC) 2407/92 |
| R-B 38 | diplomatic letters |

**Hearings:**
Mr. Harlev     Vienna Transcript at p. 1234: 1-16

273. Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

274. On one hand, there is no doubt that the NCS generally is of vital importance for an airline since it assures the airline rights and over-flight rights via international treaties. It is not necessary that the NC makes use of all its rights, e.g. that it flies to all destinations to which it has access. If an airline loses its NCS, it cannot collect royalties. Even though it may be difficult to quantify the damages resulting from the loss of the NCS, the NCS is a valuable asset. The Tribunal has no doubt that Claimant would never have bought the Airline, if it had not been assured the NCS.

275. On the other hand, it has to be taken into account that landing and over-flight rights were revoked by third parties, namely Libya, Iran, Syria and Lebanon, being sovereign states. This was beyond the control of Respondents. Further, in Bulgarian law, there are two different regimes: one is that of a mere contractual obligation and the other is that of a guarantee. It may be argued that the landing and over-flying rights were an obligation but not a guarantee.

276. Be that as it may, it is undisputed that the NCS was expressly assured by Respondent's according to para. 3.9.2 for "*all bilateral agreements to which the Republic of Bulgaria is a party*" and that both that provision and in Appendix 11 of the PA the Respondent No. 1, by its Minister of Transport, assured that status for subsequent 12 years. These express provisions show that the NCS was of primary relevance for the contract and particularly for Claimant. It also shows, since it was clear for the Parties that bilateral treaties

gave the opportunity for third states to revoke the NCS, that nevertheless Respondent was ready to accept a contractual obligation in this regard and thereby allocated the risk of revocation in the sphere of Respondent. It may be added that, in view of the frequent relevance of the NCS, such a situation and legal construction is quite common to aviation related contracts and arbitrations.

277. Therefore, since the assurance was given for "*all bilateral agreements*" and since it is undisputed that up to three States did revoke the NCS, it is clear for the Tribunal that Respondents that this leads to a liability in this regard.

278. Whether any damage has been shown to have been caused by this breach and, in the affirmative, what is the quantum, will be examined by the Tribunal at a later stage in this Award.

## 2. The Equant Shares

### a. *Summary of Contentions by Claimant*

279. There is no dispute that the Company's entitlement to the Equant N.V Shares (the "Equant Shares" or the "SITA Shares" or "Shares"), was the most valuable tangible asset the Company possessed, which was crucial to the Claimant in contemplating to purchase the Company and rehabilitate it (C IV, para. 161). This was confirmed not only by Mrs. Docheva in her cross-examination and by internal documents of the Claimant, but also by Respondents' own expert (C IV, paras 163 *et seq*.). Claimant submits that the Respondents knew well that the Claimant was relying on these Equant Shares in its planned acquisition of the Company (C IV, para. 166). The representations given by the Respondents with respect to the Company's entitlement to the Equant Shares were found after the Privatization to be untrue in a number of most material aspects (C IV, para. 168).

280. Scope of representations and alleged misrepresentations regarding the Equant Shares are outlined by Claimant as follows (C I, paras 31 and 32):

> "*i. The Scope Of The Representation*
>
> *31. Page 39 of the KPMG Financial Analyses (Exhibit "C/38") stated as follows with regard to the Company's entitlement to Equant N.V Shares (the "Equant Shares" or the "Shares"):*

> *"Balkan Bulgarian Airlines' participation in SITA gave it entitlement to a relevant number of certificates, being 26,322, as at December 1998. Each certificate in Equant is convertible to shares at the ratio 1 certificate: 20 shares. Half of the shares have a restriction on sale until July 2000".*

> *See also page 6 and Note 6 at page 37 of the KPMG Financial Analysis, which set out the value of the Company's holdings of Equant shares at USD 35,699,000.*

> *ii. The Scope Of The Misrepresentation*

> *32. The representation was found to be untrue in the following respects:*

> > *a. The Company possessed only 320,379 Equant Shares as opposed to 408,448 Equant Shares, a shortfall of 88,069 Equant Shares.*

> > *b. A restriction applied on the sale of all the Equant Shares the Company possessed, until December 1999.*

> > *c. In December 1999, the Company was permitted: i) to sell only one third of the Shares it possessed; ii) to carry out the sale at below the quoted price of the Shares on the New York Stock Exchange (USD 87.4663 per Share as opposed to USD 112 per Share)".*

281. The fact that the number of Equant Shares the Company was entitled to was only provisional was not revealed to the Claimant. This, even according to the Minister of Finance himself, in his letter dated 2 August 2000, constituted an *"(...) insufficiently thorough description of the nature and essence of the participation of Balkan Airlines Joint-Stock Company in SITA"* (C IV, para. 173). Even the SITA Foundation informed its members that its statements referred to a provisional number of shares; therefore, it is inconceivable that the Respondents should not have done the same when making representations to third parties (C IV, para. 175). Claimant asserts that the KPMG Financial Analysis disclosed that

> *"the number [of shares] will be adjusted after an allocation of Equant Shares currently held by GETS."*

This adjustment, however, is unrelated to the adjustment that caused the shortfall of 88,069 shares between the number of shares represented in the Financial Analysis and the number of shares actually possessed by BBA at the time the PA was signed. Mr.

Neitchev's cross-examination demonstrated the insufficient manner by which this matter [the fact that the number of shares was only provisional] found its expression in the KPMG Financial Analysis (C IV, para. 176).

> "*The fact that the Respondents need to rely on sources outside of the KPMG Financial Analyses in order to explain what was the Company's true entitlement to the Shares, is best proof that in itself the KPMG Financial Analyses did not provide a true description of this entitlement* (C V, para. 35)."

Further, according to the Respondents, the KPMG Financial Analyses represented the situation of the shares as of the date of its preparation. However, Claimant submits that the adjustment had already taken place before that date. (C V, para. 36)

282.  BBA held shares in GETS - a company in liquidation - and was supposed to receive half of the liquidation dividend by way of Equant Shares. (C II, para. 116) In regard to this matter, the Republic and the Privatization Agency (not for the first time) contradict each other in their factual arguments. (C IV, para. 176)

283.  Respondents' reliance on documents in the Data Room in regard to an anticipated adjustment of the number of shares is to be rejected for the reasons put forth before, i.e. that the parties agreed that Claimant would not be held to know the contents of the Data Room (C II, para. 119). To the contrary, the expected adjustment was not disclosed in the KPMG Financial Analysis and the warrant given under Article 3.7.3 of the PA that

> "*there has been no material adverse change in the financial position of the Company since 31 December 1998*"

has been violated (C II, paras 122 *et seq.*). Furthermore, neither did the Respondents prove the existence of any such information contained in the Data Room, nor any of the witnesses presented by the Respondents had any personal knowledge about this (C IV, para. 177). Even an examination of the KPMG Financial Analyses and the document allegedly containing any information regarding this issue does not reveal that an adjustment to the number of shares was due to take place (C IV, para. 179). From the Financial Analysis itself it can be derived that in February 1999 117,992 shares were sold, whereas the Respondents purport that the decrease in the number of Equant Shares held by BBA was due to the "*rules governing the administration of the Shares*" (see C II, para. 127). In the end, it is irrelevant why the decrease occurred. Crucial is that the representation regarding the number of shares held by BBA was not true at the time the PA was signed (C II, para. 128).

284. Claimant further addresses the issue of restrictions that applied to the sale of Equant Shares. As noted above, according to the KPMG Financial Analysis, only half of the SITA Shares were subject to sale restrictions. This statement was false, since restrictions applied to all shares, because the SITA Foundation had the sole discretion with respect to how and when the sales could be effected, even after July 2000. (C IV, paras 199 *et seq.*). Even according to the Respondents themselves, SITA's discretion emerged not from the Financial Analyses, but from "other sources" (C IV, para. 204) contained in the Data Room. A fact, which has not been proven by the Respondents (C IV, para. 207). BBA was only granted permission to sell about one third of its Equant Shares. Claimant was forced to pledge the remaining shares to affiliated companies in order to acquire further funds for BBA instead of selling the shares at a higher price on the stock exchange. It is clear from the above, that the KPMG Financial Analyses provided untrue information in the manner by which it valued the Shares, in a way which completely ignored the fact that the Company, selling the Shares through SITA, could not raise from these Shares their market price on the stock exchange (C IV, para. 212). Hence, restrictions applied even after December 1999 (C II, paras 129 *et seq.*).

285. Claimant submits that it could reasonably rely on the KPMG Financial Analysis as a source regarding the Company's rights to the shares. In contrast to the Respondents attempt to down play its importance, this 102 page comprehensive document went into the smallest details in the Company's operation, was titled "*Balkan Bulgarians Airlines EAD Due Diligence*" and was prepared in view of being presented to potential investors and was warranted to be true and accurate (C IV, paras 215 *et seq.*).

286. Claimant further asserts that the shortfall of Equant Shares constituted a material adverse change in the sense of Article 3.7.3 and therefore required disclosure. This requirement was confirmed by Respondents' own expert, Mr. Neitchev in his cross-examination and reinforced by warranties expressed under Articles 5.4.2 and 9.1.1 of the PA (C IV, paras 185 *et seq.*).

287. The Respondents' argument that they had no knowledge about any adjustment of the numbers of shares before the completion of the PA, has neither been substantiated by any witnesses, nor is it very plausible given that prior to the privatization, Balkan had a special department dedicated to dealing with the SITA Shares (C IV, paras 190 *et seq.*).

288. The misrepresentations regarding the number of Equant Shares caused direct damages to Claimant since it had not invested in BBA

had it known the substantial deviation in the number of Equant Shares (C II, para. 134).

289.  Knowledge of the expected adjustment by Knafaim-Arkia may not be imputed on Claimant should it exist at all since Knaifaim-Arkia and Zeevi are unconnected entities. In this respect, Claimant notes that although Knafaim-Arkia being an affiliate of Arkia, which is an airline itself which had entitlement to receive Equant Shares, it needs not have known the details of the regulations associated with these shares. This is especially so, since in this case the complexity of this issue is apparent from the cross-examination of the Respondents' expert (Mr. Neichev) during which he could not answer the questions related therewith. Given this background there is no reason to assume that Knafaim-Arkia, whose interest in the Shares was insignificant was acquainted with the "ins and outs" of the various rules governing these Shares, to an extent which immediately enabled it to detect that representations given with respect to these Shares were not true (C IV, paras 225 *et seq.*). Furthermore, the Respondents cannot assume that any information that Arkia might have had reached Knafaim-Arkia, a different company and then the Claimant, another different company (C IV, para. 227). Moreover, even if Knafaim-Arkia had any information regarding the share, then so did the Respondents, owning the Company. Therefore, in representing that the KPMG Report reflected the true state of the Company even though it omitted to mention full extent of the restrictions, the Respondents made a false statement and hence have to bear the resulting responsibility. (C V, para. 42)

290.  In any case, it was Respondent's obligation to provide accurate information (C II, para. 136).

### b.   *Summary of Contentions by Respondent No. 1*

291.  Respondent No. 1 maintains that Claimant was well aware that:

      (i)     *BBA's entitlement to Equant shares was only indirect;*
      (ii)    *the number of shares was subject to adjustment and*
      (iii)   *restrictions attached to the sale (R II B, para. 181).*

292.  The nature of BBA's entitlement to shares in Equant N.V. is described as follows. Equant's majority stockholder was "The SITA Foundation" ("Stichting" - non-profit entity under Dutch law). The foundation was formed by SITA, a non-profit entity organized under Belgian law created by airline companies to serve their telecommunication needs. Equant N.V. provided data communication services over SITA's network. The SITA Foundation held the Equant Shares for the benefit of its members,

i.e. various airline companies, among them BBA and Arkia. Thus, the shares could only be sold through the foundation as the holder. In connection with an IPO of Equant Shares in New York and Paris in July 1998, the SITA Foundation agreed with Morgan Stanley not to sell any shares for a period of two years after the IPO. This restriction applied until July 2000. In 1999 depository certificates were issued by the SITA Foundation representing the beneficial interest of its members in Equant. The certificates could be converted to shares but only after 1 January 1999. The shares were allocated to the members in two segments. The first was unconditionally allocated whereas the second was subject to a later adjustment in order to reflect the members' use of SITA services (R II B, paras 184 *et seq.*). This fact was explicitly stated in the KPMG Financial Analysis (R II B, para. 202). Mr. Golan confirmed that he was prompted to consult Knafaim-Arkia in connection with the Equant Shares after having reviewed the Information Memorandum and the KPMG Financial Analysis (R III B, para. 91). Furthermore, the conditions regarding the allocation adjustment were revealed by the Terms of Administration of the SITA Foundation as presented in the Data Room (R II B, para. 200). Additional information was publicly available through the compendious prospectus for Equant's IPO that was published in July 1998 (R III B, para.90).

293. Claimant may not deny knowledge of these circumstances, in particular since its joint purchaser - Knafaim-Arkia - was itself a member of SITA and thus familiar with this matter. Respondent No. 1 asserts that Claimant and Knafaim-Arkia are connected by signing the PA as one "Buyer" with joint and several liability (R II B, paras 192 *seq.*).

294. Besides, PwC considers

> "*the disclosures made by KPMG in the Financial Analysis as to the number of Equant shares held by Balkan, and the restrictions over their sale, adequate in the context of the purchasers' own knowledge of the SITA Foundation [...].*" (PwC Report, para 2.5)

295. Just as Knafaim-Arkia and consistent with Balkan Airlines' annual accounts, the Information Memorandum did not record an entitlement to Equant Shares at all, because it was not the "*official owner of the shares*" (R III B, para. 94).

296. Respondent No. 1 rejects the contention that Claimant suffered damage in relation to the readjustment by being compelled to inject additional funds into BBA to avoid the company's collapse, since Article 7.9.1 required Zeevi to use all proceeds from the sale of Equant Shares to repay "in priority" debts to the Bulgarian state (R III B, para. 95). To the contrary, Claimant by far did not comply

with its contractual debt-servicing and investment obligations in the first place. It may thus not claim that it had to exceed those obligations, thereby suffering damage by the readjustment (R II B, paras 208 *seq.*).

### c. *Summary of Contentions by Respondent No. 2*

297. The Respondent No. 2 summarizes it contentions on this issue as follows (R I, p. 35, before para. 5.4):

> *„As a summary it should be underlined that the Respondent and KPMG as preparing the Due diligence Report did not by any means mislead the Claimant and Knafaim – Arkia Holdings with respect of the actual number of Equant shares. Such misrepresentation exists only in the statements of the Claimant and is invented just to serve the unfounded allegations in these proceedings. Apart from the documents presented during the negotiations on the privatization, the Claimant was granted full access to the financial data and documents related to it so that it could make its on investigation and conclusions on this topics. This claim is not proved or justifies and may not be submitted by the Claimant as it may be attached only to the Company and/or because is precluded by the expiration of prescription. Further the claim is not proved as amount as the Claimant could not establish what is the exact damage caused to the Company or to it by the alleged misrepresentation."*

298. It is further contended that the anticipated adjustment in the number of Equant Shares held by BBA was properly disclosed and described in detail in the KPMG Financial Analysis (R II PA, para. 136). The Expert report of PwC revealed that the relevant disclosures on Equant Shares made in the KPMG Due Diligence Report are adequate with the intentions and purposes of this report (R III PA, para.161). In this respect, Respondent No. 2 stresses repeatedly that the KPMG Report

> *"reflects the true sate of the Company for the fiscal year as ended 31 December 1998"*. (R IV PA, para. 82)

Moreover, contrary to Claimants allegation, the KPMG report never stated the exact number of shares, but merely the number of certificates to which BBA was entitled (RIV PA, para. 83). With regard to the sale restrictions, applying to these shares, Respondent No. 2 argues that the Report was not intended to provide such information (R IV PA, para. 89). The reasons why such an adjustment occurred and what restrictions applied were set forth in the "Terms of Administration of Stitching the SITA Foundation", a

document available in the Data Room (R II PA, para. 149). All relevant facts regarding the adjustment and sale were disclosed to Claimant entirely by the documents provided and in a timely fashion. It was Claimant's obligation as a professional investor to make use of this information (R II PA, para. 139 *et seq.*). Besides, Knaifaim-Arkia itself owned Equant Shares and was thus well aware of the restrictions applying as well as the pending adjustment (R II PA, para. 159). This was confirmed by Mr. Golan's testimony (R III PA, para. 159).

