546. Notwithstanding Balkan Airlines' historic debts, and manifest need for major investment, the purchase nevertheless represented a significant commercial opportunity for its new owners. The airline was the long-standing NC for a state that was scheduled to accede to the European Union in 2007, and which itself had undertaken pursuant to the PA to forgive and reschedule a series of significant debts owed by the airline to the state in support of its future recovery. In addition, Balkan Airlines had prime take-off and landing slots at some of the major hub airports in the western world, including Heathrow, Frankfurt and New York, that had significant commercial value. Furthermore, Balkan Airlines' asset base comprised an extensive portfolio of real estate, including a 15-storey headquarters building at Sofia Airport and various multi-story hotels in Bulgaria. Additionally, Balkan owned a number of depository certificates in the SITA Foundation that, subject to certain restrictions, corresponded to an entitlement to Equant Shares. Given the comparatively low price of the purchase paid by Claimant (USD 150.000) it cannot be assumed that the Privatization Agency was not concerned to ensure that the purchasers would not simply assume control of the airline and appropriate its most valuable assets for their own benefit, which Claimant ultimately did. (R VI B, para. 30 -34)

547. Even six months after the privatization was completed Claimant's own independent airline consultant, Speedwing, conducted a review of the airline concluding that subject to significant investment in "modern aircraft", within five years (2000-2004) Balkan Airlines had realistic prospects of generating operating profits over the five-year period in the amount of USD 55.6 million (R VI B, para. 37). Contrary to Claimant's claims, the restrictions of the SITA depository certificates and the cancellation of operations to Lebanon and Syria were already known by the time of Speedwing's evaluation. None of these issues, in Speedwing's opinion, would prejudice Balkan Airlines' prospects of achieving operating profits soon if the necessary investments were made (R VI B, paras 38 *et seq.*)

548. Indeed, Claimant itself expressed the same optimism in its draft prospectus for the sale of shares in Balkan Airlines, which was drawn up more than eight months after the conclusion of the PA, in March 2000 (R VI B, para. 41). Hence, the airline's prospects of recovery were very real, but depended on (a) the airline being properly managed, and (b) sufficient investment being made in it by its new owners (R VI B, para. 42).

549. However, notwithstanding the importance of Knafaim-Arkia's experience in the airline industry to the decision by the Bulgarian government to select the Zeevi/Knafaim-Arkia joint venture (Zeevi

had no airline experience whatsoever), Knafaim-Arkia soon withdrew from Balkan Airlines, at a time and for reasons that still to this day remain unclear (R VI B, para. 44), and transferred "all of its interests" to Claimant. Whatever the form, terms and timing of this "transfer", it is likely to amount to a breach of either or both of Article 7.6 (transfer of shares) and Article 13.1 (transfer of rights and obligations) of the PA. For the prospects of Balkan Airlines, the significance of Knafaim-Arkia's disappearance cannot be overstated. (R VI B, paras 44 *et seq*.)

### b.    *Zeevi's Failure to Invest*

550.    Pursuant to Claimant's separate obligations under Articles 7 and 8 of the PA, Claimant was obliged to inject into Balkan Airlines by the end of the year 2000 USD 8.4 million to service pre-existing debts (Article 7), and USD 20 million by way of approved investments (Article 8), i.e. a total of USD 28.4 million. (R VI B, para. 50) The amounts that Claimant alleges to have actually invested in Balkan Airlines up to 31 December 2000 have varied between USD 26.5 million and USD 23.15 million. Whichever amount is accepted, Claimant still failed to fulfill is investment obligations under both Articles 7 and 8 of the PA. (R VI B, para. 51)

551.    For the capital that Claimant did purport to "invest" in Balkan Airlines was advanced by way of egregiously expensive short-term loans granted by Balkan Holdings to Balkan Airlines with durations ranging between only six and 24 months. Respondent No. 1 alleges these transactions were used to strip Balkan of its assets (R VI B, para. 52).

552.    With regard to the recommended investments into a new airplane fleet, by Speedwing, Claimant in fact did the opposite. In January 2001 Claimant sold many of the company's existing aircraft without ever replacing them, simply diverting a large portion of the proceeds of those sales directly into Claimant's own bank accounts before abandoning the airline in February 2001.(R VI B, para. 53)

553.    Respondent No. 1 contends that as of May 2000 Claimant, in fact, intended several times to shift the investment burden to the Government of Bulgaria, contrary to the PA (R VI B, para. 55).

### c.    *Zeevi Diverted Balkan Airlines Revenues*

554.    Notwithstanding Balkan Airlines' significant historic debts, its business generated substantial revenues of approximately USD 200 million each year. During the course of the year 2000, in addition to

its failure to invest in Balkan Airlines, Claimant appears to have diverted significant amounts of cash generated by Balkan Airlines' business into the accounts of its subsidiaries and officers, by causing Balkan Airlines to conclude a matrix of secret "management" and "consultancy" agreements with Claimant's entities and officers, by which regular payments were to be made from Balkan Airlines to these Claimant entities and individuals. (R VI B, para. 60) At least one of these agreements (with Claimant's Dutch subsidiary, Balkan Holdings) was precisely for services what Claimant itself had undertaken to do as an owner of the airline under the PA. Moreover, the fee to be paid under this "management" agreement was tied to the significant turnover, rather than the non-existent profit, of Balkan Airlines. As noted by both, PwC and Mr. Todorov, one can only appreciate the true effect of the 3% fee charged by Balkan Holding on Balkan Airlines' revenues in light of comparative data from other airlines: in reality it minimizes the chances of an airline even making a profit. (R VI B, para. 62)

555. In June 2000, Claimant procured that Balkan Airlines entered into two further "consultancy agreements", this time with BDO Bulgaria OOD (BDO), an intermediary consultancy firm (R VI B, para. 64). Pursuant to these "consultancy" agreements, Balkan Airlines was to pay Claimant's officers an annual total amount of well over USD 450,000. Indeed, Balkan Airlines' records show that a total of approximately BGN 1.44 million was paid to BDO in the course of the year 2000 and the first two months of 2001. (R VI B, para. 66)

556. On 7 December 2000, Claimant's officers caused Balkan Airlines to enter into yet another "Contract for Consultation Services" with Global Satellite Transmission Systems (SGTS). The ownership of SGTS is, for the moment, unclear. Oddly enough, however, the contract stated:

> *"For the implementation of these services and activity, the consultant could employ also other persons, who are associated with previous agreements and clauses between the parties." (R VI B, para. 67)*

557. Respondent No. 1 submits Claimant does not deny these allegations (R VI B, paras 68 *et seq.*).

558. Respondent No. 1 asserts, Claimant put in place this matrix of secret, overlapping "consultancy" agreements as a way of siphoning revenue from Balkan Airlines for its own purposes (R VI B, para. 71).

559. Furthermore, as has been discovered by PwC, around the time of its abandonment of the airline, Claimant transferred a total of

approximately USD 1.75 million from the various accounts of Balkan Airlines to its own accounts in at least seven installments, without any attempt to justify these withdrawals (R VI B, para. 72).

560. In addition, Respondent no. 1 alleges, Claimant used funds from Balkan Airlines to pay for its legal fees for the negotiation and consummation of its purchase of Balkan Airlines in the months following the privatization (R VI B, para. 73).

### d.    *Claimant appropriated Balkan Airlines' assets*

561. In addition to diverting Balkan Airlines' revenues, during the year and a half that it managed Balkan Airlines Claimant proceeded systematically to appropriate Balkan Airlines' most valuable assets, and the proceeds resulting from the sale thereof. Thus, Claimant caused Balkan Airlines to transfer all of its remaining SITA depositary certificates to Claimant's Dutch subsidiary, Balkan Holdings, for no consideration (R VI B, paras 77 *et seq.*). Furthermore, Respondent No. 1 contends, Claimant caused Balkan Airlines to transfer its most valuable real estate to Claimant's Bulgarian subsidiary, ZBI, as consideration for loans that were not yet due (R VI B, paras 81 *et seq.*). Finally, Respondent No. 1 recently learned, Claimant caused Balkan Airlines to sell many of its remaining aircraft in January 2001, and then transferred USD 1 million out of the USD 2.275 million proceeds directly to one of its bank accounts (R VI B, paras 85 *et seq.*).

### e.    *Claimant's explanation of its asset-stripping is not credible*

562. Respondent No. 1 alleges that Claimant's explanations regarding this issue have advanced the theory that Claimant stripped these assets in the weeks and days before it abandoned Balkan Airlines in order to use them to facilitate the procurement of third-party bank finance for Balkan Airlines that was ultimately frustrated because of the onset of bankruptcy proceedings (R VI B, para. 87). No such further third-party bank finance was ever forthcoming for Balkan Airlines, yet Claimant never returned these assets to the airline. Instead, it sold them and pocketed the proceeds (R VI B, para. 89). Claimant's alleged attempts to obtain third-party finance simply does not explain why it sold Balkan Airlines' planes and transferred a large portion of the proceeds directly into its own bank accounts (R VI B, para. 90). Claimant has presented absolutely no evidence of its alleged attempts to obtain third-party financing for Balkan Airlines (R VI B, para. 92).

### f.  *Claimant caused Balkan to cease operations*

563.  Contrary to Claimant's allegations, Balkan Airlines had long-standing debts to Bulstrad, but these had never stopped Bulstrad from renewing Balkan Airlines' coverage, so long as Balkan Airlines reached agreement with it on the rescheduling of these historic debts, and continued to meet its current insurance liabilities (R VI B, para. 97). In 2000, under Claimant's management, Balkan Airlines failed to reschedule the long-standing debt, or to meet its current liabilities to Bulstrad (R VI B, para.98). This notwithstanding, Bulstrad did not initiate bankruptcy proceedings of Balkan Airlines until after Zeevi abandoned the airline. At the time it initiated bankruptcy proceedings, Balkan Airlines' liabilities for current insurance coverage amounted to only USD 511,000 (R VI B, para. 99). Respondent No. 1 draws the Tribunal's attention to the fact that this amount compared to the USD 2 million siphoned from Balkan Airlines' accounts following Claimant's sale of many of its aircraft in view of Mr. Frank's testimony that

> "*there was absolutely no way to overcome Balkan Airlines' dramatic cash flow problem in January/February 2001.*" (R VI B, paras 95 *et seq.*)

### g.  *Claimant abandoned Balkan Airlines on 13 February 2001*

564.  Mr. Frank left Bulgaria on the night flight to Tel Aviv on 13 February 2001, allegedly in order to negotiate a loan to be granted to ZBI, now the owner of Balkan Airlines' principal real estate. He was the last Zeevi manager to leave Bulgaria. The following morning he ordered all operations ceased.

565.  On 16 February 2001, the Minister for Transport and Communications addressed a letter to Mr. Frank requesting performance of its obligations under the PA. A response was never received. Only then, Bulstrad initiated bankruptcy proceedings. (R VI B, para. 101-108)

### h.  *The Bankruptcy Proceedings*

566.  On 16 and 19 February 2001, following Zeevi's abandonment of the management of the airline, Bulstrad petitioned for Balkan Airlines' bankruptcy in respect of outstanding current insurance liabilities of USD 511,000, as well as older, re-scheduled debts (R VI B, para. 109). The Sofia City Court granted Bulstrad's request two days later, commencing bankruptcy proceedings and appointing temporary

trustees (R VI B, para. 110). In the same way as Bulstrad's petition had been based on the disappearance of Claimant's management and the ceasing of Balkan Airlines' operations, so the City Court's ruling also took account of these obviously critical developments (R VI B, para. 111). The temporary trustees issued an analysis of the evolution of Balkan Airlines' financial condition between 1998 and 2000, which revealed that Balkan Airlines' condition deteriorated sharply following Claimant's assumption of management control (R VI B, para. 113). Notwithstanding this assessment, the temporary trustees opined that, even at this stage, Balkan Airlines "*possesse[d] sufficient potential to be transformed into a good basis for its future stabilization,*" if it could benefit from the type of investment that the privatization itself had been intended to provide (R VI B, para. 117) One and a half years after the initiation of the bankruptcy procedure however, it had become clear to everyone – including Balkan Airlines' creditors – that Balkan Airlines' principal shareholder had no intention of rescuing Balkan Airlines by making the investments in the airline that it had undertaken to make under the PA. Thus, at a creditors' meeting of 29 October 2002, the creditors of Balkan Airlines rejected the trustees' proposed restructuring plan. As a result, on 29 November 2002, the Sofia City Court noted this rejection and ruled that the formal liquidation of Balkan Airlines would now commence.(R VI B, para. 120)

### i. *Bulgaria Air was designated as NC following the formal liquidation of Balkan Airlines*

567. Facing the dilemma of having lost its NC after Balkan Airlines formal liquidation and being bound under numerous ASAs to "*adequately meet the anticipated requirements of traffic from or to [its] territory, the Republic had no option but to establish a new airline, Bulgaria Air*" (R VI B, para. 122). Bulgaria Air was developed from an existing tour operator, Balkan Air Tour, a 100% state-owned company. The necessary capital injection was directly funded by the government from the state budget. Bulgaria Air adopted a strategy similar to that advocated by Speedwing in their Report to Balkan Airlines a few years earlier, which led to Bulgaria Air's immediate profitability. (R VI B, paras 123 *et seq.*)

## 2. Summary of Contentions by Claimant

568. Claimant submits, according to Article 90 of the OCA, which stipulates a fundamental rule of contract law throughout the developed world, it was not obliged to perform its obligations under the PA since, after the PA had been entered into, it transpired that

the Respondents had systematically made very grave misrepresentations to the Claimant in the PA itself, and additionally breached the PA after it had been singed. (C VIII, paras 17 *et seq.*)

569. Throughout the period, during which the Claimant was managing the Company, the Republic did not for a moment change its stubborn position according to which it would not perform its obligations under the PA. Accordingly, the Claimant's obligations under the PA have been stayed and it was under no duty to perform them. This fact in itself constitutes adequate cause for the summary dismissal of all the Republic's claims. (C VIII, para. 20)

570. Claimant submits, Article 8.5 of the PA, which Article 10.4 expressly refers to, provides that a condition precedent for referring any dispute to arbitration in connection with the performance of the Claimant's obligations pursuant to Article 8 is first referring the dispute to a special committee to be appointed specifically for the purpose, consisting of two representatives of the Republic and two representatives of the Claimant. Only if the committee is unable to make a majority decision may the Republic then refer the dispute to arbitration. (C VIII, paras 22 *et seq.*)

571. In a letter of 16 May 2001, the Respondents claimed that the investments had not been made in accordance with Article 8. In reply to the Respondents' letter, Balkan Holdings responded to the Privatization Agency in a letter of 12 June 2001, stating that it made the investments required under the PA. Claimant further requested an explanation as to why certain elements of the investment report had been rejected in order to formulate an adequate response. (C VIII, para. 24)

572. Neither did the Respondents reply to this letter, nor did they seek to appoint the special committee in accordance with Article 8.5. (C VIII, para. 25)

573. Claimant further contends, according to Article 103 of the OCA, a set-off claim is only possible provided that the claim is liquid. Since the condition precedent has not been fulfilled, the Republic's set-off claim is not liquid. Hence, it should be dismissed. (C VIII, paras 26 *et seq.*)

574. Contrary to the requirements set-off claims stipulated in Article 103 Para 1 of OCA, the claims raised by the Republic have been disputed by the Claimant. Furthermore, as far as the claims pursuant to Article 8 of the PA are concerned, these needed to be resolved pursuant to the process set-out in Article 8.5 of the PA. Consequently, it cannot be said that by the end of the limitation period (three years) the Republic's claims were indisputable or were

exercisable or liquid. Their set-off at the stage the claim was filed, after the exasperation of the limitation period (as the Republic itself admits) is, therefore, not possible. (C VIII, para. 29)

## 3.   The Tribunal

575.  In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| R VI B | paras 20 *et seq.*, 28 *et seq.*, 30 *et seq.*, 37 *et seq.*, 41 *seq.*, 44 *et seq.*; 50 *et seq.*, 60, 62, 64, 66 *et seq.*, 71 *et seq.*, 77 *et seq.* 81 *et seq.*, 85 *et seq.*, 101 *et seq.*, 109 *et seq.* 113, 117,120, 122 *et seq.* |
|---|---|
| C VIII | paras 17 *et seq.*, 20, 22 *et seq.*, 29 |

**Exhibits:**

| C-35 | PA |
|---|---|

576.  The Tribunal will now deal with the above contentions of the Parties. But in addition, later in this Award, it will examine the concrete breaches of the PA which Respondent No. 1 alleges in its counterclaims.

**1 and 2 "Zeevi's Failure to invest":**

577.  The Tribunal considers that there are two main groups of investments and that one group of investment could be made via loans. With regard to the latter it could become relevant at what interest rate the loans were given an issue on which the parties are at dispute. If the interest rate was too high then it could have been practically impossible for the Defendant to make use of these "investments". Also, it has to be taken into account that the loans were shareholder loans and that they were not given by a third party. As the Company collapsed because of the lack of cash flow the debts were not repaid, they did provide cash liquidity to the company. The Tribunal is aware that, in practice, it was difficult to separate the two different groups of obligations, since one can not tell where to the specific money went that was transferred to the Company. It was part of the logic of the deal that the value of the company was very small and that Respondent itself acknowledged that the Company had only two main assets – the Equant Shares and some real estate and that Claimant paid USD 30 million.

578.    It was also part of the logic of the deal that both types of obligations had to be fulfilled and were entered into for different reasons; one obligation was to transfer USD 30 million to allow the Company to get rid of its existing debts and then there was a second obligation namely investment that had to be made to modernize the Company. It may well have been that the market value of the company was higher than the book value and that the price of USD 30 million did not reflect the true value of the company. But for the Tribunal, the question is what the parties contractually agreed on and not what could be argued would have been fair.

579.    Clearly, the intention of the PA was to improve the Company's economic situation and to ensure its survival. Economically, there can indeed be different views why the company collapsed. But the Tribunal simply has to apply the PA to find out which Party fulfilled or breached its various obligations and whether breaches found caused or contributed to the collapse.

580.    In that context, it may have to be clarified what party at what point in time breached the PA, because a party can stop to perform its obligation if the other party to the contract has substantially breached the contract. In such a case the breach that occurred at a later point of time can be justified if specific requirements are met. For that reason it may become crutial to establish a chronological order of events.

### 3. "misappropriation of proceeds":

581.    Regarding the question of the diverted revenues the Tribunal notes that Respondents claims that a total of USD 1.75 million were transferred to Zeevi's accounts and the sum of BGN 1.44 million allegedly was misappropriated. Further, the Tribunal takes into account the evidence submitted according to which all proceeds had to be transferred to external accounts (abroad) but also that payments made by the Company to Claimant could be considered mere reimbursements for payments that Claimant had entered into on behalf of the Company:

### 4. "Assets":

582.    In this context, the Tribunal particularly notes of the following:

583.    Claimant presented a letter that the last portion of the SITA Shares was transferred into France Telekom (98.000) shares and sold for about USD 3 million.

584.    Respondent No. 1 in its submission R VIII B, in paras 90-96, asked to submit further exhibits; the Tribunal then ruled that additional evidence was inadmissible; further in its Quantification Brief at para.

92 Respondent No. 1 states that it made an error and it asked of Claimant to prove the price at which the shares were actually sold.

585.    The Tribunal considers that, in that respect, the burden of proof lies with Respondents.

### 6, 7 and 8 "Bankruptcy and Ceasing Operations":

586.    The Tribunal considers that the ceasing of operations and the bankruptcy can be dealt with together since it is in essence a repetition of arguments. In this context, it is one issue if a company files for bankruptcy, yet it is a different issue if the investor decides to leave the country, because it could be argued that abandoning the Company and leaving the country is a breach, unless there is justification for such a drastic step. The Tribunal notes that, since it is undisputed that the entire management left the country, the Claimant has the burden of proof for a justification.

587.    Further, the Tribunal considers that the PA did not require and economically it would go too far to require Claimant to invest money after the Company had filed for bankruptcy.

### 9 "Bulgaria Air":

588.    In this context, the Tribunal notes that Bulgaria Air started its operations only 1 – 1 ½ years after the bankruptcy (November 2002), and that, it was a company created from scratch. There was no connection between the Company and Bulgaria Air until Bulgaria Air, only at a later point in time, was assigned with the NCS. However, at that time the Company was still flying.

589.    It is undisputed that the Government of Bulgaria in 2002 invested twice in Bulgaria Air. On one hand it can be understood and certainly can be argued that there were good reasons, under the circumstances at that time, that Respondent No. 1 started another company to provide for a working air carrier for a whole nation rather than invest in somebody else's Company. But on the other hand, as there were liabilities and costs of the "old" Company for which Respondents were responsible, it cannot be excluded that, if the investment by the Respondents in the Company would have been made in 2002/2003 and the loans would have been given to the Company, the picture would have been very different.

## H.II   Zeevi breached Article 7 of the PA

### 1.   Summary of contentions by Respondent No. 1

590.   In accordance with Article 7 of the PA, Cliamant specifically undertook to service the "obligations" of Balkan Airlines that existed on 31 May 1999 (R VI B, para. 130). Claimant was to meet the funding obligation in Article 7.1 in two ways. First, by a USD 6 million deposit in an escrow account to be opened in Balkan Airlines' name on Completion of the PA. Secondly, by "procuring" that Balkan Airlines would be put in funds in an annual amount of USD 2.4 million. (R VI B, para. 131)

591.   Respondent No. 1 submits, Claimant violated each and every one of its obligations under Article 7.1 of the PA. Claimant did not fulfil its obligations to service existing debts by replacing Balkan Airlines' existing debts with punitive new loans (R VI B, para. 133). As confirmed by Mr. Golan, Claimant was fully aware that providing operating capital had no impact on Claimant's separate funding obligations under the PA (R VI B, para. 134). Although Claimant provided two letters of credit amounting together to USD 2.4 million in December 1999, it did so in order to secure installments due under two aircraft leases concluded by Claimant, not to secure the repayment of debts existing on 31 May 1999, as required under Article 7.1. (R VI B, para. 137).

