a claim may also arise, if a contract comes to a premature end due to circumstances other than unilateral rescission by one party. As discussed further above in this Award, Article 9.1.2. expressly provided that *"Seller shall be liable"* for misrepresentations and referred to further contractual provisions with regard to details of that liability. Thereby the Parties agreed on special contractual consequences in this regard and also made it clear that the "normal" provisions of the applicable law on a rescission *ex tunc* were replaced by these specific contractual provisions providing for certain liabilities rather than giving the option to make the contract void from its very beginning. If a rescission remained possible, in view of these contractual provisions, it could only lead to make the contract void *ex nunc*. This interpretation seems to be in conformity with the actual behaviour of the parties. In the present case, after concluding the contract, both contractual parties started performing the contract for some time, in spite of the alleged misrepresentations and breaches, but both sides stopped performing the contract in February 2001. This confirms that the contract came to an end in February 2001. And this is in line with the fact that, in the present proceedings, neither Party claims a further performance of the contract, but only damages.

1072. Therefore, the Tribunal has to establish which of the alleged misrepresentations and breaches occurred and wether and to which extent they caused the factual termination of the contract and the resulting claims.

1073. Even if the Tribunal would consider that a rescission of the PA by Claimant is a pre-condition for its claims, it notes that the Claimant has declared that it rescinds the PA. (C VII, para. 164). In that context, contrary to the Respondents' allegation that rescission at this stage is not possible because it has been more than three years since the PA was signed, Claimant can indeed argue that it found out for the first time the full extent of the mispresentations at a later stage and in these arbitral proceedings, and that the limitation period for rescinding an agreement based on an act of misrepresentation only starts running upon discovery of the misrepresentation.

1074. Therefore, the Tribunal concludes that the contract has come to an end in February 2001 and that since that time, neither Party can claim performance of the contract from the other side. This may also be of relevance for the bankruptcy proceedings which have not yet been terminated, because the decision of this Tribunal on the contractual claims between the Parties, without this Tribunal prejudging the bankruptcy court, would seem to prevent Claimant from raising and receiving payments for the same claims again in such proceedings.

1075. Therefore, the Tribunal concludes that Claimant can claim from Respondents repayment of money it can prove it made under the PA subject to any deductions due to breaches by Claimant or set-off by the Counterclaims.

1076. Here, the Tribunal now has to enter into the dispute between the Parties as to which payments of Claimant under the PA have actually occurred and been proved.

1077. In this context, the Tribunal recalls that, further above in this Award, it has concluded that payments made by third parties on behalf of Claimant under the PA must be considered as payments by Claimant.

1078. The Tribunal notes that Claimant, during the long course of this procedure, has raised very different calculations and amounts claimed as damages. Irrespective thereof, the Tribunal just has to examine for which payments under the PA has fulfilled its burden of proof.

1079. From the file, the Tribunal comes to the following table for payments actually documented:

| No. | Date | Legal Grounds | Amount in '000 | From | Evidence |
|---|---|---|---|---|---|
| 1.* | 19.07.99 | Escrow Agreement | USD 6 000 | Z and KA | C-72 A; R-16A of 15 July 1999 |
| 2.** | 05.12.99 | Loan Agreement | USD 2 400 | BAH | R-16G; C-97 of 5 December 1999 |
| 3. | 27.04.00 | Loan Agreement | USD 3 500 | BAH | R-16B of 27 April 2000 |
| 4.*** | 01.06.00 | Loan Agreement | USD 3 000 | BAH | R-16C, B107/ p. 26 of 1 June 2000; C-72D |
| 5. | 21.11.00 | Loan Agreement | USD 3 750 | BAH | R-16F, B-107/ p. 32 of 21 November 2000; C-72E |
| 6. | 06.12.00 | Loan Agreement | USD 2 500 | BAH | R-16E, C-72F of 6 December 2000 |
| 7. | 13.12.00 | Loan Agreement | USD 2 000 | BAH | R-16D, B 107/ p. 49 of 13 December 2000; C-72 G |
| | | Total | USD 23 150 | | |

\* Note: Concerning the same sum of USD 6 000 000 a Loan Agreement of 15 December 1999 was signed between BAH and BBA (B-107, R-16A)

\*\* Note: The Loan is given so that a Deposit with Bank Hapoalim is made on behalf of BBA that will enable the latter to open a letter of credit in favor of GE Capital Airways Services)

\*\*\* Note: This Loan Agreement was later rolled into a new loan under a Loan Agreement of 7 December 2000 (B 107/p. 44).

Note 1: The sum under No. 2 was given from BAH to BBA so that the latter could open respective letters of credit in favour of Elasis Leasing IV Ltd. (C-135) but as a matter of fact this was given by BAH in replacement of Zeevi' obligation under the Agreement to annually in the course of 3 years to open a letter of credit of 2 400 000. Probably that's the reason why PwC does not consider this as a loan and the total is shown as 20,750.

Note 2: As was shown above (No. 2) Zeevi has transformed its escrow obligation into a loan agreement parties to which are BAH and BBA – 15 December 1999. In the text of the Agreement it is explicitly noted that the money had been given before that.

Note 3: The above loans do not seem to be disputed between the Parties. Despite this they are further proven:

1. In the BBA bankruptcy proceedings (C-100)

    In those proceedings the Trustees have accepted as existing the above loans as follows:

    a) Final decision (no date) – loans from 5 December 1999; 15 December 1999; 21 November 2000 and 6 December 2000 of a total value of USD 13,650,000 plus 370,000 interest, and

    b) final decision (no date) – loans from 24 April 2000; 1 June 2000 and 13 December 2000 of a total value of USD 8,500,000 plus 800,000 interest.

    The second group of loans was assigned by BAH to ZBI through an assignment agreement of 25 January 2001.

    Eventually, all those were excluded by the court not on a substantive, but on a procedural ground.

2. Through "Main Liabilities (…) as of 31 January 2001" (C-130)

    a) In the rubric – "Loans from abroad" Loans from BAH of the total sum of USD 21,813,000 are shown;
    b) the Tribunal has recalculated one of the loans that was in Euro and converted it into USD);
    c) from the document one cannot say whether the sum is only the capital or it comprises interest as well.

1080. Therefore, the Tribunal concludes that payment by Claimant has been proven for a total amount of USD 23,150,000.00.

1081. In view of this conclusion, the two other options for indirect claims mentioned above become irrelevant, because the above amount includes any payments that could otherwise perhaps have been claimed as indirect damages. A different result could only be argued if it was shown and proven that, without the breaches by Respondents, the Company would have become profitable and Claimant would have received money beyond what it had paid into the Company. But, in spite of the rather optimistic Speedway Report, the Tribunal does not find proof for such an expectation.

## 3.   Liability according to the OCA

### a.   *Summary of Contentions by Claimant*

1082. Moreover and alternatively, the representation of inaccurate information by the Respondents within the scope of these representations amounted to a clear act in violation of the obligation pursuant to Article 12 of the OCA. According to the second part of Article 12, a party which acts in bad faith is liable for the damages caused by the misrepresentation. (C VII, para. 89)

1083. Article 82 of the OCA determines the damages which are awarded, allowing the coverage of all foreseeable damages, and in cases where there is bad faith these damages cover unforeseeable damages as well.

1084. Hence, the damages due pursuant to Articles 12 and 82 are thus equal to the decrease in the value of Balkan due to the missing assets and additional liabilities; or in the alternative an amount of USD 14,750,000, which is the amount of money Claimant was forced to transfer to Balkan over and above its contractual obligations. (C VII, paras 90 *et seq.*)

### b.   *Summary of Contentions by Respondent No. 2*

1085. Respondent No. 2 submits, Article 12 of the OCA deals with the pre-contractual requirements in a very general manner. Article 12 of the OCA provides for the parties to act in good faith during negotiations and formation of a contract. Hence, good faith is the criterion for assessment of their actions. (R V PA, para. 30) In this regard, Respondent No. 2 points out that there is a difference between good faith and bad faith. Good faith is related to a required conduct while bad faith implies mental attitude. Article 21, paragraph 2, Article 25, paragraph 1 and Article 82 of the OCA speak of bad faith. Good faith is inconsistent with any conduct undertaken with the intention

to worsen the situation of the other party. The Respondent might not be accused of such a conduct. (R V PA, para. 31)

1086. Respondent No. 2 states, case law unanimously supports the idea that pre-contractual liability is a specific form of civil liability and not a mere enlargement of the delictual liability. It should also not be classified as a form of contractual liability. The bad faith in conducting negotiations shall lose its independent significance once the contract is concluded – it will be absorbed by the contract and will affect in one way or another the validity and force of the latter. Since the contract is a fact and as far as it is supposed to regulate the parties' relationship, the solution shall be sought within the legal framework devoted to the contracts. (R V PA, para. 33)

1087. Claimant's interpretation of Article 12 of the OCA reflects only one opinion concerning the scope of liability under Article 12. The Respondents rely on the opposing opinion, that in case a party is not conducting negotiations and formation of contract in good faith the other party may claim negative interest only, since its aim is to cover the interest harmed due to not conducting the negotiations in good faith, it is not meant to cover the interest of performance of the contract which is the emanation of the negotiations. (R V PA, para. 34)

1088. Respondent No. 2 further notes, the provision of Article 12 of the OCA, unlike the provision of Article 82 of the OCA does not contain an indication that the compensation shall comprise of lost profits as well. The indemnification under Article 82 of the OCA is indemnification for non-fulfillment of contract. Hence, its legal consequences must not be copied onto the legal consequences of Article 12 of the OCA, which is only in effect until the conclusion of the contact. (R V PA, para. 35)

1089. As to the presumption of good faith, Respondent No. 2 refers to Article 70, paragraph 2 of the Ownership Act, stating that good faith is presumed until proven the opposite. This principle is also established in Articles 20, 42, para. 1, 56, 75, para. 2, 82, para.1, 91, para. 1 and 135 para. 1 of the OCA. (R V PA, para. 37) These provisions of the law come out of the assumption that the parties to a relationship are acting in good faith and this is the typical and most frequently occurring factual situation. (R V PA, para. 38)

1090. Therefore, the party, which is trying to derive benefits from the other party's bad faith must prove the other party's bad faith, which Claimant has failed to do. Even if the alleged misrepresentations were made, which Respondent No. 2 denies, they were still not made contrary to the good faith principle. (R V PA, para. 39)

