# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

————————————

№ 09 Civ. 8856 (RJS)

————————————

## ZEEVI HOLDINGS LTD.,

Petitioner,

VERSUS

## THE REPUBLIC OF BULGARIA,

Respondent.

————————————

MEMORANDUM AND ORDER
March 29, 2011

————————————

RICHARD J. SULLIVAN, District Judge:

Petitioner Zeevi Holdings Ltd. ("Zeevi"), an Israeli company, brings this petition (the "Petition") to confirm a foreign arbitration award (the "Award") against the Republic of Bulgaria, pursuant to 9 U.S.C. § 207. Respondent has moved to dismiss the petition for improper venue pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure, arguing that the parties' underlying agreement contained a forum selection clause that limited confirmation of the Award to courts in Bulgaria. For the reasons that follow, Respondent's motion is granted.

## I. BACKGROUND

The following facts, which are not in dispute, are taken from the Petition, the Award, and documents the Petition incorporates by reference. In 1999, Petitioner and Knafaim-Arkia Holdings entered into an agreement ("the Agreement") with the Privatization Agency for the Republic of

Bulgaria ("the Agency") for the joint purchase of 75% of the shares of Balkan Airlines, the Bulgarian national carrier. (Affidavit of Anne D. Smith, dated April 16, 2010, Doc. No. 23 ("Smith Aff."), Ex. 2 (the "Award") at 19.) Petitioner and its partner — also an Israeli company — agreed to purchase Balkan Airlines for $150,000 and to make additional investments totaling more than $100 million over a five-year period following the completion of the sale. (*Id.* at 23; Smith Aff., Ex. 1 (the "Agreement") §§ V-VIII.) The Agency provided extensive warranties and assurances as to the financial health and legal status of Balkan Airlines. (*See* Award at 21; Agreement § 3.6.) The Agency also represented that the airline enjoyed all of the rights and privileges associated with its designation as the exclusive national carrier, and that it would maintain that status for at least twelve years. (Agreement § 3.9.)

The Agreement was prepared in both Bulgarian and English, with the English-language version controlling. (*See id.* § 17.2.) Nevertheless, the Agreement itself was to be "governed by and construed in accordance with the laws of Bulgaria." (*Id.* § 14.1.) The Agreement also contained two forum selection clauses that are relevant to this action. First, Section 15.1 provided, in relevant part:

> Any claim or dispute between the Parties arising out of or relating to this Contract, which cannot be resolved in an amicable fashion, will be settled by arbitration, which will take place in Paris. The arbitration proceedings will be conducted in accordance with the Rules of Arbitration of the United Nations Commission on International Trade Law.

(*Id.* § 15.1.) Second, the Agreement provided that

> [t]he decision and award of the arbitrators will be final and binding. Such decision or award will not be subject to appeal. The execution of an award against the Seller may be conducted only in Bulgaria in accordance with the provisions of Bulgarian law.

(*Id.* § 15.3.)

By 2001, disputes arose between the parties regarding their respective performance of the contract and, on February 1, 2001, Petitioner initiated an arbitration claim in Paris against both the Agency and Respondent. (Award at 31.) In its submissions to the arbitral panel, Petitioner alleged that the Agreement contained misrepresentations concerning the financial health and liabilities of the airline and that Respondent had breached the agreement to maintain the airline's status as the Bulgarian national carrier. (*Id.* at 31, 64.) On October 25, 2006, the arbitration panel found in favor of Petitioner and issued a "Final Award" against Respondent in the amount of $10,360,143.79.[1] (*Id.* at 332.) To date, Respondent has failed to pay the Award, asserting that the arbitration panel did not have jurisdiction to issue an award against it as it was not a party to the Agreement. (Resp't's Mem. at 4.)

In June 2007, Petitioner submitted an "application for the authorization" of the Award to the Israeli district court in Jerusalem. (Affidavit of Lev Zigman, dated

---

[1] The Agency was dismissed from the arbitration. (*See* Award at 332.)