299. Furthermore, contrary to Claimant's exaggerating allegation, Mrs. Docheva did not state there was an Equant Shares Department, but merely a SITA Department, as this was of interest to the Company (R IV PA, para. 84).

300. Furthermore, Respondent No. 2 contests that the adjustment constitutes a material adverse change in the light of the overall financial position of BBA (R II PA, para. 143) and that the alleged importance to Claimant of this entitlement was communicated to the Respondents (R IV PA, para. 85).

301. The fact that Claimant transferred Equant Shares to its affiliate reveals that no restrictions existed anymore (R II PA, para. 151).

302. Respondent No. 2 maintains that even if any damage occurred by a shortfall in the number of shares held by BBA, this damage incurred to BBA and not Claimant who is therefore not entitled to seek compensation pursuant to Article 82 of the OCA.

### d. The Tribunal

303. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents and evidence:

**Party Submissions:**

| | | |
|---|---|---|
| C I | paras 31 *seq.* | |
| C II | paras 116, 119, 122 *et seq.*, 127 *et seq.*, 134, 136 | |
| C IV | paras 161, 163 *et seq.*, 166, 168, 173, 175 *et seq.*, 179, 185, 190 *et seq.*, 199 *et seq.*, 204, 207, 212, 215, 225 *et seq.* | |
| C V | paras 35 *seq.*, 42 | |
| R II B | paras 181, 184 *et seq.*, 192 *seq.*, 202, 208 *seq.* | |
| R III B | paras 90, 94 *seq.* | |

| | |
|---|---|
| R I | p. 35, before para. 5.4 |
| R II PA | paras 136, 139 *et seq.*, 143, 149, 151, 159 |
| R III PA | paras 159, 161 |
| R IV PA | paras 82 *seq.*, 84 *seq.*, 89 |

**Exhibits:**

| | |
|---|---|
| C-38 | KPMG Financial Analysis |

304. Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

305. The Tribunal understands that 1/3 (117.000) of the shares were sold in 1999 and that no restriction were applied in this respect. But it also understands that all shares were restricted for two years from the time from issuance that was until July 2000, and even after that time any sale was under the discretion of SITA. It seems that some restrictions were factual rather than legal, because many investors intended to sell their shares, so the sale had to be restricted in order to assure a realistic price.

306. The Tribunal also notes that all SITA rules had been disposed in the data-room.

307. In this context, it has to be recalled that above the Tribunal has concluded that, under Chapter III of the PA ("Declarations and Warranties of the Seller") due to Article 3.7.2., Respondents are liable for the information in the Financial Analysis prepared by KPMG.

308. Regarding the Equant Shares, indeed, the following section on page 39 of the KPMG Financial Analyses (Exhibit C-38) is relevant:

> *"Balkan Bulgarian Airlines' participation in SITA gave it entitlement to a relevant number of certificates, being 26,322, as at December 1998. Each certificate in Equant is convertible to shares at the ratio 1 certificate: 20 shares. Half of the shares have a restriction on sale until July 2000".*

309. In the last two lines it is stated that half of the shares have restrictions until 2000. In an argument *ex contrario*, interpretation of that contractual provision cannot be understood otherwise than that the other half does not have any restrictions.

310. Since, in fact, also this other half was under relevant restrictions, it is clear that the information given on page 39 of the KPMG Report is incorrect.

311. Also above in this Award, the Tribunal has concluded that, should information in the Data Room differ from information in specific documents provided by Respondent and referred to in the PA, Claimant could rely on the information in such documents and did not have to verify whether that was confirmed by information in the Data Room. Thus, since, due to the express provision in Article 3.7.2. PA, Respondents are liable for the information in the KPMG Report, that liability covers the incorrect information on its page 39 and is not changed by whatever information was in the Data Room.

312. Therefore, the Tribunal concludes that Respondents are liable for the incorrect information on page 39 of the KPMG Report regarding the Equant Shares.

313. Again, at a later stage of this Award, the Tribunal will have to examine whether that liability lead to a damage and what the quantum is in that case.

## 3. Company not being subsidized or financially supported

### a. Summary of Contentions by Claimant

314. Claimant summarizes its contentions regarding the scope of representations and misrepresentations regarding BBA being financially subsidized and supported as follows (C I, paras 35 seq.):

> "i. The Scope Of The Representation
>
> 35. Paragraph 7 of the Disclosure Letter (Exhibit "C/39"), in the chapter dealing with the Company's activity, stated as follows with regard to the subsidies and financial support the Company had received prior to its privatization:
>
>> "Balkan Airlines EAD has not been subsidized or financially supported in any other way by a government or another authorized body".
>
> ii. The Scope Of The Misrepresentation
>
> 36. The representation was found to be untrue in the following respects:
>
>> a. Pursuant to Order No. RD-08-5/04.01.1997 of the Ministry of Transport and order No. 9/08.01.1997 of the Ministry of Finance, the Company was being charged

      10% of the "Landing fee", "Air navigation fee for overfly" and "Fee for air navigation services in airports area" during the period between 1st January 1997 until 31st December 1997.

    b. Pursuant to Order No. RD-08-1181/18.12.1997 of the Ministry of Transport and order No. 544/22.12.1997 of the Ministry of Finance, the Company was being charged 20% of the "Landing fee" during the period between 1st January 1998 until 31st December 1998.

    c. Pursuant to Decree No. 60 as of 18th December 1998 of the Council Of Ministers for the release from payments of fees, the Company was being charged 30% of the "Landing of aircraft" fee, "Parking" fee and "Use of radio navigation devices and flight services in the airport area" fee as of 1st January 1999.

    d. In addition, the Company had been paying reduced handling fees to Sophia and other airports in Bulgaria."

315. Claimant rejects Respondents' view that it must have been aware of the subsidies provided to BBA as it was disclosed that BBA was under a specific recovery program. There is no evidence, however, that this program actually existed (C V, para. 52). To the contrary, the relevant Rehabilitation Act does not provide that companies under such program would necessarily enjoy subsidies. In fact, the information that BBA enjoyed reduced aviation fees was not disclosed to Claimant (C II, paras 138 et seq.). The Respondents could neither prove that the information allegedly made available through IATA is of any relevance with respect to the reduced fees (C V, para. 53). Claimant further contends that during the negotiations the Respondents reassured Mr. Golan that there were no subsidies or any other financial support enjoyed by the Company and represented so in the PA (C V, para. 46).

316. Furthermore, reduced fees applied to BBA well before it was placed under "isolation" pursuant to the Rehabilitation Act (C II, para. 140). This is evidenced by orders of the Ministry of Transport cited by Claimant (C II, para. 152).

317. Claimant's contention is that the reduced fees constituted subsidies, not only in the Respondents' own understanding, but also under Bulgarian legislation and case law (C II, paras 143 et seq.). This finding is not jeopardized by the fact that these

      "fees were not collected for the State budget."

The notion of "subsidies" does not necessarily require that funds flow from the state budget to the subsidized company. Moreover, the fees were public fees as expressed by the Minister of Transport in its letter dated 10 July 2000 (C-71). Therefore, the reduced aviation fees are to be characterized as subsidies. This view is also supported by the Respondents' own Experts in section 3.9 of their Opinion, specifically referring to subsidies (C IV, para. 235). Mrs. Docheva referred to these as financial assistance (C IV, para. 236).

318. Claimant purports that the subsidies' financial significance is evidenced by the Respondents' witness statement that a reduction in aviation fees was unavoidable for BBA to further operate.

319. In contrast to Respondents' allegation, which has yet to be substantiated by witnesses or other evidence, Claimant did not know about the lower landing fees prior to signing the PA (C IV, paras 244 et seq.). In fact, the Disclosure Letter explicitly informed the Claimant that the Company did not enjoy any subsidies or financial support (C IV, para. 246). Even if Claimant had known about it, then the information contained in the Disclosure Letter would have been false (C IV, para. 250). Furthermore, even if Mr. Golan had to have understood that the Company enjoyed reduced fees, the fact that these were not published anywhere and that Mr. Moustakov and the Privatization Agency could not ascertain what the exact facts were regarding these reduced fees must be taken into consideration (C V, para. 49). Moreover, contrary to the Respondents' allegation, Mr. Frank did not confirm, Claimant had any knowledge with respect to the reduced fees prior to signing the PA. In this regard, the Respondents took Mr. Frank's testimony out of context. The same applies to the Respondents' utilization of Balkan Holdings' letter dated 7 September 2000. (C V, para. 50) The increase of the aviation fees after the privatization constituted also a clear breach of the warranty in Article 3.9.2 of the PA (C IV, para. 256), since the Respondents' themselves argued that the reduced aviation fees the Company used to enjoy were a result of Balkan being Bulgaria's NC (C IV, paras 256 et seq.). It is further noted, that the rescheduling of the aviation fees is a non-issue in these proceedings, since it did not solve the problem of the increase in the aviation fees (C IV, para. 255), but enshrined the Company's obligation to pay the increased fees from that moment onwards (C V, para. 55). Claimant ascertains that it would not have invested in BBA had it known that new debts would accrue as a consequence from the increase in fees. The cancellation of the reduced fees increased the annual operating costs of the Company by approximately USD 5 million (C IV, para. 232). This constituted a direct damage to Claimant (C II, para. 148).

### b.    Summary of Contentions by Respondent No. 1

320.    Respondent No. 1 asserts that BBA had not received and was not
receiving any state financial subsidies at the time of its privatization
other than those disclosed prior to the purchase. Additionally, as part
of the regime of the Law on Financial Recovery applicable to BBA
prior to the purchase (BBA was placed in "isolation" under this law),
reduced fees for landing and air navigation applied. With the
purchase, however, BBA had to be removed from this regime in
order to meet the international obligation under Article 15 of the
Chicago Convention on International Civil Aviation to treat
domestic and foreign air carriers alike. Thus, the fees were
increased, however, only gradually pursuant to the agreement
between the Republic of Bulgaria and the European Investment
Bank. All relevant facts were ascertainable from the information
disclosed in the Data Room (R II B, paras 212 *et seq.*). Moreover,
Mr. Golan and Mr. Frank confirmed Zeevi knew of the lower
landing fees applicable to Balkan. Furthermore, Zeevi's argument
that the rescheduling did not satisfy Balkan Airlines' request to the
government is false (R III B, para. 112 *et seq.*). To the contrary, the
decision of the Ministers of Finance and Transport, dated 20
November 2000, granted precisely what Zeevi had requested in a
letter of 10 November 2000 (R III B, para. 114).

321.    Hence, Claimant was not mislead prior to the conclusion of the PA
and suffered no prejudice from increased landing fees thereafter (R
V B, para. 51).

### c.    Summary of Contentions by Respondent No. 2

322.    Respondent No. 2 summarizes it contentions on this issue as follows
(R I, pp. 40 *seq.*, before para. 5.5):

> „*As a summary Respondent's position is that the claim is not
> reasoned and finds no legal grounds. Neither the Respondent nor
> any other state institution had mislead the Claimant for the fact
> that the Company was not being subsidized as it actually was not
> subsidized and did not receive financial aid. Even if it is found
> that the reduction of fees is state aid, the Claimant was informed
> of this fact as being informed that the Company was undergoing
> recovery plan and was included in the list of companies for
> financial rehabilitation. Provided the legal background of that
> rehabilitation was the Financial Rehabilitation of State
> Enterprises Act of 1996, expired on 30 June 1999, the Claimant
> knew or should have known that these reductions will be existing
> no more after the recovery period expires or after the
> privatization – ignorantia legis neminem excusat.*

> *Further this claim is not properly submitted by the Claimant as the only affected party from the alleged increase of the fees and the costs are actually the passengers or at most – the Company. Therefore the Claimant may not rise such issues to arbitration as not being entitled to this right of claim though being majority shareholder in the Company until affiliated to it companies acquired the shares. After this acquisition the Claimant is not even a shareholder in the Company to suffer indirect damages or loses. And in fine – the Claimant did not provide any evidence on the actual amount of the increase of costs for the period the Company operated after the acquisition of shares by the Claimant and what is the actual amount of the damage occurring for it, safe it is denied that any damage whatsoever was caused by action or representation of the Respondent and/or the Government of Bulgaria."*

323. Respondent contends that it disclosed to Claimant that BBA was undergoing a recovery program under the Bulgarian Financial Rehabilitation of State-Owned Enterprise Act. As part of this program temporarily reduced aviation fees applied to BBA and neither constituted subsidies nor any other financial support under the definition contained in Article 20(1) of the Competition Protection Act as confirmed by Ms. Valeva and Mrs. Docheva during their witness testimonies. The Commission on Protection of Competition and the Supreme Administrative Court had both concluded that the reduced fees were not detrimental to competition. The latter, however, was required in order to characterize the reduction in fees as subsidies or state aid (R II PA, paras 161 *et seq.*).

324. Moreover, it is pointed out that damages arising in regard to ceasing state aid cannot constitute direct consequence of a breach of contract as required by Article 82 of the OCA nor were they recoverable under Article 12 of the OCA as the fees were paid by BBA but not Claimant. Besides, fees were included in the ticket sales price and thus did not give rise to any damages (R II PA, paras 176 *et seq.*).

325. Respondent No. 2 emphasizes that BBA had to be removed from the rehabilitation program after being privatized as the program was only meant for state-owned enterprises (R II PA, para. 180).

326. In addition, Respondent No. 2 submits that even according to Mr. Golan, the Claimant was aware of the fact that the Company paid reduced aviation fees prior to completion of the privatization (R III PA, para. 163). Hence, whether or not these reduced fees constituted subsidies is irrelevant, since Claimant was informed about them in the Disclosure Letter (R III PA, para. 164).

### d. *The Tribunal*

327. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents and evidence:

Party Submissions:

| | |
|---|---|
| C I | paras 35 *seq.* |
| C II | paras 138 *et seq.*, 148, 143 *et seq.*, 152 |
| C IV | paras 232, 235 *seq.*, 244 *seq.*, 246, 250, 255 *et seq.* |
| C V | paras 46, 49 *seq.*, 52 *seq.*, 55 |
| R II B | paras 212 *et seq.* |
| R III B | paras 112 *et seq.* |
| R V B | para. 51 |
| R I | pp. 40 *seq.*, before para. 5.5 |
| R II PA | paras 161 *et seq.*, 176 *et seq.*, 180 |
| R III PA | paras 163 *seq.* |

Exhibits:

| | |
|---|---|
| C-39 | Disclosure Letter |
| C-71 | Letter of the Minister of Transport of 10 July 2000 |

328. Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

329. The Tribunal first recalls that, as concluded above in this Award, Article 9.1.2. PA leads to a liability of Respondents for information contained in the Disclosure letter if such information is incorrect.

330. The relevant section of the Disclosure Letter (Exhibit C-39) is indeed Paragraph 7 in the chapter dealing with the Company's activity:

> *"Balkan Airlines EAD has not been subsidized or financially supported in any other way by a government or another authorized body".*

331. It is undisputed that the considerable reductions of the landing fees first to 10%, then to 20%, and then to 30% of the landing fees, parking fees and fees for use of radio navigation devices and flight services in the airport area as well as of the handling fees at all airports in Bulgaria by decisions of the Ministry of Transport and the Council of Ministers are not mentioned in the Disclosure Letter or

any other of the documents by which Respondents gave information to Claimant under the PA.