592.   Contrary to Claimant's allegation, that by end of 2000 it had invested more than six times the amount it was obliged to under the PA and that therefore no additional letters of credit were needed, Respondent No. 1 submits, that the letters of credit required under Article 7.1.2 were specifically to ensure payment of Balkan Airlines' pre-existing debts -- no funds provided by Claimant to Balkan Airlines for its day-to-day operations could diminish Claimant's separate obligation to pay pre-existing debts. Moreover, under Article 8 Claimant was required to additionally invest USD 20 million by the end of 2000, which were never paid. (R VI B, para. 139, 140)

### 2.   Summary of contentions by Claimant

593.   Pursuant to Article 7.1 of the PA, Claimant was required to provide an amount of USD 30,000,000 to the Company, over a period of ten years in the following manner: Upon signature of the PA, Claimant was to transfer an amount of USD 6,000,000 and thereafter, beginning in 2000, Claimant was obligated to transfer an amount of

USD 2,400,000 annually over a period of ten years, that is until the end of 2009. (CVIII, par. 64)

594. According to these terms, and contrary to Respondent No. 1's allegation that Claimant had to invest an amount of USD 10.8 million, Claimant was to invest USD 8.4 million by February 2001. This was later conceded by Respondent No. 1. (C VIII, paras 65 *et seq.*, C IX, para. 51)

595. Claimant submits, there is no dispute that by February 2001, it had transferred USD 23,150,000 to the Company, USD 14,750,000 more than its commitment for that period pursuant to Article 7.1 of the PA. (C VIII, para. 69)

596. Claimant alleges, Respondent No. 1 has repeatedly tried to create confusion in respect of the loan agreements pursuant to which the Claimant transferred a total of USD 23,150,000. This attempt is contrived and has no basis in reality. (C VIII, para. 71)

597. Moreover, since the investments according to Article 8 were to be made "*in or by*" the Company, they are to be gauged according to the money that the Claimant remitted to the Company but rather it should be determined by reference to the amounts invested by the Company, totaling approximately USD 26,500,000, as reported to the Respondents in the March 2001 investment report. On the other hand, the funds totaling USD 23,150,000 that the Claimant transferred to the Company are the index for analyzing the performance of the Claimant's obligations pursuant to Article 7.1 of the PA. These injections of funds included the sum of USD 14,750,000 over and above the Claimant's commitment pursuant to Article. (C VIII, para. 74)

598. In conclusion, in these circumstances, the Republic's allegations of the Claimant's supposed breach of Article 7.1 are absurd given that the Claimant had transferred USD 14,750,000 more than it was required under Article 7.1. (C VIII, para. 75)

599. With regard to the method of using the escrow account funds, Claimant submits, there is no dispute that the funds that were transferred to the Company were applied in payment of its debts and the fact that the Company's main problem was its cash flow and payment to current suppliers, rather than the payment of long-term debts, it is perfectly clear that the Republic's argument is frivolous and made in bad faith, and consequently, should not be heard. (C VIII, para. 78)

600. In accordance with Article 6.1, Claimant used the funds for

*"repayment of indebtedness of the Company existing as at the date of Completion <u>or arising in respect of the ongoing business of the Company following Completion or occurred after that date in relation with the business of the Company"</u>.* (C VIII, para. 79, C IX, para. 53<u>)</u>

601. Moreover, Respondent No. 1 has yet to prove that the funds were in fact not used for repayment of debts from before the privatization, even though the burden of prove still rests with it. (C VIII, para. 80)

602. Respondent No. 1's claim for liquidated damages due under Article 10.13 for alleged non-payment of past debts by the proceeds of the sale of the Equant Shares is baseless. Article 10.13 (as amended – see Exhibit C-41) provides that the Buyer would owe liquidated damages only in cases in which the proceeds of such sale are not used for *"payment of debts [i.e., any debts] of the Company or the implementation of the investment program."* (C IX, para. 54)

603. Moreover, past debts of the Company in an amount of almost USD 50,000,000 were paid during the time in which Claimant operated the Company. This amount exceeds by more than twice the amount of past debts which Respondent No. 1 claims should have been covered by the Claimant which totals USD 17,884,149 (being comprised of an amount of USD 6,000,000 on account of the escrow deposit; USD 2,400,000 on account of the transfer for 2000; and USD 9,484,149 on account of the sale of Equant Shares in December 1999). (C IX, para. 55; C-130)

604. With reference to the „Main Liabilities Structure" document, Claimant asserts, although the burden of proof, it is easy to prove that the escrow account funds were in fact applied in order to repay debts that arose before the privatization. (C VIII, para. 81)

605. Therefore, the Respondent No. 1's claim for compensation due to the fact that the escrow funds were supposedly not applied in payment of pre-privatization debts is without merit also since it has not sustained any damage as a result. (C VIII, para. 82)

606. Contrary to Respondent No. 1's allegation, Claimant not only transferred an additional sum of USD 2,400,000 to the Company by the end of 2000 in accordance with Article 7.1.2, but, in fact, exceeded this amount by USD 14,750,000. (C VIII, paras 84 *et seq.*)

607. Claimant further argues, in contrast to the Respondent No. 1's contention, Article 7.1.2 plainly provides that these funds were to be used for repaying the Company's "debts", i.e. any debts, incurred before or after the Privatization of the Company. (C VIII, paras 90 *et seq.*)

608.   Here, too, the burden of proof rests solely on the Respondents, which they have not met. (C VIII, para. 92)

609.   With respect to the transferring of funds according to Article 7.1 in form of loans, Claimant submits the PA prescribes no set method as to the manner in which the USD 30,000,000 are to be transferred. Furthermore, obliging the Claimant to transfer the funds by means of equity rather than loans would clearly have meant an immediate dilution of all the remainder of the Company's shares that were held by Respondent No. 1 on completion. Acting in that way would clearly have been in complete contradiction to the intention of the Parties. (C VIII, paras 95 *et seq.*)

610.   With regard to the sale of the remaining SITA Shares, Claimant contends, they were collateral against the loans which Claimant granted Balkan Airlines. Since they were restricted, their value was low and did not even cover the USD 8.4 million, Claimant was obliged to invest in the Company, let alone the USD 14,750,000 Claimant invested in excess of its obligations under the PA, to which it was compelled due to the misrepresentations of Respondent No. 1. (C VIII, paras 98 *et seq.*)

611.   Regarding the interest on the loan agreements, Claimant submits, they were reasonable and did not exceed 8.64% in total, as opposed to 20% per annum as alleged by Respondent No. 1. (C VIII, para. 100) Moreover, there is no dispute that the interest on the loans, as with the loans themselves, has never been collected by the Claimant. Therefore, the fact that the funds were transferred by loans is irrelevant. (C VIII, para. 102)

612.   With regard to Respondent No. 1's allegation that Claimant did not act in good faith, Claimant submits, it transferred USD 8,250,000 to the Company only two months before the commencement of its bankruptcy proceedings. Contrary to Respondent No. 1's allegations, this undisputed fact proves the extent of efforts which Claimant was ready to go into in order to save Balkan Airlines. (C VIII, para. 103)

613.   Regarding the non-issuing of letters of credit in order to secure the annual amounts of USD 2,400,000 due under Article 7.1.2, Claimant contends, since by the end of 2000, it had already transferred USD 14,750,000 over and above its obligation, there was no reason for issuing any letter of credit. (C VIII, para. 105)

## 3.    The Tribunal

614.    In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | |
|---|---|
| R VI B | paras 130 *seq.*, 133 *seq.*, 137, 139, 140 |
| C VIII | paras 64 *et seq.*, 69, 71, 74 *seq.*, 78 *et seq.*, 81 *seq.*, 84, 90, 92, 95 *et seq.*, 98 *et seq.*, 102 *seq.*, 105 |
| C IX | paras 51, 53 *et seq.* |

**Exhibits:**

| | |
|---|---|
| C-41 | Amendment to the PA |
| C-130 | Overview of Balkan Main Liabilities |

615.    Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

616.    The Tribunal considers that, concerning the investment of USD 30 million, according to Article 7.1. PA, the form is not specified by the PA and that it meets the requirements of the PA if loans were given in the amounts specified by the PA. This is particularly so with regard to shareholder loans.

617.    Regarding the terms of such loans, it can indeed be argued that it is irrelevant, whether they are given at a high or low interest rate, and for a long or short period, since the burden is on the shareholder if the Company fails to repay the loans, particularly since, it is hardly possible to determine where money went that was given to the Company. Obviously, the most important effect was that money was injected into the company and old debts were paid with it. In the present context it is thus irrelevant that the very high interest rates charged by Claimant for the loans given to the company considerably increased the company's liabilities and thus damaged its financial status.

618.    However, the further requirements of Articles 7 and 8 PA had to be met and in this regard the burden of proof is on the Claimant. In this context, the Tribunal notes that Article 7.1. expressly determines that the purpose of these payments due by Claimant was

> *"to assist the Company repaying its obligations (as more fully described in the Information Disclosure Letter)".*

Claimant's burden of proof thus particularly includes that it repaid old debts in the amount required by the PA.

619. As well, the burden of proof in regard to the payment of the USD 6.0 and USD 2.4 million, i.e. a total of USD 8.4 million, due under Article 7.1.1. and 7.1.2. PA rests with the Claimant who has to show that those amounts were transferred to the Company and that similar amounts were paid for external debts.

620. The fulfilment of the obligations under Article 7 requires two elements:

> 1) that Claimant put USD 8.4 million into the Company, and

> 2) that these funds were used to assist the Company in repaying its obligations.

621. Regarding the first element, the evidence particularly provided in Exhibits: C-72A, C-97, C-72D, E, F, and G and R-16A, B, C, D, E, F, and G, B-107 p.26, 32, and 49 show to the satisfaction of the Tribunal that, as argued by Claimant, it actually paid a total of USD 23,150,000.00 into the Company. Since this is considerably more than the USD 8.4 million required by Article 7, the first element mentioned above has been proven.

622. With regard to the second element mentioned above, since Claimant has the burden of proof, the Tribunal has evaluate the evidence as to whether it has and how it can provide such proof. On one hand, there is no evidence in the case that the loans given by the Claimant to the Company were kept separate from the normal funds of the Company, such as on a separate account, and then earmarked for and used for repayment of existing debts. But the Tribunal cannot find in or conclude from Article 7 that such payment to and from a separate account or earmarking was required. Therefore, there was nothing wrong in "mixing" the funds of the loans from Claimant with other income of the Company such as from its regular activities. And once debts of the Company were paid from these general accounts of the Company, it was not possible to identify whether that respective payment of debt was funded by the loans from the Claimant or from other income of the Company.

623. The total amount of Company obligations and respective payments during the time it was controlled by Claimant can be summarized as follows: The Company obligations are defined in Article 1 of the PA as *"The obligations of the Company as of 31.05.1999 in the Information Disclosure Letter"*. These obligations are set out in Appendix 13/16 of the Disclosure Letter (Exhibit C-39). According to this Appendix Balkan's total obligations as of 31 May 1999

amounted to BGN 209,374,016. Exhibit C-130 lists Balkan's obligations as of 31 January 2001. Columns 8 and 9 of this Exhibit identify obligations which existed "before 30.6.1999". The total amount of these obligations is: BGN 104,600,000. From the above it can be concluded that over BGN 100,000,000 of debts which existed before June 1999 were paid by Balkan during the time it was controlled by Claimant. According to the exchange rate set out in Exhibit C-130 (last page), which was USD 1 = BGN 2.10463, this equals approximately USD 50,000,000. This amount represents past debts of Balkan which are recorded to have been paid during the time in which it was controlled by Claimant. If further, one takes into account the undisputedly extremely difficult financial position of the Company at that time – which later led into bankruptcy –, it is hard to imagine that the Company could spare an amount of that magnitude from its regular income to repay debts. Had that been possible, it is hard to see why such debts were not repaid, before the Claimant took over.

624. On the basis of the above considerations, and in view of the lack of any earmarking duty and of the difficulties of more concrete proof mentioned above, the Tribunal concludes that Claimant has complied with its burden of proof also in this respect and, thus, also the second element mentioned above has been proven.

625. Therefore, the Tribunal concludes that Claimant has fulfilled its obligations under Article 7.1. and a counterclaim based on that provision must fail.

## H.III. Zeevi breached the Investment Commitments in Article 8 of the PA

626. At the outset of this section, the Tribunal recalls that above, in section G.IV. of this Award on "Investments made by Claimant", it had postponed its respective deliberations to this section of the Award in order to be able to examine at the same time the respective counterclaim by Respondent No. 1.

## 1. Parties' contentions in connection with the claims raised by Claimant

### a. Summary of Contentions by Claimant

627. Claimant argues that the amount of USD 23,000,000 has indeed been invested in Balkan Airlines through wholly-owned affiliates for and

on behalf of the Claimant. Any loss suffered thereby by theses affiliates represents a direct loss to Claimant itself (C II, paras 59 *et seq.*).

628. In its Brief of 9 February 2004 Claimant presents information on the bank transfers regarding the direct amounts invested by Claimant in Balkan Airlines. These transfers accumulate to a total amount of USD 23,150,000 (C I, para. 7 and Exhibits).

629. Claimant further asserts that these amounts had been confirmed by the Sofia City Court in its ruling of 23 October 2001 (C I, para. 7, C-73).

### b.  Summary of Contentions by Respondent No. 2

630. Respondent No. 2 contends that payments received by Balkan Airlines were transferred as loans and can therefore not be considered as "investments" (R I, para. 5.1.21.). These loans, transferred mainly by third person, i.e. Balkan Holdings, amount to USD 23,150,000 (R I, para. 5.1.21.). In the meaning ascribed to it in the PA the term "investments" is defined as

> "*costs for acquisition or improvement of material assets of the privatized company*" (R I, para. 5.1.2.).

The provided funds, however, were used for repayment of current liabilities and of allegedly false obligations towards companies connected with Claimant. Respondent denies that the alleged amount of investments had been confirmed by the Sofia City Court in bankruptcy proceedings. To the contrary, the said Court has rejected the claims raised by Claimant's affiliates in these proceedings as unfounded and unproven (R I; para. 5.1.3.; see C-73, R-82 to R-85).

631. From the latest of Claimant's submissions, it appears that Claimant admits that the above amount was not "invested" in the Company, but rather consisted of a "discharge of funding obligation". Therefore the claims purporting that Claimant had lost such investment should evidently fall aside as it was admitted that investments were not made. (R III PA, para. 153)

632. Contrary to Claimant's allegation, it never invested in the renewal of the aircraft fleet of the Company. The two ATR aircraft allegedly leased never reached the Company. (R V A, para. 16)

633. Claimant has failed to provide any evidence in support of its allegation that it met its investment obligation. Respondent No. 2 regards Claimant's argument that Article 8.1 of the PA allows

investments not by the Claimant but by the insolvent Company itself as absurd and grotesque.

### c.    *Summary of Contentions by Respondent No. 1*

634.    Respondent No. 1 describes Claimant's investment obligations under the PA as follows (R II B, paras 74 and 76; see also R II B, paras 45 *et seq.*):

> *"Zeevi's investment obligations fell into two broad categories: first, an obligation to put Balkan Airlines in funds up to USD 30 million in order to assist it to repay indebtedness that existed at the time of the privatization as fully described in the Information Disclosure Letter; and secondly, and separately, the obligation to invest not less than USD 100 million, i.e. approximately USD 20 million a year, over a five-year period following the privatization.[...] Zeevi's obligation to put the company in funds to repay up to USD 30 million of existing indebtedness was to be effected by putting in place an escrow account in the amount of USD 6 million on Completion of the sale of Balkan Airlines' shares; and, further, by putting the company in funds in the sum of USD 2.4 million each year for a period of ten years. Moreover, the annual payments of USD 2.4 million were to be secured for the first three years by letters of credit and by corporate guarantees thereafter."*

635.    These obligations are recorded in the PA. The relevant provisions are cited hereafter according to Respondent No. 1's Brief (R II B, paras 45 *et seq.*):

> *"7.1 The buyer shall have an obligation to put in the Company funds [sic] at the amount but limited to USD 30 million including the amount under Article 7.1.1 to assist the Company in repaying its obligations (as more fully described in the Information Disclosure Letter) as follows:*
>
> *At Completion, the Buyer shall deposit in the name of the Company in the escrow account the amount of USD 6 million from which the Company shall repay existing indebtedness;*
>
> > *7.1.2 Each year for a period of ten years following Completion (such period ending on 31 December 2009), the Buyer shall procure that the Company will put in funds [sic] in a sum of USD 2.4 million per annum to serve as funds with which the Company shall service its debts. Such funds shall be secured for the first three years*

by *Letter of Credit opened by the Buyer in favour of the Company and for the next seven years by a corporate guarantee of the Buyer in favour of the Company...*

*Six months after Completion the Buyer will deliver to the Seller an indicative Investment Plan pursuant to which the Buyer will plan for the investment to be in or by [sic] [Balkan Airlines] of USD 100 million over a period of five years (ending on 31 December 2004). Such investment will be·for the commercial development of [Balkan Airlines] with a view to increasing the range of services and profitability of [Balkan Airlines] in the medium and long term. The Investment Plan will set out to be anticipated levels of investment required to achieve this objective, the proposed timing of such investment and the expected priority investment areas within [Balkan Airlines] activities. The Seller shall not be involved in the preparation of the Investment Plan.*

8.2.1 *To give effect to the Investment Plan, the Buyer as a majority shareholder shall (subject to Clause 8.3 below) cause ... [Balkan Airlines] to be invested an amount [sic] of not less than USD 100 million, approximately, USD 20 million per annum over the said five-year period. At the end of each year, the Buyer shall disclose to the Seller the amount of investment effected during the preceding year. The investment for the first reporting period (which shall end on 31 December 2000) may not be less than USD 20 million. Investments made in or by [Balkan Airlines] in years 2-5 (inclusive) may vary by an amount of up to 25% of the determined amount of USD 20 million per annum.*

8.2.2 *In respect of the period ending 31 December 2000, the Buyer undertakes to provide the Seller not later than January 2, 2000 with a bank guarantee secured with an irrevocable bank guarantee with term of validity up to 30.04.2001 in the sum of USD 6 million, which guarantee may be enforced in accordance with Clause 10.2 by the Seller in the event of non-performance by the Buyer of his investment commitment for the period ending 31 December 2000. For each next reporting period the Buyer shall present to the Seller corporate guarantees securing the indemnities due for non-fulfillment of the investment program. Corporate guarantees shall be in the full amount covering the amount of the indemnity for the non-performing investments for the respective reporting period.*

*8.3 For the purpose of certifying the foregoing investments, the Buyer shall be obliged to prepare at its own expense and to submit, on or before 31 March in each year, to the Seller a written report about the investments made for each respective past period. This report shall state the type and the amount of the investments made under the Investment Program for the previous year. The investment part of the report under the foregoing Article shall be accompanied by certified by the Buyer copies of the documents, verifying the fulfillment of the investments, adjusted by the currency of the Investment Program according to the exchange rate of the Bulgarian National Bank for the day the commitment is made."*

636. The Parties further specified the investments by stipulating in Article 4.1.9 that the

   *"Investment Program shall be directed towards accelerated renewal of the airplane fleet and improved quality of services."*

637. Respondent No. 1 contends that these obligations were manifestly disregarded by Claimant. Although an escrow account of USD 6,000,000 was put in place, it was not used as required, i.e. to cover existing indebtedness. The agreed annual funds of USD 2,400,000 were not put in at all and the required letters of credit were neither opened in 1999, nor in 2000 or 2001 (R II B, para. 77). Claimant further failed to prepare an investment plan regarding the obligation to additionally invest USD 100,000,000 over five investment periods (R II B, para. 79). In fact, the total investments for the first period are considered by Respondent No. 1 to amount to USD 1,187,787 (R II B, para. 81). During the next period, i.e. the year of 2001, no investments at all were made (R II B, para. 87).

638. Regarding the USD 23,000,000 allegedly invested by Claimant between July 1999 and December 2000 Respondent No. 1 contends that the respective payments were short-term loans with interest rates up to 10.125 % compounded monthly. These loans, secured against the airline's own assets, were used by Claimant for appropriation of the airline's principal assets, i.e. real estate property and shareholding.

639. Additionally, Respondent No. 1 notes that Claimant had sold almost the airline's entire fleet of aircraft without adequate replacement as opposed to Claimant's commitment under Article 4.1.9 of the PA (R II B, para. 88).

640. The significance attached to Claimant's due performance of these investment obligations is revealed by Article 10.2 of the PA that provides for the buyer's liability in case of non-performance as follows:

> *"In case of non-performance of the investment obligations, the Buyer shall be liable as follows:*
>
> *(i) For non-fulfillment of the investments agreed under Clause 8.2 for the period starting at Completion and ending on December 31, 2000 the Buyer shall pay indemnity in the amount of 30% of the agreed but not made investments for the respective investment period in accordance with the investment plan. Under such circumstances the Seller shall have the right to withdraw the bank guarantee in order to satisfy his claim.*
>
> *(ii) For non-fulfillment of the investment agreed under Clause 8.2 for the periods 1 January, 2001 – 31 December 2002 and 1 January, 2003 – 31 December 2004, the Buyer shall be liable to pay an amount equal to 30% of the agreed but uncommitted investments under the Investment Plan to be measured at the end of the above period. Under such circumstances the Seller shall have the right to satisfy his claim from the corporate guarantees given by the Buyer for the above reporting period."*

641. Claimant wrongfully contends in its Limited Response Brief that the PA was an investment obligation imposed not on the buyers, but on the insolvent Balkan Airlines itself (R III B, para. 21). This statement is inconsistent with its original Statement of Claim and its Response Brief, always referring to "its own investment obligation" (R III B, para. 23). This is also contradictory to the wording of Article 8, which always refers to the "Buyer" (R III B, para. 24). Article 8 is even entitled "Buyer's Investment Commitment" (R V B, para. 11). Mr. Golan conceded that Article 8 imposes an investment obligation on Claimant (R V B, para. 15). Claimant, however, focuses on Article 8.1, which provides that the Buyer will plan for the investment "*in or by*" the Company of USD 100 million. These three words are not intended to contradict every other element of Article 8. Furthermore, understanding the debt-servicing obligation under Article 7 and the investment obligation under Article 8 as separate obligations is entirely consistent with Claimant's own original offer to the Privatization Agency dated 5 May 1999 (R III B, paras 25 *et seq.*). However, Mr. Golan attempted to suggest that the original offer made by Claimant, either (i) did not mean what it appeared to mean because it was cleverly negotiated, or

(ii) changed during the course of the negotiation. Neither of Mr. Golan's theories is credible or substantiated (R III B, para. 27). Finally, Claimant's contention in this matter is fundamentally at odds with the very purpose of the privatization of Balkan Airlines (R III B, para. 28). To conclude, Respondent No. 1 contends, it is simply absurd to argue that an airline that was privatized because it was insolvent an in desperate need of external investment assumed an obligation to invest USD 100 million in itself pursuant to an agreement to which it was not even a party (R V B, para. 3).

## 2. Contentions of the Parties in connection with the Counterclaims

### a. *Summary of Contentions by Respondent No. 1*

642.  Contrary to Claimant's allegation, Article 8 imposes a separate investment obligation on Claimant as the buyer and not on the non-party to the PA, Balkan Airlines itself. This is evidenced by the wording of Article 8, which only refers to the "Buyer". (R VI B, para. 145, 146) Indeed, the buyer's investment obligation was, the central purpose of the entire privatization process (R VI B, para. 150), and Claimant's belated denial of the existence of its investment obligation is inconsistent with its own position before this arbitration commenced and also for over three years in this arbitration.(R VI B, para. 145, 148)

643.  Brushing aside the repeated references to "the Buyer's" investment commitment, Claimant focuses on Article 8.1, which provides that the Buyer will plan for the investment "*in or by*" the Company of USD 100 million. However, these three words are not intended to contradict every other element of Article 8, and simply mean that the Buyer could fulfil their investment obligation through Balkan Airlines, e.g. by reinvesting their retained earnings or by making a capital increase in Balkan Airlines. (R VI B, para. 147). Respondent No. 1 suggests, it is absurd to contend that an airline that was privatized because it was insolvent and in desperate need of external investment assumed an obligation to invest USD 100 million in itself pursuant to an agreement to which it was not even a party (R VI B, para. 151).

644.  As to the question of whether shareholder loans constituted investments according to the PA, Respondent No. 1 refers to the purpose of such investments established under Article 8.1 (commercial development) and Article 4.1.9 (renewal of airplane fleet and improvement of services) (R VI B, paras 152 *et seq.*). Moreover, in order to ensure that Claimant's investments fulfilled

these requirements, Respondent No. 1 refers to Article 8.4, which provides that investments may be effected by any available method "agreed" by the parties. In this regard, Respondent No. 1 alleges, Claimant did not fulfil its information obligation under said Article. (R VI B, para. 156)

645. Hence, pursuant to pursuant to Claimant's separate obligations under Articles 7 and 8, Claimant was obliged to inject into Balkan Airlines by the end of the year 2000 USD 8.4 million to service pre-existing debts (Article 7), and USD 20 million by way of approved investments (Article 8), i.e. a total of USD 28.4 million (R VI B, para. 158). Claimant claims to have injected USD 23.15 million into Balkan Airlines by the end of 2000. All of these investments were made in the form of punitively expensive short term loans, one of which has turned out to be a letter of credit concerning an aircraft lease (USD 2.4 million) and not an investment. Therefore, even if the rest is considered investments, Claimant did not fulfil its separate obligations under both Articles 7 and 8. (R VI B, para. 159-161)

> *"Rather than constituting a means of fulfilling its investment obligations under the Privatization Agreement, the loans were entered into by Zeevi to further its own financial interests. As concluded by PwC, there were more appropriate methods of "investing" in Balkan Airlines, such as capital injections or long-term loans, consistent with its financial condition and its future development prospects. Zeevi clearly had an obligation to invest in Balkan Airlines under the Privatization Agreement, and manifestly breached that obligation."* (R VI B, para. 166).