1091. Respondent No. 2 refers to Article 195, para. 2 of the OCA in regard to the legal ground for contractual liability arising out of undisclosed information. Under this article, the seller's liability is limited to certain degrees and is dependent on the following preconditions: the seller is not liable for such defects that were known to the purchaser (most of the so called misrepresentations, which are denied, were known to the Claimant); an immediate notification for the defects is made after a period which normally is sufficient for inspection. However, according to Article 197 of the OCA all claims under Article 195 of the OCA may be submitted no later than 6 months after the subject of the sale was received by the purchaser. Since the limitation period had expired before the claim was filed, all allegations regarding the misrepresentations should be dismissed. Claimant has also failed to present evidence, which would prolong the limitation period. (R V PA, para. 43)

1092. Respondent No. 2 further contends, the information provided by the Respondents to Claimant was of much wider range than legally required. (R V PA, para. 44) Given the difficult situation of the Company, which was undisputedly known to Claimant, it should have used extra precaution, instead of relying only on unverified information. Therefore, Claimant may not refer to bad faith of the Respondents due to misrepresentation or withholding of information when it as a result of its own negligence did not find it out. In this context, Respondent No. 2 refers to the extensive information it provided in the Data Room, including reports of internationally known consultants such as Speedwing and KPMG. Claimant has failed to prove the Respondents acted in bad faith by withholding information. (R V PA, para. 45)

1093. In this regard, Respondent No. 2 contends, the Information Memorandum and the Financial Analyses should be read as an introduction to all information contained in the Data Room. (R V PA, para. 46)

1094. Furthermore, Respondent No. 2 alleges, Claimant should have performed a due diligence. Hence, the mere reliance upon the information provided by the seller borders to gambling that is far from reasonable business behavior. (R V PA, para. 47)

1095. Therefore, Respondent No. 2 contends, if any Claimant directly suffered any damage from the alleged misrepresentations, Respondents' liability must be reduced in accordance with Article 83, paragraph 2 of the OCA, since Claimant essentially contributed to the damage. (R V PA, para. 48)

*c.*     *The Tribunal*

1096. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

Party Submissions:
      C VII       paras 89 *et seq.*

      R V PA     paras 31, 33 *et seq.*, 37 *et seq.*, 43-48

1097. Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

1098. The specific liabilities for disclosure of information provided in the PA and discussed above, in the view of the Tribunal, exclude as a contractual *lex specialis* or at least make unnecessary the application of respective sections of the general Bulgarian law and in particular the OCA. Anyhow, no further damage claim could result there from than the one accepted above.

## 4.    Liability according to the European Principles of Contract Law

*a.*     *Summary of Contentions by Claimant*

1099. This notion is also in accordance with Article 4:117(2) of the European Principles of contract Law, according to which damages for losses can be claimed even if a contract has not been rescinded. Furthermore, such damages are possible also in cases where a contract has been concluded based on incorrect information given by the other party even if the said information does not give rise to a fundamental mistake. (C VII, paras 94 *et seq.*)

1100. Hence, even if Articles 9.1.2 and 11.1 of the PA do not provide Zeevi Holdings a right to sue for damages, the Respondents were still liable to compensate for the misrepresentations made in the PA. (C VII, para. 96)

*b.*     *Summary of Contentions by Respondent No. 2*

1101. With regard to Claimant's reliance on the European Principles, Respondent No. 2 contends, these are inapplicable at this stage, since the applicable substantive law in these proceedings is the Bulgarian law. Furthermore, whenever there is a conflict between the European

Principles and the Bulgarian national law, the latter shall prevail according to Article 7 of the European Agreement for Association between European communities and its Member States and Bulgaria. Moreover, the notions and the content of misrepresentation, mistake, fraud, etc. should be judged in the light of Bulgarian legislation and they can not be "enlarged", attached or adapted to meanings these terms might have in other legal order or system. (R V PA, para. 50)

1102.  In this respect, it is noted, that the principle of strict liability under in Article 4:106 of the European principles is unfamiliar to applicable Bulgarian law. (R V PA, para. 51)

1103.  In any case, Respondent No. 2 submits, Claimant failed to reproduce the entire text of Article 4:106 of the European Principles, which it relies on, in omitting to quote: the misrepresenting party is liable,

> „unless the party who gave the information had reason to believe that the information was correct:" (R V PA, para. 52)

1104.  Hence, no liability may be imposed for damages caused by erroneous data given the provider of that data exercised reasonable care in obtaining and communicating the information and there is on reason to believe, Respondent did not act in good faith. (R V PA, para. 53)

### c.    *The Tribunal*

1105.  In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | | |
|---|---|---|
| C VII | paras 94 *et seq.* | |
| R V PA | paras 50-53 | |

**Exhibits:**

| | |
|---|---|
| C-35 | PA |

1106.  Again, the Tribunal can be short with regard to this issue. For the same reasons as for the non-application of the OCA to damage claimed due to the misrepresentations, the specific provisions of the PA make also the respective principles of European Contract Law irrelevant, should they at all apply.

## 5.     Liability due to breach of warranties

### a.     *Summary of Contentions by Claimant*

1107. Pursuant to Article 3.7.3, the Respondents warranted that all information contained in this Agreement, the Information Disclosure Letter and the Information Memorandum is true and not misleading. (C VII, para. 97) Hence, in accordance with Article 79 of the OCA, Claimant is entitled to claim performance of the obligations and damages for the delay or, alternatively claim damages for non-performance, the measure of which is set in accordance with Article 82. (C VII, paras 98 *et seq.*)

1108. Accordingly, Claimant is entitled to damages in the amount of the value of the misrepresentation or, alternatively, in the amount that Claimant exceeded its obligations, i.e. USD 14,750,000. (C VII, para. 100)

### b.     *Summary of Contentions by Respondent No. 2*

1109. Regarding Claimant's allegation that Respondents are liable for breach of warranties, thereby eliminating the necessity for Claimant to prove Respondents' alleged bad faith, Respondent No. 2 contends, this argumentation is not admissible. Even if it were admissible, the liability of the Respondents should be limited to the difference between the amounts Claimant invested and the value of the assets Claimant appropriated from the Company. (R V PA, para. 55)

1110. In this regard, Claimant may not rely on Article 79 of the OCA, but rather on Article 195 of the OCA, the actions for which, however, are limited to prescription. (R V PA, paras 56 *et seq.*)

### c.     *The Tribunal*

1111. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**
| | |
|---|---|
| C VII | paras 97-100 |
| R V PA | paras 55 *et seq.* |

**Exhibits:**
| | |
|---|---|
| C-35 | PA |

1112. In this context, the Tribunal only has to recall that, further above in this Award, it has concluded that the specific provisions of the PA providing for Respondents' liability for misrepresentations are applicable without that Claimant has to prove bad faith of Respondents.

1113. With regard to the damages that can be claimed for the warranties on which Claimant relies here, they can not go beyond the damages accepted above as caused by the misrepresentations and their effect due to other provisions of the PA.

## 6. Liability due to fraud

### a. Summary of Contentions by Claimant

1114. Claimant contends it is entitled to a claim for a civil delict, since according to Article 45 of the OCA using fraud upon entering into a deal represents a civil delict/tort. (C VII, paras 101 et seq.)

1115. According to Article 51, the damages which are due as a result of the fraud amount to the value of the missing assets and additional liabilities, or the additional amounts the Claimant has had to transfer into the Company as a result of this. (C VII, para. 103)

1116. Such a claim of tort is also covered by Article 15.1 of the PA. (C VII, para. 104)

### b. Summary of Contentions by Respondent No. 2

1117. Regarding Claimant's allegations with respect to fraud, Respondent No. 2 contends, under Bulgarian law, legal entities like the Privatization Agency are not liable for tort under Article 45 of the OCA. (R V PA, para. 59) Only Articles 49 and 50 of the OCA would be applicable, on which, however, Claimant's claims are not based. (R V PA, para. 60)

1118. In any case, Claimant did not prove the casual link between the unlawful and guilty conduct and the damages that occurred. (R V PA, para. 61).

## c. The Tribunal

1119. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | |
|---|---|
| C VII | paras 101-104 |
| R V PA | paras 59-61 |

**Exhibits:**

| | |
|---|---|
| C-35 | PA |

1120. In this context, the Tribunal considers it sufficient to state that, though it has accepted a liability of Respondents for misrepresentation in application of the respective specific provisions of the PA, it does not see any evidence for fraud by Respondents.

## 7. Damages as a Result of the Collapse of the Company

## a. Summary of Contentions by Claimant

1121. Respondents' breaches and failures directly caused the Company's collapse constituting a further loss to Claimant. (C VII, para. 106)

1122. Claimant's belief in the Company's success is best proven by the massive injections of funds into the Company over a very short period of time and the additional activities Claimant undertook, such as consulting „Speedwing" in order to restructure the Company modernizing the aircraft fleet and initiating a joint venture with IAI to establish Balkan Technique. (C VII, paras 107 *et seq.*)

1123. The potential Claimant saw in its investments in Balkan is evidenced by its plans to launch a public offering based on its holdings of Balkan. (C VII, para. 112)

1124. On the Respondents' own admission, these actions brought about a substantial improvement in the Company's position. (C VII, para. 113)

1125. Despite all these activities, the Company collapsed at the beginning of 2001. (C VII, para. 114) The reason for this is that the Company was missing at least assets in the amount of USD 91,994,876 due to Respondents misrepresentations. This collapse could have been avoided had the Respondents injected into the Company only a small

portion of the total value of their false representations. (C VII, paras 115 *et seq.*) This is supported by Claimant's expert Mr. Harlev. (C VII, para. 118)

1126. As can be seen from the 2001 Budget, this budget forecasted an operating profit for the Company already for 2001 amounting to USD 1,851,000 but also required a total injection of USD 10,750,000 during the year. (C VII, para. 119) From a comparison of this amount with the amount the Respondents owed to the Company one can conclude that the collapse could have been avoided, if the Respondents had compensated to the full extent of the missing assets and additional liabilities. (C VII, para. 120)

1127. If the Respondents had at least shown its willingness to accept responsibility for its false representations, Claimant would have been willing to inject even further amounts. This is proved by the fact that claimant already had injected USD 14,750,000 over and above what was required under the PA. (C VII, para. 122)

1128. The budget for 2001 also proves that had the Company's position upon its privatization been as presented to Claimant, there would have been no problem operating the Company. (C VII, para. 125)

1129. The Company's budget for 2001, thoroughly illustrates that the size of the amounts that were lacking for the Company's continued existence were far less than the amounts that the Respondents were liable to pay in view of the false representations that had been made. Thus, had such payments been made, the Company would not have collapsed. Hence, the loss of the Company is a direct result of the Respondents' misrepresentations. (C VII, para 126)

1130. According to the Expert's conservative Valuation, which is based on data compiled by Speedwing, made for the Company by Dr. Kraizberg, the value of Claimant's share in the Company, as a going concern, as of 1 January 2001 was USD 71,845,000. The Company's collapse accordingly reflects a direct loss to the Claimant which at the very least equals this amount. (C VII, paras. 127 *et seq.*)

1131. According to Speedwing's report, which is undisputed, the Company's profits for the five-year period of the report's projections would have reached the sum of USD 55.6 million. (C VII, para. 131)

1132. This was confirmed by the Expert Opinion of Mr. Harlev, which corresponds to Mr. Golan's and Mr. Frank's witness statements, who stated that the Company had implemented the restructuring steps recommended by Speedwing to a large degree. (C VII, para. 133)

1133. The Valuation also analyzed the Company's real estate assets and its landing rights. The Valuation of the real estate assets is based on real-time valuations made to these assets. The value of the flying rights has been determined based on a market valuation report made to the Company's assets at the request of the Trustees' in Balkan's bankruptcy. 50% of this value are counted as surplus value being worth USD 5,800,000. The Respondents have acknowledged a much higher value to these rights. (C VII, paras 134 *et seq*.)