May 4, 2010, Doc. No. 42 ("Zigman Aff."), Ex. 1 at 1.)  The Israeli district court granted Petitioner's application, rejecting, as a matter of Israeli law, Respondent's argument that the Agreement required Petitioner to seek confirmation of the Award in Bulgaria.  (*Id.* at 12-13.)  On June 10, 2009, the Israeli Supreme Court denied Respondent's application for leave to appeal.  (Zigman Aff., Ex. 2 at 6.)  There is no evidence that Petitioner attempted to execute on the Israeli judgment.[2]

Notwithstanding its victory in Israel, Petitioner, on September 29, 2008, filed a petition in New York Supreme Court, New York County, seeking confirmation of the arbitral award issued in Paris and a judgment against Respondent in the amount of the award plus prejudgment interest. Respondent removed the action to this Court on October 19, 2009, and on April 16, 2010, Respondent filed a motion to dismiss the Petition, arguing that Section 15.3 of the Agreement, which limits "execution" of an arbitration award to Bulgarian courts, renders this Court an improper venue for this action. The motion was fully submitted on May 10, 2010.

## II. DISCUSSION

### A. Enforceability Of Forum Selection Clauses Under The New York Convention

The New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention" or "Convention") applies to arbitral awards, such as this one, which arise out of commercial relationships that are "not considered as domestic awards in the State where their recognition and enforcement are sought."[3]  Convention on the Recognition and Enforcement of Foreign Arbitral Awards, art 1 ¶ 1, June 10, 1958, 21 U.S.T. 2517 ("N.Y. Conv.").  Under the New York Convention, "[w]ithin three years after an arbitral award . . . is made, any party to the arbitration may apply to any court having jurisdiction under [the Convention] for an order confirming the award as against any other party to the arbitration."  9 U.S.C. § 207.  Such a court shall, in turn, "recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon."  N.Y. Conv. art. III. Typically, a district court's role in reviewing a foreign arbitral award arising under the Convention is "strictly limited and the showing required to avoid summary confirmation is high."  *Compagnie Noga D'Importation et D'Exportation, S.A. v. Russ. Fed'n*, 361 F.3d 676, 683 (2d Cir. 2004) (internal quotation marks omitted).

---

[2] Petitioner argues that the decisions of the Israeli courts are entitled to *res judicata* effect.  However, the Israeli courts interpreted the Agreement pursuant to Israeli law.  *See* Zigman Aff., Ex. 4 at 11-12.  Because this Court finds that Bulgarian law governs the meaning and scope of the Agreement, the rulings of the Israeli courts are inapposite and not entitled to preclusive effect.  *See Films by Jove, Inc. v. Berov*, 341 F. Supp. 2d 199, 205 (E.D.N.Y. 2004) ("[T]he [foreign court] did not discuss the basic premises of this court's rulings and, therefore, the opinion has little relevance for the issues considered in this case.").

---

[3] The New York Convention was implemented by and reprinted in the Federal Arbitration Act ("FAA"), which grants United States district courts original jurisdiction over "an action or proceeding falling under the Convention."  9 U.S.C. § 203.

Nevertheless, Article V of the Convention articulates a number of grounds upon which a reviewing court may refuse or defer recognition of a foreign arbitral award. These grounds are: (i) "the parties to the arbitration agreement lacked capacity or the agreement was not legally valid;" (ii) "proper notice of the appointment of the arbitrator or of the arbitration proceeding was not given;" (iii) the award "deals with a matter not submitted to arbitration or beyond the scope of the submission;" (iv) "the arbitral authority or procedure was not agreed to by the parties;" or (v) "the award was not yet binding or had been set aside or suspended in the enforcement forum." *Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukr.*, 311 F.3d 488, 494 (2d Cir. 2002) ("*Monde Re*"). A reviewing court may also refuse enforcement of the arbitration agreement if "[t]he subject matter of the difference is not capable of settlement by arbitration," or if "recognition or enforcement of the award would be contrary to the public policy of [the forum where enforcement is sought.]" N.Y. Conv. art. V.

Respondent concedes that none of the grounds for refusal explicitly articulated in the Convention applies here. It argues, however, that the Petition should nevertheless be dismissed because the Agreement's forum selection clause restricts any post-arbitration confirmation action to Bulgaria.