332. The Tribunal also sees no difficulty in finding that the very broad wording *"subsidized or financially supported in any other way"* includes such reductions of fees as mentioned above. In this context, the term "subsidy" is not an administrative one, but a contractual one and has to be interpreted in a broad sense. But irrespective thereof, the decreases in fees are covered by the addition of , *"or financially supported in any other way"*

333. It is also clear that these reductions in fees were very relevant for the "activity of the company" which is the title of that section of the Disclosure Letter to let Claimant judge the financial status and prospects of the company. This is particularly obvious as the cited paragraph follows other paragraphs in the same section of the Disclosure Letter which are intended to give a complete picture on the costs occurring for the running of the company.

334. It may well be that, as pointed out by Respondents, that these advantages were due to regime of the Law on Financial Recovery applicable to BBA prior to the purchase, and that, with the purchase, BBA had to be removed from this regime. And it may also be that relevant further information was available from the Data Room. However, as the Tribunal has concluded above in this Award, if there was a clear express information in a document mentioned in Article 9.1.2. PA such as the Disclosure Letter, the Claimant could rely on it without having to verify it in the Data Room and the Respondents are liable if such information is incorrect.

335. As the cited Paragraph 7 of the Disclosure Letter is clear and contains no ambiguity, and as this information is found to have been incorrect, the Respondents are liable in this regard.

336. Again, the Tribunal will examine at a later stage in this Award, whether this breach has caused any damage and, if so, what its quantum is.

## 4.    Ansett Aircraft Maintenance Liabilities

### a.    *Summary of Contentions by Claimant*

337. Claimant summarizes its contentions regarding Ansett aircraft maintenance liabilities as follows (C I, paras 40 *seq.*):

> *"i. The Scope Of The Representation*

40. *The Company leased three aircraft from Ansett Worldwide Aviation Ltd. ("Ansett") (see p. 65 of the KPMG Financial Analysis, Exhibit "C/38"). The following representations (and misrepresentations) were made with regard to these aircraft:*

a. *The Agreement represented that the Information Documents accurately reflected the financial state of the Company (see clauses 3.6.1, 3.6.2, 3.7.1 and 3.7.2 of the Privatization Agreement, Exhibit "C/35", and paragraphs 2 and 3 of the chapter in the Disclosure Letter, Exhibit "C/39", dealing with the Company's accounts). In this respect it is noted:*

   i. *The KPMG Financial Analyses presented the Company's balance sheet, according to which an amount of USD 5,000,000 was deposited with Ansett in connection with the lease of the three aircraft (the "Deposit"). (See Note 7a in page 42 of the KPMG Financial Analysis, Exhibit "C/38"). The Financial Analysis did not disclose that the Deposit (or part thereof) would not be refunded due to additional maintenance costs due in respect of the leased aircraft.*

   ii. *The Information Documents did not disclose that any additional maintenance costs were due in respect of the leased aircraft.*

b. *The following specific representations were made in the Disclosure Letter (Exhibit "C/39") regarding the various costs associated with the leases of the Ansett aircraft and the degree of their maintenance:*

   i. *In paragraph 9 of the chapter of the Disclosure Letter dealing with the Company's Assets, the Respondents represented:*

   **"Except as listed in Appendix XI, all movables, representing transport vehicles, owned or used by Balkan... are maintained and serviced according to effective technical standards".**

   *Appendix XI of the Disclosure Letter did not disclose the Ansett aircraft as being amongst the transport vehicles not maintained and serviced, according to effective technical standards.*

ii.   *In paragraph 5 of the chapter of the Disclosure
     Letter dealing with Accounting Reports, the
     Respondents represented:*

     **"The present Disclosure Letter represents
     complete and accurate statement for all due and
     payable amounts under lease agreements...".**

     *The Disclosure Letter did not disclose any of the
     costs associated with the return of the Ansett
     aircraft upon termination of their leases.*

iii.  *In paragraph 7 of the chapter of the Disclosure
     Letter dealing with Accounting Reports, the
     Respondents represented:*

     **"The Company's obligations outstanding as of
     May 31, 1999 are described in details and
     exhaustively in Appendix XVI".**

     *Appendix XVI of the Disclosure Letter did not
     disclose any liabilities associated with excess costs
     of maintenance of the Ansett aircraft.*

c.  *The KPMG Financial Analysis (Exhibit "C/38"), on
    pages 65 and 66, portrayed the position with regard to
    the leases of the three Ansett aircraft, stating inter alia
    that:*

    **"The future payments in USD related to these rentals
    are presented in Figure 4.20".**

    *An examination of figure 4.20, shows that it does not
    disclose any liabilities associated with the return of the
    aircraft, despite the fact that they were then already
    known at the time and were certainly and clearly
    "related" to the aircraft "rentals". Attention is also
    drawn to page 7 of the KPMG Financial Analyses,
    according to which the amounts set out in figure 4.20
    (which total USD 31,637,000) reflect "The total amount
    that is expected to be paid according to these contracts
    until they expire...".*

    *Furthermore, unlike the position with regard to the
    Ansett aircraft, Figure 4.21 on the same page of the
    KPMG Financial Analysis, provides details regarding the
    Company's additional maintenance liabilities arising in
    connection with the return of two other aircraft of the*

*Company (Boeing 767-200s) (leased from Air-France). No mention of such costs is made in connection with the three Boeing 737-500 aircraft. The difference between the information given with regard to the two types of aircraft, clearly gives rise to the misleading impression that, as opposed to the two Boeing 767-200 (in relation to which only some of the maintenance costs were covered by the maintenance fund), there was no such shortfall in connection with the Boeing 737-500 aircraft.*

*ii. The Scop Of The Misrepresentation*

41. The representations were found to be untrue in the following respects:

   a. The three Ansett aircraft were not maintained and serviced according to effective technical standards.

      *An example of the poor maintenance standards by which the aircraft were maintained is to be found in a letter from Victor Nanoiv, the Technical Director of the Company, dated 11th November 1999, attached as Exhibit "C/63A".*

      *The "Ansett Worldwide redelivery from Balkan Bulgarian Airlines" memorandum pointing out the aircraft's redelivery requirements to Ansett that were not covered by the Maintenance Fund (thus indicating the poor maintenance of the aircraft) is attached as Exhibit "C/63B".*

   b. Contrary to the representations, additional maintenance costs associated with the return of the Ansett aircraft to Ansett upon termination of their leases, existed at the time the Agreement was signed, in an amount exceeding USD 1,000,000 for each aircraft. Attention is drawn in this respect to the following:

      i. Upon return of two of the Ansett aircraft to Ansett at the end of the lease period they were maintained at the Israel Aircraft Industries Ltd. (the "IAI") in order to comply with Ansett's redelivery requirements. The IAI issued invoices with respect to these maintenance works. These invoices show that "extra payments" of USD 1,096,196 and USD 1,218,594 were made with respect of the two Ansett aircraft (respectively). The "extra payments" did not form part of the regular maintenance work

*associated with return of the aircraft at the end of a lease period, and they represented the additional maintenance cost associated with the Ansett aircraft which were not disclosed in any of the Information Documents.*

*The schedules of the IAI invoices reflecting the "extra payments" for Ansett B737-500 # LZ-BOA and Ansett B737-500 # LZ-BOB are attached as Exhibit "C/64".*

*It is noted that the third Ansett aircraft which the Company leased was in a similar condition of the other two aircraft, and the extra payments which would have been due for it upon return to Ansett would have been similar.*

    ii.   *A copy of the Company's report dated 22nd May 2000, evidencing that the total amount required for the maintenance of the Boeing 737-500 aircraft for the period May-December 2000 was 9,219,438 is attached as Exhibit "C/65". According to the report, out of this amount 70% out of USD 6,596,978 (USD 4,617,884) was covered by the Maintenance Fund, whilst the balance of USD 4,601,554, had to come from the Company's resources."*

338.    Claimant contends that no potential maintenance liabilities were disclosed and therefore they could legitimately expect the deposit to be returned (C II, para. 157). It suffered damages as the deposit would in fact have been returned if the additional maintenance costs had not occurred (C II, para. 163). The aircraft were not properly maintained before BBA was privatized which can be derived from IAI letter dated 6 May 2004 (C-94). This was confirmed by various documents, including the "Speedwing Report" and also by Mr. Frank's witness statement and cross-examination, in which he reiterated *inter-alia* that these aircraft were not properly treated for corrosion for years (C IV, paras 261 *et seq.*). The IAI determined the difference between the expected and actual costs of maintenance of the aircraft and found that

        *"aircraft which are maintained and serviced according to effective technical standards,"* do not *"incur such significantly higher costs."* (C II, para. 161)

339.    Claimant contends that the Respondents - though being under a duty to - did not disclose the Ansett maintenance costs and the fact that

the deposit would not be returned. The Disclosure Letter and the KPMG Financial Report were, in this respect, highly inaccurate (see above, para. 266) (C IV, paras 264 *et seq.*). The duty to disclose these facts was confirmed by Mr. Neitchev in his witness statement (C IV, para. 267).

340. In contrast to the Respondents' argumentation the relevant passage of the KPMG Financial Analyses, does not disclose the fact that there are uncovered maintenance costs. This disclosure simply states that 70 to 80 percent of the maintenance costs are charged to a maintenance fund to cover maintenance expenses at the end of the lease, meaning that the rest of the maintenance costs are made on an on-going basis (C IV, para. 271). This understanding was confirmed by the Respondents' own expert, Mr. Neitchev and by Mr. Frank (C V, para. 66).

341. Contrary to the position of the Respondents, any information regarding this matter contained in the Data Room neither qualifies the Information Documents nor have the Respondents presented any evidence that the Data Room contained any documents in relation therewith (C IV, para. 272).

342. The Company could also not have carried out the redelivery works in Balkan-Technique, since this was a project, which has never been materialized (C IV, para. 273).

343. Contrary to the Respondents' allegation, it was possible to predict the additional maintenance costs associated with the redelivery of the Ansett aircraft (C V, para. 58). This clearly emerges from the PwC opinion regarding the Knafaim-Arkia accounts and from the Speedwing Report (C V, para. 61 *et seq.*). Claimant further contends that in alleging the above, it contradicts it own argument that from documents allegedly contained in the Data Room it was clear that *"recourses to this security deposit was likely to be necessary"*. (C V, para, 60)

344. Thus, Respondents are liable for misrepresentations made in regard to the degree of maintenance of the Ansett Aircraft (C II, para. 160).

345. Contrary to the Respondents' allegation that the refunding of USD 750,000 proves, the aircraft were properly maintained, Claimant contends that this only confirms that a significant part of it, i. e. USD 4,250,000.00 was not refunded (C V, para. 68).

346. Acknowledging that the quantification of damages is difficult, Claimant submits that it indeed suffered damages and that contrary to the Respondents' allegation, the timing as to when the refund would occur is irrelevant (C V, para. 70).

## b. Summary of Contentions by Respondent No. 1

347.  Respondent No. 1 explains that three aircraft had been received from Ansett as a ten-year financing lease in November 1990, December 1990 and December 1991, respectively. BBA had provided a deposit of USD 5,000,000 as security for performance of all its obligations under the leasing agreement. A part of the monthly lease payment was put into a maintenance fund to be used for maintenance pursuant to the technical standard set out in the leasing agreement (R II B, paras 225 *et seq.*).

348.  It is ascertained by Respondent No. 1 that all Ansett aircraft were

> "*maintained in accordance with Bulgarian airworthiness and operational standards.*" (R II B, para. 245)

Claimant's allegations in this regard have not been substantiated. To the contrary, as Mr. Golan explained, "*we managed to convince them [Ansett] they were holding too much money from us*". In order to agree to this reduction Ansett must have satisfied itself on the standard pursuant to which the aircraft was being maintained and the then-current state of the aircraft. Furthermore, the allegedly inferior standard of the aircraft was not even recorded by Zeevi itself in its draft prospectus for Balkan. Moreover, the information contained in the IAI letter in support of Claimant's allegation could not be confirmed by any witnesses. (R III B, para. 104)

349.  All relevant information was disclosed to Claimant in the KPMG Information Memorandum and the Financial Analysis. These clearly revealed that the maintenance fund would only cover 70% - 80% of the repairs and maintenance costs occurring upon return of the aircraft. Further, these documents did not give Zeevi any basis to believe, the 20% - 30% shortfall would be covered by ongoing maintenance. (R V B, para. 54) In addition, the leasing agreement with Ansett was available in the Data Room. The testimonies of Mr. Golan and Mr. Frank were in contradiction with this documentary evidence (R III B, para. 102). Furthermore, Claimant was given opportunity to verify the standard of maintenance prior to the purchase (R II B, paras 230 and 232).

350.  Respondent No. 1 notes that PwC confirmed that the disclosures made

> "*were in accordance with [International Accounting Standard] 17 'Accounting for leases'.*" (PwC Report, para. 4.61)

Moreover, it was stated by PwC that

> *"no provision for possible future maintenance costs under the Ansett leases were required by IAS 17."*

To the contention of PwC, KPMG adequately disclosed possible maintenance costs in the Financial Analysis (R II B, para. 239; PwC Report, para. 4.68).

351.    PwC further explained that any comparison of the disclosures made in regard to the Ansett leases to those made in respect of the previous Air France leases were inappropriate (PwC Report, para. 4.60). Claimant may not derive any conclusion from such comparison (R II B, paras 234 *et seq.*).

352.    Additionally, Respondent No. 1 questions necessity of the additional maintenance performed by Claimant and the reasonableness of the costs that allegedly incurred.

353.    Finally, Respondent No. 1 contends that Claimant cannot have suffered any damage, since Balkan was not to receive any part of the Ansett security deposit before completion of the redelivery of the third Ansett B737, scheduled for December 2001, well after Claimant had abandoned Balkan Airlines (R III B, para. 105).

### c.    *Summary of Contentions by Respondent No. 2*

354.    Respondent No. 2 summarizes it contentions on this issue as follows (R I, p. 46, before para. 5.6):

> *"It is hereby repeated that this claim is unfound and neither factual nor legal grounds for it exist. The Claimant is making misrepresentation and totally voluntary interpretations of the Privatization Agreement and the financial documents and analysis prepared by KPMG. The Claimant was not in any way misled about the liabilities of the Company as these towards Ansett did not exist at the time of the privatization sale and could not be predicted. No legal or practical obligation exists for the Respondent and for KPMG to predict and disclose future obligations for which no sufficient data or proof exist.*
>
> *Further the Respondent bears no liability towards the Claimant for such alleged misrepresentation, safe such is denied, as the Claimant did suffer and did not prove to suffer any damage or loss occurring of it. The possible damaged party is the Company which had paid the additional maintenance costs, but neither the Respondent is liable for such costs nor the Claimant may submit claims attributed to the Company as it is not even shareholder in it at the moment these proceedings started. And at last – the*

> *Claimant did not prove what is the nature and volume of alleged damages caused to the company or the Claimant from the alleged lack of proper disclosure, which is denied."*

355. Respondent No. 2 contends that the deposit was disclosed and that the logical expectation regarding the deposit was that there is a risk it might not be returned. The maintenance costs, however, were unforeseeable and could as such not be disclosed. No representations regarding the degree of maintenance were made and the Respondent is therefore not liable in this regard (R II PA, paras 184 *seq.*).

356. Concerning the IAI letter dated 6 May 2004 Respondent asserts that it might well have been the Claimant's management that caused the improper maintenance (R II PA, para. 187).

357. Besides, no damage could have been suffered by Claimant as the deposit covered the maintenance costs (R II PA, para. 188).