646. In addition to its failure to invest, Zeevi violated its obligations under Article 8 in a number of other ways: Firstly, contrary to Article 8.1, Zeevi never presented an Investment Plan to the Privatization Agency. Secondly, Zeevi never provided the bank guarantee required under Article 8.2.2. Finally, in violation of Article 8.3, Zeevi never provided investment reports to the Privatization Agency. (R VI B, para. 167)

### b.    *Summary of contentions by Claimant*

647. Claimant submits Respondent No. 1's interpretation that Claimant was to inject, from its own resources, an annual amount of USD 20 million over a five year period, manifestly contradicts the clear wording of Article 8, just as it is contrary to the intention of the parties. (C VIII, para. 30)

648. It is undisputed that Article 8 imposes an obligation on Claimant to see that investments in the above amount be made in the Company,

however, Claimant disputes the allegation that it had to invest in the Company funds from its own resources. (C IX, para. 34)

649.  In view of the fact that the parties never intended Article 8 to provide for what Respondent No. 1's lawyers are now asserting, it is no wonder that Respondent No. 1 took no less than five years in order to "reveal" to Claimant its new and original interpretation of Article 8 of the PA. (C VIII, para. 32) Respondent No. 1 has not been able to produce a single witness to substantiate this interpretation. (C VIII, para. 33)

650.  Contrary to the Respondent No. 1's interpretation, and as already explained by the Claimant in its previous Briefs, the true situation is that the parties never agreed that the Claimant's obligation pursuant to Article 8 of the PA, would oblige the Claimant itself to invest an annual amount of USD 20 million in the Company. Rather Article 8 obliged the Claimant to cause the Company to invest an annual amount of USD 20 million for the purpose of the Company's commercial development. The financial sources for that investment by the Company could be the Company's own money or external funds injected into the Company, by the Claimant or anyone else. (C VIII, para. 34)

651.  Claimant contends that the wording of Article 8 sustains its interpretation of said Article. Article 8.1 refers to

> "*investments in or by the Company*"(C IX, para. 36)

652.  Article 8.4 refers to

> "*reinvestment of retained earnings and use of operating cash flows*"

of the Company.

653.  Furthermore, contrary to Respondent No. 1's allegation, Article 8.2.1 provides that Claimant, as the majority holder of 75% of the Company's shares, undertook an obligation to manage the Company in a manner which would cause the Company to be invested with USD 100.000.000. (C VIII, para. 36)

654.  In addition, Claimant interprets Article 7.9.1 as follows:

> „*Funds resulting from the sale of the SITA Shares or the Company's real estate could be applied for the utilization of the investment program, is that the Claimant was not under any obligation that the source of the investment would be solely out of the Claimant's own money, and that the investment could*

> *clearly be financed through the Company's own funds (for example: from proceeds of sale of the SITA Shares)*". (C VIII, para. 37; C IX, paras 38 *et seq.*, 49)

655. Same is true, according to Claimant, for Article 10.13 of the Amendment to the PA, according to which proceeds from sale of the SITA Shares could be used for the implementation of the investment program. (C VIII, para. 38; C IX, paras 38 *et seq.*)

656. This interpretation is further supported by the specific wording of Article 7.1. by which Claimant was indeed obliged to invest certain funds in the Company. Hence, it can be seen that when the parties specifically agreed that the Claimant's obligation would be realized through funds from sources outside the Company, they knew and were perfectly aware as to how to word this obligation in unequivocal terms. The wording of Article 7.1 differs from the wording of Article 8. (C VIII, para. 40)

657. As shown, Claimant's interpretation is in line with the language of the PA. It is further in line with real-time documents which it possesses, such as its letter of 30 June 1999 to its bankers.

658. The Republic's attempt to contradict such an interpretation is contrary to and in conflict with: (i) all the terms and conditions of Article 8; (ii) the overall provisions and structure of the PA; and (iii) the clear failure to produce even a single witness in support of its creative interpretation. (C VIII, para. 42)

659. The documents (Exhibit B-7, R-55), which t Respondent No. 1 refers to in Section 22 of its Quantification Brief in support of its theory, predates the PA by six months and does not support Respondent No. 1's proposition. (C IX, para. 41)

660. In view of the foregoing, Claimant submits, the investments of the Company amounted to USD 26,471,589, namely some USD 6,500,000 more than the amount that Claimant had undertaken that the Company would invest pursuant to Article 8. According to the Investment Report of 27 March 2001, the Company invested in computers, an IT system, two aircraft Model ATR-42, one AN-12 aircraft and three lease agreements for aircraft 737-300. (C VIII, para. 45)

661. Respondent No. 1 attempts to confuse the Tribunal between the USD 23,150,000 transfers Claimant made to the Company, and the USD 26,471,589 investments which were made in or by the Company. It is important to differentiate between the two amounts, as they are examined according to different criteria. While the USD 23,150,000 were directly invested from Claimant, the

USD 26,471,589 are comprised of direct investments from Claimant and additionally investments from other sources, such as *"reinvestment of retained earnings, use of operating cash flows"*. (C IX, para. 42)

662. To prove this allegation, Respondent No. 1 refers to Claimant's offer, in which it stated its intention to invest from its own resources USD 100,000,000. However, there is no need to refer to the offer, when there is no ambiguity in the language of the PA itself. (C IX, para. 43)

663. In this regard, Claimant contends that the burden of proof that Claimant has not invested said amounts is on Respondent No. 1. However, it has failed to prove its allegations. (C VIII, paras 47 *et seq*.)

664. Contrary to Respondent No. 1's allegation that Claimant's interpretation is new, it is the Respondent's interpretation that is new, since it was only introduced in the Respondent No. 1's Defense and Counterclaim Brief on 21 June 2004 - more than three years into this arbitration. (C IX, para. 44)

665. To further sustain its interpretation, Respondent No. 1 referred to the Speedwing Report. However, Respondent No. 1 fails to explain where exactly the Speedwing Report allegedly stated that insofar as investments in the Company were required, they necessarily had to come from external sources. (C IX, para. 45)

666. The passages in the Report, Respondent No. 1 refers to in its Quantification Brief do not show that as a pre-condition to the Company's recovery the Speedwing Report allegedly require investments in the Company which would be made out of external sources. (C IX, para. 46)

667. To further support its interpretation, Claimant refers to the fact that the establishment of Bulgaria Air company did not require external funds after an initial capital injection of BGN 10,000,000 was put into it. Hence, in Bulgaria, there is no absolute need for continuous external investments in order to establish a viable airline. (C IX, para. 48)

668. In contrast to Respondent No. 1, Claimant, even though the burden of proof remains on the Respondent No. 1, has been able to clearly show that the investments, as detailed in the March 2001 investment report, were indeed made. This is confirmed by Respondents' own documents, i. e. the report of the Company's temporary trustees, which was prepared after the Company went into bankruptcy proceedings, which stated:

*"during [sic] this period a contract for the leasing of an ATR airplane was signed. Irrespective of the fact, that from a legal point of view such a contract does not generate the effect of a material transfer, <u>in conformity with the national accounting standard No. 17 this asset is registered within the assets of the company and leads to considerable increase in the balanced value of the long term tangible assets of the Company</u>".*

*"During the 1999-2000, the Balkan airlines company concluded a number of leasing contracts with Ansett Worldwide Aviation, Gecas and ATR, according to which the Company has used three airplanes under leasing – Boeing 727-500 ... ; <u>three Boeing 737-300 with ser. No. 23749, 23923 and 25017 and registration No. BOD, BOE and BOF and one ATR 42-300 airplane</u>".* (C VIII, para. 50)

669. This is further supported by the witness evidence of Mr. Golan and Mr. Frank.

670. Hence, the investment report, in respect of investments totaling approximately USD 26,500,000 made by the Company by the end of 2000, which was USD 6,500,000 in excess of the investments required as at that time pursuant to the PA, did correctly reflect the investments that had actually been made. (C VIII, para. 51)

671. Since Respondent No. 1 never replied to Claimant's letter dated 12 June 2001 in which Claimant asked for clarification as to the grounds of Respondent No. 1's refusal to accept the investments, one can say, Respondent No. 1 never genuinely believed that it was entitled to be compensated for what now it alleges to be lack of investments in sums of tens of millions of dollars. Respondent No. 1 has always known that any detailed analysis of its allegations, would disclose that they do not rest upon any serious basis. (C VIII, par. 53)

672. Furthermore, according to Article 8.1 and contrary to Respondent No. 1's allegation, Claimant did not need to obtain the Privatization Agency's agreement to the investments that were made. Especially not, since the Respondents did not even comment on the above letter. (C VIII, para. 54)

673. More over, in contrast to Respondent No. 1's allegation, since the total investments made by the Company by the end of 2000, amounted to approximately USD 26,500,000, some USD 6,500,000 more than the investment that had been undertaken would be invested in accordance with Article 8, there was no need to provide any guarantee to secure the investment given that it had in fact been made in full. (C VIII, para. 56)

674. Claimant further notes, according to the investment report of 27 March 2001, as at that date investments totalling approximately USD 12,500,000, constituting more than two thirds of the total investment that needed to be made by the end of 2000 (and more than twice the guarantee that should allegedly have been given), had in fact already been made. Hence there was no need for a guarantee for investments, which had already been made. (C VIII, paras 57 *et seq.*)

675. Claimant alleges that Respondent No. 1 cannot prove any damage resulting from this alleged breach to provide a guarantee since the investment that the guarantee was intended to secure, was in fact made in full. (C VIII, para. 59)

676. With regard to the alleged breach of Claimant's reporting obligation, it is noted that on 27 March 2001 Claimant submitted an investment report, to which Respondent No. 1 even commented by rejecting certain investments made. When asked to clarify reasons for the rejections, in order for Claimant to adjust its investment report, no answer was given. Hence, the Respondents have no one to blame other than themselves with regard to any "reporting obligation". (C VIII, paras 60 *et seq.*)

## 3.    The Tribunal

677. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | |
|---|---|
| C I | para. 7 and exibits |
| C II | paras 59 *et seq.* |
| C VIII | paras 30, 32 *et seq.*, 36 *et seq.*, 40, 42, 45, 47 *et seq.*, 50 *seq.*, 53 *seq.*, 56 *et seq.* |
| C IX | paras 34, 36, 38 *et seq.*, 41 *et seq.* |
| | |
| R I | paras 5.1.2., 5.1.21., 5.1.3. |
| R III PA | para. 153 |
| | |
| R II B | paras 45 *et seq.*, 74, 76 *et seq.*, 81, 87 *seq.* |
| R III B | paras 21, 23 *seq.*, 25 *et seq.* |
| R V B | paras 3, 11, 15 |
| R VI B | paras 145 *et seq.*, 150 *et seq.*, 156, 158 *et seq.*, 166 *seq.* |

**Exhibits:**

| | |
|---|---|
| C-35 | PA |

| C-73 | Decision of the Sofia City Court of 21 October 2001 |
| C-35 | PA |
| B-7 | |
| R-55 | |

678.   Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

## a. The Duty to Provide Funds as Investment.

679.   First of all, the Tribunal notes that, due to any indication in the wording of Article 8 to the contrary, the respective investments can be made by a loan and by a third party on behalf of Claimant.

680.   Further, the Tribunal notes the differences in the wording between Article 7.1.:

> *"The Buyer shall have an obligation to put in the Company"*

on one hand, and on the other hand the wordings in Article 8.1.:

> *"the Buyer will plan for the investment in or by the Company"*

and Article 8.2.1.:

> *"the Buyer (...) shall cause in the Company to be invested".*

681.   The different wordings in Article 8 can not be interpreted as accidental and can only mean that such investments could either come from outside the Company or from its own resources.

682.   This is confirmed by Article 8.4. PA which expressly includes a number of other ways of investment. The wording *"agreed with the Company"* in that provision does not require an agreement with the Seller.

683.   Further, Article 7.9.1. clarifies that also proceeds from the sale of SITA Shares can be used for "investment program" which is the subject matter of Article 8. As Article 7.9.1. does not require an agreement with Seller, but only to "notify" Seller, the Tribunal does not consider such a notification as a condition for Claimant's authority for such a sale.

684.   This is without prejudice that, in view of Article 10.13. of the Amendment to the PA, a lack of notification of such sale to Seller may be relevant in another context.

685. Thus, Claimant and the Company controlled by it had wide discretion as to from where and how to perform the investments due under Article 8.

686. Now, it has to examined whether such investments were actually made. Contrary to Claimant's respective argument, Claimant has the burden of proof in this regard.

687. Claimant alleges that it did invest USD 26,471,589.00 and thus considerably more than the USD 20 million due under Article 8 PA. It relies on the Investment Report of 27 March 2001 (C-99) sent to Respondents by a letter of the same date and sees a confirmation in one of Respondent's exhibits, i.e. the Report of the Company's temporary trustees prepared after the Company went into bankruptcy which confirmed the investments made by the leasing of an ATR airplane and the leasing contracts on three Boeing 373-300 aircrafts for which testimony has been submitted by witnesses Mr. Golan and Mr. Frank.

688. When Claimant, by its letter of 12 June 2001 (C-102), referred again to the Investment Report and asked Respondent No. 1 for a clarification for its refusal to accept the investments, no reply by Respondents was received or at least no such reply has been submitted to the evidence in this case. Since no agreement by Seller to investments was required by Article 8, the Tribunal does not have to decide whether that lack of reply should be interpreted as a tacid agreement. But in any case, the above evidence satisfies the Tribunal that the investments mentioned in the Investment Report have been sufficiently proven by Claimant.

689. Therefore, the Tribunal concludes that Claimant has fulfilled its obligations under Article 8 PA to provide the required funds for investment in the Company.

## b. The Duty not to Withdraw Investments.

690. However, the above conclusion is not the end of the necessary examination by the Tribunal. Without further explanation it is obvious that Article 8 PA not only required Claimant to provide the investments, but also required Claimant to maintain the investments in the Company and not withdraw them later without justification. In examining this issue, it is not possible to separate the justification of any withdrawel from the amounts involved. Therefore, in this context, the Tribunal will also deal with the respective quantum of any misappropriation found.

691.  In various contentions already summarized further above in this Award, the Parties have dealt with the transfers of money and assets from the Company to Claimant, its subsidiaries or persons managing the Company on behalf of Claimant which respondents allege were unjustified and which for which Claimant has provided explanations. In this context, the Tribunal will not discuss those transfers which in its view are part of the normal running of the Company. But the Tribunal will hereafter discuss those transfers regarding which doubt may indeed be raised as to their justification.

692.  Respondents argue that the "secret" management and consultancy agreements it discovered in the file concluded between the Company and subsidiaries and persons under the control of Claimant were *per se* unjustified, particularly since they paid for services which Claimant had to perform under the PA. The Tribunal does not share that view, that the PA did not exclude that the Company had to pay its employees as well as the persons managing the Company. Indeed, it can be justified that payments for such services, rather than being paid as salaries, were paid by different arrangements. Without prejudice to application of Bulgarian tax and other public law, which this Tribunal does not have to examine, such other arrangements could be justified by tax reasons or making them available outside Bulgaria. If, as alleged by Respondents, the Company was to pay Claimant's officers an annual amount in the range of USD 450,000.00, the Tribunal does not consider such a remuneration exorbitant.

693.  There are, however, a number of transfers made by Claimant where such a justification seems doubtful.

694.  The first is the transfer of a total of **USD 1.75 million** to Claimant's accounts in instalments up to February 2001 (R VI B and second PwC Report Sections 5.8-12). The Tribunal cannot find any satisfactory justification in this regard.

695.  The second such item are the lawyers invoices paid to the law firm retained by Claimant in its negotiations of the PA and thereafter, for which the Tribunal cannot find a justification as proper expenses of the Company. The total amount of these invoices (Exhibit R-103 G), transferred into USD is:

| | |
|---|---|
| • Gueorguiev,Todorov & Co | 46,073.12 leva |
| • Borislav Boyanov | 4,548.67 leva |
| • Djingov, Guguinski, etc. | 89,844.43 leva |
| total: | 140,466.22 leva |

(<em>see</em> R - 103)    or 70,233.11 USD

696. From the evidence the Tribunal can see that this money was paid for services rendered by the lawyers after the privatization. Further, the Tribunal cannot see from this evidence that this money has been paid for services not rendered to the Company. Therefore, the Tribunal cannot conclude that this payment was misappropiated by Claimant.

697. At the same time, under consultancy agreements, the following amounts were paid to:

| | |
|---|---:|
| • BDO Bulgaria | 1,437,472.02 leva |
| • ET "Starch" | 1,912.00 leva |
| • SGTC – Bulgaria | 212,686.00 leva |
| • LB Consult | 89,844.43 leva |
| which makes a total of | 1,741,914.45 leva |
| which converts into | 870,957.22 USD |

698. The Tribunal considers the related evidence as not quite clear. It might well be that this money was either taken as consultancy fees by the respective entity and later paid as consultancy fee to Claimant's management staff. Under the Agreement between the Company and BDO Bulgaria OOD of 5 June 5 2000 (R-103a) a total amount of BGN 1,437.472 (R-103) has been paid which was approximately equal to USD 718,000. Under this agreement for rendered services, the Assignee shall use only the following consultants which all shall be on the payroll of the Assignee: Andrew Gray, Yechiam Mar-Chaim, Jacob Shenhav, Dov Kagan and Raphael Harlev. It seems that all those persons who were employed or hired directly by the Company received additional payments through this scheme. But the Tribunal does not consider the evidence as sufficiently conclusive to find a misapprpriation by Claimant in this regard.

699. The next issue in this context is that Respondents have demonstrated (particularly in R VI B pp. 25 and 26) that USD 2.6 million of the price of a total of USD 9.5 million for the first sale of SITA Shares were transferred to Zeevi Logistics. However, as Mr. Stanley explained in his direct examination, after his report he *"has seen documents which show these amounts [were paid] to IATA and Eurocontrol..."* (Transcript 1090:6-1091:7). Consequently the Tribunal cannot find sufficient proof that these payments were allegedly misappropriated.

700. However, in the same context, it is undisputed that Claimant contracted a transfer of the remaining SITA Shares to Balkan

Holdings in May 2000 (B-71). The Tribunal cannot find sufficient evidence for the respective justification put forward by Claimant that this was as collateral for future financial facilities. Since, in any case, these financial facilities were never put at the disposal of the Company, the value must be taken as the market value at that time. Since the sales contract was concluded in May, the risk for any further change in value cannot be charged to the profit of Claimant and against Respondents. Therefore, whether, as alleged by Claimant, the actual transfer was done in August at a lower value, is not relevant in the present context. Respondents have provided proof regarding the value in May by Exhibit B-78. The market value of this part of the SITA Shares at the time was USD 12.9 million (PwC Report Section 5.35). Even if these shares were only transferable in July 2000, Claimant cannot rely on this limitation for a lower market value in May, because it was Claimant's choice to transfer these shares earlier in breach of its contractual obligation. However, on the other hand, Respondent No.1 itself has submitted a calculation (RVII B, p.25 para. 84) – which the Tribunal has accepted above in another context – to the effect that expenses of 22 % have to be subtracted from this market value. Therefore, only 78 % of the market value of USD 12.9 million can be counted against Claimant, i.e. **USD 10,091,441.30.**

701. Further, it is undisputed that a number of the Companies aircraft were sold. While this by itself may well have been justified to replace them by newer aircraft, the Tribunal cannot find sufficient justification in the file for the transfer of parts of the respective proceeds to Claimant rather than leaving the money in the Company. The PwC Report (Section 5.42) reveals that, only two days after the sales price was received by the Company, USD 1 million were transferred to Claimant. However, the amount of USD 1.75 million referred to in Sections 5.8-5.12 of PwC Second Opinion is included in Table 15 which sums up the various transfers which were made. Section 5.42 of the PwC Second Report states: "… *As can be seen from Table 15 above, USD 1 million was paid from the same account to Balkan Holdings on 31 January 2001. It seems likely, therefore, that the USD 1 million comprised part of the proceeds received on the sale of the TU154M aircraft".* It is thus apparent that the amount of USD 1 million forms part of the amounts set out in Table 15 of the PwC Second Expert Opinion, which altogether lists total transfers in an amount of USD 1.75 million already taken into account above. This is in conformity with the submission of the Respondent No. 1 (RVI B para. 72, p. 23 and 24). Therefore, this amount of USD 1 million cannot be counted twice against Claimant.

702. Finally, the Tribunal notes that Claimant caused the sale of real estate of the Company in deeds notarized on 12 and 13 February

2001 just before Claimant's management left Bulgaria. However, since, later, theses sales were considered invalid and no money seems to have been transferred to Claimant's side in this context, the Tribunal does not have to examine this matter any further here.

703. Adding up the amounts that have been found to be withdrawn by Claimant due to the above considerations, the Tribunal concludes that the Claimant has withdrawn from the Company and thus breached its duty to maintain the investments due under Article 8 PA in a total amount of USD 11,841,441.30.

704. In conclusion, the Tribunal finds that Respondent No. 1's counterclaim based on Article 8 PA is justified for an amount of **USD 11,841,441.30.**

705. Further, Article 10.2.(i) PA provides that, for any non-fulfillment of the investment obligation for the year 2000 under Article 8.2. PA, the Buyer shall pay an indemnity of 30 % of the investment due, but not made. Above, the Tribunal has concluded that, on one hand, Claimant did fulfill its obligation under Article 8 PA to provide the required funds as investments, but, on the other hand, breached its duty not to withdraw investments. Regarding the question whether the indemnity of Article 10.2.(i) applies to both of these obligations under Article 8 PA, there can be no doubt as to ots application to the first. However, since the "indemnity" under Article 10.2.(i) is actually a contractual penalty for non-fulfilment beyond any obligation for damages, the Tribunal feels it must be interpreted in a restricted way to the effect that such a penalty can only be applied to breaches of obligations expressly mentioned. There is no evidence that the Parties, in drafting that provision, thought of and intended to include the ban on withdrawel of funds. Therefore, regarding the second obligation, i.e. not to withdraw investments originally made, the Tribunal concludes that the contractual penalty of Article 10.2.(i) cannot be applied.

706. On the basis of the above conclusion, the Tribunal thus concludes that no penalty is due according to Article 10.2.(i) PA to Respondent No. 1.

# H.IV. Zeevi breached Article 7.9.1 of the PA

## 1.  Summary of Contentions by Respondent No. 1

707. Respondent No. 1 submits Article 7.9.1 imposes on Claimant an obligation to notify in case of sale of Balkan Airlines' Equant Shares

or real estate and to use the proceeds in conformity with the PA. Article 7.9.1 further establishes that

> *"in all instances, the obligations towards the Bulgarian State outside the scope of the obligations addressed in Attachment 11 shall have priority."* (R VI B, para. 168)

Contrary to Claimant's allegation that the terms of that provision were subsequently subject to indirect amendment of Article 10.13 (R VI B, para. 172). The reference of Article 10.13 to Article 7.9.1 is expressly limited to the first sentence of Article 7.9.1. Claimant provided no evidence to the contrary. Indeed, Claimant's own draft prospectus on Balkan Airlines expressly mentions the obligation to give priority to the Bulgarian state in using the proceeds. Hence, it does not amend the remainder of Article 7.9.1 including the above quotation. (R VI B, paras 173 *et seq.*)

708. Contrary to Claimant's allegation, there were in deed obligations towards the Bulgarian State, such as social security and other "public law obligations", various airport fees and taxes for the period January 1999-February 2001 and contractual debts to the Respondent No. 1's ATC, which together exceeded USD 20 million. (R VI B, paras 180 *et seq.*) These obligations to the Bulgarian state could have been entirely satisfied by the funds generated from the disposal by Claimant of Balkan Airlines' principal properties and remaining SITA depository certificates (R VI B, para. 183). Instead, and in breach of Article 7.9.1, Claimant chose to appropriate those assets, and/or the proceeds resulting from the sale thereof, illegitimately for itself (R VI B, paras 184 *et seq.*).