1134. In view of the conservatism practiced in preparing the Valuation, among other things, the Valuation deducted from the value of the Company the entire amount of the Company's debts which have been recognized by the Trustees in Balkan's bankruptcy. (C VII, para. 138)

1135. To conclude, the Respondents' refusal to fulfill their contractual and legal obligations and compensate and indemnify for the missing assets and additional liabilities (in an amount which is far greater than the USD 10,750,000 which were needed to ensure the Company's operations), thus caused an additional direct loss to Claimant amounting to at least USD 71,845,000. (C VII, para. 139)

1136. Claimant submits, it could not have prevented Balkan Airlines' collapse. Claimant's desperate attempt to save the company is best illustrated by the fact that it injected far more funds than it was contractually obliged to. (C VII, para. 141) Furthermore, Claimant purchased the Company with the representation that the Respondents undertook to support it in all matters, which, in reality they did not (reference is made to the loss of the national carried status). This behavior also resulted in severe damage to the Company's reputation, which negatively affected the ability to inject additional funds from third parties. (C VII, para. 142)

1137. Additionally, Claimant sought to raise capital in form of a public offering of the Company. This was, however, made impossible due to the fact that Claimant had to disclose the Respondents' misrepresentations to the public. (C VII, para. 143)

1138. Moreover, had the Respondents undertaken to perform their part of the PA, claimant would have been able to inject further funds into Balkan. (C VII, para. 144)

1139. In this respect, Claimant refers the Tribunal to the letters dated 7 September 2000, 14 September 2000 and 18 September 2000, in which Claimant informs the Respondents of their breaches of the PA and the urgent need of the Company to receive additional funds due to these misrepresentations by the Respondents. (C VII, para. 146)

1140. Hence, for a relatively small amount, the Respondents could easily have avoided the enormous damages and losses that were sustained ex post facto. In view of the letters that were written, it is clear that the Respondents cannot argue that they were unaware of the heavy damages and losses that were likely to be caused. Therefore, the Respondents should compensate for the damages in full. (C VII, para. 147)

### b.     Summary of Contentions by Respondent No. 1

1141. Regarding the claim for USD 40 million for the direct loss to Claimant resulting from the Company's collapse, Respondent No. 1 submits, it was Claimant's management that led to the exponential deterioration of the airline's financial condition in 2000. (R VII B, para. 140) In view Claimant's allegation, that Balkan was doomed to fail, Respondent No. 1 refers to Claimant own consultants, Speedwing, who concluded, concluded that Balkan Airlines would achieve operating break-even within a year or two, provided significant investment was made, chiefly in "modern aircraft. (R VII B, para. 144) Mr. Harlev drew a similar conclusion. (R VII B, para. 145) Hence, the Speedwing Report and Claimant's 2001 budget show that the cause for Balkan Airlines' so-called "collapse" could not have been the misrepresentations and breaches with which Claimant charges the Respondents. (R VII B, para. 149)

1142. Respondent No. 1 alleges in this regard, Claimant was responsible for the deterioration of the financial condition of Balkan Airlines as at February 2001. (R VII B, para. 150) This allegation is sustained by the Second PwC Report, which describes the steep deterioration of Balkan under Claimant's management in 2000 and attributes this to a significant increase in Balkan Airlines' expenses, a large proportion of which comprised expenses for hired services; the disappearance of many of Balkan Airlines' principal assets; the significant increase in Balkan Airlines' debt and the halving of Balkan Airlines' cash holdings. (R VII B, para.152) These were allegedly all direct results of Claimant's management of the Company. (R VII B, para. 153)

1143. The PwC Second Expert Opinion concludes, instead of investing in Balkan Airlines, Claimant appropriated a net of approximately USD 5 million. (R VII B, para. 155) It was due to these appropriations, that Balkan Airlines collapsed in February 2001 (R VII B, para. 156)

1144. Furthermore, in view of the facts that , according to Respondent No. 1 only days before the Company collapsed, Claimant siphoned USD 1 million out of the Company and Claimant's entire

management left Bulgaria for Israel, Respondent No. 1 contends, Claimant abandoned the airline. (R VII B, para. 157) This also emerges from Mr. Frank's curriculum vitae, stating with regard to Balkan Airlines, the project was abandoned. (R VII B, para. 158)

1145. Therefore, the value of the shares in Claimant's possession is of no relevance to this arbitration, since the company did not collapse due to Respondents' alleged misrepresentations, but to the abandonment by the Company's own management, Claimant. (R VII B, para. 160)

1146. In any event, Respondent No. 1 asserts, Dr. Kraizberg's valuation of Balkan at the time of Claimant's abandonment is unreliable. In this regard, Respondent refers to the PwC Report, which concluded, that it was impossible to verify Dr. Kraizberg's valuation due to the significant amount of unsupported calculations and assertions made within the valuation. (R VII B, paras 161 *et seq.*) The inadequacies of Dr. Kraizberg's valuation do not mean that Balkan Airlines was worthless in early 2001. Balkan Airlines definitely had value in February 2001, but the Kraizberg Report is not a reliable basis upon which to calculate that value. (R VII B, para. 164)

### c.   *Summary of Contentions by Respondent No. 2*

1147. With respect to the damage resulting from the loss of the Company, Respondent No. 2 submits, Claimant breached its funding obligation. In this regard it is noted that the argument that the Claimant restrained from duly fulfillment of its investment and funding obligations in response to Respondents misrepresentations and breaches should be rejected. (R V PA, para. 101)

1148. The Company collapsed not because of Respondent's erroneous conduct but for the Claimant's own breaches of the agreement followed by the abandonment of the Company. (V PA, para. 103)

1149. Furthermore, Respondent No. 2 submits, it is contrary to good faith procedural conduct to put forward a claim for loss of the company at this late stage of the proceedings as no such claim was raised in the phase on liability issues and thus conflicts with Article 20 of the UNCITRAL Rules. (R V PA, para 104)

1150. Claimant's allegation concerning the loss of the Company is baseless, since the Company was not lost, but abandoned by Claimant. The bankruptcy proceedings would never have commenced, if Claimant, had covered the USD 500,000 claim from Bulstrad. (R V PA, para. 105)

1151. Furthermore, Claimant's evaluated loss based on Dr. Kraizberg's Valuation, is to be disregarded, since this Valuation consists mostly of presumptions. Moreover, there is no justified right to recovery of lost profits in this case since there is no evidence that the Claimant could have performed his part of the obligations. (R V PA, para. 106)

1152. Furthermore, Respondent No. 2 submits, since Claimant has failed to provide any realistic proof of it future profits, it is not possible to render an award on such basis. (R V PA, para. 108)

1153. The application of a discount cash flow analysis in the present case is inappropriate given Claimant's business plans were not fully implemented and an award based on future but uncertain profit would be thoroughly speculative. Moreover, Mr. Harlev admitted that the Company would have started to fully implement the Speedwing recommendations only in 2002. Since until then, the Company's losses were growing, the projection of future profits is even more speculative. (R V PA, para. 111)

1154. In contrast to Dr. Kraizberg's Valuation, Respondent No. 2 alleges, in valuating a company, an investor should normally take into account the following issues: cash flow, technical efficiency, fleet age and the general economic environment of the airline industry. (R V PA, paras 113 *et seq.*)

### d.  The Tribunal

1155. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | |
|---|---|
| C VII | paras 106 *et seq.*, 112 *et seq.*, 118 *et seq.*, 122, 125 *et seq.*, 131, 133 *et seq.*, 138f., 141 *et seq.*, 146f. |
| R VII B | paras 140, 144f., 149f., 152f, 155f *et seq.*, 160 *et seq.* |
| R V PA | paras 101, 103 *et seq.*, 108, 111, 113 *et seq.* |

1156. Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

1157. In so far as Claimant claims damages resulting from money it invested in or paid to the Company and could not retrieve, this claim

has already been accepted under the Respondents' liability for misrepresentations. Since it can not be claimed twice, the Tribunal does not have to deal with them again under a possible liability for the collapse of the Company.

1158. However, in addition thereto, under the present topic, Claimant seeks damages for the profits it would have made and lost due to the Company's collapse.

1159. In this regard, Claimant has the burden of proof:

      1)    that the collapse of the Company was caused by unjustified action of Respondents, and

      2)    that the Company would have made a profit and how much of that profit Claimant would have received.

1160. Regarding the first issue, after evaluating the evidence mentioned in the above contentions by the Parties, the Tribunal concludes that both Respondents and Claimant contributed to the collapse of the Company. To mention an example, in view of the relatively small amount lacking and leading to the insolvency, had Respondents paid up what were undisclosed and misrepresented obligations of the Company under the PA, the collapse would probably have been avoided. But, on the other hand, the Tribunal also has the impression from the file and particularly from the PwC Report that Claimant's management lead to a considerable increase in the Company's expenses and debts of various kinds and withdrawal of funds which, together with the sudden abandonment of the Company by Claimant's management in February 2001, as well, contributed to the collapse of the Company.