By its own terms, the Convention states that the defenses listed in Article V are exclusive. *See* 9 U.S.C. § 207 ("The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition of the enforcement of the award specified in the said Convention."). In *Monde*

*Re*, however, the Second Circuit found that, while the defenses articulated in Article V are the exclusive *substantive* grounds for refusing enforcement of an arbitral award, a court is not necessarily barred from refusing to enforce such an award on *procedural* grounds. *Monde Re*, 311 F.3d at 496. Indeed, the language of the Convention suggests that its drafters expressly "contemplated that different procedural rules would be applied in the courts of various signatory nations." *Id.*; *see* N.Y. Conv. art. III ("Each contracting state shall recognize arbitral awards as binding and enforce them *in accordance with the rules of procedure of the territory where the award is relied upon*." (emphasis added)). Signatory nations to the New York Convention, therefore, are "free to apply differing procedural rules" to actions seeking enforcement of an arbitral award as long as the procedures applied in Convention cases are not "'substantially more onerous' than those applied in domestic cases." *Monde Re*, 311 F.3d at 496 (quoting N.Y. Conv. art. III).

An American district court deciding a petition to confirm a foreign arbitral award may, therefore, enforce a forum selection clause in the underlying agreement without contravening the New York Convention's purpose of "encourag[ing] the recognition and enforcement of commercial arbitration agreements in international contracts." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). First, as the Second Circuit has noted, questions relating to the enforcement of forum selection clauses "are essentially procedural, rather than substantive, in nature." *Jones v. Weibracht*, 901 F.2d 17, 19 (2d Cir. 1990); *accord Sunrise Med. HHG, Inc. v. Health Focus of N.Y.*, 278 F. App'x 80, 81 (2d Cir. 2008). Moreover, because

American courts enforce forum selection clauses in proceedings involving the confirmation of domestic arbitration awards, *see D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103-04 (2d Cir. 2006)*,* their enforcement in proceedings to confirm foreign arbitral awards would not be "substantially more onerous" than in domestic cases.

Finally, the Second Circuit's reasoning in *Monde Re*, in which the court affirmed a district court's application of the doctrine of *forum non conveniens* to a petition to enforce a foreign arbitral award, applies with equal force to a court's enforcement of a forum selection clause. As the Second Circuit noted, forcing the recognition and enforcement of an arbitral award in a forum with no connection to the parties or the underlying events "might chill international trade if the parties had no recourse but to litigate, at any cost, enforcement of [an] arbitral award[] in a petitioner's chosen forum." *Monde Re*, 311 F.3d at 496-97 (internal quotation marks omitted). This potential chilling effect on international business is likely to be even greater if a party is able to use the New York Convention to skirt his contractual obligation to submit an arbitration award to an agreed-upon forum. Given that the New York Convention was enacted to promote international trade, *see Scherk*, 417 U.S. at 520 n.15, "it would be counterproductive if such an application of the Convention gave businesses a new cause for concern," *Monde Re*, 311 F.3d at 497 (internal quotation marks omitted).

Accordingly, the Court finds that it may, consistent with the New York Convention, enforce the parties' forum selection clause,

provided that the forum selection clause is valid.

## B.  Meaning And Validity Of The Forum Selection Clause

The Second Circuit, in *Phillips v. Audio Active, Ltd.*, 494 F.3d 378 (2d Cir. 2007), directed district courts to employ a four-part analysis to determine whether they should dismiss claims by enforcing a forum selection clause, *id*. at 383-84. First, the court should determine "whether the clause was reasonably communicated to the party resisting enforcement." *Id*. at 383. Second, the forum selection clause must be mandatory, rather than permissive. *See id.* Third, the clause must apply to the claims before the court. *See id.* If these three prongs are satisfied, the clause is "presumptively enforceable" and the court must then determine if the resisting party "has rebutted the presumption of enforceability by making a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid.'" *Id*. at 383-84 (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)).

Neither party contests that Section 15.3 of the Agreement satisfies the first two prongs of the *Phillips* test. However, the parties vigorously dispute whether (i) the clause applies to the claim before the Court, and (ii) enforcement of the clause would be unreasonable or unjust.