358. Respondent No. 2 further asserts that the Expert Report of PwC confirmed that the KPMG Due Diligence Report did not contain any misleading information and was not prepared to constitute an exhaustive due diligence according to IAS (R III PA, paras 167 *et seq.*) or to include any technical information regarding the aircraft. Since these liabilities neither had occurred, nor were they quantified, there was no obligation or possibility to disclose them (R IV PA, para. 97).

359. Moreover, Mrs. Docheva and Mr. Golan testified that after the privatization, Ansett agreed to free a significant part of the deposit as the condition of the aircraft was satisfactory (R III PA, para. 169). Claimant has not provided any evidence to the contrary (R IV PA, para. 98).

### d.    The Tribunal

360. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | |
|---|---|
| C I | paras 40 *seq.* |
| C II | paras 157, 160 *seq.*, 163 |
| C IV | paras 261 *et seq.*, 271 *et seq.* |
| C V | paras 58, 60 *et seq.*, 68, 70 |
| | |
| R II B | paras 225 *et seq.*, 230, 232, 234 *et seq.*, 239, 245 |

| | |
|---|---|
| R III B | paras 104 *seq.* |
| R V B | para. 54 |
| | |
| R I | p. 46, before para 5.6 |
| R II PA | paras 184 *seq.*, 187 *seq.* |
| R III PA | paras 167 *et seq.* |
| R IV PA | paras 97 *seq.* |

**Exhibits:**

| | |
|---|---|
| C-35 | PA |
| C-38 | KMPG Financial Analysis |
| C-39 | Disclosure Letter |
| C-63A | Letter of the Technical Director of the Company of 11 November 1999 |
| C-63B | Ansett Worldwide redelivery from BBA Memorandum |
| C-64 | IAI Invoices for Ansett B737-500 #LZ-BOA and Ansett B737-500 # LZ-BOB |
| C-65 | Company's report concerning costs of maintenance of 22 May 2000 |
| C-94 | IAI letter of 6 May 2004 |

361. Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

362. The arguments of the Parties summarized above correctly mention all relevant provisions in the PA and in documents referred to in the PA containing relevant information in this context. Thus, there is no need to repeat them here.

363. Indeed, the major relevant information on which Claimant could rely is contained in the Disclosure Letter and its references to Appendices XI and XVI, and in KPMG's Financial Analysis and Information Memorandum.

364. In this context, the Tribunal has taken note of the Report submitted by PwC, particularly sections 4.60., 4.61., and 4.68., regarding the Ansett Liabilities and Leases which conclude PwC is satisfied that the information provided was accurate according to IAS 17 as well as according to its own standards.

365. The Tribunal, having examined the Parties contentions and the documents listed above, finds no reason to disagree with that evaluation by PwC.

366. Further, the Tribunal considered that, even though the deposit was not entitled to be exclusively to maintenance, almost all of it was

spent on maintenance. Since the deposit was for all obligations and not only for maintenance this might be an indication that the leased planes were in a bad shape at the time of the closure of the PA. If the bad shape had been known, Respondents had to be aware that a refund of the deposit would be much less than the deposited USD 4.250.000. As it is undisputed that USD 750.000 were refunded, the question is, whether it had to be expected that almost the full deposit would have to be spent on maintenance. On the other hand, it is not unusual that one does not get refunded a deposit. Further Claimant failed to establish whether the bad shape/maintenance occurred before or after the sale. In addition Claimant only complained six month after the transaction took place. In view of these considerations, since Claimant has the burden of proof, the Tribunal concludes that Claimant has not fulfilled its burden of proof that the planes were in bad shape at the time they were handed over and there is no reason to change the evaluation made by PwC as mentioned above.

367. Therefore, as Claimant has the burden of proof that information supplied was incorrect, and since no reliable proof has been provided in this regard, the Tribunal finds no liability of Respondents with regard to the Ansett Aircrafts.

## 5. Liabilities in respect of Provisions for Employees

### a. *Summary of Contentions by Claimant*

368. Scope of representations and alleged misrepresentations in regard to BBA's liabilities towards employees in connection with the reduction of the workforce are described by Claimant as follows (C I, paras 43 *seq.*):

> "*i. The Scope Of The Representation*
>
> 43. *The Agreement included representations regarding the Company's liabilities towards employees in connection with the reduction of the workforce. Reference is made in this respect to the following representations:*
>
> a. *The KPMG Financial Analyses (Exhibit "C/38") represented the costs associated with the termination of employees of the Company in the following manner (see page 32):*

*"In the case of retirement of an employee the company should pay three gross salaries to the retiree as par the last amendment of the collective labor contract".*

*No disclosure was made of any other costs associated with reduction in the workforce of the Company.*

b. *Paragraph 10 of the Disclosure Letter (Exhibit "C/39") in the chapter dealing with the Company's activity, stated as follows with regard to the contingent liabilities associated with the Company's employees:*

**"Balkan airlines EAD is not a party to any agreement and is not held liable (unlimited, future or conditional liability inclusive) for granted security, compensation or other agreements for securing third parties' debts except for the ones, attached in Appendix 20".**

*Appendix 20 of the Disclosure Letter, did not disclose any further liabilities towards the Company's employees.*

c. *The Agreement represented that the Information Documents accurately reflected the financial state of the Company (see clauses 3.6.1, 3.6.2, 3.7.1 and 3.7.2 of the Privatization Agreement, Exhibit "C/35", and paragraphs 2 and 3 of the chapter of the Disclosure Letter, Exhibit "C/39", dealing with Company's accounts). These documents did not disclose any other liabilities associated with the Company employees.*

ii. *The Scope Of The Misrepresentation*

44. *The representations regarding the costs associated with the Company employees, were breached in the following respects:*

a. *After signing the Agreement, it was discovered that the Company had substantial liabilities in respect of accumulated balances of employees' unused vacations. On average, each employee had accumulated over 100 unused vacation days. The employees were entitled to receive their unused vacation pay upon termination of their employment. These costs (amounting to over USD 5,000,000) were not disclosed in any of the Information Documents.*

b. *After signing of the Agreement it was discovered that the Company had never paid social security payments on*

> *account of its overseas employees. The Company was required to make these payments after the privatization in an amount of approximately USD 1,200,000. No disclosure of this hidden cost was made in any of the Information Documents."*

369. Claimant's view is that Respondents could not simply ignore the potential liability in respect to the fact that BBA had over 3,000 employees with on average 100 unused vacations days each for which BBA owed payment until the moment this liability materialized. This did not conform with accepted accounting standard and constituted a breach of the representations made in this regard (CII, para. 165).

370. Respondents' own expert, Mr. Netchev, confirmed in his cross-examination that the above liability had to be disclosed to Claimant (C IV, para. 277). This duty also arises from specific provisions in the Agreement, namely Paragraph 10 of the Disclosure Letter. Contrary to Respondents' allegation, Appendix 20 of the Disclosure Letter did not disclose any such liabilities (C IV, para. 278). In addition, neither the KPMG Financial Analyses, nor the Information Memorandum mentions the liability towards the employees from the unused vacation days they accumulated. (C IV, para. 279) The same is true for the Collective Labor Agreement of Balkan (C V, para. 71).

371. Contrary to the Respondents' allegation, they were aware of the Claimant's plans to reduce workforce, since the Company was suffering from severe overstaffing and the Respondents' themselves discharged approx. 500 employees during 1997-1998 alone (C IV, paras 280 *et seq.*). However, whether or not the Respondents knew about the redundancies, the duty to disclose such information is not dependent on this knowledge, as confirmed by Mr. Neitchev and PwC's Expert Opinion (C IV, para. 283).

372. Claimant substantiated its contention in this respect by providing a very detailed witness statement of the CEO of the Company at that time, Mr. Frank (C IV, paras 285 *et seq.*). His statements have not been contradicted by any of the Respondents' witnesses (C IV, para. 286). The Respondents also did not provide any documentary evidence to the contrary (C IV, para. 287). Furthermore, Bulgarian Legislation provides for employers to redeem unused vacation days of their employees by payment of cash *in lieu* of vacation. The purpose of this was to overcome the problem which many Bulgarian employers encountered, of having employees accumulate "extraordinarily" high number of vacation days. This shows that the situation the Claimant faced when it purchased Balkan was not "unique" in Bulgaria (C IV, para. 288).

373. In addition, it was not disclosed to the Claimant that after the privatization, the Company was required to make security payments on account of overseas employees in an amount of USD 1.2 million (C IV, para. 290).

374. In support of the Respondents' allegations, they have produced new evidence with respect to this issue. These exhibits, however, should not be allowed, since they are in violation of Section 2.4.1 of PO No. 10. Their approval would seriously prejudice Claimant, because the Respondents' failure to produce these documents before the Hearing, which was possible, according to their dates, denied Claimant the ability to cross-examine Mrs. Docheva regarding these documents. (C V, paras 73 *et seq.*) The Respondents' attempt to prevent Claimant from cross-examining its witnesses in respect of these exhibits, also affects their credibility (C V, para. 76). Furthermore, since these exhibits deal with the amount of vacation days accrued and the quantification of damages resulting thereof, they should only be considered in the next stage of the proceedings (C V, para. 77).

375. With regard to the Respondents' allegations in respect of Balkan Technique, Claimant notes the following:

> *"The Company's maintenance department was the most problematic in terms of overstaffing. Thus, major redundancies were inevitable at that department. To overcome the problem, Balkan Technique was incorporated, thus making use of the technical crew, preventing their unemployment, and saving the Company costs due to the redundancies. This is exactly the kind of creative thinking which is required in order to rehabilitate an ailing company such as Balkan."*

### b. Summary of Contentions by Respondent No. 1

376. Respondent No. 1 cites from the Information Memorandum which states, that

> *"[a]ccording to the Collective labor contract's clauses, in case of ending a labor agreement due to a lay-off in the full time positions, closing down part of the company or decrease in the workload, the company will pay up to three gross salaries to an employee with more than five years of work experience in the company [...]."* (R II B, para. 248; R-74, para. 6.2.3)

This information was supplemented by the Financial Analysis, which referred to the Bulgarian Labor Code, and the employment contracts available in the Data Room. The provided information and significant disclosures permitted Claimant to assess the costs associated with the reduction of workforce, especially in light of the

fact that Mr. Golan had access to specific legal advice from Bulgaria's largest law firm (R III B, para. 120).

377. Claimant did not disclose any plans for massive lay-offs until it produced its "Employment Plan" of January 2000 (R III B, para. 121). Without knowledge of these plans no reasonable estimates could be made by Respondents and therefore the costs resulting from such redundancies did not constitute a contingent liability requiring disclosure (R III B, para. 122).

378. The alleged liabilities for redemption of unused holidays at the termination of employment and the alleged failure to pay national insurance contributions are found to be unsubstantiated. The allegations are based on the testimony of Mr. Frank, then CEO of BBA. Failure to provide adequate prove may not be compensated by an attempt to shift the burden of proof to Respondents (R II B, paras 260 *et seq.*). In fact, new evidence provides that instead of the alleged USD 5 million accrued, the total amount in 1999-2000 was only USD 574,762 (R III B, para. 124).

379. Furthermore, instead of being an investment for the creation of "300 new jobs", as Claimant alleges, Balkan Technique was devised to reroute Balkan's employees, thereby hiving off redundancy costs (R III B, para. 125).

380. Finally there is no evidence that any of the claimed amount was paid by Balkan, or that it suffered any damage resulting thereof (R V B, para. 60).

## c.   *Contentions of Respondent No. 2*

381. Respondent No. 2 summarizes it contentions on this issue as follows (R I, p. 49, before para. 5.7):

> „*It is hereby expressly that this claim is unfound and neither factual nor legal grounds for it exist. The Claimant is once again making bad faith misrepresentation and illogical interpretations of the Privatization Agreement and the financial documents and analysis prepared by KPMG. The Claimant was not in any way mislead about the liabilities of the Company towards the employees as these towards them and occurring of due compensations did not exist at the time of the privatization sale and could not be predicted. Neither did exist or are proved by the Claimant obligations for social security that were not disclosed at the negotiations or by the financial documents. No legal or practical obligation exists for the Respondent and for*

> *KPMG to predict and disclose future obligations for which no sufficient data or proof exist.*
>
> *Further the Respondent bears no liability towards the Claimant for such alleged misrepresentation, safe such is denied, as the Claimant did suffer and did not prove to suffer any damage or loss occurring of it. The possible damaged party is the Company which would have had paid the costs for alleged compensations, but neither the Respondent is liable for such costs nor the Claimant may submit claims attributed to the Company as it is not even shareholder in it at the moment these proceedings started. And at last – the Claimant did not prove what is the nature and volume of alleged damages caused to the company or the Claimant from the alleged lack of proper disclosure, which is denied."*

382.   Respondent No. 2 asserts that BBA's accounting reports properly disclosed the contingent liabilities towards employees. Liabilities arising upon termination of employment contracts by Claimant were not foreseeable for Respondents and KPMG (R II PA, para. 189), since neither knew how many employees were going to be laid-off by the Claimant (R III PA, para. 174). Not even Claimant knew this at the time of the signing of the Agreement and even six months after, as Mr. Golan conceded (R IV PA, para. 101). Besides, Claimant has failed to prove the extent and degree of the alleged contingent liabilities.

383.   Claimant also contends that paragraph 10 of the Disclosure letter contained representations regarding the liabilities of the Company, including towards employees. The mere and logical interpretation of the whole text of paragraph 10 of the Disclosure Letter confirms that this disclosure is related to collateral obligations of the Company only. (R IV, para. 100)

384.   Respondent No. 2 alleges that even if this information was mistakenly not disclosed, the amount stated in the comparative accounting report for accrued compensations for unused leave is only approximately USD 280,000 and not USD 5 million as purported by Claimant (R III PA, para. 172).

385.   Moreover, it became apparent from the relevant witness evidence and the exhibits attached thereto the sums claimed by Claimant were never paid. Hence, no damage could have occurred. (R III PA, para. 174)

386.   Even if costs incurred they do not constitute direct damages to Claimant and may therefore not be claimed by the latter under

Article 82 of the OCA nor under Article 12 of the OCA (R II PA, para. 192).

### d.    *The Tribunal*

387.  In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents and evidence:

**Party Submissions:**

| | |
|---|---|
| C I | paras 43 *seq.* |
| C II | para. 165 |
| C IV | paras 165, 278 *et seq.*, 283, 285 *et seq.* |
| C V | paras 71, 73 *et seq.*, 76 *seq.* |
| | |
| R II B | paras 248, 260 *et seq.* |
| R III B | paras 120 *et seq.* |
| R V B | paras 60 |
| | |
| R I | p. 49, before para. 5.7 |
| R II PA | paras 189, 192 |
| R III PA | paras 172, 174 |
| R IV PA | paras 100 *seq.* |

**Exhibits:**

| | |
|---|---|
| C-35 | PA |
| C-38 | KMPG Financial Analysis |
| C-39 | Disclosure Letter |
| | |
| R-74 | Information Memorandum |

**Hearings:**

| | |
|---|---|
| Mr. Neitchev | 785:1-13 |
| Mr. Frank | 331:22-333:4 |

388.  Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

389.  The Tribunal takes into account that in so far as the financial compensation directly derives from the applicable Bulgarian law, no disclosure by Respondents was required. The law provides that only upon termination of the employment agreement the employer has to pay compensation for leave (if, the employee agrees to that solution) or that otherwise the employee can take leave before his working contract ends.

390.   The Tribunal recalls that above in this Award it has concluded that
       Respondents are liable for information in the KPMG Financial
       Analysis. In the present context, the Tribunal considers to be of
       particular importance that this KPMG Report, as the last paragraph
       of section 4.2.4. on "personnel" on page 32, provides expressly:

> *"In the case of retirement of an employee the company
> should pay three gross salaries to the retiree as par the last
> amendment of the collective labor contract".*

391.   If the Report, as it does here, refers to financial consequences of
       retirement even in indicating such consequences provided by law, it
       gave the impression that, other than the consequences expressly
       mentioned, no major consequences of financial relevance would
       occur.