709. Respondent No. 1 claims that Claimant attempted to justify the appropriation in order to facilitate its attempts to find third-party finance for the airline (R VI B, para. 186). This in itself already constitutes a violation of Article 7.9.1 (R VI B, para. 188). Moreover, Respondent No. 1 alleges, Claimant never accessed any bank finance for Balkan Airlines with these assets but, nevertheless, has never returned these assets to the airline. (R VI B, para. 189)

## 2.    Summary of contentions by Claimant

### a.    *The Equant Shares*

710. With regard to the sale of Equant Shares owned by the Company, Claimant submits, as a consequence of undisclosed restrictions in respect of the sale of those Shares, the Company could then only sell about one third of the Equant Shares that it held (instead of half the

Shares, as had been represented to the Claimant), and even that at a price which was about USD 25 less than the specified price of each share at that time. (C VIII, para. 106) Now, in view of these misrepresentations, Respondent No. 1 claims damages according to Article 10.13 because these funds were not used to repay pre-existing debts toward the Bulgarian State (C IX, para. 56). There is no dispute that the Claimant made use of the funds obtained on the sale of the Equant Shares solely for the benefit of the Company (C VIII, para. 109)

711.    Claimant alleges, Article 10.13, as amended on 15 July 1999 does not provide that the Claimant would pay liquidated damages if the proceeds of the sale of the Equant Shares are not used for repayment of the "pre-existing debts" or debts to the Bulgarian State. (C VIII, para. 113, C IX, para. 57)

712.    Contrary to Respondent No. 1's allegation and in accordance with Mr. Golan's testimony, Article 10.13 was in fact modified in order to ensure that on the one hand, Claimant could not "strip the Company off its principle assets" and on the other hand give Claimant the necessary flexibility to make the best use of the funds for the Company and not to ensure the recovery of the Bulgarian Government's budget. (C VIII, paras 116 *et seq.*)

713.    In view of this modification, Respondent No. 1's claim in this respect is devoid of substance or indeed merit. (C VIII, para. 118)

714.    Even if the modification is not accepted, Respondent No. 1's claim is still unfounded due to the fact that when the Equant Shares were sold, the Company had no debts to the State of Bulgaria apart from the framework of liabilities referred to in Appendix 11 to the PA.

715.    With regard to the social security and other public law obligations Respondent No. 1 refers to, Claimant notes, the Trustees' Report indicating that a debt of USD 893,841 allegedly existed. However, there in no indication, that such debts existed also in December 1999 when the Equant Shares were sold. (C IX, para. 59)

716.    Regarding the alleged airport fees and taxes for the period January 1999 - February 2001, which accrued to an amount of USD 14,699,147, Claimant considers it is outrageous that Respondents first deceive Claimant by stating that there were no subsidies prior to the privatization and Respondent No. 1 now argues that it was actually entitled to be paid these fraudulent fees with priority. (C IX, para. 60)

717.    Regarding the Debt to the ATC, Claimant notes, Respondents' allegation is false. With reference to the alleged debt to the ATC in

the amount of USD 3,000,000, which was undisclosed to Claimant, it is noted that it is inconceivable that the Respondents can at the same time fail to properly disclose the existence of this debt, and argue that this undisclosed debt should have enjoyed priority of payment. Regarding the alleged assignment of an amount of USD 1,900,000 from HypoVereinsBank to the ATC, Claimant questions its existence. (C IX, paras 61 *et seq.*)

718.   Furthermore, Respondent No. 1 has not proven that the proceeds of sale of the Equant Shares were not applied in paying debts from before privatization or in implementing the investment program. (C VIII, paras 120 *et seq.*)

719.   In fact, Claimant has provided positive evidence that proves that the proceeds were so applied. During the period in which Claimant managed the Company, Company Obligations in amount of approximately USD 50,000,000 were paid. Accordingly, it is clear that proceeds of sale of the Equant Shares totaling USD 9,484,149 were applied in order to pay Company Obligations which existed on 31 May 1999. (C VIII, para. 124)

720.   Due to the fact that certain restrictions, including that the Shares could not be pledged to third parties but only to banks, financial institutions or companies related to the Company (like Balkan Holdings, which was an affiliate of the Company), applied to the sale of Equant Shares, more creative solutions had to be sought of in order to obtain funds for the Company. (C VIII, paras 126 *et seq.*) It was based on the concept of transferring the Equant Shares to Balkan Holdings, which could then pledge them to third parties, against financial facilities that would be transferred directly from Balkan Holdings to the Company. (C VIII, para. 127) This is an example of how the Claimant tirelessly explored every possible avenue and opportunity in order to obtain the financing that the Company urgently needed. (C VIII, para. 128)

721.   Moreover, Respondent No. 1 has no cause to argue for agreed compensation based on the above mentioned transfer pursuant to Article 10.13 of the PA (as amended on 15 July 1999), since Article 7.9.1 and the amended Article 10.13 deal with the sale of the Equant Shares. However, this transfer, constituted a collateral by means of the Shares aimed to obtain financial facilities for the Company. (C VIII, para. 130) Mr. Golan's testimony and the terms and conditions of the transfer agreement, which expressly permitted the Company to recover the Shares at any given time by fully repaying the financial facilities, substantiate Claimant's contention in this regard.

722.   Since it was not a sale agreement, it does not fall within the scope of Articles 7.9.1 and 10.13 and, *ipso facto*, Respondent No. 1 has no

cause of action or claim for damages pursuant thereto. (C VIII, para. 131)

723.     Even if a sale of Equant Shares was involved (which is denied), then there is still no cause for claiming damages pursuant to Articles 7.9.1 and 10.13. This is so because the Respondent No. 1's allegation is that no financial facilities were ultimately obtained against the pledge of the Shares. This being the case, no use of any proceeds (which Respondent No. 1 claims were never obtained) could be said to have been in contravention of Articles 7.9.1 and 10.13. (C VIII, para. 132)

724.     Even if a sale was involved and proceeds were obtained, the Respondent No. 1 has not pleaded and, *a fortiori*, has not proven that the use of those proceeds was not for the purpose of paying the Company's debts or the implementation of the investment program, in accordance with Article 10.13 of the Amendment to the PA. (C VIII, para. 133)

## b.     *Sale of Balkan's Real Estate*

725.     With regard to Respondent No. 1's allegation in relation to the transfer of Balkan's real estate, Claimant submits, it cannot serve as a basis for any claim, since these transfers have never been recognized by Respondent No. 1 as valid and effective. (C VIII, para. 135)

726.     The bad faith of Respondent No. 1 in this regard is evidenced by the fact that it has been trying to obscure this fact from the Tribunal. (C VIII, paras 136 *et seq.*)

727.     Claimant contends, the underlying objective in the attempt to transfer the three properties was to raise funds for the Company, which could not raise money in any other way. Contrary to Respondent No. 1's allegation the attempt to transfer the properties was part of the Claimant's uncompromising and relentless efforts to raise funds for the Company through those properties before the Company collapsed. (C VIII, para. 139)

728.     Furthermore, there can be no claim regarding alleged failure to give notification with respect of the sale of the real-estate pursuant to Articles 7.9.1 and 10.13, since Respondent No. 1 has not recognized the sale. Therefore, it is doubtful whether such notice was required. (C VIII, para. 140)

## 3.    The Tribunal

729.    In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

Party Submissions:

| | |
|---|---|
| R VI B | paras 168, 172 *et seq.*, 180 *et seq.*, 184, 188 *et seq.* |
| C VIII | paras 106, 109, 113, 116, 118, 120 *et seq.*, 124, 126 *et seq.*, 130 *et seq.*, 135 *et seq.*, 139 *seq.* |
| C IX | paras 56, 57, 59 *et seq.* |

Exhibits:

| | |
|---|---|
| C-35 | PA Appendix 18 |

730.    Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

731.    Regarding the dispute between the Parties about the relevance of Article 10.13. as amended, the Tribunal notes that the wording of Article 10.13. expressly only refers to the sale of shares and of real estate and not to the obligations towards the Bulgarian State which are the subject matter in the last sentence of Article 7.9.1. Therefore, due to this last sentence, Claimant was obliged to use the proceeds from the sales with priority to pay for such obligations towards the Bulgarian State.

732.    However, as discussed in detail above in this Award, due to Article 9.1.2. and other provisions of the PA, Seller had a liability to disclose to Claimant all relevant obligations the Company had. Therefrom, it must be concluded that obligations which were not disclosed, even if they existed, do not fall under the priority payment rule of the last sentence of Article 7.9.1. und thus had not to be paid by Claimant from the proceeds of sales.

733.    In this context, the Tribunal has to discuss Appendix 18 to the Disclosure Letter of which different versions have been submitted by the Parties. Claimant's version is in Exhibit C-109 which shows a pagination within the stamp at the bottom of the page. The Tribunal notes that Appendix 17 goes up to p. 293; then on p. 294 Appendix 18 starts existing of two pages namely pp. 295 *seq.*; then Appendix 19 starts on p. 297. In the version submitted by Respondents as Exhibit B-98, there is a new and different pagination outside the stamp at the bottom of the page in the middle with a new document

(on the ATC Loan) inserted which is paginated from 295 to 315 and only thereafter the above document of two pages with the original pagination 295 and 296 is found newly additionally paginated as 316 and 317. It can be seen from the stamp and the signatures on the ATC loan that different documents were submitted.

734. The Tribunal does not need to speculate as to how and why the later introduction of the new document occurred. But, in view of the above situation in the file, it concludes that Respondents have not been able to prove that the ATC loan was properly disclosed in Appendix 18.

735. Further above in this Award, the Tribunal also found that the Company's obligations for outstanding social security and other public law obligations, airport fees and taxes, and towards ATC were not properly disclosed by Seller.

736. Therefore, Claimant did not breach its obligation under the last sentence of Article 7.9.1. by not using the proceeds of sales for all the above obligations.

737. What remained was the obligation under the second sentence of Article 7.9.1. to use the proceeds of sales for either paying Company obligations or the investment program. In this regard, the Tribunal notes the dispute between the Parties as to whether the use of the proceeds from the SITA Shares for what Claimant alleges was a facilitation of third party financing for the Company complied with Article 7.9.1. Whatever its purpose and legal formalities were, the "transfer" of the Shares from the Company to Balkan Holdings took the Shares out of the property of the Company and thus had the same effect as a formal "sale". The obvious intention of Article 7.9.1. was to assure that property of the Company should not be disposed of without notification to Seller and its value remaining available as capital of the Company. Therefore, the Tribunal concludes that Claimant's disposal of the proceeds of the sale of the shares falls under Article 7.9.1.

738. Regarding the Claimant's "transfer" of the Company's real estate, Claimant argues that Article 7.9.1. should not be applied because Respondents have not recognized its validity and, anyhow, the proceeds were intended to be used to raise funds for the Company. However, even if both arguments were valid, there was still an obligation of Claimant to notify Seller according to the first sentence of Article 7.9.1.

739. The first sentence of Article 7.9.1. PA expressly provides that the:

> *"Buyer shall be under the obligation to notify the Seller"*

regarding sales of both the shares and the real property of the Company. It is undisputed that Claimant did not do so.

740. Therefore, the Tribunal concludes that Claimant has breached Article 7.9.1. PA in this regard.

741. The consequences of this breach have to be examined taking into account particularly Article 10.13. PA as amended which provides that the Buyer shall owe liquidated damages in the amount of 10 % of the market value of shares sold. According to Exhibit C-55, the total proceeds were USD 9,484,149. The Tribunal therefore agrees with the calculation presented by Respondent No.1 in R VI B p. 79, para. 263 to the effect that these 10 % amounting to USD 948,414.91 are also due to be paid by Claimant to Respondent No.1.

## H.V. Claimant breached its duty of good faith

### 1. Summary of Contentions by Respondent No. 1

742. Apart from Claimant's breaches of Articles 7 and 8 Respondent No. 1 alleges, Claimant undermined the basic purpose of the PA in a manner that fundamentally conflicted with its duty to perform its contractual obligations in good faith (R VI B, para. 191). Article 63(1) of the OCA requires contractual counterparts to perform their obligations loyally, fairly, conscientiously, and so as to fulfill the purpose of the agreement without any intention to damage or deceive their contractual counterpart (R VI B, paras 192 et seq.). The purpose of the PA was to facilitate the stabilization and future success of Bulgaria's NC (R VI B, para. 194). Respondent No. 1 submits, after the disappearance of Knafaim-Arkia, Balkan Airlines was left in the hands of an investor with no airline management experience, that proceeded to undermine the purpose of the PA by stripping off Balkan's assets. This bad faith behaviour is substantiated by the fact that Claimant concealed the above mentioned transactions from the Tribunal and the Bulgarian State until June 2004. (R VI B, paras 196 et seq.) Respondent No. 1 alleges, when they were uncovered, Claimant did not deny them, contending that there was no express prohibition in the PA that restrained it from looting the airline that it undertook to invest in. (R VI B, para. 198)

743. Furthermore, causing Balkan Airlines to enter into a matrix of consultancy agreements with subsidiaries for services that Claimant itself under the PA was to perform and appropriating Balkan's assets constituted additional breaches of Claimant's good faith duty (R VI B, para. 199):

*„Very simply, the Bulgarian government did not sell its national carrier to Zeevi for the nominal amount of USD 150,000 so that the latter could appropriate its assets, divert and misuse its revenues and, finally, sell off its planes and pocket the proceeds. In engaging in such conduct, and in concealing it from its contractual counterpart, Zeevi breached - at the very least - its contractual duty of good faith"* (R VI B, para. 200)

## 2.    Summary of Contentions by Claimant

744.    With regard to the allegations that Claimant undertook to strip the Company off its assets in bad faith, Claimant contends, this can only be understood as a sign of its serious distress. (C IX, para. 64) it is further indicative that Respondent No. 1 does not claim any compensation or damages which allegedly result from this. (C IX, para. 65)

745.    In this regard, Claimant submits, it remains unexplained that the Respondents seriously misrepresented and defrauded Claimant in the PA prior to Claimants alleged plundering even began. (C IX, paras 67 *et seq.*) Therefore, Claimant asserts, the Respondents' allegations are nothing but a smoke screen designed to distract attention from the Respondent No. 1's lack of any substantive defences. (C IX, para. 69)

746.    Furthermore all of the Respondent No. 1's claims concerning alleged "plundering" by Claimant of Company's real-estate and illegal transfer of monies concentrate on events which allegedly took place in January-February 2001. In view of this, Claimant wonders as to why the Respondent No. 1 did not comply, before that, with its contractual duties to compensate and indemnify Claimant or the Company for missing assets and additional liabilities? (C IX, para. 70)

747.    If Claimant indeed had the intention of plundering the Company, then why did it engage in the activities in order to restructure the Company? In this regard Claimant reminds, it paid an undisputed amount of USD 23,150,000 into the Company and USD 8,250,000 of that amount only two months before the Company's collapse. Claimant hired aviation experts such as Speedwing and Mr. Harlev to advise on how to recover the Company, etc. (C IX, para. 71)

748.    Furthermore, in order to steal from the Company, as alleged by the Respondents, it would have been much easier just to appropriate the Company's assets without investing transferring USD 23,150,000 of its money into the Company. (C IX, para. 72)

749. In view of the above, it is clear that the Respondents' allegations in this regard are devoid of merit. (C IX, para. 73)

750. Regarding the Respondent No. 1's claim that Equant Shares in the value of USD 12.9 million were transferred to the Claimant in May 2000, Claimant contends that firstly, this did not constitute a transfer but merely a security to fund additional monies which the Company required. The fact that after fraudulently representing that the Shares could be sold, Respondent No. 1 dares accuse Claimant for the steps it took to mitigate the effect of the Respondents' misrepresentations, is outrageous. (C IX, para. 75) Furthermore, contrary to the Respondnts' assertion, the Shares did not have a value of USD 12.9 million in May 2000, since they could not be sold due to the restrictions applied to them. In the end, they were sold at a value of only USD 2.5 million. (C IX, paras 76 *et seq.*)

751. Regarding the Respondents' allegations concerning the transfer of real estate, Claimant submits, there was no transfer, since any transfer was not recognized by the Bulgarian Government. (C IX, para. 78)

752. Furthermore, since the transfers were made against part of the surplus loans, which the Claimant had transferred to the Company there can be no claims regarding alleged appropriation of assets for no value. (C IX, para. 79) In connection, with the Respondents' misrepresentations, the attempt to transfer the properties was part of the Claimant's uncompromising and relentless efforts to raise funds for the Company through those properties before the Company collapsed. (C IX, para. 80) Hence, it is noted that had Claimant in fact the intention of stripping off the Company's assets, then it would have transferred the real estate immediately upon completion of the Privatization and not shortly before the Company's collapse. (C IX, para. 81)

753. With regard to the monetary transfers, which were made from the Company to Claimant totaling USD 4.6 million and the allegations that no letters of credit worth USD 2.4 million, which were given by the Claimant to GECAS in favour of the Company were ever realized, it is noted, that these accusations are based on the PwC Second Expert Opinion. PwC's easy access to the Company records in itself raises a question with respect to the indistinguishable links between the Respondent No. 1 and the Trustees in Balkan's bankruptcy proceedings. Furthermore, Claimant is disadvantaged in these proceedings, since it does not have the same access to the Company records as the Respondents have.

754. With respect to the allegations regarding the misuse of proceeds from the sale of Equant Shares, Claimant submits, contrary to the

Respondents' assertion which is based on the PwC Second Expert Report, there are in fact records of payments by Claimant in the amount of the proceeds from the Equant Shares sale on behalf of Balkan to IATA Clearing House and Eurocontrol. Hence, the USD 1,350,000 and USD 1,221,746 transfers made on 31 December 1999 from the Company to Zeevi Logistics constituted a repayment of the amounts which Zeevi Logistics extended to the Company. Therefore, regrettably, it is clear that the PwC Experts have produced a one sided and clearly misleading report, falsely accusing Zeevi Holdings of misappropriation of funds. (C IX, para. 83)

755.    In contrast to the Respondents' experts' accusation, that there is no explanation of a payment of USD 1 million from the Company to Claimant, Claimant submits, this represents a very partial repayment of the USD 8,250,000 loans that were transferred only two months beforehand in November-December 2000. This repayment was in accordance with the express terms of the loan agreement and is therefore not illegal in any way. This is especially the case in view that once it appeared that as a result of Respondents' refusal to honour the PA, the Company had very small prospects and its collapse was getting more and more imminent. (C IX, para. 83)

756.    Based on the PwC Second Expert Opinion, the Respondent No. 1 claims that Claimant transferred only USD 20,750,000 into the Company instead of USD 23,150,000, since it does not know whether USD 2,400,000 bank letters of credit which Claimant put in favour of the Company for the lease the GECAS aircraft were ever realized. In view of this allegation, Claimant contends, the Respondents have not raised this claim before and that it contradicts the bankruptcy court's decision. Additionally, Claimant refers to Elasis Leasing's calls of the letters of credit dated 14 and 16 March 2001 and the bank statements showing their withdrawal. Dr. Kraizberg also confirmed this. Hence, the Respondent No. 1's claims in this respect are baseless.

757.    According to the PwC Experts it was not possible to obtain an explanation for the reason for six payments totalling USD 750,000. Claimant's contention in this regard is, given that PwC could also not find the explanations for the other payments, this means nothing. In fact, in view of USD 23,150,000 transfers Claimant undisputedly made into the Company, the fact that after deep analyses by PwC of all Company records these Experts could only come up with six "unexplainable" transfers, is highly complementary to Claimant's integrity and proper account keeping of Company matters. (C IX, para. 83)

758.    In view of the Respondent No. 1's allegation that Claimant misused Company funds to pay for services it was under a duty to pay for,

Claimant contends, these payments were made to one of Bulgaria's most reputable law firms. Accusing this law firm of invoicing the Company for services it never supplied stands for itself. Furthermore, Exhibits B-114 and B-115 reveal that they mostly discuss services which were clearly given to the Company. Finally, the Respondent No. 1 has only annexed Djingov, Gouginski, Kyutchuvov & Velichkov's invoices. It has not shown that these were fully paid.

759. Dr. Kraizberg's Second Expert Opinion shows, that PwC's Second Report is fundamentally flawed from both factual and financing point of view and that Claimant's actions did not lead o the Company's collapse. (C IX, para. 85)

760. In this regard, it is noted that Claimant acted as an innocent investor buying a company in a bad condition, which was represented as possessing a number of valuable assets with which, in connection with Claimant's own resources could have been turned around. (C IX, para.87) Claimant's seriousness in this matter is best evidenced by the enormous amounts of monies it put into it and the active measures it took in order to find ways for the Company to recover. (C IX, para. 88)

761. Unfortunately, Claimant found that various representations made to it with respect of the Company's assets and liabilities were not correct. Furthermore, the Government acted in a manner which manifestly showed that once the Company no longer belonged to it, it could not care less what would become of it. (C IX, para. 89) Despite several warnings that if the Respondents did not live up to their obligations pursuant to the PA, the Company would collapse. Hence, Claimant was not a "plunderer" but fell victim to the Bulgarian Government's ruthless behaviour, which caused losses to Claimant amounting to at least USD 23,150,000. (C IX, paras 90 *et seq.*)

762. With regard to Respondent No. 1's claims in respect to Claimant's responsibility for the collapse of the Company, Claimant submits, this is absurd in view of the fact that the Respondents' breached the PA and Claimant by investing USD 14,750,000 over and above of what it was required to, exceeded its obligations pursuant to that same Agreement. (C IX, paras 95 *et seq.*)

763. It is noted that in order to prevent it from collapsing, Claimant invested a massive amount of USD 8,250,000 shortly before it collapsed allowing the Company to prolong its operations for two further months. (C IX, paras 97 *et seq.*)

764. In regard to Respondents' allegation Claimant asks whether it makes sense to attribute to Claimant a conduct whereby two months after putting USD 8,250,000 in the Company Claimant would cause itself to loose this amount by calling back an amount of USD 1 million? (C IX, para. 100)

765. Contrary to the Respondents' allegation, the Company did not collapse merely due to an amount of USD 511,000 missing from its cash-flow, but from amounts ranging from USD 5,750,000 to USD 10,750,000 as can be derived from the Company's list of debts. (C IX, paras 101 *et seq.*)

766. The Company's desperate condition and urgent need of larger funds is also apparent from real time correspondence in this respect. (C IX, para. 104)

767. This is further apparent from its 2001 Budget from which it appears that the amount of extra funds which the Company required to ensure its future operations ranged between USD 5,750,000 to USD 10,750,000. Hence, the Respondent No. 1's attempt to argue that only USD 511,000 were missing from the Company in order to ensure its continued operations is baseless. (C IX, paras 105 *et seq.*)

768. Moreover, seeing that the Company had no prospects, due to the Respondents' stubbornness in not fulfilling their obligations under the PA, Claimant called back a small part of its loans. (C IX, para. 107)

769. In fact, if indeed only USD 511,000 was required in order to ensure the Company's continued operations, then the Respondents' liability for the collapse of the Company becomes even clearer. (C IX, paras 109 *et seq.*) This is even more so, if one compares the missing amount to the USD 3,387,235 which the Respondents owed by then to the Company due to training of pilots and which they refused to pay to the Company even after having been notified several times prior to the Company's collapse. (C IX, paras 111 *et seq.*)

770. Finally, the Respondents' bad faith is best illustrated by the fact that Respondent No. 1 refused to put even one dollar into the Company notwithstanding the clear misrepresentations which were made, but injected an amount of BGN 10,000,000 into the newly formed Bulgarian Air. (C IX, para. 113)

771. With regard to the Management Agreement between the Company and Balkan Holdings B.V , Claimant submits, it was, contrary to the Respondents' allegation not a "secret", but openly and fully disclosed in the books. (C IX, para. 117) Thereby, it was also disclosed to the minority shareholders of the Company, which under

Bulgarian Law is not even required. (C IX, para. 118) Respondent No. 1 further misleads the Tribunal by describing the terms of the management agreement as providing for payment of management fees of 3% of Balkan's turnover which was USD 200 million. However, as appears from Article 6 of the management agreement, it only applied to the Company's turnover of activities outside of Bulgaria. (C IX, para. 119) Finally, the debt on account of this management agreement accrued in Balkan's balance sheet, had no real effect on any of its operations, since it was a debt owed to the owner of the Company. Indeed, other than an amount of USD 250,000, even Respondent No. 1 does not claim that any payment was made under the management agreement. (C IX, para. 120) In any case, the PA did not forbid the management agreement. (C IX, para. 121)

772. With regard to another management agreement between ZBI and the Company, Claimant submits, the attempt to transfer the real-estate was designed to help raise further funds desperately required to rescue the Company. However, Claimant wanted the real-estate to continue to serve as a profit center of the Company. To this end the management agreement was signed. (C IX, para. 122)

773. In respect to the various consultancy agreements Claimant notes, these are devoid of any merit. (C IX, para. 123) Contrary to the Respondents' allegation, they were not secretive at all as becomes apparent from an internal document, which Respondent No. 1 itself presented. (C IX, para. 124) The accusation that the consultancy agreements were used by Claimant to "siphon" monies out of the Company is absurd. The PwC Experts themselves confirm that

> "it appears that the individuals named above all had management roles in Balkan... the contract with BDO may, therefore, have been one of the means by which the above individuals were remunerated by Balkan" (section 5.27 of the PwC Second Expert Opinion) and that "the payments made to BDO were then paid to the management of Balkan appointed by Zeevi, rather than to Zeevi itself"

774. PwC also confirmed that Mr.Gray and Mr. Frank were CEO's of the Company; that Mr. Mar-Chaim was Balkan's CFO; and that Mr. Shenhav was senior vice president of the Company. Mr. Harlev's acted as Special Executive Advisor to the Board of Directors of Balkan Bulgarian Airlines. Hence, all of the said individuals provided services to Balkan and were entitled to be remunerated for this. (C IX, para. 125)

775. The reason why the payments to the non-Bulgarian management of the Company were effected through such type of consultancy

agreements is a consequence of tax advice which the Company received, according to which payment of salaries through BDO, which is a non-Bulgarian entity, allowed to significantly reduce the tax due for compensating the managers for the work they performed for Balkan. (C IX, para. 126) Needless to say, that it was in Claimant's interests, in as much as it was in the Company's interest, to see that expenses of the Company are reduced as much as possible. The claim that Claimant used the consultancy agreements to "siphon" monies out of the Company is, therefore, absurd.