1161. However, in view of the second issue mentioned above, the Tribunal does not have to quantify this above evaluation to establish whether Claimant might at least claim part of its lost profit. For, the Tribunal is not persuaded from the evidence that the Company would in fact have made a profit at all. In this regard, neither the optimistic Speedwing Report nor the 2001 budget nor the plans to launch a public offering nor any other evidence presented by Claimant provide sufficient proof that a profit could actually be expected. In this context, the Tribunal feels it should stress that it is aware of the difficulty of establishing, even in hindsight, what would have been the course of the Company, and that it cannot put itself in the place of an entrepreneur taking business decisions. But, in conducting its legal function, the Tribunal must be convinced that Claimant fulfilled its burden of proof regarding the expectation of a profit and comes to the conclusion that this proof has not been sufficiently supplied.

1162. Therefore, the Tribunal concludes that Claimant cannot claim damages for lost profit due to the collapse of the Company.

## 8. Additional Damages in Respect to Increase in Financing Costs, Failure of Public Offering, Failure of Public Offering of Zeevi Logistics and Damages to Reputation and Goodwill

### a. *Summary of Contentions by Claimant*

1163. Additionally, Claimant alleges, it suffered further losses. (C VII, para. 170)

1164. Claimant argues, the threat to the Company's standing as NC due to the Respondents' misrepresentations, prevented Claimant from finding investors or raising capital to finance its activities. This led to a substantial increase in the costs of financing and of operating the Company. (C VII, para. 172)

1165. Furthermore, the severe financial situation of the Company resulting from the Respondents' misrepresentations, rendered a public offering of its subsidiary, Zeevi Logistics impossible. The offering was due to raise money for the Claimant and with its failure the costs involved in its preparation and the revenues it was supposed to yield were lost. (C VII, para. 176)

1166. In addition, the problems encountered due to the serious financial situation have demanded dedication of expensive managerial time and professional advisors, over and above what would have been expected had the Company not been in the severe position. (C VII, para. 174)

1167. Finally, the uncertainty surrounding the Company's stability, the possibility of the collapse of a company owned and controlled by Claimant, and the continuing bad publicity that Claimant consequently received in the Bulgarian, Israeli and world media, constituted serious real damage to Claimants reputation and goodwill, affecting its ability to obtain credit on favorable terms and to open up opportunities for the creation of business connections. (C VII, para. 175)

1168. For the above reasons, Claimant asks the Tribunal global damages in the amount of USD 15,000,000.

### b. Summary of Contentions by Respondent No. 1

1169. Contrary to Claimant's allegations, Respondent No. 1 contends, the USD 14.75 million Claimant transferred into the Company were not in excess of its contractual obligations, since according to these obligations, Claimant should have invested USD 20 million annually. (R VII B, para. 137)

1170. More importantly, the allegation, that it had to transfer this amount in order to „make good" the misrepresentations by the Respondents, proves, that the total value of the alleged misrepresentations by the Respondents could not be more than USD 14.75 million. (R VII B, para. 138)

1171. Regarding Claimant's claim for USD 15 million for the alleged damage to its reputation, Respondent No. 1 contends, this claim is bereft of any evidence. (R VII B, para. 166) Respondent No. 1 also refers to the civil and criminal investigations against Claimant and its management in Israel and Bulgaria, stating that Claimant only has itself to blame in this matter. (R VII B, para. 167)

1172. Moreover, as to the intended floatation of Balkan and Zeevi Logistics, Claimant has allegedly failed to prove these intentions were serious, this floatation were affected by the alleged misrepresentations of the Respondents and that Zeevi Logistics was in any way connected to Balkan Airlines. (R VII B, para. 168)

1173. Hence, these claims must be dismissed. (R VII B, para. 169)

### c. Summary of Contentions by Respondent No. 2

1174. Respondent No. 2 contends, the amount Claimant alleges to have invested in excess of its obligations pursuant the PA, is odd. In view of this Respondent No. 2 points out, only after the Hearing Claimant qualified this amount to be in the fulfillment of its obligations pursuant to Article 7.1, which, allegedly only required a transfer of USD 8.4 million during this period.

1175. Contrary to this allegation, Respondent No. 2 refers to Article 8.2.1 of the PA, which calls for additional investments of at least USD 20 million per annum. In view of this additional funding obligation, Claimant certainly did not transfer USD 14,750,000 in excess of its obligations. (R V PA, para. 100)

1176. As to the alleged increase of financing costs, Respondent No. 2 contends Claimant failed to provide evidence in support of this

allegation. Moreover, this claim overlaps with some of the other claims. (R V PA, para. 131)

1177. With respect to the alleged failure of Zeevi Logistics' public offering, Respondent No. 2 contends, this claim is to be dismissed for remoteness to this arbitration. Additionally, if any loss occurred at all, it was to Zeevi Logistics, which is not a party to this Arbitration. (R V PA, para. 132)

1178. Furthermore, Respondent No. 2 alleges, this claim is not supported by any evidence (R V PA, para. 133)

1179. Respondent No. 2 rejects the claim regarding management and time expenses, since it is not backed by evidence. Furthermore, Respondent No. 2 alleges this claim to be insufficiently specified. (R V PA, para. 134)

1180. As to Claimant's allegation regarding damages to its reputation and good will, Respondent No. 2 contends according Bulgarian legislation these alleged damages are not subject of compensation as they cannot be evaluated and have no specific material expression.

### d. The Tribunal

1181. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

Party Submissions:

| | |
|---|---|
| C VII | paras 170, 172, 174 *et seq.* |
| R VII B | paras 137 *seq.*, 166-169 |
| R V PA | paras 100, 131-134 |

1182. Taking into account the above contentions of the Parties, the Tribunal's major considerations are:

1183. As mentioned already in another context further above in this Award, the Tribunal is not persuaded that it was only Respondents' breaches which caused the collapse of the Company, but also the management decisions of Claimant in running the Company involving by high expenses charged from outside the Company. Again, though the Tribunal does not intend to question in hindsight Claimant's business decisions, Claimant has the burden of proof that indeed the additional costs claimed here were caused by Respondents. In this regard, the Tribunal concludes from the

evidence submitted by Claimant, including particularly the second witness statement of Mr. Golan, that Claimant has not sufficiently provided such proof.

1184. Regarding the concrete quantification of such costs, the Tribunal appreciates Claimant's argument in C VII p. 47 that such quantification is difficult and, therefore, the global sum of USD 15 million can be demanded. But nevertheless the Tribunal finds that even in such circumstances sufficient proof has not been provided.

1185. Therefore, due to lack of proof of both causation and quantification, the Tribunal concludes that Claimant has no damage claim in this context.

## 9. Burden of Proof

### a. *Summary of Contentions by Claimant*

1186. Claimant submits, in the present case it is encountering difficulties as to its ability to exactly quantify some of its claims and with regard the burden of proof, the fact that all relevant material is located in Bulgaria and under the control of the Respondents makes it impossible to prove some of its claims. (C VII, para. 178)

1187. In order to overcome difficulties of this sort, certain legal doctrines have been developed to be used in appropriate cases, namely: shifting of the burden of proof, and awarding damages based on a global assessment. Therefore, if, contrary to Claimants position, the Tribunal is of the opinion that Claimant has not proven some of its claims, the Tribunal is able to utilize these doctrines in order to achieve a just result. (C VII, para. 179)

### b. *Summary of Contentions by Respondent No. 2*

### (1) *General Comments on Claimant's Quantification Brief*

1188. As to the conformity of Claimant's Quantum Brief with the Tribunal's PO No. 11, Respondent No. 2 contends, contrary to what was advised by the Tribunal, Claimant failed to specify the quantum and the reasoning for most of the liabilities claimed. Furthermore, Claimant failed to present a clear system and structure of its demands as it was continuously changing the legal and factual grounds of the particular claims. (R V PA, paras 10 *et seq.*)

1189. Instead of distinctly quantifying each claim, Claimant preferred to suggest a global quantification of the damages pertaining to these claims, reasoning such an approach by stating that quantifying such damages against bills and receipts is not always possible. (R V PA, para. 12)

1190. Respondent No. 2 alleges, Claimant failed to fulfill its duty to provide documentary evidence in support of its quantifications. Since mere assumptions are not enough in order to sustain a claim, these must be dismissed, according to established case law. (R V PA, para. 12)

1191. In addition, Claimant has changed its initial claim for loss of profits to a claim for loss of the Company, thereby conflicting its previous statements. (R V PA, para. 13)

1192. Moreover, contrary to the Tribunal's instructions, Claimant has failed to specify which of the claims are referred to which Respondent. Claimant's request in this regard to hold both Respondents jointly liable for the claims is in conflict with Article 121 of the OCA. Failure to point out the right respondent liable for each specific claim eliminates the possibility of proper indemnification for due compensation, if any. (R V PA, para. 14)

1193. Additionally, in other aspects of its submission, Claimant has gone beyond the border of quantifying the damages, putting bringing issues on the liability that were subject of the former stage of the proceedings to the attention of the Tribunal. Hence, Respondent No. 2 will do the same in order for it to be fairly defended. (R V PA, para. 15)

1194. Moreover, in view of the Respondent's holding that the Privatization Agency and the Republic are not liable for misrepresentations and breaches of the agreement, they are consequently not under the obligation to compensate the Claimant. (R V PA, para. 16)

1195. However, if partial or full compensation for damages and lost profit is awarded, it should be allocated within the shareholders in the capital of Balkan (Claimant and Knafaim-Arkia). Hence, any amount awarded to Claimant must at least be divided by two, since Claimant has presented no evidence sustaining the alleged withdrawal of Knafaim-Arkia. (R V PA, para. 17)

1196. With regard to the alleged shifting of the burden of proof to the Respondents, Respondent No. 2 contends, in compliance with the generally established rule in international arbitration the Claimant was to prove the elements required as conditions for the claims in terms of grounds and quantification and to prove them to the

satisfaction of the Tribunal. In this regard, Respondent No. 2 points out, unlike Claimant, the Respondents declined not a single demand for production of evidence. (R V PA, para. 18)

1197. Moreover, Respondent No. 2 asserts, there must be a direct casual link between the conduct of which the Respondent No. 2 is accused of and the alleged damage, which Respondent No. 2 contends, Claimant did not suffer in the first place. However, Claimant failed to prove such links exist. (R V PA, para. 19)

1198. Respondent No. 2 submits, since the four conditions for the incurring of liability by the Respondent are cumulative, failure to meet one of them is sufficient for a claim for damages to be dismissed.