1. The Forum Selection Clause Applies To
The Claims In This Case[4]

As noted above, Section 15.3 of the Agreement provides that "[t]he execution of an award against the Seller may be conducted only in Bulgaria in accordance with the provisions of Bulgarian law." (Agreement § 15.3.) The dispute as to whether this clause governs the instant action centers on the meaning of the word "execution."[5] Petitioner stresses that in this action it is merely seeking *enforcement* of the arbitration award (*i.e.*, a judgment against Respondent without a writ of execution that can be levied upon Respondent's property). Petitioner concedes that, pursuant to this reading of the Agreement, a judgment issued by this Court would have no legal effect outside of Bulgaria, but maintains that this is the post-arbitration procedure for which the parties bargained. Indeed, Petitioner insists that, had it understood the term "execution" to include "confirmation" or "enforcement" proceedings, Petitioner "would have never signed the Agreement, since there is no point in having an international arbitration which thereafter

can only be recognized in Bulgaria."[6] (Pet'r's Opp'n at 11.)

Each party has submitted expert reports on Bulgarian law, which include attestations to the construction of the English word "execution" under Bulgarian law.[7] The parties' experts agree that Bulgarian law looks to the "'actual common will of the parties'" as evidenced by the meaning of the individual provisions "'ensuing from the contract as a whole, taking into account the purpose of the contract, usage and good faith.'" (*See* Affidavit of Lazar Tomov, dated April 16, 2010, Doc. No. 22 ("Tomov Op.") ¶ 32 (quoting Bulgarian Obligations and Contract Act art. XX).) This is accomplished by, in the

---

[4] The parties do not dispute that this factor should be evaluated under Bulgarian law. *See Phillips*, 494 F.3d at 385-86 (suggesting, in dicta, that prongs two and three of the *Phillips* test are more appropriately examined under the law chosen to govern the contract as a whole).

[5] Because, as noted above, the English version of the Agreement controls, the proper inquiry is how Bulgarian law would construe the English word "execution." (*See* Agreement § 17.2.)

---

[6] At a pre-motion conference, Petitioner's counsel was asked why his client would have wanted to make such a distinction given that, ultimately, it would still have to go to Bulgaria to recover on a judgment received elsewhere. While acknowledging that, pursuant to the terms of the Agreement, an American judgment would have no legal value outside of Bulgaria, he expressed "hop[e] [that] at some point in the future . . . there may be an overlay of European Union law [on the Bulgarian] judicial system which would at some future point give us some reasonable opportunity of getting due process and executing of the judgment." (Transcript of Dec. 9, 2009 Conference, at 19:6-11.)

[7] These reports were submitted pursuant to Rule 44.1 of the Federal Rules of Civil Procedure. Rule 44.1 provides that, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not . . . admissible under the Federal Rules of Evidence." "Determination of a foreign country's law is an issue of law." *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92 (2d Cir. 1998). The court itself determines "what weight, if any, to give to [expert] declarations and to all of the evidence the [c]ourt uses in determining [foreign] law." *Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681, 700 (S.D.N.Y. 2003).

first instance, looking at the plain meaning of the contract's language.  (*Id.* ¶¶ 34-35.)

Given these principles of construction, the Court declines to accept Petitioner's hyper-technical and illogical reading of the word "execution."  Both the plain meaning of the word as well as its context within the Agreement as a whole support a finding that, as used in the Agreement, the word "execution" includes actions, such as this one, brought to "confirm" or "enforce" an arbitration award rendered under the terms of the Agreement.

First, Petitioner's argument that the use of the word "execution" was not intended to apply to proceedings seeking the enforcement of an arbitration award is undermined by the plain meaning of the term, which, at the very least, overlaps with the plain meaning of "enforcement."  *See Black's Law Dictionary* (9th ed. 2009) (defining "execute" as "[t]o *enforce* and collect on (a money judgment)" (emphasis added)).    In the context of international arbitral awards, "enforcement" and "execution" overlap to an even greater degree.  For example, the full name of the Geneva Convention, the treaty superseded by the New York Convention, is the "Convention on the *Execution* of Foreign Arbitral Awards."  Convention on the Execution of Foreign Arbitral Awards (the "Geneva Convention"), Sept. 26, 1927, 92 L.N.T.S. 301 (emphasis added).    The text of the Geneva Convention suggests that the drafters of the document made no practical distinction between the use of the terms "execution" and "enforcement."    Geneva Convention, art. I

("To obtain such recognition or enforcement, it shall, further, be necessary. . .").[8]

This reading of the word "execute" is further supported by the context in which the provision appears in the Agreement.  As noted above, Section 15.3 provides:

> The decision and award of the arbitrators will be final and binding. Such decision or award will not be subject to appeal.  The execution of an award against the Seller may be conducted only in Bulgaria in accordance with the provisions of Bulgarian law.