392.   As is undisputed, in fact, BBA had over 3000 employees at the time
       who, on average, had 100 unused vacation days for which, in case of
       retirement, they could claim salaries the total of which amounted to
       over USD 5 million. Further, Claimant found out that the company
       had never paid social security on account of its overseas employees
       the total of which amounted to USD 1.2 million. Though both of
       these liabilities resulted from application of the relevant Bulgarian
       laws, their factual basis in the present case had to be disclosed in the
       information documents. This is particularly so, since it was clear
       between the Parties, though not included in the contract wording,
       that one of the main measures for Claimant to put the company back
       on a financially sound track was that large numbers of the employees
       had to be terminated. Under these circumstances, if the above cited
       phrase in the KPMG Report even mentioned the three gross salaries
       to be paid to retirees, Claimant, not mentioning the above mentioned
       outstanding liabilities from prior activity of the company for unused
       vacation days and social security, particularly in view of the large
       amounts due in that regard, was, if not incorrect, definitely
       "misleading or presented in bad faith" both of which give rise to
       liability according to Article 9.1.2. PA.

393.   Therefore, the Tribunal concludes that Respondents are liable in this
       regard.

394.   Again, at a later stage in this Award, the Tribunal will have to
       examine whether this breach by Respondent caused any damage,
       particularly whether any of the amounts thus due were in fact paid
       by Balkan.

6. **Debt of the Government of Bulgaria due in respect of Training of Pilots**

*a.* *Summary of Contentions by Claimant*

395. Claimant explains scope of representations and misrepresentations regarding the debt owed by the Bulgarian government for the training of pilots by BBA as follows (C I, paras 46 *seq.*):

> "i. The Scope Of The Representation
>
> 46. *Paragraph 11 of the chapter of the Disclosure Letter (Exhibit "C/39") dealing with the Company's Activity, stated as follows with regard to debt due from the State to the Company in respect of training of Bulgarian pilots:*
>
>> "Pursuant to Appendix No 21 at present the indebtedness of the Bulgarian government towards Balkan Airlines EAD exists".
>
> *Appendix 21 of the Disclosure Letter stated in this connection that:*
>
>> "... Balkan Airlines has continued the training of the previously admitted students till 1996, receiving no money from the State Budget. For the period 1990-1996 the cost of training is 3,387,235 USD. This sum is to be regarded as due from the State Budget".
>
> ii. The Scope Of The Misrepresentation
>
> 47. *Subsequent to signing the Agreement it was found that the Bulgarian Government does not acknowledge the existence of any debt to the Company due to training of pilots."*

396. Claimant argues that representation given in the Disclosure Letter regarding a debt owed by the Government of Bulgaria transpired to be untrue as it did actually not exist (C II, para. 168). Respondents may not reject this allegation by asserting that Claimant had not even attempted to collect the debt, as (i) it is unclear whether Respondents would have paid at all and (ii) Claimant's demand in its letter dated 18 October 2000 remained unanswered (C II, para. 172).

397. The Republic argued that the Claimant did not take the required legal action to collect it. However, if legal action had to be taken to collect such a debt, then clearly the representation which was given was

false, or at the very least misleading. Furthermore, when a Government represents that a Disclosure Letter stating that it owes money, then, if later it transpires that it does not owe the money, then at the very least, the representation it gave was untrue (C V, para. 80). This was confirmed by the Respondents' Expert (C IV, para. 296).

### b.     Summary of Contentions by Respondent No. 1

398.    Respondent No. 1 explains that disclosure in regard to debt owed by the State budged was accurate. In support of this perception it cites from the Information Disclosure Letter:

> *"Pursuant to Appendix No. 21 at present indebtedness of the Bulgarian government towards Balkan Airlines EAD exists."*

Appendix No. 21 in turn reads:

> *"Balkan Airlines has continued the training of the previously admitted students till 1996, receiving no money from the State Budget. For the period 1990-1996 the cost of training is 3,387,235 USD. This sum has to be regarded as owed by the State Budget."* (C-39, para. 11, p. 5; R II B, para. 269 seq.)

399.    Contrary to Claimant's allegation, there was no misrepresentation regarding KPMG's clear methodology for provisioning for bad debts. Moreover, the representation in the Information Disclosure Letter about the existence of a pilot training debt due from the state budget to Balkan Airlines was accurate. (R III B, paras 142 *et seq.*)

400.    Claimant rather lacked the necessary diligence in collecting the debt (R II B, para. 272).

401.    Moreover, given that this debt of USD 3.387 million is dwarfed by Balkan Airlines' own debts to the Bulgarian state it is questionable that Claimant suffered any damage at all resulting from failing to collect it (R III B, para. 144).

### c.     Summary of Contentions by Respondent No. 2

402.    Respondent No. 2 summarizes it contentions on this issue as follows (R I, p. 51, before para. 5.8):

> *„It is hereby stated that this claim is unfounded and may not be submitted by the Claimant. No agreement was reached that the sums allegedly due from the state budget will be paid by the Respondent and/or the state. Further these sums were due not to*

*the Claimant but to the Company and the Claimant may not submit such claims attributed to other persons. At the same time the eventual claim of the Company towards the state was liquidated by prescription upon expiration of five years of its occurring and as no evidence was provided when and what part of the debt had occurred this period is to be calculated from the earliest date 1990 i.e. the prescription period had expired as of the day of submitting the Request for Arbitration. With respect of the last sentence the Claimant did not provide any proof of the amount of the debt for each year so that no conclusion may be made on the volume of this debt, safe it is not owed to the Claimant and the Respondent is not liable for it. "*

403. Respondent No. 2 makes the following statements in regard to the matter of alleged misrepresentations concerning payments owed by the State for training of pilots: (i) Claimant is not entitled to such debt but BBA and cannot have suffered any damages; (ii) BBA and Claimant as the one who selected BBA's management failed to undertake the necessary steps to collect the debt or to use the right of set-off and (iii) at the time the present claim was submitted the debt had liquidated due to prescription (R II PA, para. 194).

404. It shall further be noted that according to the Disclosure Letter, this debt was just a claim of the Company against the State, but not a liquid an indisputable asset, as confirmed by Mrs. Docheva and PwC (R III PA, para. 175).

### d.    *The Tribunal*

405. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents and evidence:

**Party Submissions:**

| | |
|---|---|
| C I | paras 46 *seq*. |
| C II | paras 168, 172 |
| C IV | para. 269 |
| C V | para. 80 |
| | |
| R II B | paras 269 *seq*., 272 |
| R III B | paras 142 *et seq*. |
| | |
| R I PA | p. 51, before para. 5.8 |

**Exhibits:**

| | |
|---|---|
| C-35 | PA |
| C-39 | Disclosure Letter |

Hearings:
       Mr. Neitchev       783:5-24

406. Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

407. On one hand the Tribunal considers that it could be doubted whether a misrepresentation existed in this regard, since it was an obligation from another contract. If there was breach of an obligation, then it was a breach under a different contract not under the PA. In addition debts in the amount of USD 8,5 million were signed off by Parliament.

408. On the other hand, one could consider this to be a breach of obligation under the PA, because, if Respondents never intended to pay back the debt in the first place, then it was a case of misrepresentation. And even according to Respondent No. 2's argument that the debt falls under the law of limitations, one could consider that there was a misrepresentation though a new period would start at the time the government acknowledged the debt and that the debts would therefore not fall under the statute of limitations.

409. Be that as it may, the wording of Appendix 21 of the Diclosure Letter

       *"This sum is to be regarded as due from the State Budget."*

gives the impression that Respondents confirmed the existence of this debt. If that is so, since Respondent No. 1 controls the State Budget, in good faith it was under an obligation to also accept to pay the debt. At least Claimant could understand this from the cited wording. If Respondents nevertheless intended to question the debt and insist that Claimant had to initiate legal action to collect the debt that was at least a misrepresentation which leads to liability under Article 9.1.2.

410. Therefore, the Tribunal concludes that Respondents breached their obligation under Article 9.1.2. PA.

411. But at the same time the Tribunal points out that, in its later examination of that liability, it may have to consider whether (i) that breach by Respondents caused any damage (ii) if Claimant never tried to collect the debt and (iii) if the amount is still due and could be collected for the company.

## 7.     Change of Government Policies towards BBA

### a.     *Summary of Contentions by Claimant*

412.    Claimant describes the scope of the representation and breach thereof regarding the non-disclosure of future governmental plans concerning BBA and the change of governmental policy towards BBA as follows (C I, paras 49 *seq.*):

> "49.  "*As the well-established national carrier of Bulgaria for many years, the Company, like other national carriers in many other countries, had enjoyed certain rights, benefits and privileges, which formed an integral part of its Business. These included reduced aviation fees, rights to offer refueling and other ground services to other airlines, responsibility for operating check-in services in Sophia airport, operation of VIP lounge in Sophia airport, etc.*
>
> *Note is made in this respect to the definition section of the Agreement (Exhibit "C/35"), which defined the Company's "Business" as follows:*
>
>> "*International and domestic passenger and cargo transport and thereto related services and activities, hire and lease of air transport crafts and equipment, <u>production, technical and intermediary activities</u>, investment and engineering, <u>on-land servicing and airport terminals</u>, training and re-qualifying of staff, domestic and foreign commercial business, representational agency, <u>tourism, bedding and catering, advertising, informational and any other services as permitted by law</u>*".
>
> 50.   *Immediately after the privatization, these rights and benefits started to be taken away from the Company. Among the rights and benefits which were removed were the following:*
>
>> a.   *Use of buildings and property at Sophia Airport. Over the years Balkan had used various areas at the airport for the purposes of its routine operations. After the privatization the Company was suddenly and unilaterally informed that it can no longer do so, and was required to pay if it wished to continue to use them.*

    b. *Rights to provide refueling services. Over the years the Company had enjoyed a franchise to provide refueling services at the airports for its own and other companies' aircraft. After the privatization, the Company was suddenly and unilaterally told that it no longer has these rights, and was informed that these were passed to someone else. The Company was obliged to pay for these services, and lost the income they used to generate.*

    c. *Rights to provide check-in services. Over the years the Company provided check-in services to its and other airlines' passengers. After the privatization this right was removed from the Company.*

    d. *Rights to provide ground handling and ramp handling services. Over the years, the Company provided these services for itself and other airlines. After the privatization, the Company was unilaterally told it could no longer do so.*

    e. *The custom that Government officers should fly with the Company. Since the Company was Bulgaria's national flag carrier, prior to its privatization, it benefited from a governmental custom that Bulgarian officials flew aboard its aircraft during their official traveling. This custom was stopped immediately after the privatization.*

    f. *The Company used to enjoy reduced rates of aviation fees payable to the CAA, ATC and Sophia (and other) airports. These benefits stopped immediately after the privatization of the Company.*

51. *None of the Information Documents had disclosed that any of the above rights and benefits would be removed from the Company, following the privatization.*

*As outlined above, the Agreement explicitly provided that the Information supplied to Zeevi Holdings with regard to the Company was "exhaustive", "true", "accurate", "complete", "not-misleading" and "not presented in bad faith" (see clauses 3.6.1, 3.7.1-3.7.3, 9.1.2).*

*Clearly, the non-disclosure of the fact that the Company would be denied and would lose the various rights and benefits (worth millions of dollars a year to it) immediately after the privatization, is in direct conflict with these undertakings.*

> 52. Clause 3.9.2 of the Agreement (_Exhibit "C/35"_) provided that:
>
>> "... the acquisition of the Shares pursuant to the Agreement _shall not adversely affect ... the enjoyment by the Company or the Buyer of the rights attaching or deriving from [the exclusive national carrier status]_".
>
> Denying and removing from the Company, immediately after the privatization, the various rights and benefits it used to enjoy prior to its privatization due to its status of national carrier, was also in breach of this undertaking.
>
> 53. During the negotiations, the representatives of the Government cultivated an atmosphere of good-faith and honesty, giving the clear impression that the parties are "partners" in their common goal to achieve Balkan's recovery, and that the spirit of good will and cooperation between the parties would also continue after the privatization. The behavior of the Government immediately after the privatization, which divested the Company from the various rights and benefits it used to enjoy, was in stark contradiction to this conduct and impression. "

413. Claimant contends that BBA enjoyed certain privileges due to governmental policies prior to its privatization. These privileges, like the reduced aviation fees and ticket offices in governmental buildings (C IV, para. 297) were taken away from BBA after the privatization. This was not communicated to the Claimant prior to signing the PA.

## b.    Summary of Contentions by Respondent No. 2

414. Respondent No. 2 summarizes it contentions on this issue as follows (R I, p. 55, before para. 5.9):

> „The claims for non disclosure or changes of future governmental plans are not found and irrelevant. The Claimant did not provide any legal reasoning based in the applicable substantive law or the Privatization Agreement to submit this claim. Neither did the Claimant produce evidence and reasoning whether such changes had actually occurred. The Respondent is not liable for any actions or omissions of state authorities, and even if being an agent of the State, it remains not liable as the contract would affect the represented, safe no undertakings as alleged by the Claimant were made in the Privatization Contract.

> *Further the Claimant failed to provide arguments and evidence on the direct manifestation and volume of the alleged breach and misrepresentations of the Respondent and/or the State of Bulgaria. Therefore this claim is not proved as amount. And on the last place – even if such breaches existed, which is denied, the Claimant was not the affected party for them as they allegedly resulted in the financial status of the Company and not in the patrimony of the Claimant. Therefore the Claimant may not submit such claims which, if grounds ever existed, could be attributed only to the Company."*

415.   Respondent No. 2 denies that any governmental policy in the sense described by Claimant ever existed. None of the alleged rights and privileges were awarded to BBA. Other activities and conditions were the result of the airline's normal operations rather than a specific governmental policy.

416.   In addition to the above, Mr. Frank confirmed that, contrary to Claimant's allegation, he did not see any document obliging state officials to fly BBA as part of the alleged policy (R III PA, para. 177).

c.     *The Tribunal*

417.   In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | |
|---|---|
| C I | paras 49 *seq.* |
| C IV | para. 297 |
| R I | p. 51, before para. 5.9 |
| R III | para. 177 |

**Exhibits:**

| | |
|---|---|
| C-35 | PA |

418.   Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

419.   The Tribunal considers that there is no need for long deliberations on the present issue. The issue of the NCS has already been dealt with above and cannot be reconsidered here. But beyond that specific assurance of NCS, neither the PA nor any other information document supplied by Respondents to Claimant provided any express or implied assurance that there would not be any change of

government policies towards BBA. Quite to the contrary, the privatization itself could be expected to lead to changed policies and anyhow a government has an inherent sovereign right to decide on policies and its changes. Any limitation in that regard must be clearly agreed on which is not the case here.