776. The reason why the management received money out of two contracts was because according to the Bulgarian contracts, the said individuals received amounts of BGN 1,000 (approx. USD 500). With salaries that low, the Company could not have attracted any western style management. (C IX, para. 127)

777. With regard to the consultancy agreement with SGTS, Claimant notes, it is unclear why this is an issue in this case, since this agreement has nothing to do with any of the claims. Furthermore, SGTS is a Bulgarian company, which is not affiliated to Claimant or the Company in any way. (C IX, para. 128)

778. With regard to the Respondents' claims concerning Knafaim-Arkia, Claimant contends, Knafaim-Arkia stopped its active involvement in Balkan due to the various problems the Buyers encountered after purchasing the Company, which made it difficult for it to comply with the reporting requirements applying to it as a publicly traded company. (C IX, para. 129) Furthermore, the PA did not prohibit Knafaim-Arkia's disengagement from active involvement in the Company. (C IX, para. 130) The provisions, Respondent No. 1 alleges Knafaim-Arkia breached by withdrawing from its engagement in the Company are of no relevance to the Claimant, since it remained fully active in the Company and is not responsible for alleged breaches of Knafaim-Arkia. (C IX, para. 131)

779. Claimant contends that the Respondents' claims that there were other bidders for the Company are false. Quite to the opposite, the Respondents could not sell the Company to anyone else and were therefore eager to get Claimant to sign the PA. (C IX, paras 132 *et seq.*)

780. Contrary to the Respondents' contentions, Claimant submits, the Zeevi Logistics Draft Prospectus did not state there was nothing wrong with the representations given by the government concerning the Company. In fact, this was exactly the reason for this never o materialize into a final prospectus. (C IX, para. 135)

## 3. The Tribunal

781. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | |
|---|---|
| R VI B | paras 191 *et seq.*, 196, 199 *et seq.* |
| C VIII | paras 133, 135 *et seq.*, 139 *seq.* |
| C IX | paras 64 *seq.*, 67, 69 *et seq.*, 75-81, 83, 85, 87 *et seq.*, 95 *et seq.* 100 *seq.*, 104 *seq.*, 107, 109 *et seq.*, 113, 117 *et seq.*, 125 *et seq.*, 135 |

782. Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

783. On one hand, there can be no doubt that the contractual Parties had to fulfil their contractual obligations in good faith. But, on the other hand, a contract as detailed as the PA was with its many further documents to which it referred and which it included as binding, must be interpreted as dealing by these many express provisions with all obligations which the Parties considered as being of primary importance. A high hurdle is thereby established before one can derive additional obligations from the duty of good faith though they have not been expressly mentioned in the many contractual documents.

784. Further, it was the purpose and the effect of the PA that Claimant would now be in charge of the Company and its management. This provided a wide discretion to Claimant how run the company in so far as the PA did not limit that authority.

785. It may well be that, in hindsight, a number of actions taken by Claimant in running the Company may be questioned. But, in order to be considered as a breach of the PA due to lack of good faith, Respondents would have to show that any of the actions they claim to be against good faith could not be explained by a reasonable business judgement at the time.

786. In considering the various actions submitted by respondents in this context, the Tribunal – without having to go in details of these actions – concludes that Respondents have not been able to provide the necessary proof. Claimant's explanations given regarding the various actions may not always be considered wise in hindsight, but are sufficient to show that no bad faith must have been involved.

787. Therefore, the Tribunal concludes that it cannot find a breach of good faith by Claimant.

# H.VI. Balkan Airlines collapsed in 2001 as a result of Zeevi's mismanagement of the Airline

## 1. Summary of Contentions by Respondent No. 1

788. Respondent No. 1 contends, Claimant's own consultants, Speedwing, concluded in November 1999, on the basis of their exhaustive review of the airline's business that Balkan Airlines could break even on an operational level within a year or two, provided appropriate investments were made. (R VI B, para. 204) Fleet renewal and improved services were the centrepiece of Speedwing's investment recommendations. (R VI B, para. 205) Beyond fleet renewal, Speedwing's other recommendations, such as reorganizing route structure and improving the technical department, also required substantial financial investment. (R VI B, para. 206) On the basis of these requirements, Speedwing concluded that the airline had realistic prospects of generating operating profits by 2004 in the amount of USD 55.6 million (R VI B, para. 208). Hence, Claimant's allegation, that Balkan Airlines *"lacked, from the outset, any prospects of recovery"* is false. (R VI B, para. 208). Notwithstanding the cautious optimism of Speedwing at the end of 1999, Balkan Airlines' financial position deteriorated dramatically under Claimant's management in 2000 compared to the years 1998 and 1999 (R VI B, paras 209 *et seq.*).

789. This deterioration was, according to PwC's Second Expert Report, due to a significant increase in Balkan Airlines' expenses, a significant proportion of which comprised expenses for hired services; the disappearance of many of Balkan Airlines' principal assets; the significant increase in Balkan Airlines' debt and the halving of Balkan Airlines' cash holdings. (R VI B, para. 212)

790. Respondent No. 1 alleges that deterioration of Balkan Airlines' financial condition closely reflected Claimant's violations of the PA. (R VI B, para. 214)

> *„The debilitating increase in Balkan Airlines' debt followed from Zeevi's decision to "invest" in the airline by way of exorbitantly priced short-term loans notwithstanding the terms and purpose of Article 8. The disappearance of Balkan Airlines' principal assets followed from Zeevi's decision to strip Balkan Airlines of its most valuable assets for its own benefit, notwithstanding the*

*terms of Article 7.9.1. And the sharp increase in Balkan Airlines' foreign expenses, as well as the sudden decline in its cash holdings, followed inexorably from the various cash-diverting schemes contrived by Zeevi during its period of mismanagement in violation of its duty to perform its contractual undertakings under the Privatization Agreement in good faith." (R VI B, para. 215)*

791. With reference to the loans, PwC concluded, that is:

*"was clearly not the most beneficial method to Balkan [Airlines'] financial condition and its future development prospects"* (R VI B, para. 216)

792. PwC's conclusion of the impact of the totality of these various actions by Claimant is that they:

*"had the effect of seriously weakening Balkan [Airlines'] financial position, and its ability to continue to operate in the future at the levels seen in 2000, let alone develop its business". (R VI B, para. 218)*

793. By recalculating the liquidity ratios with the assumption that Claimant had honored its investment obligations under the PA, PwC demonstrated that Balkan Airlines' liquidity would have been significantly healthier. (R VI B, para. 221)

794. Notwithstanding the deteriorating condition in which Balkan Airlines found itself after a year of Claimant's management, the onset of bankruptcy was still far from inevitable in February 2001. This fact is starkly revealed by comparing the amount of USD 511,000 of liabilities for current insurance, which led Bulstrad to commence bankruptcy proceedings against Balkan Airlines, with the approximately USD 1.75 million that Claimant itself siphoned from Balkan Airlines in the days before and after it abandoned the airline on 13 February 2001. (R VI B, para. 222) Bulstrad has over the years proven its willingness to reschedule Balkan Airlines' debts. However, the position of a creditor facing a debtor airline that has decided to halt operations, with no indication that they will be recommenced, is easy to understand. (R VI B, para. 225)

## 2.     Summary of contentions by Claimant

795. With regard to Respondent No. 1's claim for damages due to the loss of its NC, Claimant submits, the claim should be dismissed, since the Company's collapse does not constitute a breach of the PA by the Claimant. Furthermore, had Claimant not purchased it, Balkan

Airlines would have gone bankrupt as early as 30 June 1999. Furthermore, Article 7.4 specifically stipulates that such an event would not constitute a breach of the PA. (C VIII, para. 142)

796. Moreover, apart from a claim for harm to "economic morale" being rather remote, the collapse of Balkan Airlines was a direct result of the Republic's misrepresentations and breaches of the PA. (C VIII, paras. 143 *et seq.*)

797. Claimant, on the other hand exceeded its obligations under the PA. (C VIII, para. 146)

798. Furthermore, Respondent No.1's allegation of "damage" resulting from the "loss" of its NC is a total fiction, which directly contradicts its other claims in this arbitration. In order to claim that it had allegedly no motive to deceive the Claimant into entering into the PA Respondent No.1 argued that its position whether the Company would be privatized or not was allegedly "neutral" since had the Company not been privatized in June 1999 it would have "simply" gone into bankruptcy and Respondent No.1 would have appointed another NC in its place. (C VIII, para. 148)

799. With regard to damages claimed by Respondent No. 1 in respect for alleged "non-performance" of Claimant's obligations during the years 2001-2004, Claimant submits, these claims are baseless. This is because, once the Company entered into bankruptcy proceedings, Claimant was no longer obligated to provide bank guarantees, ensure that the Company would continue to invest USD 20 million, report on such hypothetical investments, or any other obligation due after the Company was no longer active or under Claimant's control. (C VIII, paras 151 *et seq.*)

800. Claimant refers to Article 20 of the OCA stating, Respondent No.1's conclusion would certainly contravene any acceptable principles of logical and good faith interpretation of an agreement in view of its overall context. (C VII, para. 153)

801. Furthermore, Claimant contends, a Company which is in bankruptcy proceedings cannot invest "for the commercial development of the Company with a view to increasing the range of services and profitability of the Company in the medium and long term" (see Article 8.2 of the PA). (C VIII, para. 155)

802. Furthermore, once the Company entered bankruptcy proceedings Claimant lost its ability "as a majority shareholder" to "cause" it to do anything (see Article 8.2.1 of the PA) since the Trustees in bankruptcy gained control over the Company. (C VIII, para. 156)

803.  Same is also true with respect to the claim that the Claimant should have carried on transferring USD 2,400,000 a year into the Company. (C VIII, para. 158)

804.  The fact that Respondent No.1 has found it necessary to artificially claim that the obligations to transfer amounts under Article 7 and cause for investments under Article 8, continue to exist even once the Company is no longer operative, only shows its lack of good faith. (C VIII, para. 159)

## 3.    The Tribunal

805.  In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | |
|---|---|
| R VI B | paras 209 *et seq.*, 212, 214, 216, 218, 221 *seq.* |
| C VIII | paras 142 *et seq.*, 146, 148, 151 *et seq.*, 155 *seq.*, 158 *seq.* |

806.  Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

807.  It is undisputed that the Company was threatened to go bankrupt at the time the PA was concluded. The optimistic potential identified in the Speedwing Report did not change that situation, but was based on assumptions which later did not realize. Similarly to the above considerations regarding good faith, on one hand, there can be no doubt that it was the common purpose of both parties to the PA to avoid the threatening bankruptcy of the Company and make the Company profitable again by its privatisation. But again, on the other hand, a contract as detailed as the PA was with its many further documents to which it referred and which it included as binding, must be interpreted as dealing by these many express provisions with all obligations which the parties considered as being of primary importance.

808.  It is clear and undisputed that the PA does not contain a clause by which Claimant gives any kind of guarantee that the Company may not fail or become insolvent. Such a guarantee would have been of such a primary importance that it can also not be interpreted "into" the contract. Article 7.4. rather indicates that a liquidation was not excluded. Thus it is clear that the Parties did not and did not intend to put the Claimant under such an obligation.

809. Further, also in the present context it must be noted that it was the purpose and the effect of the PA that Claimant would now be in charge of the Company and its management and that this provided a wide discretion to Claimant how run the company in so far as the PA did not limit that authority.

810. It may well be that, in hindsight, a number of actions taken by Claimant in running the Company may be questioned. But, in order to be considered as a breach of the PA, Respondents would have to show that any of Claimant's actions they claim to be the cause of the later insolvency could not be explained by a reasonable business judgement at the time.

811. In considering the various actions submitted by Respondents in this context, the Tribunal – without having to go in details of these actions – concludes that Respondents have not been able to provide the necessary proof. Claimant's explanations given regarding the various actions may not always be considered wise in hindsight, but are sufficient to show that no bad faith must have been involved.

812. Further, as the Tribunal has found above, there were a number of large outstanding liabilities of the Company which the seller would have had to disclose and did not disclose. These liabilities were an obvious heavy burden – unexpected by Claimant – which the Company had to carry forward all the way to the time of the eventual insolvency of the Company.

813. Respondents would have had the burden of proof that, even with the undisclosed outstanding liabilities, the Company's insolvency was caused by breaches of the PA by Claimant. In the view of the Tribunal, neither by the PwC Reports nor by any other means have they been able to provide such proof.

814. Therefore, the Tribunal concludes that this claim by Respondents fails.

## H.VII.     Deduction and Extinguishing Factors

### 1.     Summary of Contentions by Respondent No. 1

#### a.     *Set-off against counterclaim*

815. Respondent No. 1 requests the Tribunal to declare that any compensation Claimant may be entitled to receive is subject to set-off against the Respondent's counterclaims for liquidated damages

and further damages pursuant to Article 103 and 104(1) of the Bulgarian Law on Contracts and Obligations (R II B, paras 297 *et seq.*). For this purpose it is noted that Respondent's submission constitutes the respective notice of set-off.

816.  Respondent No. 1 submits, since the Tribunal admitted the counterclaims in its PO. No. 11, which are quantified at a total amount of USD 56,510,712 including interest should be set-off against any claims of the Claimant. (R VII B, paras 204 *et seq.*)

817.  In response to the alleged preconditions for the admission of the counterclaims Respondent No. 1 submits the following:

818.  Contrary to Claimant's allegation, these counterclaims are admissible. In this regard, Respondent No. 1 refers to Article 90 of the OCA, which according to Claimant, releases Claimant from its obligations under the PA so long as Respondent No.1 does not perform its obligations, stating that this Article is not applicable in the present proceedings, since Claimant did not seek to avoid the PA by 13 February 2001. Furthermore, Claimant has until now argued that it has fulfilled its obligations and not that it was not obliged to fulfill them. (R VII B, paras 211 *et seq.*)

819.  Moreover, contrary to Claimant's allegation, Article 8.5 of the PA is no obstacle to the Respondent No.1's counterclaims. In this regard, Respondent No. 1 contends, that Article 8.5 provides the parties in effect with no more than an opportunity to resolve any investment dispute by agreement. In any event, Article 8.5 envisages differences about the nature and amount of investment realized. The dispute here is first and foremost about the very existence of an investment obligation on Claimant's part. (R VII B, paras 216 *et seq.*)

820.  Furthermore, contrary to Claimant's allegations and in accordance with Article 103 of the OCA, Respondent No. 1 submits, the counterclaims were executable and liquid. (R VII B, paras 119 *et seq.*) This is so, because they arise directly from liquidated damage provisions of the PA, which also directly and unambiguously determine their amount. Respondent No.1's counterclaims became executable and liquid within 14 days following their notification to Claimant, in accordance with Article 10.3 of the PA. (R VII B, para. 123)

821.  Claimant's allegations in this regard indicate its recognition of the merit of the counterclaims. (R VII B, para. 124)

*(1)*     ***Claimant Breached Article 7 of the PA***

822. Respondent No. 1 contends, that Claimant failed to fulfill its obligations to service debts of up to USD 30 million, which was to be done by setting up an escrow account of USD 6 million and by paying USD 2.4 million annually, due to the fact that the amounts injected in Balkan Airlines were in the form of punitive short-term loans, which were used to operate Balkan Airlines. Furthermore, Claimant failed to secure its debt-servicing obligations by providing letters of credit in the form set out in Article 7.1.2 of the PA. (R VII B, paras 225 *et seq*.)

823. Regarding Claimant's argument that it reduced the pre-existing obligations of the Company by USD 49 million, Respondent No. 1 contends, there are two flaws in this submission:

824. First, Claimant's new interpretation of Articles 7.1.1 and 7.1.2 confuses Claimant's obligation to fund Balkan Airlines with Balkan Airlines' ability to repay debts out of its own turnover. Thus the USD 49 million used from Balkan's revenues to repay debts do not release Claimant from its obligation to additionally repay Balkan's debts from its own (Claimant's) funds. (R VII B, para. 231)

825. Secondly, by replacing old debts, with expensive new ones, undermines the purpose of the debt-servicing obligation of Article 7.1. (R VII B, para. 233)

826. Contrary to Claimant's allegation, Respondent No. 1 submits, Claimant did not transfer USD 14,750,00 over and above its obligation pursuant to Article 7.1, since the Letter of Credit that forms the subject matter of the loan agreement dated 5 December 1999 did not result in any money finding its way into Balkan Airlines. Hence, Claimant cannot have injected more than USD 12,350,000 in excess of its obligations. (R VII B, para. 234)

### (2) *Claimant breached Article 8 of the PA*

827. Furthermore, Respondent No. 1 contends, Claimant ignored its separate funding obligation pursuant to Article 8 of the PA according to which it was to invest additional USD 20 million annually, it failed to provide guarantees securing its performance of the investment obligation, provide to the Privatization Agency an initial investment plan as well as any of the investment reports that it was required to establish and submit thereafter. (R VII B, paras 236 *et seq*.)

828. Contrary to Claimant's argumentation in this regard, Respondent No. 1 contends its interpretation of the investment obligation pursuant Article 8 has been consistent throughout these proceedings,

in contrast to Claimant's interpretation in this regard. (R VII B, para. 240) A cursory review of the documentary record shows that there is nothing novel about Respondent No.1's and the Privatization Agency's interpretation of Article 8. (R VII B, paras 242 *et seq.*)

829. In contrast to the Respondents' interpretation, Claimant has changed its interpretation since the Respondent No.1 filed its Defense and Counterclaim. Until then, Claimant interpreted this Article the same way the Respondents did. After that, Claimant began to refuse its funding obligation pursuant to this Article. (R VII B, para. 244) According to Claimant's newly adopted interpretation of Article 8, Claimant had no more than an obligation to manage Balkan Airlines in a way that would make it attractive to external financiers, which ignores the purpose of the privatization. It is absurd to contend that an airline that was privatized because it was insolvent and in desperate need of external investment assumed an obligation to invest USD 100 million in itself pursuant to an agreement to which it was not even a party. (R VII B, para. 247)

830. But even if one were to adopt Claimant's thesis that it had an obligation to see to it that Balkan Airlines would invest in itself, rather than Claimant make these investments, this obligation has not been discharged. (R VII B, para. 248)

831. Additionally, contrary to Claimant's allegation that it fulfilled its funding obligations pursuant to Article 8 of the PA, Respondent No. 1 contends, the alleged investments in aircraft, but one, did not constitute investments pursuant to the terms of Article 8.4. In this regard, Respondent No. 1 contends there is a fundamental difference between a "financing" lease and an "operating" lease: the former contains an option, and typically the expectation, of eventual purchase of the aircraft and the lease payments therefore incorporate some element of a purchase price; the latter is structured as no more than a short-term rental with no option to buy. It is for this reason that only financing leases are considered, and accounted for, as "investments" by airlines around the world. Article 8.4 is consistent with this practice. Hence, the only amounts that could be considered as genuine investments are the lease payments actually made under the one ATR-42 financing lease. (R VII B, paras 249 *et seq.*)

### (3)    Claimant breached Article 7.9.1 of the PA

832. Respondent No. 1 contends Claimant breached Article 7.9.1 by using the proceeds from the December 1999 sale of Equant Shares to cover operating expenses, by secretly misappropriating the rest of the Equant Shares in May 2000, and by selling the main real estate of Balkan Airlines in January-February 2001 for its own benefit,

·· instead of primarily repaying the Company's debt to the Bulgarian state with the proceeds of these transfers. (R VII B, para. 256)

833. Contrary to Claimant's argumentation in this regard, that it used these assets solely for the "general benefit" of Balkan Airlines, Respondent No. 1 contends, it is irrelevant under the plain terms of Article 7.9.1. Claimant's contention is false in that it in fact did not use the proceeds from these transfers for the benefit of the Company, since it misappropriated Balkan Airlines' SITA depository certificates and real property for no value. (R VII B, paras 259 *et seq.*)

### (4)  *Claimant breached its Duty of Good Faith*

834. Respondent No. 1 further alleges, Claimant breached its good faith duty under Article 63(1) of the OCA by exacerbating Balkan Airlines' liquidity crisis by causing it to enter into numerous, overlapping "consultancy" and "management" agreements; by using Balkan Airlines' revenues for Claimant's own purposes; and by selling off a significant part of Balkan Airlines' air fleet, and pocketing much of the proceeds. (R VII B, para. 263)

835. Respondent No. 1 submits, Claimant's defence in this regard, in which it pointed out that the PA did not forbid any of these agreements, misses the point, since the duty of good faith prevents Claimant from using the silence of the PA to justify its own turpitude. (R VII B, para. 264)

836. In addition to the numerous consultancy and management agreements that have been uncovered, Respondent No. 1 alleges, it discovered yet another agreement with a Bulgarian company called Interbalkan management and consulting AD, whose services remain unclear. (R VII B, paras 267 *et seq.*)

### b.  *Unjust enrichment*

837. Respondent No. 1 further requests that any compensation Claimant might be entitled to is reduced by "*an amount equivalent to the market value of the real estate and Equant Shares appropriated by Zeevi*" (R II B, para. 306). Respondent No. 1 relies on the notion of unjust enrichment on Claimant's side in case the latter would be entitled to recover damages already compensated by appropriation of Balkan Airlines' real estate and the proceeds of the sale of the airline's shares in Equant (R II B, paras 303 *et seq.*). These assets had been transferred to Claimant involving its subsidiaries in settlement of or as security for loans given to Balkan Airlines. By

retaining these assets Claimant thereby already obtained compensation for loss of its alleged investments in the airline (see also R I, para. 5.1.6.). Moreover, the value of real estate and Equant Shares transferred to the creditor exceeded the loans extended to the Airline (R I, para. 5.1.21.). Furthermore, the alleged damages arising out of the "loss of investments" have already been claimed by the airline's nominal creditor, i.e. Balkan Holdings, before the Sofia City Court. Additional submission of these claims in the present arbitration violates the principle of *non bis in idem* and should therefore be rejected (R I, para. 5.1.7.).

838.    Without the reduction Claimant would thus recover twice for this alleged damages. Such double recovery, however, is prohibited by Bulgarian law as in Article 59 of the OCA.

c.      *Contributory negligence and failure to mitigate damages*

839.    A further reduction of any compensation Claimant might be entitled to be requested by reference to Claimant's alleged contributory negligence and its failure to mitigate damages as recognized in Article 83 of the OCA (R II B, paras 308 *et seq*.).

840.    Claimant has failed to conduct any due diligence of its own on the airline's assets and liabilities prior to the purchase but relied on the KPMG reports provided and thereby

> *"failed to acquit itself with the diligence required of a reasonable and responsible purchaser"* (R II B, para. 310).

In particular, this failure regards the nature of the Equant Shares, the reduced landing and other fees, the payments due to the airline's employees and the existence and extent of the ATC loan. Additionally, Claimant failed to take the available measures to mitigate damages in regard to the aircraft maintenance liabilities and the debt for pilot training.

d.      *Amounts received by Claimant through "consultancy agreements"*

841.    Furthermore, Respondent No. 1 requests that any possible compensation due to Claimant is reduced by the amounts Claimant received through the so called consultancy agreements concluded between Claimant's subsidiaries Balkan Holdings and ZBI and the Airline. The purpose of these agreements was to recover cash from the Airline prior to its collapse (R II B, paras 313 *et seq*.).