1199. "At the least the wrongful conduct ascribed to the Respondent is not linked to the alleged damage by a sufficiently close causal link for Respondent's liability to be involved. A direct causal link between the Respondents' conduct and the damage alleged by the Claimant cannot therefore be found with a view to holding the Respondent liable." (R V PA, para. 20)

1200. Hence, the claims for damages must be dismissed. (R V PA, para. 20)

1201. Furthermore, Respondent No. 2 contends, the compensation cannot include damages that the Claimant could have avoided through ordinary diligence. (R V PA, para. 21)

1202. Respondent No. 2 alleges the fact that Claimant bases its arguments on pre-contractual liability, contractual liability and on tort is a demonstration of Claimant's bad faith, since this kind of argumentation limits the Respondents' defence capability. It further demonstrates Claimant's lack of confidence in its own argumentation. (R V PA, para. 22.)

1203. Regarding the limitation of the Claim to USD 70,000,000, Respondent No. 2 contends, it is unclear how each claim individually is affected by the limitation. (R V PA, para. 23)

1204. Respondent No. 2 further submits, Claimant merely provided an estimate of the presumptive and uncertain damages, which are not based on any real evidence. (R V PA, para. 24)

## (2) *No Duty for Compensation for Missing Assets and Additional Liabilities*

1205. Regarding Claimant's allegations as to the valuation of the damages resulting from allegedly missing assets, Respondent No. 2 contends, such an approach is inconsistent with the relevant law. The value of the misrepresentations may not serve as a direct measure for estimating the damages suffered. Respondent No. 2 alleges, Claimant did not specify whether and how its property was decreased with the value of the misrepresentations in the amount of USD 91,994, which it claims as damages. (R V PA, para. 64)

1206. Furthermore, Respondent No. 2 asserts, in no clause the PA or the applicable law stipulates that the Claimant is entitled to receive compensation for missing assets. The only legal ground for establishing such a claim would be Article 195, on which no claim was based. (R V PA, para. 65)

1207. Moreover, Claimant never proved, it suffered direct damage due to the allegedly missing assets. Claimant only has shares of a Company, which might have suffered damages due to missing assets, hence, Claimant is not directly affected by this. Therefore, it may not claim that missing assets or additional liabilities, safe such are denied, could create obligation of the Respondents to inject assets in the Company or compensate the Claimant for such alleged missing assets as it had acquired quite much more for the symbolic price it paid. (R V PA, para. 66)

1208. Additionally, Respondent No. 2 contends, most of the values of the alleged misrepresentations and breaches, as they will be commented in particular below, are distorted, exaggerated, speculative and lacking evidentiary proof.

### c. *The Tribunal*

1209. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

|  |  |
|---|---|
| C VII | paras 178 *seq.* |
| R V PA | paras 10-24, 64 *et seq.* |

1210. The Tribunal's considerations regarding the above contentions of the Parties can be short, because the Tribunal has already dealt with the burden of proof when examining above in this Award the individual claims raised.

1211. The Tribunal recalls that, in its PO No. 11 it expressly requested from Claimant

> *"a brief on the quantum of claims identifying precisely which amount is requested in relation to each of the liabilities claimed".*

1212. In this context, the Tribunal also notes that the amounts claimed by Claimant have varied considerably during this procedure. While the original claim was for USD 230 million, Claimant then reduced it to save arbitration costs to USD 70 million by its letter of 4 March 2003. Further and again different amounts of the claim were given at other instances of the procedure. Latest examples are the USD 91 million and further USD 71 million claimed in C VII which obviously go beyond what Claimant has chosen to claim as a total in this procedure in order to save arbitration costs. This gives the impression of a certain arbitrariness of Claimant's quantification which is not made up by the evidence submitted including, in particular, the witness statement of Mr. Harlev and the expert opinion of Dr. Kraizberg.

1213. In its examination of the individual claims further above in this Award, the Tribunal has taken into account that, due to lack of access to the present files of the Company in Bulgaria, Claimant had difficulties in providing certain documentary evidence. But, nevertheless, it was not sufficient to mostly only claim global sums without sufficient evidence that these were indeed caused by the alleged breaches of Respondents and how these amounts were arrived at.

1214. However, on the other hand, in view of the large amounts of money and assets that were transferred to Claimant's, its subsidiaries and the persons managing the Company on behalf of Claimant, Claimant has the full burden of proof why such amounts were transferred, because the respective files should still be available to Claimant. This is a matter which the Tribunal will examine hereafter.

## 10. Total of Claimant's Damage Claim Accepted by the Tribunal

1215. At the end of the examination of Claimant's claims, taking into account the results from the above considerations, the Tribunal thus concludes regarding the Relief Sought by Claimant that, subject to set-off by counterclaims, Claimant

(a) under its Alternative 1, has a claim for a total of **USD 3,532,686.24**;

      (b)    under its Alternative 2, has no claim;

      (c)    and under Claimant's Alternative 3 has a claim for **USD 23,150,000.00**.

1216.  Since these amounts overlap and thus, for good reason, Claimant has raised them as alternatives, the Tribunal concludes that the higher of the alternative claims it has found to be justified shall be what is due to Claimant, i.e. **USD 23,150,000.00**.

\

## J.    Quantum for accepted Counterclaims

1217. When examining the Claimant's liability for the counterclaims above, since the justification of withdrawals of amounts by Claimant from the company could not be separated from the amounts involved, the Tribunal dealt with the quantum at the same time and concluded that Respondent No. 1's counterclaims are justified for:

> USD 11,841,441.30 under Article 8 PA
> USD 948,414,91 under Article 10.13. PA as amended.

1218. The total amount due for the counterclaims, therefore, is:

> **USD 12,789,856.21.**

1219. Since Respondent No. 1 raised the counterclaims for set-off porposes only, this amount, therefore, has to be set off against the above accepted claim of Claimant.

## K.     Final     Conclusions     on     Claims     and     Counterclaims

1220. The Tribunal has concluded that the Respondent No. 2 is not liable for any payments under the contract.

1221. At the end of the examination of Claimant's claims, taking into account the results from the above considerations, the Tribunal concluded that Claimant has a claim for USD 23,150,000.00.

1222. The set-off of the counterclaims found to be justified amounts to USD 12,789,856.21.

1223. Therefore, the net amount which is still due from Respondent No. 1 to Claimant after set-off is:

**USD 10,360,143.79.**

## L.   Interest

### L.I.   Summary of Contentions by Claimant

1224. Claimant submits, the Bulgarian statutory interest on monetary obligations is three month Libor + 10% annually. This interest should be added to all amounts which are claimed in this claim. (C VII, para. 180)

### L.II.  The Tribunal

1225. In the context of this section, the Tribunal, without repeating the contents, takes particular note of the following documents of the evidence:

**Party Submissions:**

| | |
|---|---|
| C VII | para. 180 |
| C XI | para. 156 |

1226. The Tribunal agrees that the rate proposed by Claimant is correct under Bulgarian law. Indeed, para. 1, subpara. 2 of the unique article of Decree No. 72 of the Council of Ministers of the Republic of Bulgaria of 19 April 1994 (published in Official Gazette 33 of 1994, amended in 1995 and 2000) based on Article 86, para. 2 of OCA establishes an interest rate on receivables in foreign convertible currency as follows: *"The Three Months LIBOR of the respective currency plus 10 points."*

1227. In view of the complex legal situation which could only be clarified by this arbitral procedure identifying whether and which amounts are due to Claimant, and since Claimant took a long period until it decides whether and for which limited amount claimed it wanted to continue this arbitral procedure, the Tribunal considers that interest shall only be due from the time this Award is issued and the principal amount has to be paid.

1228. Regarding the latter, to give Respondents time after receiving this Award to take the necessary steps for payment, the Tribunal considers that a period of one month is appropriate.

1229. Therefore, Respondents shall pay annual interest at the rate of three month Libor + 10% from the date one month after the date of issuing this Award identified with the signatures at the end of this Award.

## M.    Cost of Arbitration

1230.  The Tribunal has taken note of the cost claims submitted by the Parties in the Relief Sought and cited further above in this Award and the claims for costs of their legal representation and respective comments submitted by the Parties in accordance with PO No. 16.

1231.  In accordance with its authorization and discretion under Article 38 to 40 UNCITRAL Rules, the Tribunal considers the following:

1232.  The length and complexity of this arbitral procedure shows that neither of the Parties could have easily identified the procedural and substantive outcome of this dispute. The Claimant has succeeded only with a minor part of its claim. Respondent No. 1 has also only partly succeeded with the counterclaims raised for rebuttal purposes. Respondent No. 2, though found not to be jointly liable on the merits for payment, has cooperated on behalf and with the Respondent No. 1 and, in fact, has mainly been responsible for the conclusion and implementation of the contract, and further, has failed in a number of its procedural applications. Thus, both sides have been partly successful and partly unsuccessful in a number of their procedural requests and/or substantive claims raised during the course of this unusually long procedure.

1233.  Taking into account the circumstances of the case and using its discretion under Article 40(1) UNCITRAL Rules, the Tribunal considers it fair that the costs of arbitration shall be borne in equal shares between Claimant on one side and both Respondents on the other side.

1234.  Also, taking into account the circumstances of the case and using its discretion under Article 40(2) UNCITRAL Rules, the Tribunal considers it fair that each Party bears its own costs of legal representation.

1235.  As far as the amount of the costs of arbitration are concerned, the Tribunal recalls its various Procedural Orders and letters by the Chairman of the Tribunal explaining the calculation of fees and expenses and requesting the respective deposits from the Parties.

1236.  Pursuant to Article 38 (a) and Article 39 UNCITRAL Rules, the Fees of the Arbitral Tribunal are fixed as follows:

For the Claims of the Claimant (PO No. 1, section 12, Chairman's letters 4 and 19 March 2003) USD 424,125.00. For the Counterclaims of Respondent No.1 (PO No. 12, section 2) USD 315,900.00. Thus the Total Fees for all three members of Tribunal are USD 740,025.00.

Separate fees for each Arbitrator (UNCITRAL Rule 38(a)):

30 % for each Co-Arbitrator USD 222,007.50 totalling in USD 444,015.00, and 40% for Chairman of Tribunal USD 296,010.00.

1237. The expenses of the Arbitral Tribunal have been and, pursuant to Article 38 (b) UNCITRAL Rules, accordingly are fixed as USD 193,268.25.