(Agreement § 15.3.)    Section 15 of the Agreement, which is entitled "Disputes," contains two other provisions.  The first one, as noted above, requires the parties to resolve any dispute through arbitration in Paris.  (*Id.* § 15.1.)    The other provision addresses a procedural issue with respect to the appointment of arbitrators.  (*Id.* § 15.2.)  Given that the parties provided explicit procedures for arbitration and "execution" of an award, it is, at the very least, implausible that the parties specifically contemplated, but then remained silent on, an intermediate step of "enforcement."  Such a reading would lead to the nonsensical conclusion that, by remaining silent on an "enforcement" provision, Respondent essentially consented to being haled into courts throughout the

---

[8] The Panama Convention, a treaty analogous to the New York Convention, uses the phrase "execution or recognition" in its text, and not the word "enforcement."    Inter-American Convention on International Commercial Arbitration, Jan. 30, 1975, 1438 U.N.T.S. 245.

world so that Petitioner could accumulate judgments that would have legal effect only in Bulgaria.

To the contrary, the sensible reading of Section 15 is that it contains the totality of procedures with respect to disputes arising out of the Agreement. The language of Section 15.3 itself, which passes directly from a provision regarding the "final and binding" nature of an arbitration award to an explanation of the procedures available for execution of such an award, strongly suggests that the entirety of post-arbitration proceedings is to occur in Bulgaria.

This reading is further supported by a submission from Respondent's expert on Bulgarian law, who states that a foreign judgment cannot have any legal effect in Bulgaria unless it is given such effect by a Bulgarian court. (Tomov Op. ¶ 62.) According to Mr. Tomov, "[i]n Bulgaria a foreign arbitral award is entitled to recognition and enforcement, but a foreign judgment which confirms an arbitral award is not." (*Id.* ¶ 63.) Additionally, under Bulgarian law, "an applicant in confirmation proceedings is obliged to seek enforcement and recognition and cannot limit itself only to recognition." (Affidavit of Lazar Tomov, dated May 10, 2010, Doc. No. 46 ("Tomov Reply") ¶ 7.) Given these procedures, any distinction between enforcement and execution would be meaningless under Bulgarian law.

Neither Petitioner nor its expert has a persuasive response to Respondent's account of Bulgarian arbitral enforcement procedures. To the contrary, the conclusions of Petitioner's expert rely almost exclusively on

speculation regarding Petitioner's intentions in entering into the Agreement. Without offering a reasonable alternative interpretation that is grounded in the document itself, Petitioner's reading must be rejected.

Accordingly, the Court finds that this action falls within the scope of the forum selection clause.

### 2. Petitioner Has Failed To Rebut The Presumption of Enforceability

As the forum selection clause satisfies the first three *Phillips* factors, it is presumptively enforceable. Petitioner may overcome the presumption of enforceability only by making a clear showing that the clause is "unreasonable under the circumstances." *Phillips*, 494 F.3d at 383-84. This exception, which "the Supreme Court has construed . . . narrowly," can be invoked by Petitioner only if: (i) the incorporation of the clause was the result of "fraud or overreaching"; (ii) the complaining party "will for all practical purposes be deprived of his day in court due to the grave inconvenience or unfairness of the selected forum"; (iii) the "fundamental unfairness of the chosen law may deprive the plaintiff of a remedy"; or (iv) the clause contravenes a strong public policy of the forum state. *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1363 (2d Cir. 1993) (internal quotation marks omitted).

Here, Petitioner's arguments seeking to overcome the presumption of enforceability primarily touch on the second and third of these factors. Petitioner's arguments, broadly stated, are that the corruption of the Bulgarian judiciary generally, as well as the Bulgarian

government's bias against Petitioner in particular, render Bulgaria a fundamentally unfair forum.