420. Therefore, the Tribunal concludes that there is no liability of Respondents in this regard.

## 8. New Debt of BBA to ATC

### a. *Summary of Contentions by Claimant*

421. Claimant's view of the scope of representation and misrepresentation in regard to the ATC loan is as follows (C I, paras 55 *seq.*):

> *"The Scope Of The Representation*
>
> *55. Paragraph 3 of the Chapter of the Disclosure Letter (Exhibit "C/39") dealing with the Company's activity, stated as follows:*
>
>> *"Balkan Airlines EAD has entered into agreements and assumed obligations only with regard to conducting its usual activities".*
>
> *In addition Clause 3.7.3 of the Agreement (Exhibit "C/35") stated:*
>
>> *"The Seller further warrants that there has been no material adverse change in the financial position of the Company since 31st December 1998...".*
>
> *See also clauses 3.6.1 and 3.6.2 of the Agreement.*
>
> *ii. The Scope Of The Misrepresentation*
>
> *56. Subsequent to signing the Agreement, it was found that on 15th June 1999, only two weeks before the Agreement was signed, the Company took a short-term, three month loan of USD 3,000,000 from the Bulgarian Air Traffic Control (the "ATC"). This loan was not disclosed in any of the Information Documents."*

422. Claimant asserts that the reasons for BBA to take out the undisclosed USD 3,000,000 short-term loan from a government entity, i.e. ATC,

are revealed by the witness statement of Mrs. Docheva (witness statement of Mrs. Emilia Docheva, clause 6):

> *"Immediately before the privatization, just two weeks before, there was a real risk for Balkan to stop operating because of the pile of unpaid liabilities. All Balkan's partners denied to credit the Airliner's activity any more. So, the managing body of Balkan approached the Minister of Transport and Finance to permit the Company to take credit from ATC."*

Claimant's view is that the fact that BBA had serious liquidity problems described in the witness statement needed to be fully disclosed. (C II, paras 177 *et seq.*)

423. Contrary to the Republic's allegation, Appendices 18 and 19 of the Disclosure Letter do not reveal any information regarding this Loan. Respondent No. 1's assumption in this matter has not been supported by any witnesses or documents. In fact, the documents presented by the Republic show, that due to their numbering, they cannot be part of neither Appendix 18 nor 19 (C IV, para. 304). Respondent No. 2 came up with to different versions contradicting each other, concerning the Loan. However, neither version proves that disclosure of this Loan was made in Appendix 18 or 19 (C IV, para. 305). It cannot be regarded as Claimant's knowledge about a certain document, if it is not attached to where it was supposed to be attached. Especially in a Disclosure Letter consisting of 7 volumes (C IV, para. 306).

424. Since Claimant and the Respondents submitted two different versions of Appendix 18, which cannot co-exist, Claimant stresses that the Respondents' version must have been fabricated. This is due to the fact that even though it looks similar to the Claimant's version, the "PA Numbers" on the various pages of the Respondents' version, are not in consecutive order. Furthermore, some of these numbers have been "scribbled" on the pages, indicating that they came from somewhere else. (C V, paras 83 *et seq.*) Claimant concludes that *"whoever manipulates exhibits produced to an international panel of arbitrators clearly would have no problem fabricating other exhibits and evidence"* (C V, para. 87).

425. Furthermore, Claimant indeed suffered, contrary to Respondents' allegation, damages resulting from ATC Loan, since it bore legal interest as of 30 September 1999. Moreover, it constituted a liability affecting the Company's accounts, which required disclosure. Finally, misleading the Tribunal, the Respondents stated that a sum of about USD 3 million was made available to the Company through sate funds to cover the ATC. The document provided in support of that funding, however, suggests that only BGN 3 million (USD 1.6

million) were made available to cover a different loan (C IV, para. 309).

### b. Summary of Contentions by Respondent No. 1

426.  Respondent No. 1 notes that Claimant was well aware of BBA's severe cash flow limitations. The Financial Analysis revealed that the airline's current liabilities exceeded its current assets and that BBA was unable to repay debts that fell due and faced serious shortages of operating capital (R II B, para. 275).

427.  It is further asserted by Respondent No. 1 that the ATC Loan was in fact specifically disclosed in the Information Disclosure Letter which was *inter alia* appended by three documents related to this loan (see Appendix 18). The Information Disclosure Letter in turn was appended to the PA (see Annex No. 1). (R II B, paras 276 *et seq.*)

428.  The confusion relating to the pagination of the relevant disclosure results from the fact that (i) the ATC Loan documents were attached twice to the Information Disclosure Letter; and (ii) two different page numbers appear on each page of the Republic's copy of the Information Disclosure Letter. To clarify this matter, Respondent No. 1 submitted a complete copy of Appendix 18 with its Post Hearing Brief of 8 October 2004 (R III B, paras 128 *et seq.*).

429.  Even if Claimant was indeed unaware of the ATC Loan it could not have suffered any damage since (i) the loan was interest-free, (ii) it was still outstanding when BBA entered insolvency proceedings and (iii) BBA's operation was in no way impeded by ATC in order to collect the debt nor had BBA ever tried to repay the loan (R II B, para. 280).

### c. Summary of Contentions by Respondent No. 2

430.  Respondent No. 2 summarizes it contentions on this issue as follows (R I, p. 56, before para. 5.10):

> *„The present claim is unfounded and not justified. The Claimant was informed for this short-term loan by the information documents and during the negotiations. Further this loan was received in the course of the normal operation of the Company and did not by any means damage the Company and/or the Claimant.*

431.    Respondent No. 2 further notes that the fact that a loan is disclosed in a draft prospectus, which was not published, does not damage the Claimant either (R IV PA, para.107).

> *"As the loan to the Air Traffic Control was repaid by the Company without any financial burdening or damages, it is mostly ungrounded to claim damages or losses out of such factual background. No proof written or oral for damages caused by the loan or the alleged concealing of it, which is denied, had been presented in these proceedings. As a consequence the volume of impact of this loan or the alleged misrepresentation on the activities of the Company was not proved also."*

432.    Respondent No. 2 states that the debt to ATC was made in BBA's normal course of operations and activities and was used to finance those, whereas the creditor's identity is irrelevant in this regard. It is denied that Respondent No. 2 represented the absence of liquidity problems but merely stated in the Disclosure Letter that

> *"Balkan Airlines EAD has entered into agreements and assumed obligations only with regard to conducting its usual activities."* (R II PA, para. 201)

433.    Respondent No. 2 alleges, according to Mr. Golan's witness statement the debt was not concealed from the Claimant, contradicting paragraph 7.17 of Claimant's Statement of Claim (R III PA, para.179).

434.    In its attempt to mislead the Tribunal, Claimant presented to it only part of the Disclosure letter, which it even admitted.

435.    With regard to the numbering problem of the relevant appendices Respondent No. 2 notes, at no point the Respondents had specified the numbering of the pages as made along the signing of the Contract. What is important is that these documents were attached to the Disclosure letter as Attachment 18. It could not be attached as Appendix 19 as this appendix contains disclosures regarding loans provided not to but by the Company. Claimant's allegation that Appendix 18 contained only the HypoVereinsBank loan is false.

## d.    The Tribunal

436.    In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | |
|---|---|
| C I | paras 55 *seq.* |
| C II | paras 177 *et seq.* |
| C IV | paras 304 *et seq.*, 309 |
| C V | paras 83 *et seq.*, 87 |
| | |
| R II B | paras 275 *et seq.*, 280 |
| R III B | paras 128 *et seq.* |
| | |
| R I | p. 56, before para. 5.10 |
| R II PA | para. 201 |
| R III PA | para. 179 |
| R IV PA | para. 107 |

**Exhibits:**

| | |
|---|---|
| C-35 | PA |
| C-39 | Disclosure Letter |

437. Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

438. First of all, the Tribunal notes that it is undisputed that the USD 3.000.000 were paid to and received by the Airline and were not paid back to the Directorate of ATC.

439. With regard to the dispute between the Parties as to whether there was a disclosure in this regard by Appendix 18 to the Disclosure Letter, the Parties have submitted two different versions of this Appendix. While Claimant assumes a forgery in this context, Respondents explain the differing pagination by a twofold use of the Appendix.

440. The Tribunal concludes that it does not have to decide this evidentiary issue for the following reason: Though an unpaid debt reduces the value of a company, to prove any damages resulting from the alleged misrepresentation in this regard, Claimant would have to prove that a damage occurred though the loan provided additional liquidity to the company. The Tribunal does not see that Claimant did provide such proof. Quite to the contrary, the Tribunal notes that the loan was interest-free, was not repaid and the amount was still available at the time BBA entered into insolvency proceedings. In particular, Claimant has not been able to provide proof that either the existence of the loan impeded BBA's ongoing operation or caused the start of the insolvency proceedings.

441. Therefore, in this particular case, the Tribunal considers it appropriate to already deal with the causation of damage by the

alleged misrepresentation, because it makes it clear that even in case of such a misrepresentation the Tribunal would not be in a position to accept any claim for damages in this regard.

## 9.    Transfer of Real Estate Assets

### a.    *Summary of Contentions by Claimant*

442.    Claimant defines scope and breach of undertaking to transfer real estate assets in the name of BBA as follows (C I, paras 58 *seq.*):

> "i. *The Scope Of Undertaking*
>
> 58.    *Paragraph 5 of the Finance Minister's letter annexed as Appendix 11 to the Agreement (Exhibit "C/46B") stated as follows:*
>
>> "*Regarding the property of Balkan Airlines in Bulgaria and abroad paid by the company, however, lacking ownership deed, no claims for payments related to prior periods should be filed and full support shall be provided to Balkan Airlines for the utilization thereof at similar terms.*"
>
> *Attention is drawn in this context to clause 3.12 of the Agreement as well.*
>
> ii. *The Scope Of The Breach Of The Undertaking*
>
> 59.    *Contrary to the Finance Minister's assertions, no assistance was given to Zeevi Holdings to transfer the Company's real estate under the Company's name. This prevented the Company from selling these properties and collecting vitally important cash for the Company.*"

443.    Mr. Golan's First Witness Statement supports this view, which has not been contradicted by any of the Respondents' witnesses (C IV, para. 310).

### b.    *Summary of Contentions by Respondent No. 1*

444.    Respondent No. 1 asserts that neither the PA nor the Letter of the Minister of Finance referred to by Claimant do in fact contain the alleged undertaking to transfer title to real estate assets to BBA. Respondent No. 1's understanding is that the aforementioned letter

rather contains the Minister's undertaking to provide *"full support"* to BBA for "utilization" of

> *"property of Balkan Airlines in Bulgaria and abroad, paid by the company, however, lacking ownership deed"* (R II B, para. 282).

The property lacking title deeds was described in the KPMG Financial Memorandum and the Financial Analysis (R II B, para. 283).

445.   No breach of this undertaking occurred since utilization of the mentioned property by BBA remained unimpeded at least until 31 December 2000 (R II B, para. 285). Respondent No. 1 has fully complied with this obligation, and Claimant presented no evidence at the Hearing to prove otherwise (R III B, para. 133).

### c.   *Summary of Contentions by Respondent No. 2*

446.   Respondent No. 2 summarizes it contentions on this issue as follows (R I, p. 57, before para. 5.11):

> *„It is expressly repeated that no undertaking for transfer of assets was made by the Respondent or the Sate towards the Claimant or the Company. The respective undertaking of the State for assistance for utilization of used premises and real estate was fulfilled and no proof of the opposite exists. Therefore such claim is totally unfounded and not proved. Further it may not be submitted by the Claimant as it is not direct beneficiary of such undertaking; safe it is denied that the undertaking, as being interpreted by the Claimant exists. The addressee of such transfer of assets could be the Company but not the Claimant and respectively this claim may be submitted by the Company only to which the Claimant has no right of procedural substitution."*

447.   Respondent No. 2 submits, it was confirmed by Mrs. Docheva that the Company was never deprived from its rights to use assets it had paid for but were on the name on the State (R III PA, para. 183).

### d.   *The Tribunal*

448.   In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | |
|---|---|
| C I | paras 58 *et seq.* |
| C IV | para. 310 |
| | |
| R II B | paras 282 *seq.*, 285 |
| R III B | para. 133 |
| | |
| R I | p. 57, before para. 5.11 |
| R III PA | para. 183 |

**Exhibits:**

| | |
|---|---|
| C-46B | Appendix 11 to the PA, English translation of the letter from Bulgarian Minister of Finance of 22 June 1999 |

449.   Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

450.   This again is an issue where the Tribunal considers that no long deliberations are required.

451.   In the view of the Tribunal it is obvious that no guarantee was given in this respect. The wording *"full support"* in the Finance Minister's letter is too vague, to conclude that it gave a assurance to clear the way for a transfer of the real estate assets.

452.   Therefore, the Tribunal does not find any liability of Respondents in this regard.


## 10.   Debt of the Yugoslavian Railway Company

### a.   *Summary of Contentions by Claimant*

453.   Claimant describes scope of undertaking and breach thereof regarding the debt of the YRC as follows (C I, paras 61 *seq.*):

> *"i. The Scope Of Undertaking*
>
> 61.   *Pursuant to the letter of the Minister of Finance dated 22nd June 1999, which was attached as Appendix 11 of the Agreement (Exhibit "C/46B") it was agreed that governmental support would be provided to the Company through transfer of an amount of BGN 16,558,557 (approximately USD 8,500,000 (!)), to be used by the Company for the purposes of purchasing a debt of the Yugoslavian State Railways to the Bulgarian State Railways.*

*ii. The Scope Of The Breach Of The Undertaking*

> 62. *After the privatization it became apparent that the Yugoslavian State Railway debt could not be collected, and that it was consequently worthless. Despite the substantial efforts made by the Company, without any help being given on part of the Bulgarian Government, it has proved impossible to enforce the debt and obtain any payments from the Yugoslavia authorities. This was in breach of the Bulgarian Government's obligation pursuant to Appendix 11 to assist in collecting the debt."*

454. Claimant explains that the debt of the YRC assigned to BBA by the Bulgarian Railway Company transpired to be worthless as it turned out to be not collectable despite Claimant's efforts in this regard. Claimant understands that this fact should have been disclosed by Respondents. The claim is based on the PA rather than the assignment agreement between BBA and the Bulgarian Railway Company. According to the PA the Yugoslavian Railway debt was to be assigned to BBA. Assignment of a worthlessness debt did not fulfill this obligation (C II, paras 185 *et seq.*).

455. With respect to the Respondents' argumentation that Claimant has not made sufficient efforts to collect this debt, it is noted that, according to Mrs. Docheva's statement, the receivers managing the Company since February 2001 have also not managed to collect this debt (C IV, para. 311).

456. Claimant alleges that Respondent No. 1 tried to mislead the Tribunal in stating that its obligations were to extend funds to allow the Company to acquire the Yugoslavian Railway debt and to assist Balkan to set off this acquired receivable against the Company's debt to YRC. Unfortunately, the debt which Balkan owed was not to YRC but to the Yugoslav state, hence the receivables could not be set off against YRC. (C V, para. 90)

## b.   *Summary of Contentions by Respondent No. 1*

457. The scheme underlying the Yugoslavian Railway debt is described by Respondent No. 1 as

> *"an arrangement whereby Balkan Airlines would be able to settle liabilities to the Yugoslav state, by obtaining credit in the same amount from BDZ against the Yugoslav state railways"* (R II B, para. 288). Respondent No. 1 thereby *"undertook to finance the assignment of the BDZ receivable and to provide support in the settlement of the respective liabilities"* (R II B, para. 289).

458.     The described undertaking has been fulfilled as transfer of USD 8,500,000 to BBA was effected on 9 July 1999 and the receivables were assigned by BDZ to BBA on 31 August 1999. Thereby, BBA was put into the position to avoid payment of its debt to the Yugoslav state by way of setting off. Respondent No. 1 has further expressed its willingness to assist BBA in this matter. Claimant, however, eventually requested cancellation of the assignment and cash payment of the given credit instead (R II B, paras 289 *et seq.*). Contrasting this, Mr. Golan's testimony at the Hearing confirmed that this was also Claimant's understanding, i.e. that the Yugoslav debt was not meant to be "paid back" (R III B, para. 136).