## 2.      Contentions of Respondent No. 2

842.   Respondent No. 2 contends that a significant part of the claims submitted by the Claimant were already submitted by its subsidiary companies in the insolvency procedures against Balkan Airlines AD. Therefore the submission of such claims in this arbitration is demonstration of bad faith and disregard of the principle *non bis in idem*.

843.   Should the Tribunal decide to award to the Claimant the relief sought, this will have as effect the unjust enrichment of the Claimant, which is prohibited by Articles 55 – 59 of the OCA as the claims submitted do not represent the legal beneficial interest of the Claimant but of other entities and thus the Claimant would be entitled to receive compensation that belongs to persons different from the Claimant. (R III PA, paras 212 *et seq.*)

## 3.      Summary of Contentions by Claimant

844.   Claimant contends that the Respondents' request for deduction of any amount from the damages Claimant is entitled to is to be rejected as unjust (C II, paras 47 *et seq.*). It is explained that Claimant does not seek to recover any amount twice. Insofar as loans are returned, claims in bankruptcy proceedings succeed and Claimant has a good title to the airline's real estate, the amount of claim for lost investments is reduced respectively (C II, paras 53, 58, 66). On the other hand, Claimant will waive any right to the real estate insofar as its claim for lost investments succeeds (C II, para. 66).

### a.      *Investments by way of secured loans*

845.   The fact that investments in the airline made by Claimant by way of irrecoverable loans as opposed to investments by equity is deemed irrelevant. Claimant emphasizes that loans extended under repayment terms not less then 12 months are considered "investments" by Bulgarian law (Article 12(1) item 6 of the Bulgarian Foreign Investments Act). The respective provision in the treaty between Bulgaria and Israel (see C-79A) even does not require the 12 month term. C II, para. 48 *et seq.*

### b.      *Claim in bankruptcy proceedings*

846.   The fact that the investments had been claimed back in the Airline's bankruptcy proceedings does not bar the Claimant from claiming

these investments in the present arbitration. Claimant has the right to seek recovery from different entities in different actions. Moreover, the bankruptcy court has denied Claimant's rights to claim back the investments which evidences that the investments have been lost and may therefore be claimed in this arbitration.

### c.    Transfer of the airline's assets

847.    Regarding the alleged appropriation of the Airline's assets as consideration for the investments Claimant notes that it had to inject further funds in the airline in order to keep it operating and thereby mitigate damages. Claimant acknowledges that these funds were put in by way of loans secured by a pledge over the Airline's Equant Shares. These shares were finally sold. Although

> "*significantly less than the amounts loaned against,*"

the proceeds of this transactions

> "*should be deducted from the Claimant's claim*" (C II, para. 65).

848.    Claimant points out that its attempt to acquire the Airline's real estate has failed and is therefore irrelevant for this arbitration. Trustees in the Airline's bankruptcy proceedings contested the transfers' validity and initiated court proceedings. While two claims are still pending, the claim against transfer of the Airline's office building has already been granted (C II, para. 66; see C-80). Claimant emphasizes that transfer of the airline's real estate was only meant to raise additional funds.

### d.    Mitigation of damages

849.    Claimant points out that indeed it struggled to mitigate damages by further investing into Balkan Airlines in order to

> "*save it from immediate collapse*" (C I, para. 22)

even though Claimant

> "*would be able to demand compensation for all monetary losses resulting from the collapse*" (C I, para. 22).

### e.    Claimant's motives

850.    Claimant further stresses that it did indeed attempt to mitigate losses. In fact, Claimant invested further funds in the Airline in order to

avoid its collapse and thus loss of the entire investment. This conduct of business is contrary to the Respondents' allegation (see R I, para. 5.1.21.) that Claimant did not aim at the Airline's recovery but strived to dispense of its remaining assets before liquidating it (C II, paras 67 *et seq.*).

### f.    Contributory Negligence

851.    The Respondents argue for contributory negligence on part of the Claimant in entering into the transaction. Having deceived the Claimant into entering the transaction based on their misrepresentations, the Respondents now blame the Claimant for being negligent because it relied on them.

852.    In the event, the Respondents' analyses are also legally flawed. Article 83 of the OCA, to which the Respondent No.1 is not applicable to this case. (C III, paras 324 *et seq.*)

## 4.    The Tribunal

853.    In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | |
|---|---|
| R I | paras 5.1.6. *seq.*; 5.1.21. |
| R II B | paras 297 *et seq.*, 303 *et seq.*, 306, 308 *et seq.*, 313 |
| R VII B | paras 119 *et seq.*, 123 *seq.*, 204 *seq.*, 211 *seq.*, 216 *et seq.*, 225 *et seq.*, 231 *et seq.*, 236 *seq.*, 242 *et seq.*, 247 *et seq.*, 256, 259, 263 *seq.*, 267 *seq.* |
| R III PA | para. 212 |
| C I | para. 22 |
| C II | paras 47 *et seq.*, 53, 58, 65 *et seq.* |
| C III | paras 324 *et seq.* |

**Exhibits:**

| | |
|---|---|
| C-79A | Investment Treaty between the Republic of Bulgaria and Israel |
| C-35 | PA |

854.    Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

855.    Regarding the possibility of set-off, the Tribunal recalls from its PO Nos 11, 12 and 13 that, for the reasons mentioned there, it has jurisdiction over the counterclaims and, in so far as counterclaims of Respondent No. 1 are found to be justified, they can lead to set-off against any claims of Claimant found to be justified.

856.    Article 8.5. PA provides no obstacle in this regard because the committee mentioned in that provision is for a different purpose and its last sentence makes it clear that any disagreement would anyhow have to be settled by arbitration.

857.    Neither does the Tribunal see any obstacles to set-off coming from the relevant provisions of Bulgarian law, particularly Article 103 OCA.

858.    Further above in this Award, the Tribunal has already dealt with the counterclaims raised for alleged breaches by Claimant of Article 7, 8, 7.9.1. PA and the duty of good faith.

859.    In addition to these counterclaims examined by the Tribunal further above in this Award, in the present context Respondents raise a counterclaim for unjust enrichment for the market value of real estate and Equant Shares appropriated by Claimant by which any claims of Claimant found to be justified would have to be reduced. In this context, it has to be examined whether the express provision for liquidated damages in Article 10.13. PA as amended excludes such an additional claim for unjust enrichment. In this respect, the Tribunal concludes that there is no exclusive effect of Article 10.13., because it only facilitates proof of any damages in case of lack of notification or if the proceeds are not used for the Company's debts or the investment program. If, however, it is shown that the Buyer has appropriated the proceeds for its own benefit, it would be illogical to interpret Article 10.13. in a way that the Buyer would still only have to pay 10% and be allowed to keep the remainder of the proceeds which it appropriated in breach of the PA.

860.    Therefore, a counterclaim for unjust enrichment can still be raised in this regard.

861.    After having considered the liability of the Parties for the claims and counterclaims raised, the Tribunal will now have to examine how far causation of damages and the quantum of such damages has been established.

# I. Causation of Damages and Quantum for accepted Claims

## I.I. NCS

### 1. Summary of contention by Claimant

862. Claimant contends, it is impossible to "put a price tag" on value of the misrepresentations and breaches concerning the Company's NCS, since had influence on every aspect of the Company's operations. Furthermore, Claimant notes, it is undisputed that Claimant purchased Balkan Airlines for the sole reason of its NCS. (C VII, paras 12 *et seq.*) Without a governmental undertaking to preserve the Company's NCS, the value of the Company significantly decreased, especially in view of the fact that several countries already cancelled Balkan Airlines' status. (C VII, para. 14)

863. Furthermore, Claimant submits this situation had severe consequences on Claimant's ability to raise monies for the Company from third party investors and affected the planned public offering. (C VII, para. 15)

864. This effect was also reflected in the Company's damaged reputation resulting thereof. (C VII, para. 16)

865. The loss of several routes also negatively affected the Company's income. The average profit, Balkan Airlines would have made if it had kept the lines would have been about USD 2,316,666 per line. (C VII, para. 17)

866. Furthermore, the loss NCS on the non-operated lines led to serious doubts which were cast by third parties as to Balkan's NCS the counter measures of which led to substantial additional expenses. (C VII, para. 20)

867. On a conservative basis, the direct value of the breaches and misrepresentations concerning the NCS has been set at USD 15,000,000. (C VII, para. 23; C X, paras 39-41)

### 2. Summary of Contentions by Respondent No. 1

868. Regarding the alleged breach concerning Balkan's NCS, Respondent contends, Claimant bases allegation on Article 3.9.2 of the PA, pursuant to which it formulated two separate claims: One for

USD 15 million (the „direct value") and one for the return of its
entire USD 23.15 million "investment" in Balkan Airlines.

869.    Regarding the „direct value" of the NCS, Respondent No. 1 submits,
        it was never in breach of Article 3.9.2 and those destinations that
        were cancelled were cancelled by Claimant itself or had no effect on
        it. (R VII B, para. 55) Respondent No.1 maintained Balkan Airlines'
        NCS at all relevant times. The destinations, which were lost (Syria,
        Lebanon and Iran), were only marginal. Furthermore, evidence now
        emerged, proving that flights to Iran were cancelled by Claimant
        itself due to economic reasons, belying Mr. Golan's testimony in this
        regard. (R VII B, para. 56) As to Syria and Lebanon Respondent
        No. 1 contends, Claimant's letter dated April 2000 indicates his
        belief that Syria's and Lebanon's refusals to recognize Balkan
        Airlines as the Bulgarian NC were to be, at all events, temporary.
        And given the commercial non-viability of these destinations,
        Claimant had no objection to the appointment of a substitute air
        carrier. (R VII B, para. 59) Moreover, prior to completion of the
        privatization, Claimant had already evaluated the risk of Arab states
        refusing Balkan's NCS and that therefore upon completion of the
        PA, Balkan's shares were transferred to Claimant's Dutch
        subsidiary. (R VII B, para. 61)

870.    Respondent No. 1 alleges, Claimant has been unable to detail the
        value of the alleged damages caused from this, hence it is impossible
        to conclude that any damage was suffered at all. (R VII B, para. 62)
        It is for this reason that the quantum of damages sought by Claimant
        today, USD 15 million, is plucked from the air. (R VII B, para. 62)

871.    Furthermore, Claimant's calculation of the damage is odd. It alleges
        that the route to Beirut alone was worth USD 2.3 million. This is
        based on a simple division. It is said that in 1999 Speedwing
        predicted a total operating profit of USD 55.6 million, over the
        period to the end of 2004, and if that amount is divided by 24 (the
        total number of destinations served by Balkan Airlines in 1999) it
        yields USD 2.3 million per destination. (R VII B, para. 64). In
        addition, Respondent No. 1 points out, that in this calculation,
        destinations like London or Frankfurt were set at the same level as a
        destination operated by charter flights, like Beirut. Yet on
        Speedwing's prediction the Beirut route would have brought
        USD 36,376 in revenues (not profit), while London would have
        accumulated USD 1,227,632 -- or 34 times more; and Claimant
        should be awarded directly the income (not profit) that Balkan
        Airlines -- not Claimant -- might have derived over five years,
        parsing the fact that Claimant abandoned Balkan Airlines in early
        2001, almost four years before the expiry of the five-year period. (R
        VII B, para. 66)

### 3. Summary of Contentions by Respondent No. 2

872. Contrary to Claimant's allegation, the Respondents deprived it of its NCS, Respondent No. 2 contends, that the undertaking of the Respondents was to act itself in such manner as not to deprive the Company from its status as national air carrier meaning actions which were in Respondent's control only. The fact, that other states cancelled Balkan's NCS to their territory or their inquiries as to Balkan's new ownership are beyond the Respondents' control and not part of the PA. (R V PA, paras 70 *et seq.*)

873. Furthermore, Respondent No. 2 contends, it did not breach the undertaking regarding Balkan's status as NC by designating Hemus Air as NC to destinations Balkan ceased to fly to due to economic reasons. (R V PA, para. 73)

874. In addition, Claimant failed to provide certain parameters of the alleged damage resulting thereof. The amount of USD 15,000,000, which Claimant claims in this regard, is unsustained by any evidence. (R V PA, para. 74)

875. Furthermore, the amount of lost profit, Claimant attributes to the lost routs is unacceptable. The only regularly operated line that was lost, was Beirut. However the calculation as to the lost profit resulting thereof may not be defined on an average basis with regard to the total profit of all destinations. Besides, the Claimant fails to refer to the right figures in the Speedwing business strategy. The actual net profit in the Speedwing's calculations is in the amount of USD 14,980,000. Thus, if the inappropriate average ratio applied by the Claimant is to be used, the provisional lost profit of the loss of the line to Beirut will be diminished to USD 624,167. (R V PA, para. 75)

### 4. The Tribunal

876. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

Party Submissions:

| | |
|---|---|
| C VII | paras 12 *et seq.*, 20, 23 |
| C X | paras 39-41 |
| R VII B | paras 55 *seq.*, 59, 61 *seq.*; 64 |
| R V PA | paras 70-75 |

877. Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

878. Further above in this Award, the Tribunal has concluded that, indeed, Respondents are liable for the loss of the NCS with regard to Syria, Lebanon and Iran.

879. Regarding the question as to whether that breach of the PA caused any damage, the two claims raised by Claimant have to be examined separately.

880. The return of the entire investment of USD 23.15 million could only be demanded if it were shown that Claimant would not have concluded the PA had it known that the NCS for these three countries could not be maintained. The Tribunal is not persuaded in this regard. For those involved in the conclusion of the PA, it was obvious that an investment from Israel in the Company might create problems for the NCS in Arab or Islamic countries. In fact, in view of that consideration, Balkan's shares were transferred by Claimant to its Dutch subsidiary. The income from routes to these three countries were only a very small part of the proceeds of the Company. Further, the flights to Iran seem to have been cancelled also for economic reasons. Therefore, in the view of the Tribunal, Claimant has not been able to prove that it would not have concluded the PA, had it known that the NCS for these three countries could not be maintained.

881. Secondly, Claimant claims an amount of USD 15 million as the value of the lost NCS *"on a conservative basis"*. The Tribunal cannot find sufficient evidence for such a global amount of damage.

882. Even for the USD 2,316,666.00 subsidiarily claimed per line on the basis of the Speedwing Report, the Tribunal is not convinced by the calculation submitted. Because that calculation simply takes an average from all destinations served by the Company which does not take into account the rather obvious differences between destinations such as on one hand London and on the other hand the three destinations of which only Beirut was operated regularly.

883. Therefore, the Tribunal concludes that Claimant has not been able to prove any damage caused by the loss of the NCS.

## I.II.  The Equant Shares

### 1.  Summary of Contentions by Claimant

884.  Claimant calculates the direct value of Respondents' misrepresentations regarding the Equant Shares at USD 20,844,914. (C VII, para. 24) This amount is comprised as follows:

- **USD 8,630,174,** which is the value of the missing shares (C VII, para. 25);
- **USD 5,072,186,** which is the loss resulting due to inability to sell the first half of the shares (C VII, para. 26);
- **USD 7,048,316,** which is the loss resulting due to inability to sell the second half of the shares (C VII, para. 27);
- **USD 2,660,238,** which is the loss resulting due to Claimant's inability to sell the shares at their market value (C VII, para. 28)

### 2.  Summary of Contentions by Respondent No. 1

885.  As to Claimant's allegation regarding the misrepresentation of the number of Equant Shares the Company was entitled to and the restrictions applying to the sale of these shares, Respondent No. 1 contends, the disclosures in relation to the Equant Shares were adequate in the circumstances. (R VII B, paras 67 *et seq.*)

886.  In this regard, Respondent No 1 refers to Article 7.9.1 according to which, the sale proceed of the Equant Shares would have had to be used to repay debts to the Republic outstanding on privatization as a matter of priority. Hence, Claimant has yet to prove, it suffered a direct loss from these alleged misrepresentations. (R VII B, para. 70)

887.  Respondent No. 1 further contends, Claimant's calculation of the allegedly suffered damages is flawed. (R VII B, paras 71 *et seq.*)

888.  Regarding the alleged „missing shares" Respondent submits, these were not missing, but SITA implemented it Frequent Flyer adjustments during 1999. Therefore a number of the shares were restricted, until the adjustment finalized. (R VII B, para. 74)

889.  Additionally, Claimant's valuation of the shares is flawed. Apart from certain deductions due to service and other fees, the shares that were restricted could not be sold until July 2000. They must therefore be valued at the USD 44 market price of July 2000, rather than the USD 98 market price of 15 July 1999. (R VII B, para. 79) Hence, the maximum damage Claimant could have suffered from this is USD 3,022,825.08. (R VII B, para. 80)

890. As to Claimant's allegation regarding to the inability to sell the first half (51,757) of the Shares, Respondent No. 1 contends, this number bears no relation to reality.

891. At the time of the division, there were 263,220 "restricted" and 263,220 "unrestricted" shares. 117,992 shares had been sold in February 1999. Those shares could only come from the "unrestricted" portion, thereby reducing it from 263,220 to 145,228. In December 1999, Balkan Airlines sold 108,432 shares, which again must have come from the "unrestricted" portion, thus further reducing this from 145,228 to 36,796 shares. (R VII B, paras 81 *et seq.*) Including a deduction of sale fees, etc. Claimant's maximum damage suffered could not have been more than USD 2,812,686.24. (R VII B, para. 85)

892. With regard to Claimant's allegations as to its inability to sell the second half of the shares by July 2000, Respondent No. 1 contends, Claimant had already in May 2000 transferred all remaining shares in its possession to Balkan Holdings, two months prior to the alleged inability to do just that. (R VII B, para. 87) Moreover, the value of the transferred shares was USD 12,937,745.25, but Balkan Airlines received nothing in return for the transfer. (R VI B, para. 88)

893. Finally, in regard to Claimant's allegation as to its inability to sell the Shares at market price, Respondent No. 1 submits, this was due to the adjustments by the SITA Foundation and to the fees and expenses deducted from the original net amount. These deductions were foreseeable to any business man and also disclosed to Claimant in the Financial Analyses. Hence, Claimant's claim under this head must be rejected completely. (R VII B, para. 90)

894. To conclude, instead of a total of USD 23,410,914 the Equant Shares were only valued at USD 5,835,511.32. Moreover, the value of the SITA Certificates transferred to Balkan Holdings for no reason (USD 12,937,745.25), should be deducted from any alleged damage suffered by Claimant. (R VII B, para. 93)

## 3. Summary of Contentions by Respondent No. 2

895. Regarding Claimant's allegations with respect to the Equant Shares, Respondent No. 2 contends, the Respondents did not make any misrepresentations in this regard.

896. Furthermore, the value of the alleged misrepresentations is falsely calculated by Claimant.

897.    Given the provisions of the Stitching the SITA Foundation the number of conditional shares held by the Company was subject to adjustment with respect of the frequency of flights of the Company during the previous 4 years. Therefore, at the date when KPMG had prepared the analysis the available data was of the Equant Shares status as of December 1998. This is the reason the analysis to point exactly that this status was as of that date. The adjustment of the number of the conditional shares was explicitly envisaged to occur after the privatization. (R V PA, para. 78) Hence, the 88,069 shares allegedly missing, were only due to SITA's adjustments, which were disclosed to Claimant.

898.    Respondent No. 2 further alleges, it is misleading to claim the value of the "missing shares" and the value of the remaining portion of the first half of the shares as of the date of completion. Even if the Claimant had succeeded so, a sale could have been effected only in compliance as set by the SITA Foundation. As mentioned above half of the shares were subject to restriction. Given the sale of 117,992 of the unrestricted shares in February 1999 reflected in the Financial Analysis it is comprehensible why the Claimant could sell only 108,432 shares and not more in December 1999. Therefore, reference to prices on the New York Stock Exchange as at 15 July is inconsistent. In light of the above it is obvious that sale of the remaining part of the shares could be possible not before July 2000 and this was properly revealed to the Claimant. That would mean that any calculations for value of the shares should be made as of July 2000. The monthly close prices for July 2000 at NYSE were USD 35,56. (R V PA, para. 80)

899.    The fact that the remaining shares were transferred after July 2000 refutes Claimant's allegation that the restrictions applied still after said date. (R V PA, para. 81)

900.    Further, the Respondents may not be held liable for the inability to sell the shares by their market value and were sold at lower prices than the closing prices at the NYSE, since this could have been a result of many circumstances. (R V PA, para. 81)

## 4.    The Tribunal

901.    In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

   C VII          paras 24-28

| R VII B | paras 67 *et seq.*, 70 *et seq.*, 79 *et seq.*, 85, 87 *seq.*, 90, 93 |
|---|---|
| RV PA | paras 78, 80 *seq.* |

902. Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

903. Further above in this Award, the Tribunal has concluded that Respondents are liable for the incorrect information on page 39 of the KPMG Report regarding the Equant Shares. It will now have to be examined whether this breach caused any damage to Claimant.

904. Claimant earlier submitted that a damage in the total of USD 20,844,914.00 was caused and that amount is made up of four different items of damages. In its final Relief Sought, it only claimed USD 11 million.

905. Regarding the first item, the Tribunal cannot find proof of any "missing" shares, only of some shares restricted temporarily due to SITA's implementation of the frequent flyer adjustments.

906. Regarding the second item, i.e. the inability to sell the first half of the shares, the Tribunal finds the calculation submitted by Respondent No. 1 more convincing: As is undisputed, there were 263,220 "restricted" and 263,220 "unrestricted" shares. The 117,992 shares sold in February 1999 could only come from the "unrestricted" portion, thereby reducing it from 263,220 to 145,228, Again the 108,432 shares sold in December 1999 must have come from the "unrestricted" portion, thus further reducing this from 145,228 to 36,796 shares. Thus, including a deduction of sale fees, etc. Claimant's maximum damage suffered under this second item could not have been more than USD 2,812,686.24.

907. Regarding the third item, i.e. the inability to sell the second half of the shares, the Tribunal notes that Claimant "transferred" all the remaining shares to its own subsidiary Balkan Holdings and, indeed, this was done in May 2000 which was two months before a sale would have been possible anyhow. The Tribunal does not see how, nevertheless, any damage was caused to Claimant by the alleged inability.

908. Regarding the fourth item, i.e. the inability to sell the shares at their market price value, Respondent No. 1 is correct in pointing out that the adjustments by the SITA Foundation and the fees and expenses were either disclosed in the Financial Analysis or at least foreseeable for Claimant.

909. Therefore, the Tribunal concludes that only a damage amounting to USD 2,812,686.24 has been proven by Claimant in connection with the Equant Shares.

# I.III. Subsidies of Aviation Fees

## 1. Summary of Contentions by Claimant

910. The direct value of the misrepresentation regarding the subsidies of the aviation fees totals USD 20,000,000. This calculation is based on a yearly increase of USD 5,000,000 (this amount is uncontested by the Respondents) in the amount of the aviation fees payable by the Company due to the cancellation of the subsidies, which the Company used to enjoy prior to its privatization. (C VII, paras 30 *et seq.*)

## 2. Summary of Contentions by Respondent No. 1

911. Concerning the allegations with regard to the alleged cancellation of the reduction of the aviation fees, Respondent No. 1 contends, Claimant's damage calculations in this regard have varied wildly during the course of the proceedings from initial USD 35 million to USD 5 million to USD 20 million. Claimant has failed to explain how it arrived at these amounts let alone why they varied so much. (R VII B, paras 94 *et seq.*)

912. Furthermore, Respondent No. 1 contends, Claimant did not suffer any damages from the termination of the reduction, since under Claimant's management, Balkan Airlines paid no aviation fees due to the Civil Aviation Authority and, because of the rescheduling of due amounts over ten years, there was no impact on the balance sheet. Finally, in Balkan Airlines' 2001 budget Claimant's management forecast an operating profit, on the basis that aviation fees accruing in that year would be paid without any reductions. (R VII B, para. 97) Hence, Balkan Airlines did not suffer any damages from these fees. (R VII B, para. 98)

## 3. Summary of Contentions by Respondent No. 2

913. With respect to the allegations concerning the reduced aviation fees, Respondent No. 2 contends, the Respondents did not make any misrepresentations in this regard. Only as long as the Company was in isolation under the recovery program, reduced aviation fees were

granted. This was properly disclosed to Claimant in the Data Room. (R V PA, para. 83)

914. Furthermore, Respondent No. 2 alleges, Claimant failed to prove any correlation between the alleged misrepresentations and any damages resulting thereof. (R V PA, para. 84)

915. Claimant has further failed to substantiate the amount of USD 20,000,000, it alleges to be the value of the misrepresentations in this regard. (R V PA, para. 85)

## 4.      The Tribunal

916. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | |
|---|---|
| C VII | paras 30 *et seq.* |
| R VII B | paras 94 *et seq.*, 97 *seq.* |
| R V PA | paras 83 *et seq.* |

917. Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

918. Further above in this Award, the Tribunal concluded with regard to subsidies to the Company that, as para. 7 in the Disclosure Letter is clear and contains no ambiguity, and as this information is found to have been incorrect, the Respondents are liable in this regard.