## N.    Decisions

1.   Claimant has a claim against Respondent No. 1 for USD 23,150,000.00.

2.   A set-off by the counterclaims of Respondent No. 1 found to be justified amounts to USD 12,789,856.21.

3.   Therefore, the net amount which is still due from Respondent No. 1 to Claimant after set-off is USD 10,360,143.79.

4.   Respondent No. 1, i.e. the Republic of Bulgaria, is liable to pay to Claimant, within one month after the date mentioned hereunder as the date of this Award, the amount mentioned above in section 3, i.e. USD 10,360,143.79 to an account identified by Claimant.

5   In case of non-payment of the above, Respondent No. 1 shall pay annual interest at the rate of three month Libor + 10% starting from one month after the date mentioned hereunder as the date of this Award.

6.   The costs of arbitration shall be borne in equal shares between Claimant on one side and both Respondents on the other side.

7.   Each Party shall bear its own costs of legal representation

8.   All other claims and counterclaims are dismissed.

Place of Arbitration:  Paris (France)
Date of this Award:   25 October 2006
Signatures of the Tribunal:


Mr. Avner Yarkoni
(Arbitrator)

Prof. Silvy Chernev
(Arbitrator)
Dissenting


Prof. Karl-Heinz Böckstiegel
(Chairman of Tribunal)


Final Award 25 October 2006 in UNCITRAL Arbitration
Zeevi v Bulgaria et al

DISSENTING OPINION OF CO-ARBITRATOR
Dr. Silvy Chernev

UNCITRAL Arbitration Case UNC 39/DK

ARBITRATION IN ACCORDANCE WITH THE ARBITRATION
RULES OF THE UNITED NATIONS COMMISSION ON
INTERNATIONAL TRADE LAW

Zeevi Holdings

v.

1. The Republic of Bulgaria
2.The Privatization Agency Of Bulgaria

Award

by the Arbitral Tribunal:

Adv. Avner Yarkoni (Co-Arbitrator)

Prof. Silvy Chernev (Co-Arbitrator)

Prof. Karl-Heinz Böckstiegel (Chairman )

DISSENTING OPINION

Of Co-Arbitrator Dr. Silvy Chernev

I do not share a number of the factual and legal conclusions of the majoirity of the Arbitral Tribunal on this Case that undery the decisions on the Initial Claims and the Counter-Claims and thus determine the final result of the Case. Had such facts and legal issues found a different treatment and answers the contents of the Award would have been different.

After extensive deliberations and profound professional discussions and, after overcoming certain differences, my conclusions, opinions and judgements on the above-mentioned number of issues still remained differenet from those of the majority of arbitrators as a result of which I have the obligation to prepare and attach this Dissenting Opinion to the Award.

## I. GENERAL CONSIDERATIONS

## 1. ON CHARACTERISTICS OF THE PRIVATIZATION AGREEMENT ("PA")

1.1. The legal relationship that is the object of the present case is the result of a privatization agreement – the PA.

A privatization agreement is usually a specific purchase of shares whereby the buyer, apart from paying the purchase price for a package of shares assumes additional obligations such as: to make certain investments in the respective company; to preserve a number of employees or to maintain the scope of activity of the privatized enterprise for a number of years; to refrain from further transfer of shares for a certain period of time, etc. All those additional obligations do not correspond to any adverse obligations on

2

behalf of the seller but are designed to follow a more intense public interest in the sphere of privatization.

1.2. The common goal of the parties to the PA, explicitly expressed in Art. 7 and Art. 8 of the PA was that Balkan Bulgarian Airlines ("BBA") would continue to exist, while PA was to be observed at least for 10 years after its completion, respectively the Buyer should observe his obligations for at least this period of time.

1.3. The PA is characterized by the following: the BBA was an acting company in a very bad financial condition and its shares were sold against a symbolic price and, against additional considerable obligations: putting money into the Company so that it can repay some of its existing debts under Art. 7, and investment under Art. 8.

As a matter of fact the Claimant had to pay only USD 150 000 in cash and then put money into the Company from which he owed 75%. This has to be emphasized because under the PA the Claimant did not give anything to the Seller but only to his own company and hence even the idea of restitution is unacceptable. He was supposed to put money into his own company at his own risk. This he did only in the form of loans and since the Company ended up in bankruptcy the Claimant should share the lot of all other creditors.

1.4. Another important feature of the PA is that an informal Consortium consisting of the Claimant and Knafaim-Arkia Holding, Israel acted as the Buyer. It was at all possible for this Consortium to participate in the

3

privatization proceeding because Knafaim-Arkia Holding was a daughter company of another company - "Arkia Israeli Airlines" that was an aviation operator.

Not long after the completion of the PA (a few months) Knafaim-Arkia Holding disappeared from "the stage of events" and only at the very end of the present proceeding a vague letter stating that Knafaim-Arkia Holding had transferred its interest to the Claimant was presented. Whatever transaction occurred between the two Israeli companies is their internal business. With regard to the PA however Knafaim-Arkia never complied with the requirements of the applicable law (Art. 102 of the OCA) which provides for the explicit consent of the creditor (the Respondent in the present Case) for the transfer of obligations.

Thus, the Respondent was misinformed from almost the first moment about one of the most important characteristics of the Buyer – namely, that at least one of the participants on behalf of the Buyer is a company with experience in aviation.

It is absolutely secure that the Buyer would not have even been admitted to the privatization proceeding as a result of which the PA was completed if it was known that the participation of Knafaim-Arkia Holding was formal and used just to overcome the lack of eligibility on behalf of the Claimant.

This peculiarity of the legal relationship at issue, seems at all to be forgotten in the process of assessment of the behavior of the parties to the PA.

2. On the Nature of the Seller's liability under the PA and the applicable law

The Claimant's claims are based on his assertion that the information given to him prior to the completion of the transaction was incomplete, incorrect and misleading.

The obligation of a negotiating party to provide correct, truthful and complete information in the process of negotiations normally has a pre-contractual (non-contractual) nature. It is derived from general principles including the requirement that participants in civil law relations shall act in good faith on one side, and from the applicable law (Art. 12 OCA). After the prevailing doctrinal view the liability under Art. 12 of OCA is a specific type of non-contractual liability which occurs in cases when a contract has not been completed or it turns to be null and void; or is invalidated or rescinded.

In the particular case the parties have agreed to transform the general non-contractual requirement into a contractual obligation which can be supported by the contents of the clauses contained in Art. 9.1.2 and 11.1. of the PA and the declarations and warranties of Art. 3.6.2. and 3.7.3.

The parties to the PA have specified the type and volume of the information for the correctness and truthfulness of which the Seller shall be liable but have not made any stipulation on the nature and contents of the liability itself (that is true both of Art. 9.1.2. And of Art. 11.1. as well as of Attachment 11 that is referred to by the latter article of the PA).

Since the parties have not derogated the applicability of the rules of contractual liability under the applicable law the final conclusion should be that the parties have established contractual basis for liability concerning the information obligation and this liability is namely contractual within the context and under the applicable law and does not displace the application relevant rules.

The factual composition of contractual liability under the applicable law comprises four imminent elements, namely: unlawful breach of a contractual obligation; damage, causal connection between the breach and the damage and *culpa*. The absence of any of these elements brings to the absence of liability except in case of stipulated liquidated damage which is not the case with the Creditor's claims.

I share the conclusions of the majority concerning the contractual nature of the liability at issue, but I do not share the assumption that once agreed upon the contractual liability excludes the applicable law in full.

(see item 1103 of the Award which runs as follows: "The specific liabilities for disclosure of information provided in the PA and discussed above, in the view of the Tribunal, exclude as a contractual *lex specialis* or at least make unnecessary the application of respective sections of the general Bulgarian law and in particular the OCA .")

One has to insist on this particular characteristic of the liability at issue since the majority bases its conclusions on the assumption that the parties have agreed on specific liability that excludes the applicable law.

The practical result of this view of the majority leads to the unacceptable conclusions in items 168 and 169 of the Award that the Respondent shall be unlimitedly liable including for damage that was unforeseeable at the time of the conclusion of the Agreement, and that liability can exist even though no particular damage was caused as a result of a certain breach (item 885 concerning the damage as a result of the assumed breach related to the NCS and item 923 concerning the Subsidies and the Financial Support; and finally the general conclusion in item 1103).

## II. DISSENT ON THE SOLUTION OF THE CLAIMANT'S CLAIMS

1. On the Findings and Conclusions on the Breach of Representation Concerning the National Carrier Status ("NCS") (items 272-278 of the Award)

1.1. First of all I disagree with the interpretation of the First Respondent's "Obligation to maintain NCS" given in the Award.

From a closer look the undertaking of the First Respondent to maintain NCS of the Company is different from most of the remaining cases of so called "breaches under the PA". While in the case of the Equant shares, the obligations of the Company towards its employees, the training of Pilots debt, etc., the Respondent assumed contractual liability for his possible failure to reveal information about certain issues before the completion of the transaction, in the case of the NCS and some other of the alleged

7

DISSENTING OPINION OF CO-ARBITRATOR
Dr. Silvy Chernev

breaches, the Respondent has assumed certain obligations concerning his future behavior.

The conclusions of the majority concerning the nature and contents of the Respondent's obligation to maintain the NCS are thoroughly unconvincing. The majority concludes: "... that nevertheless Respondent was ready to accept a contractual obligation in this respect and thereby allocate the risk of revocation in the sphere of the Claimant." (item 276). Such a conclusion is baseless both from factual and legal points of view. Nothing from the text of the PA and from the abundant evidence collected, or the applicable law, may justify the totally unacceptable conclusion that a sovereign state would assume an "obligation" to be liable for actions of other legal subjects (subjects that also happen to be sovereign states in the case). It is most natural that the party assumed an obligation to maintain this status (provided the Company satisfies the requirements of a Bulgarian aviation operator as per Art. 3.9.2.) through itself or its competent bodies. At the utmost one may think that such liability might have been assumed for cases of any wrongdoing on behalf of the Bulgarian state that has provoked unfavorable behavior of the other states, parties to NCS Agreements. In the particular case however, the reasons that led to the undesired behavior of Syria, Lebanon and others in no way can be related to any actions of the Republic but were rather related to the nationality of the Claimant. It's hard to accept that any party to an agreement may assume liability not for its own actions, not for Acts of God or other factors of objective nature but for unfavorable factors related to the other party. This however, in the case of a sovereign state, seems simply impossible.

The only plausible conclusion is that the First Respondent undertook to maintain the NCS of the Company as much as this was dependent on himself and the provisions of the law.