First, Petitioner argues that it is not assured of collecting on its Award in Bulgaria because the nation's laws do not include a procedure for enforcing a judgment against the state itself. According to Petitioner's expert, execution of such awards "is determined freely by the financial unit of the same state entity against which the award was rendered." (Affidavit of George A. Bermann, dated May 3, 2010, Doc. No. 31 ("Bermann Op.") ¶ 31.)

Bulgaria, however, is a signatory nation to the New York Convention and, as such, is required to provide a forum to hear confirmation proceedings of foreign arbitral awards. *See Seales v. Panamanian Aviation Co.*, 356 F. App'x 461, 464 (2d Cir. 2009) (stating that Jamaica was an adequate alternate forum, in part because the Montreal Convention applied both in that forum and in the United States). Even if enforcement of arbitral awards is procedurally different in Bulgaria than it is in the United States, that fact, in and of itself, does not give rise to the conclusion that enforcement of the Agreement's forum selection clause would be fundamentally unfair. *See PT United Can Co. Ltd. v. Crown Cork & Seal Co.*, 138 F.3d 65, 74 (2d Cir. 1998) ("The availability of an adequate alternate forum does not depend on the existence of the identical cause of action in the other forum."). Moreover, Respondent's expert cites numerous cases in which state courts have issued judgments against state entities and have recognized foreign arbitral awards. (*See* Tomov Op.

¶¶ 90-92; Tomov Reply ¶ 75.)[9]

Petitioner also argues that there is evidence of specific bias against it by the Bulgarian government that makes enforcement of the Award a practical impossibility. Specifically, Petitioner alleges that its company's representatives have been "harassed and intimidated" by state authorities who initiated a criminal investigation "accusing [Petitioner's] representatives of, among other things, having engaged in 'anti-state activities.'" (Affidavit of Gad Zeevi, dated May 3, 2010, Doc. No. 30 ("Zeevi Aff.") ¶ 9.) Petitioner additionally alleges that, in 2001, a former attorney for the company was detained by Bulgarian authorities "for approximately nine hours, questioned [regarding] alleged 'anti-state activities' on behalf of Zeevi Holdings, and had all of [his] legal file[s] examined and copied." (Affidavit of Dimitar Danailov, dated May 3, 2010, Doc. No. 29 ("Danailov Op.") ¶ 4.)

Petitioner's experts also make extensive allegations regarding pervasive corruption in the Bulgarian judiciary. These allegations are based on reports of the European Union and other Pan-European governing bodies, reports of legal and international organizations, and

_____

[9] To the extent that Petitioner argues that Bulgarian courts insulate the state from paying judgments to private parties, the cases cited by Petitioner are not suggestive of a pervasive policy of refusing to enforce arbitral awards. To the contrary, those cases either predate Bulgaria's accession to the European Union or address factual situations other than a party's attempt to obtain execution of an arbitration award from a Bulgarian court. *See* Affidavit of Dimitar Danailov, dated May 3, 2010, Doc. No. 29 ("Danailov Op."), Exs. I, J.

case law pertaining to the enforcement of judgments against the Bulgarian government.

While these materials permit Petitioner to draw out unseemly aspects of the Bulgarian government generally, and the Bulgarian judiciary specifically, when considered as a whole, they do not support a finding that Bulgaria is a fundamentally unfair forum in which to hear Petitioner's claim. As other courts have noted, the "'alternative forum is too corrupt to be adequate' argument does not enjoy a particularly impressive track record." *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1084 (S.D. Fla. 1997). Indeed, principles of comity strongly caution against declaring the entire court system of another country to be inadequate, and these concerns are even more forceful where, as here, the parties consented to jurisdiction in the allegedly inadequate forum in the first place. *See id.* at 1085 (citing *Cuba R.R. Co. v. Crosby*, 222 U.S. 473, 480 (1912)).

Moreover, to establish that a foreign forum is fundamentally inadequate, Petitioner must put forward evidence of corruption specifically targeted at a party rather than broad claims about the foreign judicial system as a whole. *See Monde Re*, 311 F.3d at 499 (finding that "bare denunciations and sweeping generalizations" of corruption will not suffice to render a foreign forum inadequate); *Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681, 705-06 (S.D.N.Y. 2003). While Petitioner has advanced allegations of incidents of harassment by Bulgarian authorities, these allegations cannot justify the sweeping conclusion that Bulgarian courts will not enforce Petitioner's Award.