### c.     *Summary of Contentions by Respondent No. 2*

459.     Respondent No. 2 summarizes it contentions on this issue as follows (R I, pp. 58 *seq.*, before para. 5.12):

> „*It is expressly repeated that no undertaking for collection of the transferred debt was made by the Respondent or the Sate towards the Claimant or the Company. The respective undertaking of the State for transfer of the debt was fulfilled which was proven, and this was made with no financial costs for the Claimant or the Company. Therefore such claim is totally unfounded and not proved. Further it may not be submitted by the Claimant as it is not direct beneficiary of such undertaking, safe it is denied that the undertaking, as being interpreted by the Claimant exists. The addressee of such transfer of debt was the Company but not the Claimant and respectively this claim may be submitted only by the Company to which the Claimant has no right of procedural substitution. As consequence of the lack of grounds of the claim no proving is made of the volume and nature of damages or loss of future profits that were suffered by the Claimant.*"

460.     Respondent No. 2 denies that any undertaking was made that the Yugoslavian Railway debt will remain collectable. Likewise, Article 100(2) of the OCA provides that the assignor is not liable in this regard. Respondent fulfilled its contractual obligation to assign the debt. It is further emphasized that neither Claimant nor BBA made any payments in return for this debt. Therefore, no damage can have arisen in regard to the uncollected debt (R II PA, paras 207 *et seq.*).

461.     It is contested that the Claimant failed to provide oral or documentary evidence that the Yugoslavian Railroad debt was crucial undertaking for it to purchase the Company or that it had

undertaken the necessary steps to collect this debt from the YRC at all (R III PA, para. 186).

### d.    The Tribunal

462.    In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | |
|---|---|
| C I | paras 61 *seq.* |
| C II | paras 185 *et seq.* |
| C IV | para. 311 |
| C V | para. 90 |
| | |
| R II B | paras 288 *et seq.* |
| R III B | para. 136 |
| | |
| R I | pp. 58 *seq.*, before para. 5.12 |
| R II PA | paras 207 *et seq.* |
| R III PA | para. 186 |

**Exhibits:**

| | |
|---|---|
| C-46B | Appendix 11 to the PA, English translation of the letter from Bulgarian Minister of Finance of 22 June 1999 |

463.    Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

464.    The Tribunal considers that two bullet points in the letter of the Minister of Finance dated 22 June 1999, which was attached as Appendix 11 of the PA (Exhibit C-46B) must be seen together, since both are under the heading *"Debt to FR Yugoslavia"*. If that is so, it is of relevance in interpreting the undertaking of the Ministry of Finance that the first bullet point expressly mentions *"for the purposes of acquiring receivables of BDZ from FR Yugoslavia"* and that the second bullet point makes it clear that the purpose is the settlement of the respective liabilities. In view of these wordings, the respective undertaking of the Ministry cannot be understood as an assurance to provide fresh money to Claimant. Rather, the assignment actually effected, in the view of the Tribunal, was indeed an option to comply with the undertaking.

465.    With regard to the question as to whether the assignment was worthless, the Tribunal notes that this has not been shown by

Claimant for the limited purpose of the transfer mentioned above. It would still seem that the assignment put the Company into the position to avoid payment of its debt to the Yugoslav party, and indeed, YRC never collected the money (C-70/R-5). A set-off against a debt that really existed would have been possible and as long as there has not been a set-off, the Company still had a receivable at its disposal.

466.    Therefore, the Tribunal does not find a liability of Respondents in this respect.

## 11.    Assistance with respect to Excess Debts

### a.    *Summary of Contentions by Claimant*

467.    Claimant describes scope of undertaking and breach thereof regarding assistance with respect to BBA's excess debts as follows (C I, paras 64 *seq.*):

> "*i. The Scope Of Undertaking*
>
> 64.    *Clause 3.11 of the Privatization Agreement (Exhibit "C/35") stated:*
>
> > **"The Seller hereby undertakes to assist the Buyer and the Company in renegotiating any other debts of the Company listed in the Information Disclosure Letter - Annex 1 to this Contract".**
>
> *ii. The Scope Of The Breach Of The Undertaking*
>
> 65.    *The Bulgarian Government took no steps to assist in renegotiating any of the Company's debts.*
>
> 66.    *Moreover, the Government (and its various agents) stood first to demand payment by the Company of various past debts, such as the undisclosed debt to the ATC (see Section H above) or the increased debts to the CAA and airports (see Section C above), with regard to which legal proceedings had also been brought.*"

468.    Claimant asserts that Respondents failed to provide any assistance to renegotiate BBA's debts (C II, para. 188).

469.    Mr. Golan's witness statement remains uncontested by the Respondents (C IV, para. 312).

### b. Summary of Contentions by Respondent No. 2

470. Respondent No. 2 summarizes it contentions on this issue as follows (R I, p. 61, before para. 6):

> „*This claim is once again made in bad faith as the Claimant misinterprets the contents of the PA and the undertakings made in it. The claim finds no legal or contractual grounds and no sufficient proof of it is presented. Further the Claimant failed to prove the volume and the nature of the damages or losses incurred allegedly by it.*"

471. Respondent No. 2 points out that no attempts of Claimant were made in regard to renegotiations of debts whereas Respondent in fact provided assistance by rescheduling of BBA's existing debts (R II PA, para. 211). Claimant could not provide a single piece of evidence that it even requested such "assistance" or that it was denied such (R III PA, para. 188).

### c. The Tribunal

472. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

Party Submissions:

| | |
|---|---|
| C I | paras 64 *seq.* |
| C II | para. 188 |
| C IV | para. 312 |
| | |
| R I | p. 61, before para. 6 |
| R II PA | para. 211 |
| R III PA | para. 188 |

Exhibits:

| | |
|---|---|
| C-35 | PA |

473. Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

474. Again, this is an issue not requiring long deliberations.

475. The wording of Article 3.11. PA "*undertakes to assist*" is rather vague and cannot be considered to give a guarantee in this regard. Furthermore, Claimant's allegations in this context are not sufficient to show that Respondents beached that rather general undertaking.

476. Therefore, the Tribunal does not find any liability of Respondents in this context.

## 12. Compensation for Loss of the Value of the Company

### a. Summary of Contentions by Claimant

477. Respondents' breaches and failures directly caused the Company's collapse constituting the loss of the value of the Company to Claimant. (C VII, para. 106)

478. Claimant's belief in the Company's success is best proven by the massive injections of funds into the Company over a very short period of time and the additional activities Claimant undertook, such as consulting „Speedwing" in order to restructure the Company modernizing the aircraft fleet and initiating a joint venture with IAI to establish Balkan Technique. (C VII, paras 107 et seq.)

479. The potential Claimant saw in its investments in Balkan is evidenced by its plans to launch a public offering based on its holdings of Balkan. (C VII, para. 112)

480. On the Respondents' own admission, these actions brought about a substantial improvement in the Company's position. (C VII, para. 113)

481. Despite all these activities, the Company collapsed at the beginning of 2001. (C VII, para. 114) the reason for this is that the Company was missing at least assets in the amount of USD 91,994,876 due to Respondents misrepresentations. This collapse could have been avoided had the Respondents injected into the Company only a small portion of the total value of their false representations. (C VII, paras 115 et seq.) This is supported by Claimant's expert Mr. Raphael Harlev. (C VII, para. 118)

482. As can be seen from the 2001 Budget, this budget forecasted an operating profit for the Company already for 2001 amounting to USD 1,851,000 but also required a total injection of USD 10,750,000 during the year. (C VII, para. 119) From a comparison of this amount with the amount the Respondents owed to the Company one can conclude that the collapse could have been avoided, if the Respondents had compensated to the full extent of the missing assets and additional liabilities. (C VII, para. 120)

483. If the Respondents had at least shown its willingness to accept responsibility for its false representations, Claimant would have been

willing to inject even further amounts. This is proven by the fact that claimant already had injected USD 14,750,000 over and above what was required under the PA. (C VII, para. 122)

484. The budget for 2001 also proves that had the Company's position upon its privatization been as presented to Claimant, there would have been no problem operating the Company. (C VII, para. 125)

485. The Company's budget for 2001, thoroughly illustrates that the size of the amounts that were lacking for the Company's continued existence were far less than the amounts that the Respondents were liable to pay in view of the false representations that had been made. Thus, had such payments been made, the Company would not have collapsed. Hence, the loss of the Company is a direct result of the Respondents' misrepresentations. (C VII, para 126)

486. According to the Expert's conservative Valuation, which is based on data compiled by Speedwing, made for the Company by Dr. Elli Kraizberg, the value of Claimant's share in the Company, as a going concern, as of 1 January 2001 was USD 71,845,000. The Company's collapse accordingly reflects a direct loss to the Claimant which at the very least equals this amount. (C VII, paras. 127 *et seq.*)

487. According to Speedwing's report, which is undisputed, the Company's profits for the five-year period of the report's projections would have reached the sum of USD 55.6 million. (C VII, para. 131)

488. This was confirmed by the Expert Opinion of Mr. Raphael Harlev, which corresponds to Mr. Golan's and Mr. Frank's witness statements, who stated that the Company had implemented the restructuring steps recommended by Speedwing to a large degree. (C VII, para. 133)

489. The Valuation also analyzed the Company's real estate assets and its landing rights. The Valuation of the real estate assets is based on real-time valuations made to these assets. The value of the flying rights has been determined based on a market valuation report made to the Company's assets at the request of the Trustees' in Balkan's bankruptcy. 50% of this value are counted as surplus value being worth USD 5,800,000. The Respondents have acknowledged a much higher value to these rights. (C VII, paras 134 *et seq.*)

490. In view of the conservatism practiced in preparing the Valuation, among other things, the Valuation deducted from the value of the Company the entire amount of the Company's debts which have been recognized by the Trustees in Balkan's bankruptcy. (C VII, para. 138)

491. To conclude, the Respondents' refusal to fulfill their contractual and legal obligations and compensate and indemnify for the missing assets and additional liabilities (in an amount which is far greater than the USD 10,750,000 which were needed to ensure the Company's operations), thus caused an additional direct loss to Zeevi Holdings amounting to at least USD 71,845,000. (C VII, para. 139)

492. Claimant submits, it could not have prevented Balkan Airlines' collapse. Claimant's desperate attempt to save the company is best illustrated by the fact that it injected far more funds than it was contractually obliged to. (C VII, para. 141) Furthermore, Claimant purchased the Company with the representation that the Respondents undertook to support it in all matters, which, in reality they did not (reference is made to the loss of the national carried status). This behavior also resulted in severe damage to the Company's reputation, which negatively affected the ability to inject additional funds from third parties. (C VII, para. 142)

493. Additionally, Claimant sought to raise capital in form of a public offering of the Company. This was, however, made impossible due to the fact that Claimant had to disclose the Respondents' misrepresentations to the public. (C VII, para. 143)

494. Moreover, had the Respondents undertaken to perform their part of the PA, claimant would have been able to inject further funds into Balkan. (C VII, para. 144)

495. In this respect, Claimant refers the Tribunal to the letters dated 7 September 2000, 14 September 2000 and 18 September 2000, in which Claimant informs the Respondents of their breaches of the PA and the urgent need of the Company to receive additional funds due to these misrepresentations by the Respondents. (C VII, para. 146)

496. Hence, for a relatively small amount, the Respondents could easily have avoided the enormous damages and losses that were sustained *ex post facto*. In view of the letters that were written, it is clear that the Respondents cannot argue that they were unaware of the heavy damages and losses that were likely to be caused. Therefore, the Respondents should compensate for the damages in full. (C VII, para. 147)

### b.    *Summary of Contentions by Respondent No. 1*

497. Regarding the claim for USD 40 million for the direct loss to Claimant resulting from the Company's collapse, Respondent No. 1 submits, it was Claimant's management that led to the exponential

deterioration of the airline's financial condition in 2000. (R VII B, para. 140) In view Claimant's allegation, that Balkan was doomed to fail, Respondent No. 1 refers to Claimant own consultants, Speedwing, who concluded, concluded that Balkan Airlines would achieve operating break-even within a year or two, provided significant investment was made, chiefly in "modern aircraft". (R VII B, para. 144) Mr. Harlev drew a similar conclusion. (R VII B, para. 145) Hence, the Speedwing Report and Claimant's 2001 budget show that the cause for Balkan Airlines' so-called "collapse" could not have been the misrepresentations and breaches with which Claimant charges the Respondents. (R VII B, para. 149)

498.    Respondent No. 1 alleges in this regard, Claimant was responsible for the deterioration of the financial condition of Balkan Airlines as at February 2001. (R VII B, para. 150) This allegation is sustained by the Second PwC Report, which describes the steep deterioration of Balkan under Claimant's management in 2000 and attributes this to a significant increase in Balkan Airlines' expenses, a large proportion of which comprised expenses for hired services; the disappearance of many of Balkan Airlines' principal assets; the significant increase in Balkan Airlines' debt and the halving of Balkan Airlines' cash holdings. (R VII B, para.152) These were allegedly all direct results of Claimant's management of the Company. (R VII B, para. 153)

499.    The PwC Second Expert Opinion concludes, instead of investing in Balkan Airlines, Claimant appropriated a net of approximately USD 5 million. (R VII B, para. 155) It was due to these appropriations, that Balkan Airlines collapsed in February 2001 (R VII B, para. 156)

500.    Furthermore, in view of the facts that , according to Respondent No. 1 only days before the Company collapsed, Claimant siphoned USD 1 million out of the Company and Claimant's entire management left Bulgaria for Israel, Respondent No. 1 contends, Claimant abandoned the airline. (R VII B, para. 157) This also emerges from Mr. Frank's curriculum vitae, stating with regard to Balkan Airlines, the project was abandoned. (R VII B, para. 158)

501.    Therefore, the value of the shares in Claimant's possession is of no relevance to this arbitration, since the company did not collapse due to Respondents' alleged misrepresentations, but to the abandonment by the Company's own management, Claimant. (R VII B, para. 160)

502.    In any event, Respondent No. 1 asserts, Dr. Kraizberg's valuation of Balkan at the time of Claimant's abandonment is unreliable. In this regard, Respondent refers to the PwC Report, which concluded, that it was impossible to verify Dr. Kraizberg's valuation due to the

significant amount of unsupported calculations and assertions made within the valuation. (R VII B, paras 161 *et seq.*) The inadequacies of Dr. Kraizberg's valuation do not mean that Balkan Airlines was worthless in early 2001. Balkan Airlines definitely had value in February 2001, but the Kraizberg Report is not a reliable basis upon which to calculate that value. (R VII B, para. 164)

## c.  *Summary of Contentions by Respondent No. 2*

503.  With respect to the damage resulting from the loss of the Company, Respondent No. 2 submits, Claimant breached its funding obligation. In this regard it is noted that the argument that the Claimant restrained from duly fulfillment of its investment and funding obligations in response to Respondents misrepresentations and breaches should be rejected. (R V PA, para. 101)

504.  The Company collapsed not because of Respondents' erroneous conduct but for the Claimant's own breaches of the agreement followed by the abandonment of the Company. (V PA, para. 103)

505.  Furthermore, Respondent No. 2 submits, it is contrary to good faith procedural conduct to put forward a claim for loss of the company at this late stage of the proceedings as no such claim was raised in the phase on liability issues and thus conflicts with Article 20 of the UNCITRAL Rules. (R V PA, para 104)

506.  Claimant's allegation concerning the loss of the Company is baseless, since the Company was not lost, but abandoned by Claimant. The bankruptcy proceedings would never have commenced, if Claimant, had covered the USD 500,000 claim from Bulstrad. (R V PA, para. 105)

507.  Furthermore, Claimant's evaluated loss based on Dr. Kraizberg's Valuation, is to be disregarded, since this Valuation consists mostly of presumptions. Moreover, there is no justified right to recovery of lost profits in this case since there is no evidence that the Claimant could have performed his part of the obligations. (R V PA, para. 106)

508.  Furthermore, Respondent No. 2 submits, since Claimant has failed to provide any realistic proof of it future profits, it is not possible to render an award on such basis. (R V PA, para. 108)

509.  The application of a discount cash flow analysis in the present case is inappropriate given Claimant's business plans were not fully implemented and an award based on future but uncertain profit would be thoroughly speculative. Moreover, Mr. Harlev admitted

that the Company would have started to fully implement the Speedwing recommendations only in 2002. Since until then, the Company's losses were growing, the projection of future profits is even more speculative. (R V PA, para. 111)

510. In contrast to Dr. Kraizberg's Valuation, Respondent No. 2 alleges, in valuating a company, an investor should normally take into account the following issues: cash flow, technical efficiency, fleet age and the general economic environment of the airline industry. (R V PA, paras 113 *et seq.*)

## *d.* *The Tribunal*

511. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

Party Submissions:

| C VII | paras 106 *et seq.*, 112 *et seq.*, 118 *et seq.*, 122, 125 *et seq.*, 131, 133 *et seq.*, 138f., 141 *et seq.*, 146f. |
|---|---|
| R VII B | paras 140, 144f., 149f., 152f, 155f *et seq.*, 160 *et seq.* |
| R V PA | paras 101, 103 *et seq.*, 108, 111, 113 *et seq.* |

512. Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

513. In this regard, Claimant has the burden of proof that the collapse of the Company was caused by unjustified action of Respondents.