919. Again. It will now have to be examined whether any damage was caused to Claimant by this breach, and if so, whether they amount to the USD 5 million finally requested by Claimant in this regard.

920. Even if a yearly increase of USD 5 million in the amount of aviation fees payable by the Company were accepted and thus lead to the amount claimed for four years, it has indeed to be taken into account that, while Claimant was in control, the Company in fact did not pay the aviation fees, to the Civil Aviation Authority. Further, these fees due were rescheduled over 10 years and thus a respective liability did not burden the budget of the Company during the relevant period.

921. Therefore, the Tribunal concludes that Claimant has not proven any damage in this context.

## I.IV. Ansett Aircraft Maintenance Fees

### 1. Summary of Contentions by Claimant

922. Originally, according to Claimant, the direct value of the misrepresentation regarding the Ansett aircraft maintenance fees is USD 4,250,000, resulting from additional maintenance costs, which Balkan Airlines had to bear due to the inferior manner in which they were maintained, which was not disclosed to Claimant. (C VII, para. 35 *et seq*.). But, in its final Relief Sought, Claimant only claimed USD 2.4 million in this regard.

### 2. Summary of Contentions by Respondent No. 1

923. With regard to the Ansett aircraft security deposit, it is Respondent No. 1's submission, that Claimant's allegations in this regard have three fundamental problems. (R VII B, para. 100) First, the security deposit was an amount due to Balkan Airlines, not to Claimant. (R VII B, para. 101) Secondly, as to the amount of the security deposit, Claimant accepted that the full amount was USD 4.25 million and not USD 5 million as alleged. (R VII B, para. 102) Thirdly, the deposit was always to be returned to Balkan Airlines no earlier than November 2001, that is, after the expiry of the term of the third aircraft lease. (R VII B, para. 103)

924. Hence, Claimant's claim is purely hypothetical, in that, had it not abandoned the Company at the beginning of 2001, then at the end of 2001 it would have obtained an unspecified sum from Ansett. (R VII B, para. 104)

925. Regarding the sums that were withheld by Ansett, Respondent No. 1 speculates that this was due to de- and re-registration fees, the cost of stripping off Balkan Airlines' livery and insignia, and other such regular outlays – not simply repairs, as alleged by Claimant. (R VII B, para. 105)

### 3. Summary of Contentions by Respondent No. 2

926. With respect to Claimant's allegations concerning the maintenance condition of the tree Ansett aircraft, Respondent No. 2 contends, it is reasonable to expect that any deposit (USD 5,000,000 as security for maintenance liabilities) may not be returned to the one who made it. Furthermore, Respondent No. 2 is not liable for misrepresentations

regarding the degree of maintenance of the Company's aircraft as no such representations were made in the PA or should have been made. (R V PA, para. 86)

927. Moreover, Claimant failed to present any evidence in support of its allegations concerning the level of maintenance of the Ansett aircraft. (R V PA, para. 87)

928. Respondent No. 2 alleges, Claimant did not suffer any damages from this, since, it did not pay the security deposit, but the Company did. Moreover, there is no proof to the extent that Claimant lost future profits from this as the future of the same moneys was uncertain. (R V PA, para. 88)

## 4. The Tribunal

929. Taking into account the above contentions of the Parties, the Tribunal's consideration of this issue can be very short. For, further above in this Award, the Tribunal has concluded that, as Claimant has the burden of proof that information supplied was incorrect, and since no reliable proof has been provided in this regard, the Tribunal finds no liability of Respondents with regard to the Ansett Aircrafts.

930. Therefore, no damage can be claimed by Claimant in this respect.

## I.V. Debt Owed to Employees

## 1. Summary of Contentions by Claimant

931. According to Claimant, the direct value of the misrepresentation regarding the amount of unpaid vacation days accrued by Company employees is USD 5,000,000. Claimant further notes, additional damages were caused as a result of it, since Claimant was not able to cut down on the workforce as fast as it would have wanted to due to these extra undisclosed costs. (C VII, para. 40)

932. This amount is supported by the evidence of Mr. Frank, the CEO of the Company at the time and the person most knowledgeable on the issue. (C VII, para. 41)

933. The documentary evidence produced by Respondents contradicting the basis for the calculated amount is to be disregarded, since it was produced in contravention of section 2.4.1.a of PO No. 10, especially, since Mrs. Docheva, who is allegedly signed on the

documents, denied the Claimant the ability to cross-examine her on these documents. (C VII, para. 44)

934.   In addition to the above mentioned amount, the direct value of the misrepresentation regarding the amount of the undisclosed debt to the national security is USD 1,200,000, which is uncontested by Respondents. (C VII, paras 46 *et seq.*)

## 2.   Summary of Contentions by Respondent No. 1

935.   Regarding the claims for alleged payments due to employees, which are valued at USD 5 million for accumulated holiday entitlements and at USD 1.2 million for national insurance contributions, Respondent No. 1 contends, Claimant lacks any proof for these claims and unjustly tries to shift the burden of proof to the Respondents. (R VII B, paras 107 *et seq.*) Claimant's attempt in this regard is unjust, since it has failed to identify and request from the Respondents any relevant documentary evidence.

936.   In contrast to Claimant's allegations regarding the accumulated holidays, Respondent No. 1 contends, the total amount actually accrued in 1999-2000 was no more than USD 574,762. (R VII B, para. 109).

937.   Regarding the accrued national security dues, Respondent No. 1 contends, Balkan Airlines' Financial Statements for the years 1999 and 2000 record no such liability. (R VII B, para. 110)

## 3.   Summary of Contentions by Respondent No. 2

938.   Regarding the Claimant's allegations concerning the alleged misrepresentations the liabilities including the contingent liabilities towards employees, Respondent No. 2 contends, that it could not have known that employment contracts would be terminated, all the more since the employment plan was provided quite after the PA had been concluded. (R V PA, para. 89)

939.   Furthermore, Claimant failed to substantiate the claimed amount of USD 5 million by evidence. In this regard, Respondent No. 2 submits, that the actual figure of the accrued compensations due for unused annual leave was less than USD 200,000. (R V PA, para. 90)

940.   Furthermore, even if Claimant's calculations are correct, it did not constitute any direct damage to Claimant. (R V PA, para. 92)

## 4.     The Tribunal

941.    In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | |
|---|---|
| C VII | paras   40 *seq.*, 44, 46 *seq.* |
| R VII B | paras 107-110 |
| R V PA | paras 89 *seq.*, 92 |

942.    Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

943.    In the context of this claim for debt owed to employees, the Tribunal recalls that further above in this Award it has concluded that that Respondents are liable in this regard, but also added already there that the Tribunal later in this Award would have to examine whether this breach by Respondents caused any damage, particularly whether any of the amounts thus due were in fact paid by Balkan.

944.    As evidence for the alleged damage of USD 5 million due to outstanding unpaid vacation days, Claimant has only submitted circumstantial evidence in addition to Mr. Frank's testimony which is more general and does not provide a detailed calculation. The Tribunal accepts that, since it did not any more have access to the personnel files of the Company, it had difficulties to provide detailed proof. The Tribunal further accepts that the rebuttal evidence submitted late by Respondents by way of documents allegedly signed by Mrs. Docheva could not be put on cross-examination to that witness. It is undisputed that there were indeed large volumes of claims for unpaid vacation days and it was obvious that these outstanding debts, in view of their volume, were a matter of concern for the Company's budget as well as for its ability to lay off personnel which, as is undisputed, was necessary and intended by the privatization of the Company. According to the testimony of Mr. Frank, only a few hundred were in fact dismissed. The damage, therefore, is on one hand what these dismissed employees received for unpaid vacation days and, on the other hand, that no more employees could dismissed which would have benefited the Company's budget considerably. Further, from the evidence collected, the Tribunal only knows of a few persons from foreign representative offices who compensated for their unpaid leave, about one person who has been constituted as creditor in the bankruptcy proceeding. In addition, when passing through all the accountancy

figures for all compensations paid (not only those at issue) it can be seen that they did not much exceed 2 million Bulgarian leva.

945. In view of this, even 30% of the sought after USD 2 400 000 would be high, but given the lack of objective possibility for the Claimant to prove its claim, and the evidentiary circumstances just referred to, the Tribunal considers it appropriate to make use of its discretion regarding the quantification of damages to accept that 30% of the claim raised in this respect shall be accepted, i.e. an amount of USD 720,000.00.

946. In addition, regarding the USD 1.2 million allegedly due for outstanding unpaid social security, the Tribunal notes that Claimant has not included it in its final Relief Sought and that Respondents have not submitted any substantiated comments. Therefore, the Tribunal has no basis for accepting such a claim.

947. Therefore, the Tribunal concludes that an amount of USD 720,000.00 is due by Respondents as damages in the present context.

## I.VI. Debt Due for Training of Pilots

### 1. Summary of Contentions by Claimant

948. The direct value of the misrepresentation regarding the debt due for training of pilots is USD 3,387,235. This amount is based on the value of this debt, which represented a valuable liquid asset that was missing from the Company. (C VII, paras 48 *et seq.*)

949. Contrary to Respondent No. 1's allegation, the Respondents never paid this debt to the Company while it was operated by Claimant. (C VII, para. 50)

### 2. Summary of Contentions by Respondent No. 1

950. With respect to the alleged misrepresentations concerning the pilot training fees valued at USD 3,387,235, Respondent No. 1 submits, if at all, this amount would be due to the Company and not to Claimant. (R VII B, para. 112) Furthermore, Claimant has failed to prove, any damage has resulted thereof, since being not recorded, it had no impact on the balance sheet. (R VII B, para. 113)

### 3. Summary of Contentions by Respondent No. 2

951. Regarding the alleged misrepresentation concerning debt due for training of pilots, Respondent No. 2 contends, if at all, the Company may claim such compensation and not the Claimant. (R V PA, para. 93)

### 4. The Tribunal

952. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | |
|---|---|
| C VII | paras 48 *et seq.* |
| R VII B | paras 112 *seq.* |
| R V PA | para. 93 |

953. Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

954. The Tribunal recalls that further above in this Award the Tribunal has concluded that Respondent breached their obligation under Article 9.1.2. PA regarding the debt due for the training of pilots. But at the same time the Tribunal pointed out that, in its later examination of that liability, it will have to consider whether that breach by Respondents caused any damage if Claimant never tried to collect the debt and if the amount is still due and could be collected for the company.

955. The Tribunal agrees with Respondents that, since this debts was due to the Company, was not recorded in the balance sheet, and it has not been shown that it could no more be collected, Claimant could not prove a direct damage for itself in this regard.

956. But it is also obvious that, had the debt been paid at the time, it would have had a very positive effect on the Company's cash flow and on attempts to avoid insolvency. However, the Tribunal does not see sufficient proof that the insolvency would have not occurred in case of such payment which, after all, had been due for some time and could not necessarily be expected at that particular period.

957. Therefore, the Tribunal concludes that, while no concrete damage of Claimant is found in the amount requested by Claimant in this

regard, the issue may have to be reconsidered as a misrepresentation factor contributing to the insolvency together with other factors.

# I.VII. Change of Government Policies

## 1    Summary of Contentions by Claimant

958.    The direct value of the misrepresentations and non-disclosures regarding the change in Government policies towards the Company is USD 8,000,000. (C VII, para. 51)

959.    This is being calculated based on a yearly loss of profit of USD 2,000,000 - USD 3,000,000 due to denial of the Company's right to provide refuelling services, check-in services, ground handling and ramp handling services. (C VII, para. 52)

960.    However, the implications of this misrepresentation and breach are far wider than the monetary value of the losses which were caused, since the fact that the Bulgarian Government abandoned the Company and sent a clear message that it no longer viewed it as its NC had a serious effect on the recovery procedures of the Company. (C VII, para. 53)

## 2.    Summary of Contentions by Respondent No. 1

961.    Regarding the alleged change of Government policies, which Claimant values at USD 8 million, Respondent No. 1 submits that Claimant has not presented any evidence other than the unilateral recollections of Mr. Frank, which cannot be verified. Hence it has not discharged its burden of proof. (R VII B, paras 118 *et seq.*)

## 3.    Summary of Contentions by Respondent No. 2

962.    With reference to Claimant's allegations in this matter, Respondent No. 2 submits, no particular Government policy towards Balkan Airlines existed and no change of such policy occurred in connection with the privatization. Moreover, the amount claimed has not been substantiated by any evidence. (R V PA, para. 94)

## 4.    The Tribunal

963.    With regard to this claim, the Tribunal can again be very short, because – as it has concluded further above in this Award – no

liability of Respondents could be found in this regard and thus there is no basis for a damage claim.

# I.VIII.    Debt Owed to ATC

## 1.    Summary of Contentions by Claimant

964.    The direct value of the misrepresentation regarding the undisclosed ATC Loan is USD 3,000,000. This amount is based on the value of the additional undisclosed debt the Company owed at the date of the closing of the PA to the ATC. (C VII, paras 54 *et seq.*)

## 2.    Summary of Contentions by Respondent No. 1

965.    With regard to the ATC loan valued at USD 3 million Claimant alleges was not disclosed in the PA, Respondent No. 1 contends, it disclosed the relevant documents in Appendix 18 the Information Disclosure Letter. In any case, Claimant has failed to show, any relevant damage resulting from the alleged non-disclosure, since these loans were never paid back. (R VI B, paras 122 *et seq.*)

## 3.    Summary of Contentions by Respondent No. 2

966.    Respondent No. 2 reiterates its submission in regard to the ATC loan, in stating that it did not make any misrepresentations in this respect and that all the necessary information thereto was attached to the Disclosure Letter. (R V PA, para. 95)

## 4.    The Tribunal

967.    Regarding this claim, the Tribunal can again be very short and just recall its conclusion further above in this Award:

968.    In this particular case, the Tribunal considers it appropriate to already deal with the causation of damage by the alleged misrepresentation, because it makes it clear that even in case of such a misrepresentation the Tribunal would not be in a position to accept any claim for damages in this regard.

## I.IX.  Transfer of Real Estate

### 1.  Summary of Contentions by Claimant

969.  The direct value of the breach of undertaking to transfer real estate under the Company's name is USD 2,812,727.87. (C VII, para. 57)

970.  This amount is based on the fact that for over 18 months during which the Company was under the control of Claimant, substantial part of this real-estate has not been registered under its name. (C VII, para. 58)

### 2.  Summary of Contentions by Respondent No. 1

971.  Contrary to Claimant's allegation with regard to the alleged undertaking to transfer Balkan Airlines title to real estate, Respondent No. 1 contends, the PA does not provide for such undertaking. (R VII B, para. 124)

972.  As to the quantification, Respondent No. 1 contends, Claimant failed to substantiate its valuation of USD 2.81 million. (R VII B, paras 125 *et seq.*)

973.  It is further noted, Claimant does not purport to identify the property that its claim concerns. In view of this, Respondent No. 1 asserts, the vast majority of the real estate of Balkan Airlines' must have been registered. Therefore, Claimant's claim can only concern properties of marginal importance. Hence, one cannot take the whole of Balkan Airlines' real estate as the basis for calculating the value of marginal, non-registered properties, which Claimant did. (R VII B, para. 128)

974.  Respondent therefore alleges, Claimant has failed to discharge its burden o prove in this matter. (R VII B, para. 131)

### 3.  Summary of Contentions by Respondent No. 2

975.  Respondent No. 2 denies Claimant's allegations that the Respondents undertook to transfer any real estate to the Company, which the Company did not already own. According to the PA, Respondent No. 2 was only obliged to assist in utilizing the properties, without transferring them. (R V PA, para. 96)

976.  Respondent No. 2 also rejects the method by which Claimant has calculated the alleged damages resulting from the alleged breach. The value of the real estate in question was no more than

USD 6,450,000. Moreover, contrary to Claimant's allegation that it was entitled to interest in the total amount of USD 2,218,727 is false, since it is inadmissible accruing an interest on a non-monetary obligation. (R V PA, para. 97)

## 4. The Tribunal

977. Again, in this context, the Tribunal can be very brief. It is only recalled that, further above in this Award, the Tribunal concluded that it does not find any liability of Respondents in this regard. Therefore, no damages can be claimed on this basis.

# I.X. Debt to Yugoslavian Railway Company

## 1. Summary of Contentions by Claimant

978. The direct value of the breach of undertaking concerning the YRC debt is USD 8,500,000. (C VII, para. 59)

979. This amount is based on the value of the YRC promissory note, which was transferred by Respondents to the Company as part of the explicit terms of the PA, and turned out to be worthless. (C VII, para. 60)

## 2. Summary of Contentions by Respondent No. 1

980. Referring to the allegations concerning the Yugoslav Railroad debt amounting to damages of USD 8.5 million, Respondent No. 1 contends, in accordance with Claimant's own expert, Respondent No. 1, in fact, did extend to Balkan Airlines the funds necessary to acquire the receivable against the Yugoslav Railways, and it was ready to assist Balkan Airlines in settling its debt by way of set-off. (R VII B, paras 132 *et seq.*)

981. Moreover, Claimant has failed to prove, it suffered any damages from this alleged breach, thereby failing to discharge its burden of proof. (R VII B, paras 134 *et seq.*)

## 3. Summary of Contentions by Respondent No. 2

982. Respondent No. 2 submits, it did not breach any undertaking concerning the debt of the YRC as the Respondenst did not undertake that such debt would be collected. The Respondents only

had to assign the debt to the Company, which they did. Furthermore, since neither Claimant nor the Company paid anything for that debt, no damage resulted of the alleged breach. According to Article 100, paragraph 2 of the OCA, Respondent No. 2 as the seller (assignor) of a debt, is not liable to the assignee (the Company), if the debt cannot be collected. (R VI PA, para. 98)

## 4. The Tribunal

983. Also with regard to this issue, further above in this Award the Tribunal has concluded that there is no liability of Respondents. Thus, the claim can also not support any damages.

## I.XI. Summarizing the Quantification of Damages and Losses due to Claimant

## 1. Liability according to the PA

### a. *Summary of Contentions by Claimant*

984. Claimant submits the PA contains two clauses, namely Articles 9.1.2 and 11.1 pursuant to which, in case of any misrepresentation the Respondents are liable to compensate and indemnify the Claimant for the damages and losses resulting from such misrepresentations. (C VII, paras 61 *et seq*.)

985. Hence, they impose a liability to compensate and indemnify the Claimant for a total amount of USD 91,994,876, which represents the sum of the above mentioned value of misrepresentations. (C VII, para. 65)

986. Contrary to Respondents' allegation, the losses were indeed suffered by Claimant, since, any asset missing from a company's balance sheet immediately decreases the value of the company by at least the value of such asset. (C VII, para. 66) This is presently especially the case because the misrepresentations, caused Claimant to wrongly evaluate Balkan's true value and enter a transaction it would not have otherwise entered. (C VII, para. 67) Furthermore, the Respondents failed to compensate even Balkan itself for the missing assets and additional liabilities. (C VII, para. 69)

987. This breach compelled Claimant to transfer more monies into the Company than what it would otherwise had been compelled to transfer, this is even more the case, since Claimant transferred

USD 14,750,000 over and above the amount it was obliged to transfer under the PA. (C VII, para. 70) Thus, Claimant is at least entitled to be compensated for this amount. (C VII, para. 71)

988. With reference to Respondent No. 2's allegation that Article 11.1 refers to an "Attachment 11" instead of an "Appendix 11" and its alternative allegation that liability for misrepresentations pursuant to Articles 9.1.2 and 11.1 is confined only to issues dealt with in Appendix 11, Claimant contends that the value of this interpretation demonstrated by the fact that Respondent No. 1 did not join this argumentation. (C VII, paras 73 *et seq.*)

989. Claimant submits that in accordance with its logic and wording, Article 9.1.2 imposes an obligation on the Respondents to compensate Claimant for misrepresentations. It is true that the provision of Article 9.1.2 subjects this obligation to Article 11.1 of the PA. However, this only becomes relevant in cases in which Article 11.1 deals differently with an issue dealt with under Article 9.1.2. (C VII, para. 75)

990. Article 11.1 provides that liability for misrepresentations shall be borne by the Seller, "in accordance" with "Attachment 11". This means that any imposition of liability on the Respondents pursuant to Article 11.1, must accord with the Ministers' letters found in Attachment 11 but is not limited to them, as this would contradict the intention of Article 11.1. (C VII, para. 76)

991. Article 11.1's mechanism makes a distinction between "unknown liabilities", which are owed to state-owned creditors, and "unknown liabilities", which are owed to private creditors. The mechanism for dealing with the first type is for the debt to be analyzed and then for support to be given by the State to settle it in full. The mechanism for dealing with the other type, is to set off such liabilities against Balkan's debt to the SFRD. None of Claimant's claims for misrepresentations fall within either parts of the "unknown liabilities". Therefore the Minister of Finance's Letter does not at all deal with or concern these claims and does not limit the scope of the Respondents liability. (C VII, paras 79 *et seq.*)

992. Furthermore, in interpreting Article 9.1.2 and 11.1 of the PA, one must look at the entire Agreement with each provision being *"understood in the context of the overall contract by taking into account the purpose of the contract, usage and good faith"* according to Article 20 of the OCA.

993. It goes against all logic to interpret these Articles as being confined only to the liability matters discussed in the Minister's Letters, which in essence deal only with "unknown liabilities". If this was

indeed the purpose of these Articles, then the Letters of the Ministers would have been enough as they were.