1.2. In the light of the above-said in item II, 1.1. I do not share the conclusion laid in item 277 of he Award, namely: "Therefore, since the assurance was given for "all bilateral agreements" and since it is undisputed that up to three States did revoke the NCS, it is clear for the Tribunal ... that this leads to a liability in this regard."

The reasons for the actions of the three sovereign states were beyond the control of the First Respondent. At the same time there is abundant material on the case that a series of diplomatic measures were promptly undertaken by the Bulgarian State. In the sphere of a dangerous field of international politics and diplomacy one might not have realistically expected that the Bulgarian state should have resorted to more severe measures against the three countries as suggested by the Claimant.

1.3. In the process of consideration whether there was liability or not, one has to take into account that the Executive Director of the Company appointed by the Claimant – Mr. Andrew Gray in his letter to the Minister of Transportation of the Republic of Bulgaria, Mr. Slavinski (Exhibit B-158) admits that BBA is forced to withdraw from the Near East destinations (including Syria and Lebanon) since they were not profitable and that BBA was ready to accept a substitute carrier for a certain period of time. The expressed consent for substitution does not pose any conditions whatsoever.

If taken into account, this express waiver of the NCS rights given in a letter to the highest official in the sphere of transportation of the country, signed by the Executive Director appointed by the Claimant, one may never reach a conclusion that the NCS was breached, respectively that the Respondent was liable for this.

The final conclusion is that there was no breach of the NCS undertakings of the First Respondent under the PA, respectively no grounds for liability occurred.

1.4. Further, even though in item 277 the Award states that there was liability, at the stage of determination of quantum (item 885) not surprisingly, the Award reaches the conclusion that: "... Claimant has not been able to prove any damage caused by the loss of the NCS."

What was observed elsewhere (in the Section: General Considerations, item I, 2) is fully valid. If no damage was suffered by the Claimant in this particular respect no liability can occur.

This is of great importance in the case since the final contents of the Award is based on the notion that even though the Claimant suffered no particular damage from the "breach" concerning the NCS, liability still exists and as a matter of fact the restitution adjudicated is based on this assumption.

2. On the Findings and Conclusions on the Breach of Representation Concerning the SITA Shares (items 272-278, 903-911 of the Award)

2.1. I share the conclusion of the majority that the information concerning the Equant shares contained in the KPMG report was somewhat insufficient.

2.2. Considering the damage due to the inability of the Company to sell 36 796 shares at a certain moment the majority admits that the price of the shares is the utmost damage that might have been suffered by the Claimant (items 903-911). As a matter of fact the inability for the sale of the shares was temporary and the real damage might only be an eventual negative difference between the price at which the shares were actually sold and the price at which they might have been sold at the previous moment when a ban on the sale existed. In any case this figure would be much lower than the one showing the "utmost" damage as per item 911 - USD 2 812 686.24.

2.3. Further, the Award is based on the assumption that the Respondent's information obligation concerning the Equant Shares is absolute and independent of the Claimant's own resources to obtain the necessary information and thus to reduce or mitigate the damage. Although the issue was raised at multiple occasions by both Respondents there is nothing on this issue in the paragraphs dedicated on the Equant shares (303-313, 903-911). There is nothing specific in the Section dedicated on "Contributory Negligence and Failure to Mitigate Damages (item 841 and the following).

The majority is reluctant to take into account the fact that the "Buyer" under the PA consisted of two entities – the Claimant and Knafaim-Arkia Holding, the latter being the daughter of an air-line company which itself was a holder of Equant shares ("Arkia Israeli Airlines" – see Exhibit B-51).

The idea that the Respondent should be fully liable for the insufficiency of the information concerning the Equant shares while at the same time the Buyer himself was not only in a position to obtain such information but as a matter of fact disposed of it (through one of its representatives) and still preferred to wait and file claims (through its second representative – the Claimant) instead of clarifying the matter before the completion of the transaction, is completely contrary to the principle that the parties in civil law relations shall act in a "bona fidae manner". At the same time it is contrary to the applicable law, too – argument of Art. 83 of the OCA.

Had this particularity of the situation been taken into account the real damage suffered by the Claimant as a result of the insufficiency of the information concerning the Equant shares should have been further reduced and/or compensated against under the provisions of the applicable Art. 83, para. 1 and 2 of the OCA.

The combined conclusion under 2.3. together with the conclusions made in 2.2. above render the majority's conclusion in item 1074 that there is a breach as per Art. 3.7.2. of PA and that this breach is of essential character highly contentious. On the other hand namely this conclusion becomes decisive for the final conclusion concerning the Respondent's liability. Given the price of the transaction and the fact that all the money given on the transaction was lent by the Claimant to a company in which he holds 75%, the statement in the Award *(ibidem)* that "… the Claimant would not have concluded the transaction or would have concluded it only with much more favorable or less risky conditions" does not have any serious grounds.

DISSENTING OPINION OF CO-ARBITRATOR
Dr. Silvy Chernev

3. On the Financial Support and Subsidies to the Company before the Transaction

3.1. From a formal point of view I agree that the declaration in para. 7 of the Information Disclosure letter is untrue, since BBA was paying aviation fees in reduced amount before the privatization.

3.2. The Claimant however knew about the reduced aviation fees, which was undoubtedly proved by Mr. Golan's testimony during the Paris Open Hearing on the Case (Minutes of the Paris Hearing, p.p. 508-509). On the other hand, knowing about the reduced fees the Claimant could not have had realistic expectations that after the privatization the BBA would continue to pay less in comparison to other companies. The latter would have been contrary to free competition principles and the Chicago convention.

3.3. Apart from the above-said neither the Claimant nor the Company suffered any damage since no fees were paid at all and all of them were rescheduled for another 10 years (Exhibit B-10 and items 918-923).

3.4. Again the lack of damage excludes the possibility for any liability to occur.

This makes the conclusions laid out in item 1074 of the Award absolutely unacceptable. After all, however, those conclusions underlie the final result on the Case.

## 4. The Final Adjudication on the Claimant's Claims

### 4.1. The Amount of Damage

After the considerations of all claims concerning the separate "breaches" of either warranties concerning truthfulness and accuracy of information before the transaction and breaches concerning obligations assumed by the Respondent for the period after the transaction the Award reaches to the conclusion that the total amount of the damages suffered is USD 3 532 686.24 (item 519). This figure is the sum of USD 2 812 686.24 (damages as a result of misinformation concerning the Equant shares) and USD 720 000 (damages as a result of undisclosed compensations due to employees).

4.2. Although I share the conclusion that in some of the cases there were breaches (the Equant shares, the Employees compensations) for reasons that were laid in the previous sections of this opinion, including the necessity for the application of Art. 83, para. 1 and 2 of the OCA I reckon that even the figure in 4.1. is quite high and does not reflect the real damage.

4.3. Taking into account this total amount of damage (exaggerated in my view) and adding to it the inexistent liability concerning the NCS and the Financial Support (Subsidies) the majority reaches the absolutely unacceptable conclusion laid in item 1074.[1]

---

[1] "1074. The misrepresentations found by this Tribunal further above in this Award are very substantial, particularly those regarding the Equant shares, the subsidies granted and then removed, and the outstanding debts for

4.4. This unacceptable and untrue factual conclusion seems to ground the majority's decision not to adjudicate compensation for the damages suffered by the Claimant (with all my reservations concerning the amount expressed above), but rather, to opt for Alternative 3, item i (restitution of amounts transferred).

4.5. Lack of Legal Grounds for Restitution

---

employees. Though one may perhaps doubt — as the Tribunal did with regard to the NCS — whether any one of these misrepresentations by itself would have lead Claimant not to conclude the PA, and though the Tribunal found that Claimant could not prove damage caused by some of the misrepresentations, together they were of such an importance and volume that, in the judgement of the Tribunal from the evidence before it, it must be assumed that Claimant would not have concluded the PA or would have concluded it only with much more favourable or less risky conditions. This is confirmed by the fact that the Parties considered the Seller's liability for misrepresentations so important in this specific deal that they included specific provisions in this regard in Article 9.1.2. PA and thus made this a major duty for Seller and thereby not leaving the respective consequences for misrepresentations to the application of the relevant Bulgarian law, particularly that on rescission. In view of this, it is obvious to the Tribunal — and plausible for a deal of this kind - that the Parties gave specific importance to the information to be disclosed by Seller."

4.5.1. The applicable law provides for restitution only in cases when a contract was initially invalid (Art. 34 in connection with Art. 26 of the OCA), invalidated (Art. 34 in connection with Art. 27 of the OCA) or rescinded (Art. 55, para. 1, sentence 3 in connection with 87 of the OCA). [2]

There is no doubt that no grounds for nullity or invalidation of the PA exist (that is the common view of the Tribunal) although such claims (for fraud) were considered and dismissed.

The only possible grounds for restitution remains the possible rescission.

4.5.2. Rescission in the case is impossible because as a final result the real damage is insignificant if compared to the amount of interest of the whole deal[3] and may not lead to the rescission of the Agreement as per Art. 87, Para 4 of OCA. That conclusion is even more valid if one takes into account the fact that the real damages suffered by the party were considerably lower than those finally accepted by the Tribunal (see above 4.2.)

4.5.3. Even if the rescission on part of the Claimant was grounded there is no grounds for restitution because the particular Agreement concerns an extended period of time and the fulfillment thereof has periodic character (Art. 88 OCA).

---

[2] Some additional cases are possible such as, the existence of a negative condition or a term, an existing stipulation, etc. which are not considered as apparently irrelevant for the case.
[3] The Claimant seeks around 70 000 000 USD for his 75% share of the Company, while the expert Dr. Kreuzberg evaluates the sale price of the Company over 30 000 000 USD (see the transcript of Open Hearing on Aug. 29, 2005 – p. 1033, line 19, 20).

4.6. In order to ground its decision for restitution the majority comes to factual and legal conclusions that do not give any clear answer what the grounds for restitution is (whether this is rescission or another type of grounds), and omits to take into account the applicable law assuming that the parties have agreed on specific liability totally excluding its provisions. However, as pointed above, the only thing that the parties have agreed upon was that one of them shall be liable in case of misrepresentation. The scope of the liability, the legal consequences of such liability are not at all concerned by the parties' agreement which may lead to only one conclusion, namely: for everything that has not been explicitly agreed by the parties the laws of Bulgaria shall apply as per Section XIV, 14.1. of the same Agreement.