Bulgaria is a member state of the European Union. As part of the accession process, before and immediately following its becoming a member state, Bulgaria was subject to monitoring to ensure its judiciary, among other state functions, met the standards required for EU membership. (*See, e.g.*, Danailov Op. ¶¶ 14-15 .) Petitioner disputes that Bulgaria has, in fact, fully complied with the demands of EU membership, pointing to several reports of independent organizations that document the purportedly worsening state of Bulgaria's court system since its accession to the EU. (*See* Affidavit of Vivian Grosswald Curran, dated May 4, 2010, Doc. No. 40 ¶¶ 13-14.) However, when read in full, the actual reports do not bear out Petitioner's claims. For example, in its December 13, 2006 "Commission Decision," the Commission of the European Communities did note that "the accountability and efficiency of the judicial system" lingered as a "remaining issue" that "warrant[ed] the establishment of a mechanism for cooperation and verification of the progress of Defendant to address specific benchmarks" in this area. (Danailov Op., Ex. E.) However, Respondent's expert notes that neither the EU nor any of its member states "has invoked any of the safeguards to exclude Defendant from [Pan-European legal] regimes because of the inadequacies of its judicial system." (Affidavit of Joseph H.H. Weiler, dated May 10, 2010, Doc. No. 47 ¶ 16.)

Further, in a recent case, the Seventh Circuit held that Bulgaria provided an adequate forum for a Bulgarian petitioner alleging tort, contract, and RICO claims against a bank whose parent company was located in the United States. *See Stroitelstvo Bulg. Ltd. v. Bulgarian-Am. Enter. Fund*, 589

10

F.3d 417, 426 (7th Cir. 2009).  The Seventh Circuit considered many of the allegations of corruption advanced by Petitioner here and found them insufficient to establish that Bulgaria was an inadequate forum.  The court noted that Bulgaria was a member of the European Union, that it "has an independent judiciary that provides full and fair consideration of commercial disputes," and that while public perception of the judiciary was low, this perception was not based on quantifiable data.  *Id.* at 421.  The court concluded that "generalized, anecdotal complaints of corruption are not enough for a federal court to declare that an EU nation's legal system is so corrupt that it can't serve as an adequate forum."  *Id.*

Accordingly, Petitioner has failed to meet the high standard necessary to demonstrate that Bulgaria is a fundamentally unfair forum in which Petitioner will be denied a remedy. This finding is particularly appropriate in light of the fact that Petitioner voluntarily reached out to conduct business in Bulgaria and, moreover, contractually agreed to it as a forum for post-arbitration actions.  *See Base Metal*, 253 F. Supp. 2d at 707 (finding that, where the plaintiffs "voluntarily entered into numerous contracts in Russia . . . that contain Russian forum selection clauses" they "must have anticipated the possibility of litigation in Russia" (citing *Eastman Kodak*, 978 F. Supp at 1084-85 ("There is a substantial temerity to the claim that the forum where a party has chosen to transact business . . . is inadequate."))).

Because Petitioner has failed to demonstrate that enforcement of the forum selection clause is unreasonable under the circumstances, the Court finds that the forum selection clause is valid and grants Respondent's motion to dismiss the Petition.

## IV. CONCLUSION

For the reasons stated above, Respondent's motion to dismiss the Petition is granted.  The Clerk of the Court is respectfully directed to terminate the motion located at docket number 19 and to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: March 29, 2011
       New York, New York

* * *

Petitioner is represented by Kenneth Foard McCallion, McCallion & Associates LLP, 24 West 40th Street, New York, NY 10018.  Respondent is represented by David Grant Hille, Kasowitz, Benson, Torres & Friedman, LLP, 1501 Broadway, 12th Floor, New York, NY 10036; Helena Ann Lynch, White and Case LLP, 155 Avenue of the Americas, New York, NY 10036; Abby Cohen Smutny, and Anne Davies Smith, White and Case LLP, 701 Thirteenth Street, NW, Washington, DC, 20005.

11

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/29/11