514. After evaluating the evidence mentioned in the above contentions by the Parties, the Tribunal concludes that both Respondents and Claimant contributed to the collapse of the Company. To mention an example, in view of the relatively small amount lacking and leading to the insolvency, had Respondents paid up what were undisclosed and misrepresented obligations of the Company under the PA, the collapse would probably have been avoided at least at that particular time. But, on the other hand, as will be discussed in more detail in connection with the counterclaims, the Tribunal also concludes from the file and particularly from the PwC Report that Claimant's management lead to a considerable increase in the Company's expenses and debts of various kinds and withdrawal of funds which, together with the sudden abandonment of the Company by

Claimant's management in February 2001, as well, contributed to the collapse of the Company.

515. In any case, in the view of the Tribunal, Claimant has not provided sufficient proof, that it lost the value of the Company due to breaches of Respondents.

## 13. Conclusion on Claimant's Alternative 1

516. Taking into account the above considerations and conclusions on the various claims submitted by Claimant under its Alternative 1, therefore, the Tribunal finds that a total amount of USD 3.532,686.24 would be due to be paid by Respondent No. 1. However, further, the Tribunal has to examine the Alternatives 2 and 3 before it can decide which of them shall be accepted for the final decision in this Award.

## G.IV. The Relief Sought by Claimant under Alternative 2

517. Under its Alternative 2, Claimant seeks the following relief:

*i. Amount Transferred Over And Above Contractual Commitment*

| *Description* | *Principal Amount (USD)* | *Interest Amount During The Period 1 February 2001 – 28 October 2005 (USD)* | *Total Amount (USD)* |
|---|---|---|---|
| Amount Transferred Over And Above | 14,750,000 | 8,693,688 | 23,443,688 |

*ii. Compensation for the loss of the value of the Company*

| *Description* | *Principal Amount (USD)* | *Interest Amount During The Period 1 February 2001 – 28 October 2005 (USD)* | *Total Amount (USD)* |
|---|---|---|---|
| Company | 45,000,000 | 26,523,116 | 71,523,116 |

Final Award 25 October 2006 in UNCITRAL Arbitration
Zeevi v Bulgaria et al

| Value | | | |
|-------|---|---|---|

*iii. Compensation for value of additional assets*

| Description | Principal Amount (USD) | Interest Amount During The Period 1 February 2001 – 28 October 2005 (USD) | Total Amount (USD) |
|-------------|------------------------|--------------------------------------------------------------------------|--------------------|
| Value of additional assets and/or additional liabilities | 8,000,000 | 4,715,220 | 12,715,220 |

518. The Tribunal can deal with these claims without going into further detail. First, regarding the *amount* allegedly transferred over and *above* Claimant's contractual *commitment*, the contract does not provide a basis for its reimbursement and it could therefore only be reclaimed if the collapse of the Company was caused by breaches by Respondents. The latter condition would also apply to the two other claims raised under Alternative 2.

519. However, as the Tribunal has already concluded above with regard to the last claim raised under Alternative 1, in the view of the Tribunal, Claimant has not provided sufficient proof, that the Company collapsed and Claimant lost the value of the Company due to breaches of Respondents and its assets due to breaches of Respondents.

520. Therefore, the claims raised by Claimant under Alternative 2 must fail.

## G.V. The Relief Sought by Claimant under Alternative 3

521. Under its Alternative 3, Claimant seeks the following:

*i. Damages or restitution of amounts transferred*

| Description | Principal Amount (USD) | Interest Amount During The Period 1 February 2001 – | Total Amount (USD) |
|-------------|------------------------|----------------------------------------------------|--------------------|

| | | 28 October 2005 (USD) | |
|---|---|---|---|
| Amounts Transferred by Zeevi Holdings | 23,150,000 | 13,644,669 | 36,794,669 |

*ii. Compensation for the loss of the value of the Company*

| Description | Principal Amount (USD) | Interest Amount During The Period 1 February 2001 – 28 October 2005 (USD) | Total Amount (USD) |
|---|---|---|---|
| Company Value | 44,600,000 | 26,287,352 | 70,887,352 |

522. With regard to the claim raised under section ii., that claim must fail for the same reasons as the claims for the loss of the value of the Company under Alternatives 1 and 2.

523. With regard to the claim raised under the section i., i.e. for *damages or restitution of* allegedly USD 23,150,000 *transferred* by Claimant into the Company, since that issue cannot be separated from the quantification issues, the Tribunal will deal with it below when considering the restitution of amounts transferred by Claimant to the Company.

## G.VI. Investments made by Claimant

524. The issues of Claimant's obligations for investments under the PA, what actually was invested by Claimant and what was the volume of such investments, are also of relevance in the context of Respondents' counterclaim and in the context of quantum of any liability. The Tribunal considers that it is preferable to examine these issues together in that later context in the respective sections of this Award.

## G.VII.    Claimant's right to compensation

### 1.    Summary of Contentions by Claimant

525. Claimant submits two alternative claims. First, it claims USD 30,000,000

> *"for the return of Zeevi Holdings' investment in Balkan."*

Claimant further notes that

> *"Zeevi Holdings would never have made [...] these investment had it known about the misrepresentations. Alternatively [...] these investments would not have been lost had the position of the Company been as described in the Information Documents [...].*"

Claimant considers the loss of investment directly caused by the alleged misrepresentations and seeks to recover it from Respondents. (C II, para. 46 lit. a.)

526. Second and in the alternative, Claimant seeks compensation

> *"for the value of the missing assets and additional liabilities which were misrepresented to it in the Agreement."*

Claimant asserts that it is entitled to receive compensation or indemnification for the decrease in value of Balkan Airlines linked to the alleged misrepresentations. Claimant further emphasizes that Balkan Airlines did not suffer any damages due to the misrepresentations and that Balkan Airlines cannot claim compensation from the Respondents. (C II, para. 46 lit. b)

## 2. Summary of Contentions by Respondent No. 1

527. Respondent No. 1 contends that Claimant is not entitled to recover its alleged investments in Balkan Airlines. This contention is based on two grounds.

528. First, Claimant has failed to furnish proof that it was induced by the alleged misrepresentations to conclude the PA (R II B, paras 318 *et seq*.). Respondent No. 1 asserts that the Claimant's contention that it would not have concluded the PA but for the alleged misrepresentations remains unsubstantiated. To the contrary, it refers to the analysis and conclusion drawn by PwC on this matter that

> *"it would seem unlikely that any of the misrepresentations alleged by Zeevi, that we have reviewed, would have had a significant influence on the decision made by Zeevi"* (PwC Report, at para 5.9; see R II B, para. 319).

529. Second, Claimant has not sought rescission of the PA although this is a necessary prerequisite for being entitled to recover the claimed damages (R II B, paras 321 *et seq*.) nor is Claimant actually entitled to seek such rescission (R II N, paras 324 *et seq*.). Pursuant to

Article 29 of the OCA only fraudulent misrepresentations would justify avoidance or rescission of the PA (R II B, paras 322 *seq.*). Thus, Claimant has the burden to prove that:

(i) the Respondents intentionally misrepresented to Claimant false or inexistent facts as true; and

(ii) these misrepresented facts were of the essence to Zeevi's decision to enter the PA. (R II B, para. 324)

530. Claimant may now not rescind the PA as these prerequisites are not pertinent. As Balkan Airlines was obviously insolvent there were only two assets that were crucial for Claimant's decision to settle the purchase. One was the airline's status as NC. This fact, however, was not misrepresented. The other asset were the Equant Shares. As to those, the financial analysis prepared by KPMG was presented to Claimant. Thus, no fraudulent misrepresentation has occurred.

531. Furthermore, Respondent No. 1 contends that Claimant may as well not seek compensation for the alleged breaches of contract claimed in the alternative due to lack of a direct causal nexus between the alleged breaches and possible damages suffered (R II B, paras 329 *et seq.*). This requirement is stipulated by Article 11.1 of the PA as well as Article 82 of the OCA as the two possible legal bases for the claim. Respondent No. 1 identifies three heads of damage that are of a speculative nature and as such by definition too remote to be admissible.

532. The first is Claimant's alleged inability to sell shares in Balkan Airlines to a strategic partner. Respondent No. 1 notes that no investor would have been interested in purchasing these shares in light of the airline's grave financial situation.

533. The second is failure of Zeevi Logistics' public offering. Not only had the failed public offering occurred at a time when stock market prices had plummeted. The company's portfolio most likely included shares in various other companies so that the impact of the shares in Balkan Airlines held by Zeevi Logistics is too speculative.

534. The third, is the claimed damage to reputation and goodwill. Respondent No. 1 emphasizes that Claimant's assets are subject to orders for receivership its principal on trial for financial crimes. Compared to this, possible damage to its reputation by breaches of the PA is inconceivable.

535. The further implication of the requirement of a direct causal link is that Claimant may only claim for damages sustained to itself (R II B, paras 335 *et seq.*) but not for damages suffered by Balkan Airlines. Thus, Claimant had to prove that either its rights as a shareholder of

Balkan Airlines have diminished or its obligations increased. As a shareholder Claimant is entitled to a share of the company's dividends but not its income. Thus, Claimant is on the other hand not entitled to claim damages for the airline's lost income incurred in connection with the loss of the NCS.

## 3.    Summary of Contentions by Respondent No. 2

536.    Respondent No. 2 denies that Claimant posses the substantive nor the procedural right to claim compensation for the loans granted to Balkan Airlines as, what Claimant regards it to be, investments. These loans have been transferred to the airline not from the Claimant but a third company (in the largest amount by Balkan Holdings; see R I, para. 5.1.21.). Even if this company was an affiliate of the Claimant the claimed sums are solely attributed to the third company and Claimant therefore lacks legal authorization to submit any claims on its own behalf in this regard (R I, para. 5.1.5.).

## 4.    The Tribunal

537.    In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | |
|---|---|
| C II | para. 46 lit. a and b |
| R II B | paras 318 *et seq.*, 321 *et seq.*, 329, 335 *et seq.* |
| R I | paras 5.1.21, 5.1.5. |

**Exhibits:**

| | |
|---|---|
| C-35 | PA |

538.    Taking into account the above contentions of the Parties in so far as considered relevant, the Tribunal's major considerations are:

539.    In this section, the Tribunal will deal only with general questions related to Claimant's right to compensation. The further questions as to whether and which specific damages were caused by Respondents' breaches of their liability, and what the quantum of such damages is, can better be examined later after the investments made by Claimant have been examined and the breaches found by the Tribunal can be related to specific damages with regard to causation and quantum.

540. The Tribunal notes that Respondent No. 1, as summarized above, concedes that two assets were crucial for Claimant's decision to conclude the PA, i.e. the NCS and the Equant Shares. Respondent then argues that, since no misrepresentations were made regarding these two assets, Claimant has no right to compensation. However, as the Tribunal has concluded above in the sections of the Award dealing with these two assets, there was indeed misrepresentation regarding both assets and thus, Respondents are liable with regard to both according to Article 9.1.2. Thus, the condition on which Respondent No. 1 based its argument is wrong, and on the basis of its own argument at least with regard to these two assets Claimant has a right to compensation.

541. Furthermore, contrary to Respondents' respective argument, already above in this Award, the Tribunal has concluded that in view of the express liability for information contained in the PA, there is no need for Claimant to prove Respondents' negligence or even intention with regard to the misrepresentations found by the Tribunal.

542. On the other hand, Respondent is correct in arguing that Claimant has the burden of proof that alleged damages were suffered by Claimant itself and not by third parties. This does not *per se* exclude damages occurred to Balkan Airlines. Indeed such a damage to the company could still cause a damage to Claimant itself, if Claimant's rights as a shareholder in the company were diminished or Claimant's obligations towards the company or for investments under the PA increased.

543. Both Respondents argue that Claimant cannot claim any damage in connection with investments made in the company not by itself, but by third parties. The Tribunal is not persuaded by this argument. The wording of the PA both in Article 8.1 and Article 8.2.1. speaks of "*investment in or by the Company*". Considering the size of the deal and the extensive legal consultation of the Parties in negotiating the PA, it is hard to believe that this phrasing appeared accidentally. Quite to the contrary, it must be interpreted to the effect that, as long as required investments were made, it was irrelevant whether it was made by Claimant itself or a third party. This interpretation also makes economic sense as the investment was important in the context and not by which means Claimant channeled it. This interpretation also is compatible with the general legal principle that, unless otherwise agreed, that an obligation can validly be fulfilled by a third party.

544. Finally, Respondents have not argued, and indeed there is no indication, that the investments allegedly made by third parties resulted from some other deal or agreement with Respondents. Therefore, it is undisputed that also such investments by third parties

were initiated by Claimant. This implies that, since Claimant had a liability regarding such investments towards such third parties for repayment or compensation, that Claimant can claim compensation from Respondents for damage caused to these investments initiated by Claimant in case of liability of Respondents under the PA.

# H.    Liability under the Counterclaims raised by Respondent No. 1

## H. I.    The Reasons for the Republic's Counterclaim

### 1.    Summary of Contentions by Respondent No. 1

#### a.    *Zeevi and Knafaim-Arkia were selected because of their intention to invest in Balkan Airlines*

545.    Respondent No. 1 contends that Claimant and Knafaim-Arkia were selected as the buyers of Balkan Airlines because of their undertaking to invest USD 130 million in an airline which they knew to be in need of significant investment. In 1996, Balkan Airlines was one of 71 state-owned entities placed in public "isolation" under the Law on Financial Recovery. This means that enterprises that were effectively insolvent were protected from their creditors due to financial support by the government. According to the above mentioned law, said financial support could only last until 30 June 1999. After that date, without significant investments by private investors, Balkan Airlines would have gone bankrupt (R VI B, p. 6, paras 20 *et seq.*). Hence, in accordance with these tender pre-conditions, on 5 May 1999 Claimant and Knafaim-Arkia submitted a joint proposal for the purchase of 75% of Balkan Airlines' share capital in a letter that set out both their proposed debt-servicing and investment commitments (R VI B, p. 7, para. 23). These significant investment commitments would have been best serviced by the combination of Claimant's the apparent financial strength and Knafaim-Arkia's experience in operating airlines. Therefore, Claimant and Knafaim-Arkia together were selected as purchasers of Balkan Airlines (R VI B, p.8, para. 27). Respondent No. 1 submits Claimant and Knafaim-Arkia prior to purchasing Balkan Airlines understood that it was insolvent and in need of significant investments. This is supported by internal memorandums of Claimant dated prior to the purchase date and definitively on this issue, Claimant's own counsel affirmed during the oral hearing in Paris in July 2004 that

> "*it is not disputed that the financial condition of Balkan was not good when it was offered for sale, a fact known to Zeevi Holdings. Balkan [Airlines] had about $100 million of debt.*"
> (R VI B, paras 28 et seq.)