994. Hence, Respondents are liable to compensate and indemnify the Claimant for and amount of USD 91,994,876, or alternatively for USD 14,750,000. (C VII, paras 82 *et seq.*)

### b.   *Summary of Contentions by Respondent No. 1*

995. The method and magnitude of Claimant's damages quantification has changed radically and repeatedly during the course of these proceedings from under USD 45 million to over USD 90 million. (R VII B, para. 11) This continuous re-thinking of quantum shows artificial and arbitrary nature of these claims. Claimant's original claim was aggregated at close to USD 400 million, which then changed to USD 230 million then to USD 70 million, then to USD 176 million, which it then proceeds arbitrarily to deflate to USD 106,467,980. (R VII B, para. 12)

996. Claimant now appears to claim four heads of damage, which can be summarized as follows:

> *"(i) indemnification by the Respondents for the alleged direct value (or "price tags") of their purported misrepresentations amounting to USD 91,994,876, or alternatively, the amount that Zeevi allegedly injected in Balkan Airlines "over and above" its contended contractual obligations because of the misrepresentations, amounting to USD 14,750,000; and*
>
> *(ii) damages to Zeevi for the so-called "collapse" of Balkan Airlines amounting to the alleged value of Zeevi's share of the airline as a going concern in January 2001, valued at USD 71,845,000; and/or*
>
> *(iii)     compensation for the amount that Zeevi alleges to have expended in connection with the Privatisation Agreement valued at USD 23,150,000; and*
>
> *additional charges for alleged prejudice to its reputation and goodwill, increase in finance costs and "failure of public offering", valued at USD 15 million." (R VIIB, para. 14)*

997. Each of these claims is nonsense, since, according to Respondent No. 1, Claimant never paid the value that it alleges was lost by Balkan Airlines and it did not lose anything from the Company's collapse, because it did not collapse, but it was abandoned by Claimant. (R VII B, paras 15 *et seq.*) Furthermore, as to the alleged

damages suffered by Claimant due to loss of reputation and good will, Respondent No. 1 refers to the criminal proceedings and investigations against Claimant and Mr. Zeevi personally in Israel. (R VII B, para. 18)

998. Regarding Claimant's claim of USD 23 million or USD 14.75 million Respondent No. 1 contends, this claim is itself fundamentally flawed because there is an absence of a causal connection between the alleged misrepresentations and Claimant's decision to purchase an airline that it knew to be insolvent with debts ranging between, in its own words prior to the purchase, "USD 65 and 120 million" and as a matter of fact, Claimant "spent" less than USD 23 million in Balkan Airlines, and appropriated more than USD 23 million from the airline. (R VII B, para. 21)

999. In addition to the fatal conceptual problems that condemn Claimant's claims, and the fact that they take no account of the assets and revenues that Claimant itself appropriated from Balkan, Respondent No. 1 asserts, it remains impossible to award Claimant any amount until the nature of Knafaim-Arkia's interest in the PA and Balkan Airlines is made clear, which Claimant has refused to do. (R VII B, para. 22)

1000. Finally, Respondent No. 1 points out, Claimant would in no case be entitled to any payment, due to the liabilities it incurred for its the multiple breaches of the PA, which amount to USD 56.5 million. (R VII B, para. 23)

## (1) *Claimant's claim for damages in excess of its alleged investments in Balkan is Hopeless*

1001. In regard to Claimant's request for relief, Respondent No. 1 contends, there seem to be two principal alternative theories according to which Claimant claims damages, one for USD 15 million as "*indemnity and compensation for misrepresentations and breaches*" and one for USD 14.75 million as compensation for the amount which it was bound to transfer into the Company in excess of its contractual obligations due to the Respondent's alleged misrepresentations and breaches. In addition, Claimant advances further claims in the amounts of USD 40 million, USD 13 million as "*compensation for the value of assets which the Respondents represented that [Balkan Airlines] possessed*" and USD 2.25 million in consequential damages for Zeevi's "increase in financing costs". (R VII B, para. 25)

1002. These claims total up to USD 106,467,980 including interest. (R VII B, para. 26)

1003. Respondent No. 1 submits, these claims are legally flawed, since, several of them concern damage that, Claimant itself did not suffer. Furthermore, Claimant's valuations of the alleged misrepresentations and breaches of the PA are flawed. Additionally, given that Claimant itself caused the financial demise of Balkan Airlines, Claimant cannot now purport to benefit from its own wrongdoing. Finally, the claim for consequential damages relating Claimant's supposed *"reputation and goodwill"* is outrageous in view of Claimant's inauspicious conduct in the management of Balkan Airlines. (R VII B, paras 27 *et seq.*)

### (2)  The supposed direct value of the alleged misrepresentations does not represent loss to Claimant

1004. Contrary to Claimant's allegation Respondent No. 1 contends, Articles 9.1.2, 11.1 as well as Attachment 11 taken together limit the Respondents' liability *"for all claims, losses, liabilities, obligations"* etc *"suffered by [Zeevi] or [Balkan Airlines]"* to the substantial obligations undertaken by the Minister of Finance in his letter, Attachment 11 to the PA. (R VII B, paras 34 *et seq.*)

1005. Beyond this limitation, Article 9.1.2 stipulates that Claimant must have suffered a direct loss in order to be entitled to damages. (R VII B, paras 40 *et seq.*) Hence, even if Balkan Airlines had suffered damage, the reference to damage suffered by Balkan Airlines in Article 9.1.2 obviously does not entitle Claimant to recover for damage that Claimant itself has not suffered directly. (R VII B, paras 44 *et seq.*)

1006. Furthermore, Claimant would only be entitled to damages resulting from misrepresentations, if Claimant had paid for these missing amounts itself, which Claimant did not do. Consequently, it is not entitled to any damages allegedly resulting thereof. (R VII B, para. 47)

### (3)  Claimant's Illusory „Price Tags"

1007. Respondent No. 1 contends that despite several rounds of pleadings, Claimant has been unable to demonstrate any causal link between the alleged misrepresentations or breaches and the amounts claimed by way of damages. (R VII B, para. 50)

### c. *Summary of Contentions by Respondent No. 2*

1008. As to the conformity of Claimant's Quantum Brief with the Tribunal's PO No. 11, Respondent No. 2 contends, contrary to what was advised by the Tribunal, Claimant failed to specify the quantum and the reasoning for most of the liabilities claimed. Furthermore, Claimant failed to present a clear system and structure of its demands as it was continuously changing the legal and factual grounds of the particular claims. (R V PA, paras 10 *et seq.*)

1009. Instead of distinctly quantifying each claim, Claimant preferred to suggest a global quantification of the damages pertaining to these claims, reasoning such an approach by stating that quantifying such damages against bills and receipts is not always possible. (R V PA, para. 12)

1010. Respondent No. 2 alleges, Claimant failed to fulfill its duty to provide documentary evidence in support of its quantifications. Since mere assumptions are not enough in order to sustain a claim, these must be dismissed, according to established case law. (R V PA, para. 12)

1011. In addition, Claimant has changed its initial claim for loss of profits to a claim for loss of the Company, thereby conflicting its previous statements. (R V PA, para. 13)

1012. Moreover, contrary to the Tribunal's instructions, Claimant has failed to specify which of the claims are referred to which Respondent. Claimant's request in this regard to hold both Respondents jointly liable for the claims is in conflict with Article 121 of the OCA. Failure to point out the right Respondent liable for each specific claim eliminates the possibility of proper indemnification for due compensation, if any. (R V PA, para. 14)

1013. Additionally, in other aspects of its submission, Claimant has gone beyond the border of quantifying the damages, putting bringing issues on the liability that were subject of the former stage of the proceedings to the attention of the Tribunal. Hence, Respondent No. 2 will do the same in order for it to be fairly defended. (R V PA, para. 15)

1014. Moreover, in view of the Respondent No. 2's holding that the Privatization Agency and the Respondent No. 1 are not liable for misrepresentations and breaches of the agreement, they are consequently not under the obligation to compensate the Claimant. (R V PA, para. 16)

1015. However, if partial or full compensation for damages and lost profit is awarded, it should be allocated within the shareholders in the capital of Balkan (Claimant and Knafaim-Arkia). Hence, any amount awarded to Claimant must at least be divided by two, since Claimant has presented no evidence sustaining the alleged withdrawal of Knafaim-Arkia. (R V PA, para. 17)

1016. With regard to the alleged shifting of the burden of proof to the Respondents, Respondent No. 2 contends, in compliance with the generally established rule in international arbitration the Claimant was to prove the elements required as conditions for the claims in terms of grounds and quantification and to prove them to the satisfaction of the Tribunal. In this regard, Respondent No. 2 points out, unlike Claimant, the Respondents declined not a single demand for production of evidence. (R V PA, para. 18)

1017. Moreover, Respondent No. 2 asserts, there must be a direct casual link between between the conduct of which the Respondent is accused of and the alleged damage, which Respondent No. 2 contends, Claimant did not suffer in the first place. However, Claimant failed to prove such links exist. (R V PA, para. 19)

1018. Respondent No. 2 submits, since the four conditions for the incurring of liability by the Respondent are cumulative, failure to meet one of them is sufficient for a claim for damages to be dismissed.

> *"At the least the wrongful conduct ascribed to the Respondent is not linked to the alleged damage by a sufficiently close causal link for Respondent's liability to be involved. A direct causal link between the Respondent"s conduct and the damage alleged by the Claimant cannot therefore be found with a view to holding the Respondent liable."* (R V PA, para. 20)

1019. Hence, the claims for damages must be dismissed. (R V PA, para. 20)

1020. Furthermore, Respondent No. 2 contends, the compensation cannot include damages that the Claimant could have avoided through ordinary diligence. (R V PA, para. 21)

1021. Respondent No. 2 alleges the fact that Claimant bases its arguments on pre-contractual liability, contractual liability and on tort is a demonstration of Claimant's bad faith, since this kind of argumentation limits the Respondents' defence capability. It further demonstrates Claimant's lack of confidence in its own argumentation. (R V PA, para. 22.)

1022. Regarding the limitation of the Claim to USD 70,000,000, Respondent No. 2 contends, it is unclear how each claim individually is affected by the limitation. (R V PA, para. 23)

1023. Respondent No. 2 further submits, Claimant merely provided an estimate of the presumptive and uncertain damages, which are not based on any real evidence. (R V PA, para. 24)

1024. Respondent No. 2 alleges, Claimant tries to expand the liability of the Respondents under Article 9.1.2. and 11.1. beyond the explicit content of the provisions referring to the undertakings made in letters which form Appendix 11. (R V PA, para. 26)

1025. Contrary to Claimant's allegation, Respondent No. 2 submits, Balkan itself did not suffer any damage as a result of the alleged misrepresentations since its position remained factually the same both before and after the misrepresentations were made. Even if damages occurred, Respondent No. 2 submits, these were not suffered directly by Claimant, but by the Company. Hence, the second pre-requisite of Article 11.1, which establishes that the damages must be directly suffered by Claimant, is not met. (R V PA, para. 27)

1026. Respondent No. 2 points out, that according to the definition of a joint stock company, which Balkan is, the shareholders are not the owners of the company's assets, but only of its capital. Hence, even if the property of the Company is worth less than represented, it can only indirectly affect the Claimant, since only the Company can be directly affected by this. (R V PA, para. 28)

### d.   The Tribunal

1027. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | |
|---|---|
| C VII | paras 61 *et seq.*, 65 *et seq.*, 69 *et seq.*, 73, 75 *seq.*, 79, 82 |
| R VII B | paras 11 *seq.*, 14 *et seq.*, 18, 21 *et seq.*, 25 *et seq.*, 34 *et seq.*, 40 *et seq.*, 44 *et seq.*, 47, 50 |
| R V PA | paras 10 *et seq.*, 24, 29 *et seq.* |

**Exhibits:**

| | |
|---|---|
| C-35 | PA |

1028. First, the Tribunal recalls that further above in this Award, it came to the following conclusions:

1029. In this context, the Parties also disagree regarding the following issues:

    1)    Whether Claimant knew or should have known that certain information was incorrect and that this may exclude Seller's liability. The Tribunal considers that this issue can better be examined in the context of the further issue of causality also disputed between the Parties.

    2)    Whether there is causality between the incorrect information and any damage of Claimant. The Tribunal will examine this issue further when dealing with the specific claims raised and with the quantum of any liability.

    3)    Whether damage of third Parties is claimed by Claimant and is covered by the liability provisions. Again, the Tribunal will deal with this issue when examining specific claims raised and with the quantum of damages.

    4)    Finally, the Parties disagree on the scope of liability under the provisions of the PA. Again, the Tribunal will deal with this issue when examining the specific claims raised and the quantum of liability.

1030. Also, the Tribunal recalls that, above in this Award, it concluded as follows:

> *"Therefore, the Tribunal concludes that Claimant could rely on and Respondents are liable for all information included in the documents referred to in the PA as well as in the documents expressly referred to in such documents irrespective of what the Data Room contained. In particular, this liability includes information in:*
>
> > *the PA itself;*
> > *the Disclosure Letter;*
> > *KPMG's Information Memorandum;*
> > *KPMG's Financial Analysis."*

1031. Then, again at a later stage further above in this Award, the Tribunal examined whether and to which extent, as alleged by Claimant, Respondents breached their obligations under this liability in the context of the specific claims raised and to what extent a causation of damages could linked to such breaches.

1032. On that basis, the Tribunal now has to finalize this evaluation and quantification.

> 1) First, direct damage of Claimant can have occurred if Claimant proves that, if it had been aware of the misrepresentations by Respondents which this Tribunal has found, it would not have concluded the PA and thus also not made any of the payments or investments it actually made.

> 2) Further, indirect damages may be due under certain conditions. On one hand, Claimant must prove that it, and not only a third party, suffered damage caused by Respondents' breaches of liability found by this Tribunal. Since the Company is insolvent and Claimant is no more running the company, **damage suffered by the Company** is not automatically a damage of Claimant. On the other hand, however, such damage suffered by the Company may have an effect as damage of Claimant, if Claimant can prove that, if Respondents' breach had not occurred,

> > a) either Claimant would have saved investments or payments made to the Company, or

> > b) Claimant could and would have extracted money from the Company before its insolvency.

1033. Since it is chronologically the first damage claim and may override the two other options, the Tribunal will first deal with the above mentioned possible direct damage.

## 2. Damages or Restitution of Amounts Transferred by Claimant in Connection with the PA and Rescission of the PA

### *a. Summary of Contentions by Claimant*

1034. Claimant contends, it is now clear that it only entered the PA due to Respondents misrepresentations. (C VII, para. 148)

1035. In this respect Claimant again refers to the misrepresentations by the Respondents in view of the NCS. Claimant alleges, the Respondents knew, prior to completion of the PA that at least two states cancelled the NCS and that the NCS was fundamental to Claimant, yet still they withheld this information.

1036. Regarding the Equant Shares, Claimant alleges, by completion of the PA, the Respondents represented that there has been no material adverse change in the financial position of the Company since 31 December 1998 even though already in April 1999 the Company was informed that the number of Equant Shares it was entitled to decreased by 88,086.

1037. With respect to the aviation fees, Claimant contends, prior to the sale, the Company enjoyed reduced aviation fees, even though, the Respondents represented that the Company has not been subsidized or financially supported in any other way.

1038. In addition to the above representations, fraudulent representations were also made with respect to the limitations applying to sale of the Equant Shares; maintenance condition of the Ansett aircraft; extent of liabilities to employees; debt owed for training of pilots; etc. (C VII, para. 149)

1039. Had Claimant known these issues, or known that the Respondents withheld information from it, Claimant would never have purchased the Company. (C VII, para. 150)

1040. Claimant submits, the Respondents committed fraud according to Bulgarian case law and legal doctrines (C VII, para. 151). The material and fraudulent nature of the above misrepresentations is apparent also from the definition given to these terms pursuant to Articles 4:103(1) and 4:107(2) of the European Principles Of Contract Law. (C VII, para. 153) Claimant asserts there is no doubt that the Respondents have committed fraud due to the non-disclosure and acted fraudulent with respect to the NCS; the decrease in the number of Equant Shares; the fraudulent representation regarding the Company's non-subsidy; and the rest of the misrepresentations. (C VII, para. 155)

1041. As a direct result of the PA Claimant spent an undisputed amount of USD 23,150,000 which it eventually lost. With regard to the amount by which Claimant exceeded its contractual obligations it is noted that Claimant never expected the Government of Bulgaria to dishonour its obligations pursuant to which there was no reason for Claimant not to ensure the Company's operation and survival by injecting additional amounts. The Transfer of the additional amount

of USD 14,750,000 thus directly flows from the entry of Claimant into the PA. (C VII, para. 157)

1042. This is all the more so, given that the Claimant constantly informed and put the Respondents on notice, for example by its letter dated 23 November 2000, that it was forced to continue to transfer monies into the Company due to the above considerations. (C VII, para. 158)

1043. Hence, Claimant is entitled to at least the amount it transferred into the Company (USD 23,000,000) pursuant to the PA. (C VII, para. 159)

1044. Contrary to the Respondents' allegation, there is no need for Claimant to rescind the PA in order to be able to claim back the amount it transferred pursuant to the agreement. (C VII, para. 160) Both Bulgarian and European law do not require rescission of an Agreement in order to claim compensation for losses directly caused as a result of misrepresentations. See e.g., decision No. 307 of 20 February 1998 – case No. 792/1997 of the Supreme Court of Cassation – 5th Department or Article 4:117(2) of the European Principles Of Contract Law (C VII, para. 163).

1045. Alternatively, if, contrary to Claimants position, the Tribunal decides that a rescission of the PA is a pre-condition for such a claim, the Claimant would hereby rescind the PA. (C VII, para. 164)

1046. In relation herewith, contrary to the Respondents' allegation that rescission at this stage is not possible because it has been more than three years since the PA was signed, Claimant submits, it found out for the first time that it had been seriously defrauded by the Respondents in connection with the NCS of the Company only from the Exhibits which were enclosed to the Republic's Defense & Counterclaim Brief which was filed on 21 June 2004. Not only did the Respondents conceal this fact for more than five years until 21 June 2004, but in the PA itself they chose to give opposite fraudulent representations. Given the undisputed fundamentality of the warranties and representations concerning the Company's NCS, it is clear that discovery of such a fundamental fraud grants the aggrieved party the right to rescind the PA. According to section 32 of the OCA, the limitation period for rescinding an agreement based on an act of misrepresentation or fraud only starts running upon discovery of the fraud or misrepresentation. Hence, the limitation period only started one year ago and has therefore not yet elapsed. (C VII, para. 166)

1047. Furthermore, according to Article 116(b) of the OCA, "*the running of the limitation period shall be interrupted upon bringing of an action*". Therefore, since the claim was initiated on 1 February 2001

it was well within the time period for rescinding the PA. (C VII, para. 167)

1048. The Respondents' continuous breaches of warranties gives Claimant a continuous right to rescind the PA based on such breach. (C VII, para. 168)

1049. Consequently, even if rescission of the PA is required, this does not prevent this claim. (C VII, para. 169)

### b.     Summary of Contentions by Respondent No. 1

1050. With respect to the alleged USD 23 million investment by Claimant in the Company, Respondent No. 1 notes, it is undisputed that this claim cannot be combined with neither the "price tags" claim for indemnity and compensation for misrepresentations and breaches nor the claim for damages equal to the value of Claimant's shareholding in Balkan Airlines at the time of its "collapse", as they all cover the same damages. (R VII B, para. 171 *et seq.*)

#### *Restitution of the entire investment requires rescission*

1051. Respondent No. 1 alleges, it is undisputed that restitution of the entire investment would require prior rescission of the PA, which at this stage is impossible. (R VII B, para. 177) Furthermore, Respondent No. 1 alleges, Claimant is attempting to dress up its claim for restitution of USD 23.15 million as a claim for "*money which it directly spent due to the Respondents' wrongful actions*". This, however is belied by Claimant's own submissions, stating that it invested USD 14.75 million over its contractual obligations due to the alleged misrepresentations. The only way to rescind the PA would be due to fraud at the conclusion of the contract according to Articles 27 and 29 of the OCA. (R VII B, para. 179 *et seq.*)

1052. However, far from requesting the Tribunal to rescind the PA, Claimant says that rescission is not a necessary part of its claim for restitution. (R VII B, para. 184)

1053. Finally, according to Article 32 (2) of the OCA, actions for rescission are subject to a three-year limitation period, running from the time when the facts necessary to sustain the claim became known to the defrauded party. This period has long expired, because it has been already four years, since the claim was filed. Claimant's reliance on Article 116(b) is false, since an action for breach of contract interrupts the limitation period applicable only to that claim. Rescission was not how Claimant framed its claim in February 2001, nor is it how Zeevi frames its claim now. (R VII B, para. 185 *et seq.*)

*Claimant was not wrongly induced to enter the PA*

1054. Respondent No. 1 contends, none of the alleged misrepresentations and breaches could have affected Claimant's decision to purchase the Company. According to Claimant's own words, the sole reason for Claimant to enter the PA was the Company's NCS. (R VII B, para. 191) Contrary to Claimant's allegations, to assist Claimant, Respondent No. 1 agreed in the PA to forgive and reschedule many of the debts that crippled Balkan Airlines' balance sheet. (R VII B, paras 193 *et seq.*)

1055. Claimant's own contemporaneous documentary record reveals clearly that it was under no illusions as to Balkan Airlines' desperate and uncertain financial condition. (R VII B, para. 195) Despite the uncertainties and the knowledge of the financial situation, Claimant proceeded with the purchase in view of the potential Balkan Airlines had, which was sustained by the Speedwing Report. (R VII B, para. 196)

1056. In any event, Claimant invested less than USD 23 million in the Company and took more than USD 23 million from the Company

1057. Respondent No. 1 alleges, Claimant took approximately USD 5 million more from Balkan Airlines, than it transferred into the Company. (R VII B, para. 197)

1058. Of the alleged USD 23.15 million invested in the Company, USD 2.4 million did not relate to any actual injection of funds into Balkan Airlines, but to a contingent liability under a letter of credit that was never called upon. After the expiration of the letter of credit, Claimant was able to use this amount in any way it pleased. Hence, this amount must be deducted from the alleged investments by Claimant, reducing them to USD 20.75 million. Further deductions have to be made from this amount in the value of the cash and assets Claimant appropriated from the Company totaling USD 25.8 million. Hence, Claimant did not invest, but enriched itself in a total amount of over USD 5 million. (R VII B, paras 200 *et seq.*) Therefore, Claimant's claim for the return of its total investment in Balkan Airlines is unsustainable.

## c. *Summary of Contentions by Respondent No. 2*

1059. Regarding the claim for restitution of the amounts allegedly transferred to the Company, Respondent No. 2 submits, Claimant invested through loans no more than USD 20,750,000. However, it seized from the Company through various transfers an amount in excess of its investments. (R V PA, para. 119)

1060. Furthermore, in order to receive back the amounts spent in connection with the PA, the relevant applicable legislation requires rescission of the PA. (R V PA, para. 121)

1061. However, Respondent No. 2 alleges, since, if a contract is rescinded the parties owe to each other everything they have respectively received, from the amount of USD 23,150,000 which is claimed a deduction should be made of the shares of the company it received due to the PA. (R V PA, para. 123)

1062. Concerning Claimant's alternative rescission of the PA, Respondent No. 2 contends, this was not done in a timely fashion. According to Article 32, para. 2 of the OCA the right to claim rescission of a contract is prescribed with the expiry of three years period commencing from signing of the contract as a rule or in the alternative – from the time the mistake or the fraud have been discovered. Claimant's argument that before the conclusion of the PA, at least two states cancelled the NCS of the company is false. The letter canceling Balkan's NCS with respect to Iran is dated 29 October 1999, after the conclusion of the PA. (R V PA, para. 126)

1063. Same is true for the flight rights to Lebanon, which were only cancelled on 15 July 1999, also after the conclusion of the PA. (R V PA, para. 127)

1064. In both cases, the Bulgarian Government promptly protested before the other side that the right for suspension of the operational rights of Balkan was not exercised in a proper manner. Only after Balkan itself started using Hemus Air for its flights to Lebanon this company was appointed as a designated air carrier. (R V PA, para. 127)

1065. Contrary to Claimant's further argument, that according to Article 116(b) of the OCA the limitation period shall be interrupted upon bringing of an action, Respondent No. 2 contends, while this is true, the interruption of the limitation period however, pertains only to the specific claim that is filed and not to any claim that might arise out of the agreement. (R V PA, para. 129)

1066. Contradicting Claimant's allegation that Respondent's alleged breach of warranties prolonged the limitation period, Respondent No. 2 argues, it borders to absurd to insist on the possibility of fulfillment of warranties now and thus to surmount the requirement for timely placing of claim. (R V PA, para. 130)

### d. The Tribunal

1067. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

Party Submissions:

| | |
|---|---|
| C VII | paras 148 et seq., 155, 157 et seq., 160, 163, 164, 166-169 |
| R VII B | paras 171 et seq., 177, 179, 184 et seq., 191, 193, 197, 200 et seq. |
| R V PA | paras 119, 121, 123, 126 et seq. |

1068. Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

1069. The misrepresentations found by this Tribunal further above in this Award are very substantial, particularly those regarding the Equant Shares, the subsidies granted and then removed, and the outstanding debts for employees. Though one may perhaps doubt – as the Tribunal did with regard to the NCS – whether any one of these misrepresentations by itself would have lead Claimant not to conclude the PA, and though the Tribunal found that Claimant could not prove damage caused by some of the mispresentations, together they were of such an importance and volume that, in the judgement of the Tribunal from the evidence before it, it must be assumed that Claimant would not have concluded the PA or would have concluded it only with much more favourable or less risky conditions. This is confirmed by the fact that the Parties considered the Seller's liability for misrepresentations so important in this specific deal that they included specific provisions in this regard in Article 9.1.2. PA and thus made this a major duty for Seller and thereby not leaving the respective consequences for misrepresentations to the application of the relevant Bulgarian law, particularly that on rescission. In view of this, it is obvious to the Tribunal – and plausible for a deal of this kind – that the Parties gave specific importance to the information to be disclosed by Seller.

1070. The Tribunal has considered the dispute between the Parties regarding the questions whether there was a rescission of the contract and, if so, whether it was justified and can be the basis of the claims raised.

1071. The Tribunal is not persuaded by Respondents' allegation, that the only option for Claimant was to rescind the PA in order to be able to claim back the amount it transferred pursuant to the agreement. Such