4.7. There is still another contradiction in the above cited opinion of the majority laid in item 1076.

The Award is based on the right conclusion that if a rescission is possible, it could only lead to make the contract void *ex nunc*. As noted in the above item 4.5.3. the applicable law also provides ex nunc rescission for contracts of the type of the PA. Then the lawful question arises: if the rescission should be valid *"ex nunc"* and not *"ex tunc"* what would the grounds for restitution for the money that was given before the alleged rescission of the PA be?

4.8. The final question that comes concerning the restitution is: what is the object of restitution. What was given by the Claimant to the Seller was USD

150 000. Everything else was lent by the Claimant to the Company in whose capital he holds 75%.

It is evident that apart from groundless, restitution is also impossible if carried out ex nunc. Finally, there is no more than USD 150 000 to be restituted.

5. The restitution opted for by the majority as a tool to compensate the Claimant for the suffered damages leads to another unacceptable practical result. With this approach any "contribution" to the failure of the PA on behalf of the Claimant is practically ignored while abundant evidence showing that the Claimant's actions were among the significant reasons for the failure to achieve the goals and objectives of the PA was collected.

6. As a final conclusion of everything laid in Section II one may say that a compensation for damage of approximately between USD 1 000 000 and USD 2 000 000 is owed to the Claimant.

III. DISSENT ON THE SOLUTION OF THE COUNTER-CLAIMS

1. Preliminary Notes

1.1. Under the PA the Claimant had two distinct and precisely differentiated obligations and each of them served a different objective:

- Under Art. 7.1. the Claimant had to "put in the Company funds at the amount but limited to USD 30 000 000 to assist the Company in repaying its obligations (in Art. 7.1.1 the phrase used is: "from which the Company shall repay existing indebtedness"). The obligation was scheduled for an overall period of 10 years.

- Under Art. 8 the Claimant as a majority shareholder had the obligation to cause in the Company to be invested USD 100 000 000 over a period of 5 years.

Both obligations were money obligations and each of them had a specific objective and there can be no doubt about the distinction between the two.

The burden of proof for the fulfillment of such types of obligations requires that the Claimant had to present specific evidence for the fulfillment of those distinct and separate obligations.

1.2. What was done by the Claimant during he period he had control over the Company was to provide loans in the amount of USD 23 150 000 to the latter. The money that was put into the Company was used for whatever purpose it was most needed: operational needs, payment of any kinds of debts (depending on which creditor was most insistent or on which creditor the Company was most dependent at the moment); installment  a new computer system, etc.

1.3. In the process of proving the fulfillment of the obligations the Claimant would use to the same money (USD 23 150 000) in order to prove the fulfillment of both of his obligations.

1.4. The fact that money was put into the Company (having in mind that the Claimant had the title over 75% of its capital) did not necessarily mean that any of the obligations under the PA was being fulfilled. The Claimant might well have put money in his company because the Company needed it and still not fulfill any of his obligations under the PA.

1.5. While having control over the Company the Claimant misappropriated a significant amount of money from the Company (around USD 11-14 000 000[4]) and this money should be taken into consideration at the end of the day (what is done by the Tribunal in the final result with regard to the fulfillment of the obligation under Art. 8).

1.6. This all means that the Tribunal should have observed a strict evidentiary approach and examined what purpose was used each penny for.

Further, the fact that the Claimant was putting money into the Company without pointing to which of his obligations the particular money should be related and the second fact that during the present process the Claimant points to one and the same money – USD 23 150 000 as a source for the fulfillment of both of his obligations (under Art. 7 and under Art. 8 of the PA) means that the Tribunal should not only consider of each obligation in

---

[4] the price of three expensive buildings worth tens of millions of Euro not incuded

separate, but try to verify if the results of the separate treatment of the two obligations are compatible with the result from their common treatment.

2. The Counterclaim related to the fulfillment of the Obligation under Art. 7 of the PA

2.1. The interpretation of the nature of this obligation in the Award has brought about to unconvincing conclusions (item 575-589).

The majority prefers a literal approach to the relevant texts of the PA and thus reaches to a conclusion that the "payment" obligation under Art. 7 of the PA (different from the "investment obligation" under Art. 8 of the PA) might be considered as fulfilled by means of loans.

This interpretation, although based on certain wording of the PA (It is no secret that the whole PA is far from a good example in legal writing) evokes objections of a different character:
- why would one sell a Company against USD 150 000 and against a number of obligations of the buyer to provide further loans for an over indebted Company. A principal of a company that happens to be a sovereign state has much greater possibilities to obtain loans for one of its companies;
- the whole amount of money that was supposed to be put into the Company under Art. 7 (USD 30 000 000) had to be used for a purpose: to assist the Company in repaying its obligations ("repay existing indebtedness") – the explicit text of the PA. There is no even common sense if a number of

21

existing obligations of the Company are to be replaced by new such obligations from loans.[5]

Since nothing more than USD 150 000 was paid by the Claimant for the Company the repayment of accumulated debts of the amount of USD 30 000 000 instead of payment of a purchase price was a form under which the Respondent further assisted the Company (and in an indirect way – the Claimant who was expected to bring the Company to normal operation and even improve it so that world standards are met). This type of explanation of the logical meaning of the obligation under Art. 7 of the PA gives an answer why the Seller did not ask for a higher purchase price. A State would prefer to have a modern, effectively operating air operator, rather than take a few million more for the assets of a badly functioning air company and dissolve it.

The conclusion should be that the Claimant had a separate obligation to put USD 8 200 000 (for the period he was in control of the Company) and the fulfillment of this obligation can be satisfied **only if** this sum of money went for the repayment of debts (existing at the moment of completion of the Agreement)

2.2. In order to accept that the obligation under Art. 7 of the PA was fulfilled the majority uses two premises:

---

[5] One has to take into account that the new obligations were quite more onerous than those existing at the moment of the transaction.

- that money in amount greater than USD 8 200 000 was put into the company for the period until February 2001;

- the debts of the Company were reduced with around USD 50 000 000.

2.2.1. There is no evidence in the case that the loans given by the Claimant to the Company were used for repayment of existing debts and surely the burden of proof lies upon the former.

The mere fact that USD 50 000 000 of the Company's debts were repaid during the period does not mean that they have been repaid by the money lent by the Claimant to the Company. During the period at issue the Company was having regular activity and there were significant revenues from this activity. The money from those revenues was used for different purposes but since there is no evidence what the sources through which the debts were reduced were, most probably the debts were reduced from money from the Company's own revenues, i.e., the Claimant did not fulfill his obligation but rather relied on the Company's revenues to achieve this. On its turn this was among the reasons which brought about to the inability of the Company to get recovered what was the real objective of the PA.

2.2.2. The fact that USD 23 150 000 were put into the Company also does not lead to the Conclusion that the obligation at issue was fulfilled.

- First of all, the money put into the Company has to be accounted against the money that was taken out of the Company without legal justification. This money is (as said above and as accepted by the Tribunal) between USD

11 000 000 and 14 000 000 (in rough figures and exclusive of the value of the 3 buildings and the turnover money of the company that were sent abroad into accounts under control of the Claimant and never were accounted for in the books of the Company);

- the same amount of money (the difference between the 23 150 000 USD put into the Company and the money that was taken out of the Company by the Claimant without justification) is being used as tool to prove the fulfillment of the other obligation – the one under art. 8 of the PA.

The final conclusion should be that the fulfillment of the Obligation under Art. 7 of the PA was not proved to the sufficient standard and that the Counter Claim under this item has to be fully satisfied for USD 1 000 000.

3. The Counterclaims related to the Obligation under Art. 8 of the PA

3.1. The Claimant never proved the amount of money given on investment. The only document that was presented by him (Exhibit C-99) showing on USD 26 471 589 is a unilateral document[6], coming from the party on which the burden of proof lies and is not sufficient to prove the investment from the point of any standard of proof (Scripum pro scribente nihil probat sed contra scribentem)

---

[6] The document is dated 27.03.2001, i. e. after the Company was abandoned by the Claimant. It is no wonder why the Claimant did not get any answer from the P Agency under the circumstances.

3.2. Even if we accept as done in the Award that the money given as loans to the Company (USD 23 150 000) was used for investment this money has to be reduced by the amount expropriated, i.e. between USD 11 000 000 and USD 14 000 000. The fulfillment should be estimated between USD 12 150 000 and USD 9 150 000. Vice versa, the lack of fulfillment should be measured between USD 7 850 000 and USD 10 850 000 (the obligation is USD 20 000 000 minus the figure that would be accepted as fulfillment).

30% liquidated damage would be between USD 2 355 000 and USD 3 255 000

4. The total liquidated damages under the Respondent's Counter Claims amount to:

- USD 1 000 000 concerning the obligation under Art. 7 of the PA

- at least USD 2 355 000 concerning the obligation under Art. 8 of the PA

- USD 948 414.91 concerning the obligation under 7.9.1. of the PA which is reflected in the Award.

The total liquidated damages (taken even in the lowest) amount to USD 4 303 415.91

This justified sum for the Counter Claims is greater even than the highest amount of damage that is recognized by the Tribunal as owed to the Claimant, namely USD 3 532 686.24

25

The final result on the case shall be that the Claimant's Claims are rejected in full.

## IV. THE FINAL RESULT OF THE CASE IS INJUST

The Claimant misinformed the Respondent about his experience in aviation as a result of which the Respondent entered into the PA which would never had happened had the real situation been known to the Respondent in advance .

The Claimant failed to fulfill his obligations under the PA to a significant extent and had a considerable contribution to the bankruptcy of the Company, hence for the failure to the achievement of the PA goals and objectives.

Further, he unlawfully misappropriated significant assets of the Company, incliding revenues of the Company that were transferred to accounts under the control of his official abroad and were never accounted for[7].

The Respondent admitted a number of breaches that brought about certain damage that is comparatevely insignificant with regard to the volume of the transaction.

---

[7] Due to the lack of clarity concerning the development of the proceedings the Award does not at all take into consideration the three extremely expensive real estate properties that were misappropriated by him. Most probably the final result concerning those properties will also be positive for the Claimant.

DISSENTING OPINION OF CO-ARBITRATOR
Dr. Silvy Chernev

Through this Awards, given the comparatively insignificant breaches of the Respondent and against the serious breaches, ommissions and infringements of the Claimant under the PA and the laws of the territory, the Respondent is further is condemned to reimburse every single penny that was lent by the Claimant to the Company in which he held 75% (except for the money that was misappropriated by the Claimant).

October, 2006                                          Dr. Chernev